UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nandor J. Vadas, Magistrate Judge

| | | |
|---|---|---|
| IVAN VERNORD CLEVELAND, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| VS. | ) ) | NO. C 07-02809 NJV |
| BEN CURRY, WARDEN, et al., | ) ) | |
| Defendants. | ) ) | |

San Francisco, California
Monday, November 4, 2013

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:

        LAW OFFICE OF DENNIS CUNNINGHAM
        115 A Bartlett Street
        San Francisco, California  94110
  **BY:  DENNIS CUNNINGHAM, ATTORNEY AT LAW**

        THE LAW OFFICES OF JEFF WOZNIAK
        179 11th Street - 2nd Floor
        San Francisco, California  94103
  **BY:  JEFF WOZNIAK, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
        Candace Yount, CSR No. 2737, RMR, CCRR
        Official Reporters

**APPEARANCES**:  (CONTINUED)

For Defendants:

OFFICE OF THE ATTORNEY GENERAL
State of California
455 Golden Gate Avenue - Room 11000
San Francisco, California  94102
BY:  **MICHAEL J. QUINN, DEPUTY ATTORNEY GENERAL**
**KYLE A. LEWIS, DEPUTY ATTORNEY GENERAL**

# I N D E X

Monday, November 4, 2013

|  | **PAGE** | **VOL.** |
|---|---|---|
| Preliminary Jury Instructions | 19 | 1 |
| Opening Statement by Mr. Cunningham | 35 | 1 |
| Opening Statement by Mr. Quinn | 56 | 1 |

| **PLAINTIFFS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **TRASK, KENNETH** | | |
| (SWORN) | 60 | 1 |
| Direct Examination by Mr. Cunningham | 60 | 1 |
| Cross-Examination by Mr. Lewis | 77 | 1 |
| Redirect Examination by Mr. Cunningham | 95 | 1 |
| **CLEVELAND, IVAN VERNORD** | | |
| (SWORN) | 101 | 1 |
| Direct Examination by Mr. Cunningham | 102 | 1 |
| Cross-Examination by Mr. Quinn | 135 | 1 |

## E X H I B I T S

| **PLAINTIFFS' EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1 | 110 | 148 | 1 |
| 2 | | 149 | 1 |
| 6A2 | | 151 | 1 |

## E X H I B I T S

| **DEFENDANTS' EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| B | 82 | 147 | 1 |
| C | 139 | 147 | 1 |

```
 1   Monday - November 4, 2013                        8:39 a.m.
 2                     P R O C E E D I N G S
 3                          ---oOo---
 4   (Proceedings were heard out of presence of prospective jurors:)
 5        THE CLERK:  Calling Civil 07-2809, Ivan Vernord
 6   Cleveland versus Ben Curry.
 7      Counsel, please state your appearances for the record.
 8        MR. CUNNINGHAM:  Good morning, Your Honor.  Dennis
 9   Cunningham for the plaintiffs.
10        THE COURT:  Mr. Cunningham, good morning.
11        MR. QUINN:  Good morning.  Michael Quinn for the
12   defendants.
13        THE COURT:  Mr. Quinn, good morning.
14      I have some late motions that were filed, I believe, on
15   Friday and perhaps this morning.  Why don't we take defendants'
16   motions first, Objection to Plaintiffs' Exhibit Number 7,
17   Cleveland's Psychological Records.
18        MR. QUINN:  Right.  As we stated in our papers, the
19   materials were not listed on the plaintiffs' exhibit list.  The
20   materials -- it does not appear that there's any witness who
21   could authenticate those materials so they do constitute
22   hearsay.
23      In addition, those materials are irrelevant, we believe,
24   as we described in our papers.  So defendants don't have
25   anything to add beyond what was stated in the papers.
```

1  **THE COURT:** Are these documents that were provided by

2  defendant to the plaintiff at sometime in the discovery

3  process?

4  **MR. QUINN:** No. No. And the materials have not been

5  provided to defendants.

6  **THE COURT:** As of this morning?

7  **MR. QUINN:** As of this time. There's basically a

8  placeholder. Tab 7 is just one page that refers to however I

9  described it. It's handwritten confidential documents.

10  **THE COURT:** And as of this morning, defendants have

11  not received this document; is that correct?

12  **MR. QUINN:** That is correct.

13  **THE COURT:** Counsel?

14  **MR. CUNNINGHAM:** That's right, Judge. These are

15  Plaintiff Cleveland's psychological records from the

16  institution, and I include them only against the possibility

17  that they may come into play, in which case I'd be glad to

18  disclose them. They're not -- otherwise it would seem to me

19  that they shouldn't be shared, but I could definitely hand them

20  over if they want them.

21  **THE COURT:** All right. For the reasons stated,

22  defendants' motion is granted.

23  Moving on to Plaintiffs' Added Pretrial Request. The

24  Court received this document this morning, number two, Added

25  Exhibit Lists.

1    If I remember correctly, I have already excluded this from

2  nonplaintiffs unless it becomes relevant and the parties

3  request a sidebar.

4    Any comments, Counsel?

5    **MR. QUINN:**  I saw that it was filed.  I hadn't -- it

6  was filed at 8:15.  I didn't have a chance to really look at

7  it, but I don't have anything beyond what you've previously

8  ruled upon.

9    **THE COURT:**  All right.  Counsel?

10    **MR. CUNNINGHAM:**  No, Judge.  I just feel that corpus

11  of documents -- of the documents from the institution that

12  reflect all the activity around these cases would be --

13    **THE COURT:**  Denied except as I previously ruled.

14    **MR. CUNNINGHAM:**  Okay.

15    **THE COURT:**  Number three, witness Lieutenant Armando

16  Padilla.

17    Let me ask plaintiffs' counsel.  Have you subpoenaed

18  Lieutenant Padilla?

19    **MR. CUNNINGHAM:**  No, I didn't, Judge.  No, I haven't

20  done it.

21    **THE COURT:**  Do you intend to call Lieutenant Padilla?

22    **MR. QUINN:**  He's on our witness list; but as we stated

23  in the witness list we filed just last week, we reserve the

24  right to change the witnesses, not call witnesses.

25    **THE COURT:**  I understand.

1    **MR. QUINN:**  So we won't know whether we're going to

2    call him until the trial actually begins.

3        **THE COURT:**  All right.  This is late.  You had an

4    opportunity, if you wanted him as your witness, to put him on

5    your witness list and to subpoena him.

6        Plaintiffs' motion for witness Lieutenant Armando Padilla

7    is denied unless you do intend to call him.  As a courtesy, I

8    would ask the defendants to inform plaintiff, and if it's not

9    an imposition, to allow plaintiff to call Lieutenant Padilla

10   first; and then you can cross-examine him if you'd like, or you

11   can call him in your case in chief afterwards also.  All right?

12       **MR. QUINN:**  Okay.

13       **THE COURT:**  Thank you.

14   Number four, well, you know, first of all, we asked for

15   the instructions weeks in advance.

16       **MR. CUNNINGHAM:**  I know it was a while ago, Judge.  I

17   know it was.

18       **THE COURT:**  What I'm concerned about is that this is

19   not a statement of claims and defenses but 11, 12, and 13 are

20   indeed argument.  I'll certainly allow you to inquire of the

21   witnesses of this information and to argue it in closing.

22       But do counsel have copies of my proposed jury

23   instructions?

24       **THE LAW CLERK:**  They're here.

25       **THE COURT:**  All right.  Why don't you -- we have

**PROCEEDINGS**

1  prepared both the initial jury instructions, a proposed closing

2  instructions, and also proposed verdict.

3      Why don't you give it to Mr. Quinn also.

4          **MR. QUINN:**  Thank you.

5          **THE COURT:**  So these are, I believe, the ones that

6  counsel have in their hand, are my proposed preliminary

7  instructions.  They are, as they should be, I believe, rather

8  vanilla.  Why don't we go through them very briefly.

9      These are the final or --

10          **THE LAW CLERK:**  Preliminary.

11          **THE COURT:**  Preliminary.  Thank you so much.

12      Let me go through these very quickly with the parties.

13  1.1B, Duty of Jury.  Any objection?

14          **MR. CUNNINGHAM:**  I'm sorry, Judge?

15          **THE COURT:**  1.1B, Duty of Jury.  Any objection?

16      Well, these are -- although this looks like the final set.

17      Hold on.  These are the final instructions.  This is 1.1B.

18                  (Pause in proceedings.)

19          **THE COURT:**  Okay.  Duty of Jury, 1.1B.  Any objection?

20          **MR. CUNNINGHAM:**  No, Your Honor.

21          **MR. QUINN:**  I don't have it.

22          **THE COURT:**  All right.

23          **MR. QUINN:**  It looks okay.

24          **THE COURT:**  All right.  1.2, Claims and Defenses.

25  Take a look at that, please.

1              (Pause in proceedings.)

2         **THE COURT:**  This is -- the Court has prepared the

3    Claims and Defenses based on the submission by both parties.

4              (Pause in proceedings.)

5         **MR. QUINN:**  With regard to 1.2 --

6         **THE COURT:**  Yes.

7         **MR. QUINN:**  -- there's a brief line in there about the

8    retaliation claim.  We had previously raised the issue during

9    the Pretrial Conference call that there was no defendant in

10   this case who was being charged with retaliation; and the Court

11   hadn't ruled one way or another, but said --

12        **THE COURT:**  But you had indicated that one --

13   obviously one of the retaliation claims had been removed by

14   motion for summary judgment; and then there remains a second

15   retaliation claim that you believed was still operative and

16   it's still, I believe, reflected in the Complaint.

17        **MR. QUINN:**  It's in the Complaint, but the point is

18   that there's no defendant.  Neither Abanico nor Curry are

19   accused of retaliating against Cleveland.

20        **THE COURT:**  My understanding is, you can correct me if

21   I'm wrong, but Cleveland argues that Abanico searched his cell

22   in retaliation for his filing grievances against Abanico.

23        **MR. CUNNINGHAM:**  No, Judge.  Abanico was not the one

24   who searched the cell.

25        **THE COURT:**  So is there a retaliation claim remaining

**PROCEEDINGS**

1  in the case?

2      MR. CUNNINGHAM:  There is, but it's not -- it is

3  inchoate in the sense that it doesn't accuse either defendant

4  specifically.  It was -- it was, if you recall it, ransacking

5  of the cell that he complained of.  I know there was more than

6  one that happened.

7      And I think that that's what the sentence should reflect,

8  not that Abanico did it, but that it happened more than once,

9  and that it was -- that word "ransack" would have to be there

10 because the search is obviously legitimate in and of itself or

11 it can be.

12     THE COURT:  Not if it's a search based on retaliation.

13     MR. CUNNINGHAM:  No.

14     THE COURT:  I'm going to allow it in subject to a

15 Rule 50 motion at the end of the submission of the evidence,

16 Counsel.

17     MR. QUINN:  If I can just add in closing, there is, I

18 think, a potential for confusing the jury if the plaintiff is

19 allowed to assert these claims where there's no defendant

20 really to answer them.  I just --

21     THE COURT:  I understand, but at this juncture I think

22 I'm going to allow him subject to a Rule 50 motion at the

23 closing of the evidence.

24     I'm going to change Claims and Defenses.  In addition,

25 Plaintiff Cleveland argues his search -- his cell was searched

1    in retaliation for Cleveland filing grievances against Abanico.

2         **MR. CUNNINGHAM:**  Can we have an adjective to modify

3    "search"?

4         **THE COURT:**  No.  That will be denied.

5         **THE LAW CLERK:**  And then the next-to-the-last

6    sentence.

7         **MR. CUNNINGHAM:**  Judge, also --

8         **THE COURT:**  Defendants also argue that Cleveland's

9    cell was not searched in retaliation for filing complaints

10   against him.

11       All right.

12       **MR. CUNNINGHAM:**  Judge, I think also in the first

13   paragraph it ought to state -- it ought to -- where it says,

14   "Prison officials failed to take meaningful action," I think it

15   should say, "Prison officials under the command of the

16   defendant Warden Curry, former Warden Curry," so that he is

17   explicitly named in the plaintiffs' claims.

18       **THE COURT:**  Counsel?

19       **MR. QUINN:**  I don't think there's any need to amplify

20   what's already there.  I mean, the sentence is clear and I

21   think it's just overkill, for lack of a better term.

22       **THE COURT:**  So after "officials" what is it that you

23   want, Counsel?

24       **MR. CUNNINGHAM:**  "Under the command" -- "under the

25   command of Defendant Curry."

1        **THE COURT:**  "Under the..."

2    So you're asserting a supervisory liability claim?

3        **MR. CUNNINGHAM:**  Yes.

4        **MR. QUINN:**  He's asserting a claim failure to

5    intervene.  There's no supervisorial liability claim that's

6    listed in the -- by name in the Amended Complaint that's the

7    operative Complaint.

8        **THE COURT:**  You know, at 15 minutes to 9:00 before --

9    10 minutes to 9:00 before we pick a jury, this is really the

10   wrong time to be arguing this.

11       **MR. CUNNINGHAM:**  Well, it's a case -- the claim has

12   been there, Judge, a *Farmer versus Brennan* claim, all the way

13   along; and, you know, there's -- there may be an issue of

14   syntax or semantics, but that's --

15       **THE COURT:**  All right.  "Prison officials under

16   the" --

17       **MR. CUNNINGHAM:**  Command, supervision, whatever.

18       **THE COURT:**  -- "under the supervision of Defendant

19   Curry."

20   And, again, that's subject to a Rule 50 at the close of

21   evidence.

22       **MR. QUINN:**  I'll just note for the record, plaintiffs'

23   counsel has not subpoenaed Warden Curry either.

24       **THE COURT:**  All right.  We'll proceed.  It might be an

25   interesting Rule 50.

1        1.3, Burden of Proof/Preponderance of the Evidence?

2           **MR. CUNNINGHAM:** Fine with us.

3           **THE COURT:** There is no clear-and-convincing standard

4 in this case do you believe?

5           **MR. QUINN:** I don't believe so.

6           **THE COURT:** Counsel?

7           **MR. CUNNINGHAM:** I don't believe there is, Judge.

8           **THE COURT:** The *Harvey* search indicates that the

9 claims that have been put forth in the Amended Complaint are

10 only those that need a burden of proof of preponderance of the

11 evidence. That may change for some reason and we can revisit

12 that with the final instructions if necessary.

13        Two or More Parties, Different Legal Rights?

14           **MR. QUINN:** That's fine.

15           **MR. CUNNINGHAM:** That's fine, Judge.

16           **THE COURT:** 1.6, What is Evidence. Any objection?

17           **MR. CUNNINGHAM:** Yes, that's fine.

18           **MR. QUINN:** That's fine.

19           **THE COURT:** 1.7, What is not Evidence?

20                 (Pause in proceedings.)

21           **MR. CUNNINGHAM:** It's all right.

22           **MR. QUINN:** It's fine.

23           **THE COURT:** 1.8, Evidence for Limited Purpose?

24           **MR. CUNNINGHAM:** That's fine.

25           **MR. QUINN:** That's fine.

1          THE COURT:  1.9, Direct and Circumstantial Evidence?

2                      (Pause in proceedings.)

3          MR. QUINN:  It's fine.

4          MR. CUNNINGHAM:  It's fine, Judge.

5          THE COURT:  1.10, Ruling on Objections?

6          MR. CUNNINGHAM:  Fine with plaintiff.

7          MR. QUINN:  It's fine.

8          THE COURT:  1.11, Credibility of Witnesses?

9          MR. CUNNINGHAM:  Fine.

10         MR. QUINN:  It's fine.

11         THE COURT:  And then 1.12, Conduct of the Jury.  I've

12   included in that the admonitions not to use electronic devices.

13         MR. CUNNINGHAM:  You mean in terms of, like, looking

14   up something on Wikipedia or something like that?

15         THE COURT:  In the chat rooms, blogs, Web site, or

16   other feature, email, text messaging, et cetera, et cetera.

17         MR. CUNNINGHAM:  Oh, I see.

18         MR. QUINN:  It's fine.

19         MR. CUNNINGHAM:  Okay, Judge, yes.

20         THE COURT:  1.13, No Transcript Available for the

21   Jury?

22         MR. CUNNINGHAM:  Fine.

23         MR. QUINN:  That's fine.

24         THE COURT:  1.14, Taking Notes.  I will allow them to

25   take notes.

1          MR. QUINN:  That's fine.

2          MR. CUNNINGHAM:  Do they keep the notebooks here in

3    the courtroom?

4          THE COURT:  Yes.  They can't take them out.

5      And, Lisa, how would you like to do that?  Would you like

6    to collect them every day?

7          THE CLERK:  No.  They can just leave them on their

8    seats.

9          THE COURT:  Leave them on their seats.

10         THE CLERK:  Or they can take them back into the jury

11   room, as long as they don't --

12         THE COURT:  I'll let you deal with it.

13         THE CLERK:  Okay.

14         THE COURT:  Thank you.

15     1.18, Bench Conferences and Recesses?

16         MR. QUINN:  That's fine.

17         MR. CUNNINGHAM:  Yes.

18         THE COURT:  Then 1.19, Outline of the Trial?

19         MR. CUNNINGHAM:  Looks good, Judge.

20         MR. QUINN:  It's fine.

21         THE COURT:  All right.  The Court will then give the

22   preliminary instructions as modified.

23     Lisa, please let me know when the jury is ready.

24         THE CLERK:  Okay.

25         THE COURT:  Thank you.

1    THE CLERK:  You're welcome.

2              (Recess taken at 8:56 a.m.)

3           (Proceedings resumed at 9:05 a.m.)

4   (Proceedings were heard out of presence of prospective jurors:)

5    THE CLERK:  Calling Civil 07-2809, Ivan Vernord

6   Cleveland versus Ben Curry.

7    THE COURT:  I forgot to ask counsel, any objection to

8   having preliminary matters heard outside of your clients being

9   here?

10   MR. CUNNINGHAM:  No.  You mean -- I'm not sure what

11   you mean, Judge.

12   THE COURT:  The preliminary matters we just took up.

13   MR. CUNNINGHAM:  Oh, no, no.  No.  I mean,

14   retrospectively, no.  That's all right.

15   THE COURT:  All right.  Thank you.

16   MR. CUNNINGHAM:  But, Judge, I do want to ask that you

17   request the guards to let the prisoners have at least one hand

18   free so they can write notes and stuff like that.  They're

19   gaffled to the waist at this point.

20   THE COURT:  All right.  I believe I said on Friday

21   that the inmates would be allowed to be just in leg chains and

22   to have their hands free at this time.  So if we could, I would

23   appreciate that.

24      But first, gentlemen, good morning.

25   ALL:  Good morning.

1    **THE COURT:** I'm Judge Vadas. I'm going to allow you

2 to be present during the trial and allow you to sit at counsel

3 table with your lawyers, and I'm going to allow you to have

4 your hands free at this juncture to take notes and to assist

5 your counsel in the trial.

6    The very first indication that I have that there's any

7 problems here, I will have you removed from the courtroom and

8 you can watch the trial by videoconference.

9    So what I would like from each one of you is a promise and

10 an understanding that you realize that this is a benefit that

11 I'm giving you to be here during the trial, and that you will

12 respect that and not cause any trouble.

13    Do I have that from all of you?

14    **ALL:** Yes, sir.

15    **THE COURT:** All right. Having said that, you can go

16 ahead and let them have their frees.

17    **THE CORRECTIONAL OFFICER:** Both hands, sir?

18    **THE COURT:** Yes, that will be all right. Both hands

19 at this juncture.

20    All right. Thank you.

21                    (Recess taken at 9:07 a.m.)

22             (Proceedings resumed at 9:28 a.m.)

23    (Jury voir dire was reported but not transcribed as a part

24 of the Hourly Delivery of the transcript.)

25 (Proceedings were heard in presence of the prospective jurors:)

**PROCEEDINGS**

1    **THE COURT:** Madam Clerk, if you would call the jurors.

2    **THE CLERK:** Okay. At this time I'm going to call the

3    jurors that were selected.

4    Juror Number 1 is Nancy Mowbray. If you'll please come

5    forward and take Seat Number 1 at the top.

6                     (Cell phone ringing.)

7    **THE CLERK:** And, Counsel, make sure their cell phones

8    are off.

9    **THE COURT:** Next time that happens, the Court owns the

10   cell phone. Have I made myself clear, Counsel?

11   **MR. WOZNIAK:** Yes, Judge.

12   **THE CLERK:** Michael Gray, Juror Number 2.

13   Omaya Rand, you're Juror Number 3.

14   Julie Jaffarian, you're Juror Number 4.

15   Karen Vickers, you're Juror Number 5. If you'll please

16   take the first seat in the bottom row.

17   Michael Deloach, you're Juror Number six.

18   Lisa Berrett, Juror Number 7.

19   Janet O'Leary, you're Juror Number 8.

20   Your Honor, the jury has been seated.

21   **THE COURT:** All right. Mr. Quinn, is this your jury?

22   **MR. QUINN:** Yes, Your Honor.

23   **THE COURT:** Mr. Cunningham, is this your jury?

24   **MR. CUNNINGHAM:** Yes, Your Honor.

25   **THE COURT:** Ladies and gentlemen, those of you who

## PRELIMINARY JURY INSTRUCTIONS

1  have not been picked this morning, the Court and the parties

2  would like to thank you for taking the time out of your busy

3  schedule to attend this portion of the jury selection.  So when

4  you get called again, now at least you get to say, "I got this

5  far."

6                          (Laughter)

7          THE COURT:  Please go back to the Jury Commissioner

8  and you'll get further instructions.  Thank you again for your

9  service.

10                  (Prospective jurors excused.)

11         THE COURT:  Ms. Clark, would you administer the oath,

12 please?

13         THE CLERK:  Okay.  Will the jury please stand and

14 raise your right hand?

15                     (Jurors sworn.)

16         THE CLERK:  Please be seated.

17              **PRELIMINARY JURY INSTRUCTIONS**

18         THE COURT:  Ladies and gentlemen of the jury, you are

19 now the jury in this case.  It is my duty to instruct you on

20 the law.

21     You must not infer from these instructions, or from

22 anything I may say or do, as indicating that I have an opinion

23 regarding the evidence or what your verdict should be.

24     It is your duty to find the facts from all the evidence in

25 the case.  To those facts, you will apply the law as I give it

1  to you.  You must follow the law as I give it to you whether

2  you agree with it or not; and you must not be influenced by any

3  personal likes or dislikes, opinions, prejudices, or sympathy.

4  That means that you must decide the case solely on the evidence

5  before you.  You will recall that you took an oath to do so.

6      In following my instructions, you must follow all of them

7  and not single out some and ignore the others.  They are all

8  important.

9      I will now give you a brief summary of the positions of

10  the parties.

11      Plaintiffs allege that beginning in May 2006 they were

12  intentionally and pointedly groped, fondled, and molested by

13  Defendant Abanico under cover of an authorized clothed body

14  search in violation of the Eighth Amendment.

15      Plaintiffs argue that the searches were not conducted in

16  accordance with the rules or with the training Abanico

17  received.  They claim that although they complained about the

18  searches and filed formal grievances against Abanico, prison

19  officials, under the supervision of Defendant Curry, failed to

20  take meaningful action to prevent Abanico from interacting with

21  prisoners.

22      In addition, Plaintiff Cleveland argues that his cell was

23  searched in retaliation for Cleveland filing grievances against

24  Abanico.

25      Defendants deny plaintiffs' claims in their entirety.

1   Defendants argue that they did not violate plaintiffs' rights.

2   To the contrary, they argue that Abanico adhered to the

3   training he received at the Correctional Academy while

4   performing such searches.

5        Defendants further argue that such searches performed in

6   accordance with the Department's training manual requires some

7   amount of touching or grabbing of plaintiffs' groin and

8   buttocks through their clothes to accomplish the purpose of the

9   search.

10       Defendants also argue that because Abanico's contact with

11  plaintiffs' groins during the searches did not last longer than

12  a few seconds, they were consistent with search procedures, and

13  because there was no evidence that plaintiffs were sexually

14  abused or molested during the searches, there was no reason for

15  Curry to intervene in the matter.

16       Accordingly, defendants argue that they did not violate

17  plaintiffs' Eighth Amendment rights.

18       Defendants also argue that Cleveland's cell was not

19  searched in retaliation for filing complaints against him.

20       Finally, defendants argue that they're entitled to

21  qualified immunity.

22       Burden of proof/preponderance of the evidence.  When a

23  party has a burden of proof by any claim by a preponderance of

24  the evidence, it means that you must be persuaded by the

25  evidence that the claim is more probably true than not true.

1    You should base your decision on all of the evidence

2  regardless of which party presented it.

3    Burden of proof/clear and convincing evidence.  When a

4  party has the burden of proving any claim by clear and

5  convincing evidence, it means you must be persuaded by the

6  evidence that the claim or defense is highly probable.  This is

7  a standard of proof -- this is a higher standard of proof than

8  proof by a preponderance of the evidence.

9    You should base your decision on all of the evidence

10  regardless of which party presented it.

11    You should decide the case as to each party separately.

12  Unless otherwise stated, the instructions apply to all parties.

13    The evidence you are to consider in deciding what facts

14  are consists of the sworn testimony of any witness, the

15  exhibits which are received into evidence, and any facts to

16  which the lawyers have agreed.

17    In reaching your verdict, you may consider only the

18  testimony and exhibits received into evidence.  Certain things

19  are not evidence and you may not consider them in deciding what

20  the facts are.  I will list them for you.

21    One, arguments and statements by lawyers are not evidence.

22  The lawyers are not witnesses.  What they have said in their

23  opening statements, closing arguments, and at other times is

24  intended to help you interpret the evidence, but it is not

25  evidence.  If the facts as you remember them differ from the

way the lawyers have stated them, your memory of them controls.

Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

Testimony that has been excluded or stricken or that you have been instructed to disregard is not evidence and must not be considered. In addition, sometimes testimony and exhibits are received only for a limited purpose. When I give a limiting instruction, you must follow it.

Anything you may have seen or heard when the Court was not in session is not evidence. You are to decide the case solely on the evidence received at trial.

Some evidence may be for a limited purpose only. When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence.

1  It is for you to decide how much weight to give to any

2  evidence.

3      By way of example, if you wake up in the morning and see

4  that the sidewalk is wet, you may find from that fact that it

5  rained during the night; however, other evidence, such as a

6  turned-on garden hose, may provide a different explanation for

7  the presence of water on the sidewalk.

8      Therefore, before you decide that a fact has been

9  proven -- has been proved by circumstantial evidence, you must

10  consider all the evidence in the light of reason, experience,

11  and common sense.

12      There are rules of evidence that control what can be

13  received into evidence.  When a lawyer asks a question or

14  offers an exhibit into evidence and a lawyer on the other side

15  thinks that it is not permitted by the rules of evidence, that

16  lawyer may object.  If I overrule the objection, the question

17  may be answered or the exhibit received.

18      If I sustain the objection, the question cannot be

19  answered and the exhibit cannot be received.  Whenever I

20  sustain an objection to a question, you must ignore the

21  question and must not guess what the answer might have been.

22      Sometimes I may order that evidence be stricken from the

23  record and that you disregard or ignore the evidence.  That

24  means that when you are deciding the case, you must not

25  consider the evidence that I told you to disregard.

# PRELIMINARY JURY INSTRUCTIONS

In deciding the facts of this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it.

Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see or hear or know the things testified to, the witness' memory, the witness' manner while testifying, the witness' interest in the outcome of the case and any bias or prejudice, whether other evidence contradicted the witness' testimony, the reasonableness of the witness' testimony in light of all the evidence, and any other factor that bears on credibility or believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

I will now say a few words about your conduct as jurors. First, keep an open mind throughout the trial and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the evidence in the case and on my instructions as to the law that applies, you must not be exposed to any other information

about the case or the issues involved during the course of your

jury duty.  Thus, until the end of the case or unless I tell

you otherwise, do not communicate with anyone in any way and do

not let anyone else communicate with you in any way about the

merits of the case or anything to do with it.

This includes discussing the case in person, in writing,

by phone, or electronic means, via email, text messaging, or

any Internet chat room, blog, or Web site, or other feature.

This applies to communicating with your fellow jurors

until I give you the case for deliberation; and it applies to

communicating with everyone else, including your family

members, your employer, media, or press, and the people

involved in the trial, although you may notify your family and

your employer that you have been seated as a juror in the case;

but if you are asked or approached in any way about your jury

service or anything about this case, you must respond that you

have been ordered not to discuss the matter and to report the

contact to the Court.

Because you will receive all the evidence and legal

instruction you properly may consider to return a verdict, do

not read, watch, or listen to any news or media accounts or

commentary about the case, or anything to do with it.

Do not do any research, such as consulting dictionaries,

searching the Internet, or using other reference materials, and

do not make any investigation or in any other way try to learn

1    about the case on your own.

2        The law requires these restrictions to ensure the parties

3    have a fair trial based on the same evidence that each party

4    has had an opportunity to address.  A juror who violates these

5    restrictions jeopardizes the fairness of these proceedings and

6    a mistrial could result and require the entire trial process to

7    start over.  If any juror is exposed to any outside

8    information, please notify the Court immediately.

9        During deliberations, you will have to make your decision

10   based on what you recall of the evidence.  You will not have a

11   transcript of the trial.  I urge you to pay close attention to

12   the testimony as it is given.

13       If at any time you cannot hear or see the testimony,

14   evidence, questions, or arguments, let me know so that I can

15   correct the problem.

16       If you wish, you may take notes to help you remember the

17   evidence.  If you do not take notes -- excuse me.  If you do

18   take notes, please keep them to yourself until you and your

19   fellow jurors go to the jury room to decide the case.  Do not

20   let note taking distract you.

21       When you leave, your notes should be left in the envelope

22   in the jury room.  No one will read your notes.  They will be

23   destroyed at the conclusion of the case.

24       Whether or not you take notes, you should rely on your own

25   memory of the evidence.  Notes are only to assist your memory.

You should not be overly influenced by your notes or those of your fellow jurors.

Ms. Clark later on will explain to you the protocol for keeping your note tablets during the trial.

From time to time during the trial it may become necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury is present in the courtroom or by calling a recess. Please understand that while you're waiting, we are working. The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and how to avoid confusion and error.

Of course, we will do what we can to keep the number and length of these conferences to a minimum. I may not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

The trial proceeds in the following way:

First, each side may make an opening statement. Any opening statement is not evidence. It is simply an outline to help you understand what the party expects the evidence will show. A party is not required to make an opening statement.

Plaintiff will then present evidence, and counsel for

1    defendants may cross-examine.  Then the defendants may present

2    evidence and counsel for plaintiff may cross-examine.

3        After the evidence has been presented, I will instruct you

4    on the law that applies to the case and the attorneys will make

5    closing arguments.  After that, you will go to the jury room to

6    deliberate on your verdict.

7        It is now five minutes to noon.  It's now your case.  My

8    suggestion is the following:

9        We take evidence from 9:00 to noon with a 15-minute break,

10   and then from 1:00 to 4:00 with a 15-minute break.  If you'd

11   like a longer lunch hour, then I push the closing of the court

12   day further back.

13       So would you like to come back at 1:00 o'clock or at 1:30?

14          **A JUROR:**  I vote for 1:00.

15          **A JUROR:**  1:00.

16       **THE COURT:**  It looks like everyone votes for 1:00.

17       So I'll excuse you at this time.  Please be promptly back

18   at your seats at 1:00 p.m. for opening statements.

19       Have just a brief seat inside the jury room and Ms. Clark

20   will give you your badges so people will know to avoid you like

21   the plague.

22       All right.  Thank you.

23       Anything further, Counsel, at this time?

24          **MR. CUNNINGHAM:**  No, Your Honor.

25          **MR. QUINN:**  No, Your Honor.

1    THE COURT:  All right.  Opening statements at 1:00 and

2    your first witness afterwards.

3         MR. CUNNINGHAM:  Say that last again?

4         THE COURT:  And your first witness afterwards.

5         MR. CUNNINGHAM:  Yes.

6         (Luncheon recess taken at 11:56 a.m.)

7    **Afternoon Session**                              **1:03 p.m.**

8       (Proceedings were heard out of presence of the jury:)

9         THE COURT:  Counsel wanted to see me before . . .

10        MR. CUNNINGHAM:  Yes, Judge.  For the plaintiffs, we,

11   first of all, have a concern about being able to visit with the

12   clients in the off times.  They're -- They're in a holding cell

13   here where apparently it's impossible to visit it during the

14   lunch hour, and I don't know -- Apparently the courtroom is the

15   only good place.  Because they --

16        THE COURT:  Well, hold up.

17      What about taking them up to the lockup on the 20th floor?

18   Can you arrange that?

19      They should have opportunity to talk to them during the

20   course of the trial, so if you could work something out, I'd

21   appreciate it.

22        THE CORRECTIONAL OFFICER:  Okay.

23        THE COURT:  If it's a problem, let me know and then

24   we'll talk some more; okay?

25        THE CORRECTIONAL OFFICER:  What time?

**PROCEEDINGS**

1       **THE COURT:**  Probably lunchtime is the best time.   And

2   they have to be fed, too.

3           **THE CORRECTIONAL OFFICER:**  Yes.

4       **THE COURT:**  You get them here what time?

5           **THE CORRECTIONAL OFFICER:**  Between 8:30 -- Right

6   around 8:30.

7       **THE COURT:**  Right around --

8           **THE CORRECTIONAL OFFICER:**  The marshals don't start

9   till about 8 o'clock.  They need time to up and get situated,

10  so we try to get them to them at 8:30.

11      **THE COURT:**  All right.  Let's see if we can't give

12  them some time before trial tomorrow morning.  Then if that

13  doesn't work, then we're talking about having extra time at

14  lunch; okay?

15      **MR. CUNNINGHAM:**  That would be good, Judge.  I mean,

16  we do need a little time.

17      **THE COURT:**  Okay.

18      **MR. CUNNINGHAM:**  And maybe the end of the day a little

19  while before they rush off.  I know they want to get back.

20          **THE CORRECTIONAL OFFICER:**  It's not a matter of us

21  wanting to get back.

22      **THE COURT:**  No, I know, but you've got shift change

23  and all of that.

24      Maybe after today, if they could wait -- If maybe after

25  the close of taking the evidence this afternoon, maybe they

# PROCEEDINGS

1  could have a half an hour before you transport them?  I hope

2  that --

3          **THE CORRECTIONAL OFFICER:**  Will that be here?

4          **THE COURT:**  Yes.  How does that work?

5          **MR. CUNNINGHAM:**  That would be good, Judge.  This

6  Sergeant, he's been very helpful.  He's running the show.

7          **THE COURT:**  All right.

8          **MR. CUNNINGHAM:**  My other concern at this moment is

9  that the hint that Mr. Quinn made this morning about Warden

10 Curry's not here.  He's told them he's not going to come but we

11 fully intend to call him in our case.  I don't know if we can

12 meet our burden without it.  We didn't subpoena him, but I just

13 assumed he'd be here.  I'm kind of taken aback that he's not

14 here.

15         **THE COURT:**  Mr. Quinn.

16         **MR. QUINN:**  Well, I mean, the plaintiff wanted to use

17 him as a witness.  There's Rules of Federal Procedure.  He

18 could have subpoenaed him.

19     He's listed on our witness list, but as with Lieutenant

20 Padilla, we may call him but, as the case proceeds, we may

21 decide not to, so --

22         **THE COURT:**  Okay.  Well --

23         **MR. CUNNINGHAM:**  But we put him on the original

24 witness list back --

25         **THE COURT:**  No, I know, but counsel's right.  You did

1    have a burden to -- to -- to --

2         **MR. CUNNINGHAM:**  Notify.

3         **THE COURT:**  -- subpoena him yourself.

4       However, it may have been that -- that he was -- that

5    there was a misunderstanding that you intended to call him and

6    then changed your mind subsequent to that.  I mean, I'm a

7    little concerned about -- about that.

8         **MR. QUINN:**  Well, the defendants hadn't had any

9    conversations with plaintiffs or anybody about calling Curry or

10   not calling Curry.

11        **THE COURT:**  All right.  So there was no discussion

12   about that.

13        **MR. QUINN:**  Absolutely none.

14        **MR. CUNNINGHAM:**  Other than putting him on our list,

15   so . . .

16        **THE COURT:**  Well, I understand that, but that's not

17   enough.

18                     (Pause in proceedings.)

19        **THE COURT:**  Well, why don't we proceed this

20   afternoon -- this afternoon, and I'll think about it, and we'll

21   see where we go at the end of the day; all right?

22        **MR. QUINN:**  Thank you.

23        **THE COURT:**  Madam Reporter?

24               (Court and court reporter confer.)

25                     (Pause in proceedings.)

1    **THE COURT:**  Okay.

2    **MR. QUINN:**  With respect to depositions, we have five

3  sealed depositions that we may be referring to.

4    We were wondering, we have some electronics or technology

5  here where we -- we were wondering if we could use the sealed

6  depos after they're opened and put them up on the ELMO.

7    **THE COURT:**  Have they -- They've obviously been

8  exchanged with counsel; is that correct?

9    **MR. QUINN:**  Well, counsel was at the deposition.

10   **THE COURT:**  At the depositions.  All right.

11   Yeah, I see no reason why not.

12   All right.  Why don't we proceed.  Miss Clark, if you

13  could call the jury in.

14                    (Pause in proceedings.)

15   (Proceedings were heard in the presence of the jury:)

16   **THE CLERK:**  Okay.  We're back on the record in civil

17  07-2809, Ivan Cleveland versus Ben Curry.

18   **THE COURT:**  Mr. Cunningham, your opening statement.

19   **MR. CUNNINGHAM:**  Thank you, Your Honor.

20               **OPENING STATEMENT**

21   **MR. CUNNINGHAM:**  This is a job for me now to try to

22  orient you with -- as to the evidence that is going to be

23  brought in, what the evidence will show, and what you will be

24  called upon to interpret, understand and interpret.

25   And it's all about stuff that happens in what a lot of

1  people call another world.  It's been called a world apart but

2  it's actually in this world, it's part of this world.  It's a

3  prison, a big part of this world, a big part, and yet there is

4  a huge difference in what life is like in the prison.

5      So you're going to learn that these guys, all of whom have

6  done a lot of time already, and four of them who have life

7  sentences although they're all working on getting parole, and

8  Ivan Cleveland had a sentence with an 85 percent rule.  That

9  means that you can only get 15 percent off for good time.

10     So they've been living in prison for a long time.  And in

11 prison, one of the things that happens to you constantly is,

12 you get searched.  You get patted -- You get what they call a

13 clothed-body search.

14     There are other kind of searches, like strip search when

15 you take off your clothes and your body's inspected when you're

16 naked, and they have even further ability in a given case when

17 they have a reasonable suspicion.

18     You don't need any suspicion to search, unlike if you were

19 on the street, to search prisoners at random in the prison

20 moving from place to place.  They can be searched really at the

21 drop of the hat.

22     And in the prison at Soledad, which is where they all were

23 when this took place, which is down near Salinas, there's a

24 huge central corridor that's very long and all of the cell

25 blocks are -- you enter the cell blocks off of the corridor.

1    You enter other places, the -- the mess hall, the kitchen,

2    counselor's offices, different job sites.  You go to the yard

3    from the cell block.  Visits.  Just about anyplace you're going

4    to go from a cell block, or what they call a wing down there.

5    You're going to go out of the wing into the corridor and go

6    where you're going someplace in the corridor.

7          Now, they have guards stationed in the corridor, mostly

8    pretty much a couple at each place where you can come into the

9    corridor and go out of the corridor, but not necessarily any

10   fixed place.

11         And a certain number of those guys, pretty much all of

12   them, are -- are -- are -- among their other duties, when

13   they're on duty in the corridor, is to perform random

14   clothed-body searches.

15         And complaints of the plaintiffs in this case are about

16   random clothed-body searches as they were carried out by

17   Officer Abanico.  Officer Abanico at the time -- and, again,

18   these -- these events are all six or seven years old.  For

19   reasons which need'nt concern you, it's taken us this long to

20   get to this point where they have claims against them.

21         But during 2006 and 2007 -- 2006 he was fairly new.  And

22   when he came to work in the corridor, there started to be

23   complaints about the way he searched.  And ultimately there

24   were quite a big number of complaints about the way he searched

25   and specifically that frequently he went over the line

1   sexually.  He would grab the genitals.  He would squeeze them.

2   He would grab the penis.  He would squeeze it.

3        When they search you, you get -- you're told to assume the

4   position, so to speak.  You get on the wall with your hands up

5   on the wall like this (indicating), and they spread your legs,

6   and they want you leaning.

7        So the point is, you're in a secure position.  You

8   can't -- It's difficult for you to make any kind of move

9   without first, you know, retaining your balance and doing

10  whatever.

11       And the officer's behind you.  And the second officer is

12  usually there with his back to the search that's taking place,

13  and he's watching the rest of the traffic in the corridor.

14  He's making sure they keep moving and don't stop to watch

15  what's going on in the search.  He's making sure nobody comes

16  out of the corridor, traffic, and up to the place where the

17  search is going on.  He just -- So he's -- he's a little

18  security for the search that's happening by the other officer.

19       And in the searches that we're complaining about, Officer

20  Abanico would be doing a search from behind and he would have

21  another officer there, but that officer wouldn't be watching.

22  He wouldn't see what happened and wouldn't necessarily know

23  what happened.

24       And the prisoner wouldn't necessarily know who it was.

25  Even though it might be someone he was perfectly familiar with,

1   by the time he gets pulled out of the traffic and put on the

2   wall, he's paying attention to the officer who's ordering him

3   to do that, and that would be in these cases Officer Abanico.

4       The . . . When you're in prison, and when you're in

5   prison as long as these guys have been in prison, you've been

6   searched thousands of times.

7       If you've been in prison 10 years, you've undoubtedly been

8   searched at least once a day. So that's 3,000 searches, 3600

9   searches right there. So if you've been down 20 years, you've

10   got 7, 8, 10,000 searches.

11       Every one of these men will tell you nobody ever searched

12   them the way Officer Abanico did that caused them to file

13   complaints against him. They had never had their genitals

14   grabbed and squeezed, nothing like that, except in these cases.

15       And that, I think, is going to be a very important element

16   of the evidence here, as -- as will be also the fact that so

17   many people complained about him and there are no other

18   complaints about any other officers during this period of time,

19   or otherwise, as far as we know, doing that kind of thing in

20   the search. Okay?

21       When they make the complaints, there's a whole process

22   that the complaints go through. They -- There's a -- what they

23   call an informal review where a staff member who's close around

24   this situation where the whatever events took place, sits down

25   with the officer -- with the prisoner and asks him what it's

1  about.

2      And if they can't resolve it, the -- the prisoner on

3  his -- on the written grievance form -- And you'll see some of

4  those forms.  They're called 602s.  That's a CDC serial number

5  and they've got a million forms and these are the forms, 602s,

6  that they use.

7      He says he's dissatisfied.  The case then goes to what

8  they call the second level.  And now it's looked at in a more

9  formal way by a higher ranking officer.

10     And they always say they -- they -- they call -- These

11 complaints, we call it 602s, are entitled in the institution

12 Inmate Appeal.  So everything is an appeal from that first

13 process of informal discussion with a local or Security Officer

14 or somebody like that.  Maybe even the officer.  Many times

15 it's the officer with whom you have the grievance against sits

16 down with you and try to straighten it out.  And of course they

17 have to do that.

18     But when they have a staff complaint, the prisoner is

19 complaining specifically about some kind of misconduct by the

20 staff member or some injury received or whatever against the

21 staff member.

22     They often do what they call a bypass and they'll stamp

23 the form "Bypass," and this means it goes right to the second

24 level.

25     And then there's a third level which is -- is -- that it

1  goes to the Director's office, the Director of the CDC, our

2  California Department of Corrections and Rehabilitation in

3  Sacramento.  And the results of whatever's in the file,

4  whatever's been done at the institution, are reviewed and then

5  a decision is made and given back to the inmate.

6  Inmate.  Let me parenthetically say they're all called

7  inmates.  They're always called inmates.  They're addressed as

8  inmates in formal papers.  They won't use their first name and

9  say Inmate Cleveland, Inmate Jones and a number.  So they

10  become used to thinking of themselves as inmates.

11  I try to never use the word unless I have to.  I call them

12  prisoners because I think the "inmates" is a demeaning kind of

13  a -- it's a -- it's part of a process that reduces them to

14  something, you know, special if not less than human, and it

15  objectifies them.  All right?  They're objectified because

16  they're in prison.

17  There are security rules in prison.  They get searched all

18  the time in prison.  This is the way prison life goes.  But

19  this is what -- The rules, then, that protect them from abuse

20  in that circumstance, in that setting, become all that more

21  important, as you'll see, in the Eighth Amendment.  Prohibition

22  of cruel and unusual punishments is the Constitutional basis

23  for those protections.

24  And what we're doing in a civil rights case is considering

25  whether a violation has occurred -- occurred.  You're actually

1  the agency by which the Constitution is enforced by private

2  parties when they -- when there is a complaint of wrongdoing by

3  an official.  So that's what this is.  That's the

4  Constitutional provision that's involved.

5      What you'll learn in this case is that complaints by these

6  men and complaints by a number of others and petitions, in

7  particular a petition that was filed towards the beginning of

8  this sequence of -- of complained-of searches was filed by Ivan

9  Cleveland with -- and it was styled in such a way that a number

10  of other prisoners could sign it.  And there were 80 or 90,

11  dozens of prisoners -- and you'll see that document -- signed

12  their names and numbers to his statement that Officer Abanico

13  was doing these searches in this wrong way.

14      You'll see there's -- between his and any of the other

15  complaints that you get to see, some you'll -- you know,

16  there'll be some by play with the Court as to which ones you

17  see and which ones you don't, but I'm certain you'll see that

18  one.

19      And you'll see that there were all these people

20  who . . . laid their names on the line, who -- who -- who took

21  a stand about these searches by this officer and -- and

22  demanded, so to speak, that they -- the institution, the

23  administration, do something about it.

24      And you'll hear from the prisoners that that's not, you

25  know, a trifling thing when you make a complaint against a

1   staff member.  You often are told, "Well, if you're going to

2   persist in this complaint, we're going to have to put you in

3   the hole in order to protect you."

4       Protect you from what, you might ask?  Well, from some

5   retaliation, apparently, by the staff.

6       They were -- Many of them on many occasions were -- were

7   threatened with that, and they stood firm and -- and not all of

8   them -- they didn't -- I don't think any of them went to the

9   hole immediately because of filing the complaint, even though

10  they were threatened.

11      But you'll also learn that after this petition was filed,

12  with all these names on it, that the security squad came and

13  called all these guys that had signed it and one by one told

14  them, "You'd better take it back or you're going to the hole."

15      And they had a video camera so that they could record the

16  statement of -- of each inmate recanting his subscription to

17  the petition, because of the threat, a guy who said, "I'm

18  getting ready to go to the Board.  I can't have this on my

19  record.  You know, you've got to excuse me.  I can't stick with

20  it."

21      Some of them did; some of them didn't.  There -- There --

22  We don't have any numbers or any particulars about that, but we

23  know that happened.  Ivan Cleveland will testify about it.  He

24  was there when it happened.

25      The -- The . . .  The appeal process, then, that they had

 1   to go through is -- is this series of steps.  But there is a

 2   principle that -- and a rule within the institution that if

 3   you're dealing with a complaint against a staff member, the

 4   prisoners don't get to hear the outcome.  If action is taken or

 5   not taken, it's not announced to them.  It's not -- They don't

 6   get something back and say this is how this thing came out.

 7        If -- If the -- If a -- If a staff member that they

 8   complained about tells them what happened in the complaint, one

 9   way or another, then they find out.  Or if it's about some

10   certain practice that's going on and in the end they find out

11   in that kind of a way.

12        But there's no -- The process itself is set up in such a

13   way as to keep the information from them.  And you can

14   understand that there's, again, a security concern and -- and

15   a . . . a concern about the relations between the prisoners and

16   the staff.

17        The Supreme Court said in a case that -- in a prison, the

18   prisoners and the guards live in a state of unremitting

19   attention.  And this is certainly true because there's such a

20   vast difference in the power positions.

21        And the -- And the prisoners are at risk of getting in

22   trouble in such a way it goes on their record and then it

23   goes -- then the Parole Board sees it.  Then it prejudices them

24   in terms of job assignments.  It gets, you know -- There's all

25   kind of consequences to it.

1    And -- And the -- So the tension between the two sides

2   is -- is -- is not between equals; it's between the dominant

3   and the submissive side.  It's between the people with the

4   power and people without it.

5    They're not entirely without power.  There's things they

6   can do, but there's consequences also.

7    You'll hear one or more of them say, you know, things have

8   changed in the recent years in terms of the tightness of the

9   way things are run.  "If -- If somebody had done that to me in

10  a search 25 years ago, I'd have turned around and punched them

11  out, but I didn't dare do that here, and it's been impressed

12  upon me in the years in between that it wouldn't ever be worth

13  the consequences."  As much as you might be upset about what

14  this guy did or was doing, you have to contain yourself.

15   Now, they don't -- they didn't contain themselves.  You'll

16  hear the defense say, "Well, they've all testified -- or

17  several of them have testified that any grabbing of their

18  genitals or squeezing was quick, two or three seconds, and,

19  therefore, what difference does it make, you know?  Tough

20  luck."  I mean, you're in prison.

21   But the reason it was so short is because they did come

22  off the wall.  They did jerk away from the guy.  "What are you

23  doing?  What's your problem?"  You know, it was a shock.  "Get

24  back on the wall, sir.  Get back on the wall."

25   And when he has you on the wall, he can lean his arm, his

1    elbow, in your back and then search you.  He can search you

2    with two hands what he ought to do, on your legs, on your arms,

3    your front and back, but he can also put his elbow in your back

4    and jam you against the wall so he knows that he's got control

5    of you and then do the search with one hand, whatever he's got

6    left to pat down.

7        Now, you have to think of anatomy.  We're talking about

8    male anatomy.

9        There's an instruction and a strong point that you'll hear

10   from the defense is, well, they had more or less . . .

11   escalated the search technique recently, reasonably enough so

12   that Officer Abanico will claim this was the way he was trained

13   in the Academy a short time before he went to work at Soledad,

14   that in order to counteract the threat of contraband or the

15   possibility that contraband would get through, they were taught

16   to do what they call, quote-unquote, cup the groin.  Cup the

17   groin.

18       Now, the cup, the understanding is a cupping of the hand

19   flat.  But if you think about the anatomy, the legs come up in

20   a V.  The space between the legs in the V, that's the groin.

21   You can -- You're not supposed to look up in the dictionary but

22   that's where the groin is.

23       In front -- If he has his back to you, in front of that

24   are his genitals.  But you can't really cup your hand up there

25   because it comes to a V.  So you're going to turn your hand one

1    way or another, and if you think about it, if he's coming up

2    the leg, up the thigh, the inside hand is going to reach the V

3    and be stopped there, and anything that's above that, such as

4    something sewn into the underwear, a pack of dope or, you know,

5    whatever, you're going to feel it at that point when underwear

6    goes against the groin.

7        Now, I told you this ain't -- it's not a pleasant subject

8    matter, but these details are important because the claim is

9    going to be that they could -- all they were -- all he was

10   doing was cupping the groin or cupping the genitals, and these

11   guys just had to learn to live with that.  That's the way it's

12   done.

13       You'll hear -- I believe you'll hear the Warden testify --

14   the former Warden -- that when he found out they were doing

15   that, he was shocked.  Why was he shocked?  Because he'd been

16   in the system 30 or 40 years and he knew that this is a

17   volatile thing.  This is a thing -- It's an event to begin with

18   the search.  It's unpleasant and . . . the feeling about

19   vulnerability and the feeling about protecting the genitals is

20   such that, you know, it can blow up easily.

21       It's, among other things, a credit to the restraint that

22   these men had developed after years in prison, and a credit

23   to -- or a result of the strength of the disciplinary regimen

24   that they, rather than turning around and socking the guy, they

25   endured it.  I mean, except to the extent that they pulled

1   away.

2       Now, a couple of them will tell you they pulled away, and

3   they refused to be searched by this officer again.  And there

4   again, you're disobeying a direct order, so they took the risk

5   of going to the hole when they did that, but you -- in the

6   particular cases, none of them did.

7       One of them was locked up in a . . . briefly on the

8   corridor in what they call the cage, where they put anybody

9   that they're going to have -- have a special problem with that

10  they're going to deal with.

11      An officer claimed that he pulled him over because he was

12  wearing a -- a inmate fashion -- inmate fashion earring, which

13  is against the rules.  And so he spent a day, or the shift,

14  whatever it was, in the cage, and then he was written up for

15  that on another form, it's called a 115, and charged with --

16  with this wrongful possession of this earring.

17      But when he had a hearing, there was the other officer who

18  was present said there wasn't any earring, so he was

19  exonerated.  But he was -- He has the 115 in his record, and he

20  will spend that time locked up.

21      So the -- the . . .  You'll find -- You'll learn that, in

22  the process of the appeals, all the appeals that are made

23  against them -- I believe it's 18 in this two-year --

24  one-year -- 13-month period.  They started in August of 2006

25  and ran all the way till -- I believe the last one was filed in

1    the -- toward the end -- September or October of '07 with the

2    exception of one other that was filed later in an incident that

3    seemed to be a sequel.

4        But the fact is that the searches that everybody was

5    complaining about stopped at a certain point toward the end of

6    2007, after 12, 13, 14 months of constant complaints, all of

7    which were rejected.  All the complaints, including the ones

8    that were signed by dozens of prisoners.

9        There was one of those in October of '06, there was

10   another one in June of '07, and they were . . . they were

11   turned down.  They were denied.  They were rejected as appeals.

12       And the excuse -- There was a kind of double excuse always

13   that he's only searching you the way he's been trained.  How

14   they thought he knew he didn't go beyond the way he was

15   trained, I don't know, but they accepted his word for it.

16       And whoever looked into it after the Warden was presented

17   with the first petition, and who was concerned about that for

18   the reason that I stated, because of his experience, and he had

19   to learn at that point that this is how we do it now.  And he

20   was very dubious but he accepted that, obviously, that's how

21   they do it now.

22       They said the searches were all by the book.  And

23   furthermore, "You're not presenting us enough -- enough

24   evidence.  Your -- Your complaint could not be substantiated."

25       Well, how would you substantiate in the course of such a

1  search if the guy grabbed the -- the person, they grabbed him

2  or not or squeezed him or not.  It's over, and who -- what

3  other substantiation would there be besides his word that he

4  did it -- that it happened?

5       If they had -- I'm sorry.  Excuse me just a sec.  Let me

6  get a little water here.

7                      (Pause in proceedings.)

8       **MR. CUNNINGHAM:**  There was no substantiation available

9  really and it was just something to say denying the appeal.

10      Some of it is more elaborate and they see some of that

11 language.  They're also going to say in every one of those

12 cases, "Your appeal was partially granted as an inquiry was

13 made into your complaint."The very fact of looking into it at

14 that second level is -- is considered and used as a partial

15 grant of an appeal.

16      So now their statistics look okay; right?  They're

17 partially granting all these appeals because they actually see

18 what they're about and maybe they go talk to somebody about it.

19 They do something.

20      This is supposed to be a granting but it's really a -- a

21 jargon -- misuse of jargon really because nothing was granted.

22 No relief.  The relief was denied.

23      Sometimes they make a big thing.  "Oh, your appeal was

24 partially granted."  Some people think, when they see the

25 paper, "Wow, my appeal was partially granted," but nothing

1    happened, or I don't know what happened because it was about a

2    staff member and they never tell you, anyway.

3        But you'll see -- I believe you'll see at least one where

4    it says "partially granted" in that you were looked into.

5        Okay.  The Warden, when he got the -- when the first group

6    appeal, the petition, was brought to his attention, he had --

7    you know, he spoke to Associate Warden, I think -- I'm not

8    sure -- a Deputy Warden.  He spoke to a couple of different

9    people and sent them to find out what they could.

10       In particular, he sent a Lieutenant Biggs, who's the head

11   of the ISI, Institutional Security Inspectors, or something

12   like that, who they call the goon squad.  These are the people

13   that came down and demanded that the guy that signed the

14   petition take it back.

15       Lieutenant Biggs, in order to investigate how Abanico did

16   his searches, testified in deposition that he went down and did

17   some searches -- spent part of his shift in the corridor near

18   the place that Abanico was working and did searches and watched

19   him out of the corner of his eyes but didn't see anything wrong

20   with what he was doing.

21       Well, I don't think you would do that if the Lieutenant is

22   right down the way doing the same thing.  And you don't know if

23   he's -- that he's observing you necessarily.  I don't think he

24   told them, but he's there.

25       And if something happens, if you cause somebody to jump

off the wall and holler at you, the Lieutenant's going to be there, so he didn't do it.

We're not saying he did it every time he searched anybody. We are saying he did it a lot and all those people that signed the petition claimed he did it to them. And all the people filed the 602s, claimed he did it to them, and these guys claim he did it to them.

A couple of them only had one chance. Another one, Huff, said he pulled him over again and again. And he wouldn't grab them those times; he would just rub them real hard underneath.

There -- There wouldn't be a reason to pull the same guy over again and again unless you're messing with him.

So that's the essence of it. I mean, that's what I think you're going to learn here, is, those searches like that took place and -- and -- and they didn't do anything about it.

Now, if you decide that he didn't abuse them, he didn't cross the line, he didn't wrong them, do this in a wrong and maybe a prurient way, that will be the end of it.

But if you decide that he did, you're also going to have to decide whether the Warden is coresponsible with him because he -- you know, because they white-washed all the complaints.

They just rejected them, and he was in on that process and he was in charge. And if it's his responsibility to make sure that -- and -- and where he's on notice that some Constitutional violations may be taking place, it's up to him

1    to take -- to take steps to make sure they don't or that they

2    ended.

3       And he said he didn't do that unless he did it at the end

4    of the 13 months or whatever it was, because he does -- he did

5    testify that, at some point, which he can't remember and

6    you'll -- there's no record of it, but that he spoke with

7    Abanico and he told him, "You'd better find a way to do these

8    searches without getting everybody so angry with you and

9    without making people upset and without filling my office with

10    complaints and petitions and stuff."

11       And after that, apparently, it stopped.  I say we don't

12    know the precise timing but we do know it's all happening in a

13    span of time and then it was over.  There hasn't been another

14    complaint against Abanico since then.

15       In all these years, I believe he's probably -- I don't

16    know.  He may be a Sergeant by now.  He's a very upstanding

17    citizen by his peers.  I'm sure he has a wife and family.  He's

18    been in the service.

19       He's, you know, a very presentable man, but he has this

20    problem.  We can't even say that it wasn't, you know, a special

21    problem that he had.  It might have just been an aggression

22    problem; this is the mode that he used.  And he might have just

23    been thinking that he had to show these guys who was boss and

24    this was the mode that he did.

25       Nobody else did it.  Nobody else had a complaint against

1  them.  And you can believe there are plenty of officers who

2  make their -- whose random clothed-body searches for security

3  purposes are done in a vigorous way.  There's some where

4  they're not.

5      But there are some where the book is followed and the book

6  says you don't grab the genitals.  You don't squeeze the

7  scrotum.  You don't do that stuff.  Obviously, the training

8  would be you've got to watch out not to do that stuff.

9      So I think you're going to see very clearly that he was

10  over the line again and again, that that was an abuse that

11  created the situation that violated the Eighth Amendment

12  because these guys had no recourse.

13      And that's partly the warden's fault also because he

14  didn't get them in the very first day and saying, "What's going

15  on here?  How come all these people have signed a thing against

16  you?"

17      He didn't have anybody else to do that, either.  He let it

18  go on.  He hooked up with Lieutenant Biggs saying, oh, they

19  must be doing some crooked stuff and he's interfering with --

20          **MR. QUINN:**  Objection, Your Honor:  Argumentative.

21          **THE COURT:**  Sustained.

22      Counsel, this is --

23          **MR. CUNNINGHAM:**  All right, Judge.

24          **THE COURT:**  This is opening statement.

25          **MR. CUNNINGHAM:**  Um-hmm.

1  **THE COURT:**  Please explain to the jury what your

2  belief is that the evidence will show.

3  (Pause in proceedings.)

4  **MR. CUNNINGHAM:**  Hang on just a minute.

5  (Pause in proceedings.)

6  **MR. CUNNINGHAM:**  There -- There was -- Ivan Cleveland

7  in particular is the prisoner who initiated this lawsuit.  He

8  did it on his own representing himself but talking about the

9  thing that was happening to lots of prisoners.

10  He's the same guy who got up the first petition.  He also

11  initiated -- attempted to initiate a case in the County Court

12  back then in the fall of '06 to -- to see if he could get some

13  intervention from there.

14  At that time, he -- along with the petition that he filed,

15  he filed about 16 or 17 affidavits that were handwritten.  He

16  handwrote a form --

17  **MR. QUINN:**  Objection, Your Honor.

18  **MR. CUNNINGHAM:**  -- and there --

19  **THE COURT:**  Hold on, Mr. Cunningham.

20  **MR. QUINN:**  This is hearsay; relevance.  It's also the

21  subject of a motion in limine --

22  **THE COURT:**  All right.

23  **MR. QUINN:**  -- previously.

24  If we could request a side bar, that would be the most

25  efficient.

1      **THE COURT:**  Okay.

2      **MR. QUINN:**  It should be brief.

3          (Side bar heard, commencing at 1:45 PM.)

4          (Whereupon, the following proceedings were.

5      Heard in the presence of the jury at 1:47 PM:)

6      **MR. CUNNINGHAM:**  You'll learn there was, in a couple

7  of cases at least, what the prisoners regard as retaliation

8  against them for the complaints.  There was not -- In one case,

9  Abanico was involved in; in another case, he wasn't.

10     There's no telling really, except for the coincidence,

11  whether this happened because of them making trouble for him

12  about this practice.

13     Now, I'm going to be done now and -- and counsel will talk

14  to you about what they think the case is going to show, and

15  then we'll start.

16     Mr. Trask is going to testify and, Judge, we -- our plan

17  is to -- for him to testify first just about the general

18  circumstances in the prison.  Then I think we would interrupt

19  his testimony, if the Court will allow us then, and let him

20  come later in the sequence of prisoners telling about their

21  individual case.

22     **THE COURT:**  All right.

23     **MR. CUNNINGHAM:**  Okay.  And so I invite your strong

24  attention to the details of this evidence, and I hope that when

25  you have heard it all, you'll understand that this is a bad

1    thing and it happens all the time.

2              THE COURT:  Mr. Quinn, opening.

3                      **OPENING STATEMENT**

4         MR. QUINN:  Good afternoon, ladies and gentlemen.  My

5    name is Michael Quinn.  I'm a Deputy Attorney General for the

6    State of California and I represent the defendants in this

7    matter.

8         Ladies and gentlemen, this is a simple case.  It involves

9    a Correctional Officer who was doing his job at a correctional

10   facility in Soledad, California, a job that involves among

11   other things conducting clothed-body -- random clothed-body

12   searches of inmates as they moved between locations in the

13   prison.

14        Prisons in California can be chaotic and violence places,

15   and officers routinely conduct clothed-body searches in order

16   to prevent inmates from smuggling and transporting contraband,

17   such as weapons and drugs between locations within the prison.

18        The evidence will show that, as part of a clothed-body

19   search, officers like Officer Abanico are told to cup the

20   groin.  Cupping the groin is essential during a clothed-body

21   search because inmates oftentimes attempt to conceal contraband

22   below the waist, in the groin area.

23        Failing to conduct a thorough search places the entire

24   institution at risk, because the weapons or other contraband

25   can be used to attack other inmates or correctional staff at

1    the prison.

2         Now, as Mr. Cunningham mentioned, plaintiffs in this case

3    have alleged that the clothed-body search -- searches that

4    Abanico conducted violated the Eighth Amendment.

5         But in this case, the evidence will establish that

6    Defendant Abanico did not violate the Eighth Amendment during

7    the clothed-body searches.  To the contrary, he conducted the

8    clothed-body searches in accordance with Departmental policy,

9    in accordance with State law, which requires some contact with

10   the groin area in order to accomplish the purpose of the

11   search.

12        The evidence will show they he did not sexually abuse,

13   harass or molest these inmates during these searches.  To the

14   contrary, the contact with the groin was for a limited

15   duration, one to two seconds for the most part.

16        And the evidence will also indicate that he did not place

17   his hands beneath the clothing of the inmates.  He did not say

18   anything of a sexual nature to the inmates, and he did not

19   physically injure these inmates during the searches.

20        In short, Officer Abanico was doing his job as required

21   under the regulations.  He was discharging his duties as a

22   Correctional Officer.

23        Now, during the trial, you will hear from several

24   defendants -- several witnesses who will speak on behalf of

25   defendants.  You will hear from a Correctional Lieutenant --

1  Correctional Lieutenant Stoltenberg who works at the

2  Department's training center in Galt, California.

3      He will explain to you how officers are trained to conduct

4  clothed-body searches and the necessity of cupping the groin in

5  order to conduct a thorough search.

6      In addition, you'll here from Officer Abanico himself.  He

7  will testify regarding how he was trained to conduct the

8  searches and how he actually conducts the searches at the

9  Correctional Training Facility where he's worked for nearly a

10 decade.

11     In conclusion, ladies and gentlemen, I want to

12 reemphasized that this case is about an officer who was doing

13 his job, who was conducting clothed-body searches as he was

14 required to, and there was no evidence that he harassed,

15 molested or abused the inmates during the search.

16     Because the plaintiffs' rights have not been violated

17 under the Eighth Amendment, the defendants request that a

18 judgment be rendered in their favor.

19     And I thank you for your attention.

20     **THE COURT:**  Thank you, Mr. Quinn.

21     Mr. Cunningham, your first witness.

22     **MR. CUNNINGHAM:**  Judge, our first witness is plaintiff

23 Kenneth Trask.

24     **THE CLERK:**  Will you please come over here and take

25 the witness stand.

1        **THE COURT:**  I noticed some of the jurors fanning

2 themselves.  It is a little hot in here.  I did ask that the

3 air conditioning to be turned up a little bit.  Hopefully,

4 knowing the government, that will mean it will go from really

5 hot to really cold.  It's difficult, I guess, to control it.

6        **THE CLERK:**  Will you please stand and raise your right

7 hand.

8        **MR. CUNNINGHAM:**  Excuse me, Judge.  Can the clerk and

9 I speak to you for one second here?

10        **THE COURT:**  Well --

11        **MR. CUNNINGHAM:**  Just -- I'm sorry.  I forgot to do

12 this.

13        (Sidebar conference heard but not reported.)

14        **THE CLERK:**  Can you raise your right hand.

15                 **KENNETH TRASK**,

16 called as a witness for the Plaintiffs, having been duly sworn,

17 testified as follows:

18        **THE CLERK:**  Please be seated.

19    Please state your full name for the Court and spell your

20 last name.

21        **THE WITNESS:**  My name is Kenneth Trask, T-R-A-S-K.

22        **THE CLERK:**  Thank you.

23                 **DIRECT EXAMINATION**

24 BY MR. CUNNINGHAM:

25 **Q.**  Mr. Trask, how old are you?

1  **A.**  I'm 57 years old.

2  **Q.**  You're a prisoner in the California Department of

3  Corrections?

4  **A.**  Yes, sir.

5  **Q.**  How long have you been in there?

6  **A.**  Oh, this term, I've been in almost 30 years.

7  **Q.**  All right.  And you had a term before that?

8  **A.**  Yes, sir.

9  **Q.**  Okay.  And are you eligible for parole?

10  **A.**  Yes, sir.

11  **Q.**  Are you working on your parole?

12  **A.**  Yes, sir.

13  **Q.**  Okay.  You were at CTF, California Training Facility,

14  Soledad in 2006-2007?

15  **A.**  Yes, sir.

16  **Q.**  How long were you at Soledad?

17  **A.**  I spent about 10 years there.

18  **Q.**  Uh-huh.  And when did you leave there?

19  **A.**  I left in September . . .  Well, no.  I left in April 24th

20  of 2008.

21  **Q.**  Okay.  That was shortly after this -- you began -- you

22  became involved in this case; is that right?

23  **A.**  Yes.  I spent eight -- eight months in the hole, and I was

24  transferred from the hole to --

25       **MR. LEWIS:**  Objection, Your Honor, as to the use of

1   the word "hole."  It's not a recognized term within the

2   California Department of Corrections and Rehabilitation.

3           **THE COURT:**  Overruled.

4   **MR. CUNNINGHAM:**

5   **Q.**   What is the hole?

6   **A.**   The hole is, to explain it, is a prison inside of the

7   prison.  They call it administrative segregation where you're

8   separated from the other inmates in the institution.  You have

9   no contact with other inmates.  You can't use the phone, and

10  you're locked up basically 24 hours a day, unless you choose to

11  go out into the yard, and you can go out to the yard sometimes

12  in the morning and sometimes in the morning -- sometimes in the

13  afternoon, and you're allowed to either be on the yard by

14  yourself or you can be out there with other inmates.

15  **Q.**   All right.  Before you went to the hole, were you -- where

16  were you assigned to -- your living quarter?

17  **A.**   I was assigned to D Wing.

18  **Q.**   Okay.  And is B Wing (sic) one of the wings that empties

19  on to the main corridor?

20  **A.**   I was in D Wing.

21  **Q.**   D Wing.  I'm sorry.

22  **A.**   Yeah, delta.

23  **Q.**   Can you describe for the jury the layout of the corridor

24  and the wings?

25  **A.**   Yes.  The corridor is about maybe a quarter of a mile

1    long.  You have 10 different wings inside the corridor that

2    faces the corridor.

3        One of the wings is the hold, which has no communication

4    or anything with other inmates.  The other wings are -- house

5    at least 250 inmates in each one.

6        The two bigger wings, F and G, houses 300 inmates.  And

7    this corridor is like -- it's like a little city.  Like

8    Mr. Cunningham was telling you, it's where we exit our

9    buildings and go to work.  We go to work, we go to hospital, we

10   go to the yard, we go to the canteen, and, you know, other

11   places.  You can't -- You can't get to these other places

12   without going through the corridor.

13   **Q.**   Okay.  And the corridor runs east and west; is that right?

14   **A.**   Yes, sir.  It runs from, yeah, east and west.

15   **Q.**   Okay.  So -- And which end is the yard on?

16   **A.**   That's on the west side.

17   **Q.**   Okay.  And where is the mess hall located?

18   **A.**   The mess hall is more, like, in the center of the corridor

19   between -- It would be centered between west and east.

20   **Q.**   Okay.  And if it's running west to east --

21   **A.**   Um-hmm.

22   **Q.**   -- a quarter of a mile --

23   **A.**   Yes, sir.

24   **Q.**   -- then there's wings on the north side and wings on the

25   south side?

1    **A.**   Well, down at the lower corridor, there's only -- On the

2    left side -- By the way, the corridor itself is about maybe 15

3    to 20 feet wide.

4    **Q.**   About from you to me?

5    **A.**   Yes, about there.

6    **Q.**   Is that about right?

7    **A.**   Yes.  So you have -- On the west side, you have two -- You

8    have two wings that's on the left side of the corridor, which

9    will be F and G.  All the other wings are on the other side of

10   the corridor.

11   **Q.**   The housing wings.

12   **A.**   They're housing wings as well --

13   **Q.**   Yeah.

14   **A.**   -- but they're outside the corridor.

15   **Q.**   I understand.  And then places like the infirmary or the

16   counselor's office or the school --

17   **A.**   Mostly are on the left side of the corridor, yes, sir.

18   **Q.**   Further down to the --

19   **A.**   Yes, sir.

20   **Q.**   -- east?

21   **A.**   Yes.

22   **Q.**   Okay.  And D Wing is on the south side?

23   **A.**   D Wing is on the -- D Wing is the second wing from the

24   yard, which you have -- You have E wing, D Wing, C wing, and

25   then you go down the corridor.

1    Each wing -- During these moments, one of the officers

2 from those wings, his job was to go out and stand in front of

3 the wing.  When the inmates exit the wings, his job was to make

4 sure they were going where they're supposed to go.

5    For instance, if I came out of the wing and I turned west

6 to go to the yard, but I was supposed to be going east, then I

7 would be stopped and asked where I was going.

8 **Q.**    How do they know which inmates are supposed to go where?

9 **A.**    Well, normally the officers who are on the outside of

10 the -- a wing are familiar with the inmates in the wing.

11    So with the different releases, the officer know -- they

12 know if it's work time you're going to work.  If you have a

13 ducat to go to hospital, so to speak, he know that you're going

14 to the hospital.

15    Some of the officers outside the wing will ask you where

16 you're going.  They want to see your ID, see your pass, so they

17 can make note of where you're going.

18 **Q.**    What's a ducat?

19 **A.**    A ducat is a little form that you get saying that you're

20 being released to go to the hospital, or you're being released

21 to go to laundry, or you're being released to go maybe on a job

22 interview, so . . .

23 **Q.**    Is that the same as a pass?

24 **A.**    It is a pass, yes, sir.

25 **Q.**    Okay.  A pass is a ducat.  A ducat --

1   **A.**   Yes.

2   **Q.**   -- is a pass?

3   **A.**   Yes.

4   **Q.**   Okay.  So when you come out of your cell and you're going

5   someplace, you have to bring an I.D. you mentioned?

6   **A.**   You have to have your I.D. on you at all times.

7   **Q.**   Okay.  And what about a ducat?  You need a ducat to go to

8   the yard?

9   **A.**   No.

10  **Q.**   You need a ducat to go --

11  **A.**   You only need a ducat when you have appointment.  You may

12  have appointment for the hospital, you may have appointment to

13  report to the Sergeant's office, to the counselor's office, or

14  somewhere like that.

15  **Q.**   Okay.  So everybody who's passing in the corridor doesn't

16  have a deduct.

17  **A.**   No, sir.

18  **Q.**   They don't have to check deducts.

19  **A.**   No.

20  **Q.**   Okay.  And what -- what -- what is the staffing of a wing,

21  like the wing you were in?  What kind of officers do they have

22  in there?

23  **A.**   Well, normally there's -- there's three tiers in the wing.

24  You have at least --

25  **Q.**   Three or four?

1   **A.**   Three or four, yes. You have at least three officers in

2   that wing.

3      You also have -- Again, like, one of the officers leave

4   when there's movement, but there's normally at least three

5   officers in each wing. It may be more at a time.

6   **Q.**   Do they have a Sergeant in the wing?

7   **A.**   No, sir.

8   **Q.**   Where is the nearest Sergeant?

9   **A.**   According to D Wing, the counselor's office is between

10   E Wing and D Wing. The sergeant's office is down in the center

11   corridor.

12   **Q.**   Okay. And that Sergeant, is he responsible for the

13   corridor?

14   **A.**   You have different sergeants. You have -- The officers in

15   the corridor are assigned to a certain part of the corridor.

16   That corridor may have a Sergeant for that part.

17      But, like, for instance, E Wing, F Wing, G Wing and D Wing

18   was just one part of the corridor where a Sergeant will be

19   appointed to that part and that part only.

20      After you go down to report to other wings, you have

21   another Sergeant for that.

22   **Q.**   Okay. So it's like those last four wings just before the

23   yard, there's one Sergeant there?

24   **A.**   Yes, sir.

25   **Q.**   Another Sergeant in toward the middle?

1  **A.**   Well, all Sergeants will be assigned to the same

2  Sergeant's office.  But the Sergeant that's responsible for D,

3  E, C and G would be one particular Sergeant.

4  **Q.**   Okay.

5  **A.**   But they all will be -- They all will be in the same

6  office.

7  **Q.**   And when -- You said when there's going to be movement --

8  There's certain times of the day when there's movement of

9  prisoners out of the cell blocks into the corridor; right?

10  **A.**   Yes, sir.  There's movement in the corridor all the time.

11  It's like a little city.  Somebody's always up and down the

12  corridor.

13  **Q.**   Okay.  But there's certain times when there's a lot of

14  people going; right?

15  **A.**   Yes.

16  **Q.**   Going to the mess hall; going to the yard.

17  **A.**   Yes.

18  **Q.**   At more or less a point of time.

19  **A.**   Yeah.  Your yard release time can vary.  It could be

20  between 8:00, something like that.  Work release, chow release.

21  You know, you have different releases --

22  **Q.**   Okay.

23  **A.**   -- where the corridor is really crowded.  The only time

24  the corridor isn't crowded is during staff changing on their

25  job.

1  **Q.**  Shift.

2  **A.**  Shift change, yes, sir.

3  **Q.**  Shift change.

4  And so did you say the tier officers come on down to the

5  corridor when people are coming out of the tiers?

6  **A.**  Well, no.  The tier officers stay in the building.

7  **Q.**  One?

8  **A.**  You have one officer that is assigned to the corridor.  So

9  he will go out and stand in front of his building.

10  **Q.**  Uh-huh.

11  **A.**  If you were assigned to D Wing, when there's a release,

12  you go out and stand at G -- D Wing and vice versa with other

13  buildings.

14  **Q.**  Okay.  And besides those officers that come out of wings

15  during the mass movement --

16  **A.**  Um-hmm.

17  **Q.**  -- in the corridor, are there other officers who are just

18  assigned to the corridor?

19  **A.**  Yes, sir.  You have what's called S&Es.  I couldn't tell

20  you what S&E stands for but these S&Es, they're back and forth,

21  up and down the corridors, and doing other jobs inside the

22  corridor in the prison.

23  **Q.**  All right.  And -- And is it the responsibility of all the

24  officers who may be in the corridor to make random clothed-body

25  searches or just some of them?

1  **A.**    Yes.   Any officers can make a random body search.

2  Normally the officer that's assigned to your building when

3  you're coming out of the building, he's the one that searches

4  that particular building.

5       For instance, if I'm in D Wing and the D Wing officer is

6  outside that building, he searches the inmates coming out.

7  When we're coming from the yard, the officers in the corridor

8  may search any inmate when he's going down the corridor to

9  report to whatever building or wherever he's going.

10 **Q.**    If there's a release from the Wing area to the corridor --

11 I'm sorry -- to the yard, or to the chow hall or to work, do

12 all -- does everybody get searched?

13 **A.**    No, sir.

14 **Q.**    How many people -- If you come out, go to the yard, how

15 many people will get searched on the way?

16 **A.**    I guess there's --

17      **MR. LEWIS:**  Objection:  Calls for speculation; also

18 assumes a fact not in evidence, Your Honor.

19                  (Pause in proceedings.)

20      **MR. CUNNINGHAM:**  Let me rephrase it.

21      **THE COURT:**  To the extent the witness can testify from

22 his own personal experience of what he's saying, he may answer.

23 To anything else, the objection's sustained.

24      **MR. CUNNINGHAM:**  Okay.

25

MR. CUNNINGHAM:

Q.   In your experience, when -- when there's a release of a large number of prisoners from a given Wing or from the Wing you're in, how many of them would get searched?

A.   Well, it depends on the officer.  You know, some officers may, you know, let numerous inmates go by.  But then you have other officers that may stop numerous inmates, so it depends on how many inmates the officer wants to search.

Q.   And is it up to the officer -- As far as you know, is it up to the officer?

A.   As far as I know, yes, sir.

Q.   And do -- If you -- If the tier -- If the -- the Wing officer searches you, that's when you first come out?

A.   Yes, sir, and he may search you when you going back in.

Q.   Okay.  Now, would some other officer further down search you also?

A.   Well, normally if you've been searched coming out your building, if you go down the corridor and an officer wants to search, you can tell him, "I've been searched."  Sometimes they will accept it; sometimes they won't.

Q.   Okay.

                    (Pause in proceedings.)

BY MR. CUNNINGHAM:

Q.   And . . .  And in a -- in a ballpark or an average, say, in a month, during that time, those years while you were in

1  Soledad, how many times would you get searched -- random

2  clothed search in the corridor?

3  **A.**   Numerous of times.  I mean -- You said once a day.  It may

4  not be once a day.  Depends on who's in the corridor.

5      You can say maybe three to four times a week.

6  **Q.**   Um-hmm.  Is it fair to say that different officers do the

7  search in different ways?

8  **A.**   No, I wouldn't say that.  I would say that most of the

9  officers search in the same way.  I never had a -- a problem

10  with the way an officer would search me until Officer Abanico

11  started searching me.

12  **Q.**   Uh-huh.  What do they do -- What's a normal search?  Like

13  a non-Abanico search, how does it proceed?

14  **A.**   Well, they all proceed the same way.  Some officers --

15  I've been in searches where you were telling how we lean on the

16  wall.  Some officers would have you lean so far back you'd

17  almost fall.  You'd put your hands on the wall and you have to

18  step back.  You can step back to the point where just a little

19  notch might tilt you over.

20  **Q.**   Um-hmm.

21  **A.**   But that depends on the officers.  Officers like you say

22  will have one hand on your back while they search you with one

23  hand.  But they will always start at the top and work their way

24  to the lower back.

25  **Q.**   Start up around your neck.

1  **A.**   Yes, sir.

2  **Q.**   Uh-huh.  And they search all the way down you?

3  **A.**   Yes, sir.  They will search -- They will search arms,

4  legs, going down your body.

5  **Q.**   Um-hmm.  If they searched with one hand, is that because

6  they have --

7  **A.**   Yes, sir.

8  **Q.**   -- the elbow or the hand back over you?

9  **A.**   Yes, sir.

10  **Q.**   If they search with two hands, do they just dispense with

11  that?

12  **A.**   Yes.

13  **Q.**   Is there kind of way you know which way they're going to

14  do it or any particular habit a given officer has?

15  **A.**   In that -- In that respect, you -- again, it depends on

16  the officer.  You -- I knew all the officers, so their methods

17  was mostly the same.  Again, the only different that I ever see

18  or since I've been in prison, even up to now, was Abanico's

19  method.

20  **Q.**   Um-hmm.  And when they search your legs, do they go -- do

21  they -- how do they start?

22  **A.**   Well, they work their way down.  When it comes to your

23  groin area and all that, they sweep down your groin area and

24  keep going.  I've never had a officer that -- that lingered in

25  that area.

Q.    Uh-huh.  When they're doing with two hands, they go from the groin right down the leg?

A.    Yes, sir.

Q.    To the foot.

A.    Yes, sir.

Q.    If they do one hand, how do they do both sides of the leg?

A.    They do one hand if they holding you, or two hands sweep down the leg.  Sweep inside and sweep outside and move on.

Q.    All right.  And when they come up to the top of the thigh with two hands, do they go all the way to the groin where they touch your crotch?

A.    Sometime, yes.

Q.    Uh-huh.  And -- And would they do the one hand the same?

A.    Yes, sir.

Q.    And have you had -- Strike it.

      You said you never -- you only had a -- the way Abanico did it was different --

A.    Yes, sir.

Q.    -- from the way the other officers did it?

A.    Yes, sir.

Q.    What was the difference?

A.    Well, it was -- Abanico would linger in that area.  He would squeeze the testicles and sometimes squeeze the penis.

Q.    Okay.  And all . . .

      THE COURT:  Counsel, I don't mean to interrupt but you

1   indicated that you --

2         MR. CUNNINGHAM:  Yes.  I'm stopping right here, Judge,

3   with that.

4         THE COURT:  It's up to you.  It's your witness.  I

5   think you said you wanted to use him first for general --

6         MR. CUNNINGHAM:  I do.  I do.

7         THE COURT:  -- and then --

8         MR. CUNNINGHAM:  Let me just ask one further question.

9         THE COURT:  Proceed.

10  MR. CUNNINGHAM:

11  Q.   You were one of the people that collected signatures for

12  one of the petitions; right?

13  A.   Yes, sir.  I did a petition that had 90 signatures on it.

14  Q.   And that was in '07, June '07?

15  A.   Yes, sir.

16  Q.   Okay.  And when you got those signatures, did you question

17  all those procedures --

18  A.   Yes, sir.

19  Q.   -- as to -- as to whether they had, and did they all

20  affirm to you at least that they've been searched by Abanico --

21  A.   Yes, sir.

22  Q.   -- in the same way?

23         MR. LEWIS:  Objection:  Hearsay, Your Honor.

24         THE COURT:  Sustained.

25

1  **MR. CUNNINGHAM:**

2  **Q.**   That's what you learned from the petition when you asked

3  them sign the petition?

4  **A.**   I would never let anybody sign if they wasn't searched by

5  the --

6  **Q.**   Or they didn't tell you at least.

7          **MR. LEWIS:**  Objection, Your Honor.

8  **BY MR. CUNNINGHAM:**

9  **Q.**   True or false:  Didn't tell you; didn't make that claim.

10         **THE COURT:**  It's hearsay.  Sustained.

11         **MR. CUNNINGHAM:**  Okay.

12         **THE COURT:**  It jurors -- The jurors are instructed to

13  disregard the last question and answer.

14  **MR. CUNNINGHAM:**

15  **Q.**   During that time, those months from August of '06 to

16  September-October '07, to your knowledge, where was Abanico

17  assigned?

18  **A.**   D Wing Corridor Officer.  He would be the officer that was

19  assigned to that Wing but would go out in the corridor and

20  do -- do random searches.

21  **Q.**   Okay.  And the -- In the petition that you got together,

22  were those prisoners that signed it all from D Wing?

23  **A.**   Yes, sir.

24         **MR. CUNNINGHAM:**  Okay.  One moment, Judge.

25                        (Pause in proceedings.)

1    MR. CUNNINGHAM:  I have no further questions of the
2  witness at this time, Judge.
3    THE COURT:  All right.  There will be some
4  cross-examination, and it will be subject to recall before the
5  direct.
6    MR. LEWIS:  Thank you, Your Honor.
7                  **CROSS-EXAMINATION**
8  MR. LEWIS:
9  Q.   Good afternoon, Mr. Trask.
10 A.   How you doing, sir?
11 Q.   I want to ask a real quick question about some of the
12 testimony you gave.
13     I believe you said that . . . that some of the officers
14 mostly used the same methods, but they actually didn't; did
15 they?  You testified that some officers use one hands but other
16 officers use two hands.
17 A.   Yes, sir.
18 Q.   Those are two different methods; aren't they?
19 A.   If you want to call it two different methods.  What I
20 meant is, their method was different from Abanico.
21 Q.   Well, their method was actually different from each
22 other's method; wasn't it?
23 A.   The two methods is the only methods I know, sir.
24 Q.   So you're contending there's only three ways to search an
25 inmate with one hand, with two hands and Abanico's way?

**A.**   I don't know.  I'm saying the way -- You talking about my experience, so I --

**Q.**   So in your experience, you had -- you've been searched in multiple different ways; haven't you?

**A.**   I've been searched in the way that I just told you, three -- either two hands or one hand or the way Abanico searched me.

**Q.**   You said one time there was -- there was an arm in your back with their elbow?

**A.**   Sometimes.

**Q.**   So that's another way; isn't it?

   **MR. CUNNINGHAM:**  Objection:  He's arguing with the witness, Your Honor.

   **THE COURT:**  Overruled.

   **THE WITNESS:**  Sometimes when they had the arm in the back, that's when they would use the one hand.

**MR. LEWIS:**

**Q.**   But arm in a back is like this with a hand and then there's also an elbow.  So those are two different ways; correct?

**A.**   I don't know -- I don't know.  My back is to the -- to the officer.  My hands are on the wall.  I don't know if it's an arm or elbow sometimes.

**Q.**   But you just testified there's times when you used hands and times when you used elbows.

1  **A.**   Yes, sir.

2  **Q.**   Did they -- Let me ask the question.

3       Are you saying now you didn't actually know the search was

4  being done to you?

5  **A.**   I'm saying at different times, it could be the arm;

6  sometimes it could be a hand.

7  **Q.**   And other times, there could have been one hand and at

8  other times, it could have been two.

9  **A.**   Yes, sir.

10  **Q.**   You testified Officer Abanico conducted 20 clothed-body

11  searches on you between 2006 and 2008 while you were at a

12  Correctional Training Facility; correct?

13  **A.**   Yes.

14  **Q.**   You don't remember any of those searches; do you?

15  **A.**   No.  I remember one in particular.

16  **Q.**   What was that particular?

17  **A.**   That would be the night that he claimed that I threatened

18  to kill him, and I was sent to the hole.

19  **Q.**   And was that day on September 13th, 2008?

20  **A.**   September 13, 2007.

21  **Q.**   In actuality, he didn't perform that search; did he?

22  **A.**   Yes, sir, he did.

23  **Q.**   He did?

24  **A.**   Yes, sir.

25  **Q.**   Were you deposed in this matter?

1  **A.**   What's "deposed"?

2  **Q.**   Where you had a -- kind of a conversation with maybe

3  Mr. Quinn in my office where he asked you a series of questions

4  in front of a court reporter.  You were sworn an oath?

5  **A.**   Yes.

6  **Q.**   And your attorney was present; correct?

7  **A.**   No, he wasn't.

8  **Q.**   Your attorney wasn't present?

9  **A.**   No.

10  **Q.**   Were you given an opportunity to understand that you were

11  under oath and everything you said was the truth and the whole

12  truth?

13  **A.**   I don't remember if I was sworn in if that's what you're

14  asking.

15  **Q.**   Do you remember raising your right hand similar to what

16  you did right here?

17  **A.**   No, sir.

18  **Q.**   So is your testimony you were deposed before or weren't

19  deposed before?

20  **A.**   I don't know.  I did my testimony over the phone with just

21  me and a court reporter in a room with the officers.

22  **Q.**   And the court reporter was there taking down everything

23  she wrote?

24  **A.**   Yes, sir.

25  **Q.**   Did you have an opportunity to review that transcript

1  afterwards?

2  **A.**   No, sir.  I reviewed it in the last couple days but that's

3  the only time.

4  **Q.**   And so you are familiar with what you said at that time,

5  then.

6  **A.**   Yes, sir.

7  **Q.**   All right.  So I'm going to pull out an exhibit, if you

8  would give me a minute here.

9        **MR. LEWIS:**  Your Honor, I'm going to get Mr. Trask's

10  sealed deposition transcript.

11        **MR. CUNNINGHAM:**  It strikes me that this is beyond the

12  scope of where I wanted to cut it off.  I -- You know, he's

13  cross-examining but --

14        **THE COURT:**  Well, I think he's asking right now about

15  the -- the method of searches, which is what I think you --

16        **MR. CUNNINGHAM:**  That could be, but the particular

17  searches --

18        **THE COURT:**  Excuse me.  Let me finish, counsel.

19    You inquired about some of the details during your direct

20  examination so I think your objection will be overruled at this

21  time.

22        **MR. LEWIS:**  Your Honor, pardon my opening this.

23            (Pause in proceedings.)

24        **THE COURT:**  Are you going to mark that, counsel?

25        **MR. LEWIS:**  Your Honor, we could.  It's . . .  I

1   could, but I'm going to try to read from it and maybe we'll

2   mark it again.  If Mr. Trask is going to be up here again, we

3   can do it then as well.

4           THE COURT:  Well, if you're going to use it as an

5   exhibit and show it to the witness, I'll ask that it be marked.

6           MR. LEWIS:  I was going to try to use the ELMO so he

7   can see it.

8           THE COURT:  Miss Clark, do we have those on the

9   exhibit list?

10          THE CLERK:  I don't have an exhibit list.

11          MR. LEWIS:  The transcripts aren't in the exhibit

12  list.  They could be.  I could have this marked next in line.

13          THE COURT:  Why don't you?

14          MR. LEWIS:  Ma'am, I think it would be B.

15          THE CLERK:  B?

16          MR. LEWIS:  B for "bravo."

17       (Defendants' Exhibit B marked for identification)

18                       (Pause in proceedings.)

19          THE COURT:  I assume at this time, you indicated you

20  sealed it.  Do you move to unseal the deposition.

21          MR. LEWIS:  Yes, sir.

22          THE COURT:  Any objection?

23          MR. CUNNINGHAM:  I'm sorry.  I didn't hear.

24          THE COURT:  Counsel moved to unseal the exhibit.  Any

25  objection?

1      **MR. CUNNINGHAM:**  (Shaking head.)

2      **MR. LEWIS:**  And pardon me, Your Honor, it's going to

3  take a little while to warm this up.

4      **MR. CUNNINGHAM:**  It doesn't seem necessarily right

5  that he can put the text up on the screen before he identifies

6  some passage that is relevant in cross-examination.

7      **THE COURT:**  All right.  Why don't we go ahead and just

8  lay a foundation.

9      **MR. LEWIS:**  Yes, Your Honor.

10      **MR. CUNNINGHAM:**  And it also seems to me if he's going

11  to quote from the deposition, that the -- it's one thing for it

12  to be put up here, it's another thing for the witness to have a

13  copy to read.

14      **THE COURT:**  Perhaps you can give it to the witness to

15  see what you're talking about.

16      **MR. LEWIS:**  Yes, Your Honor.

17     May I approach, Your Honor?

18      **THE COURT:**  Please.

19      **MR. QUINN:**  For the record, I'm now showing Mr. Trask

20  what was a sealed version of his deposition.

21  **MR. LEWIS:**

22  **Q.**  Mr. Trask, do you see this cover?  And could you read that

23  for me, please.

24  **A.**  Deposition of Kenneth Trask.

25  **Q.**  Okay.  And the date here is Friday, March 29th, 2013.

1    **A.**    Yes, sir.

2    **Q.**    Having read this, do you recall maybe the conversation we

3    mentioned where you were on the phone and Mr. Quinn was on the

4    other side and there was a court reporter there?

5    **A.**    I don't know if it was Mr. Quinn was on the other side,

6    but I remember my deposition being taken.

7    **Q.**    So you remember being deposed on this day.

8    **A.**    Yes.

9    **Q.**    All right.  Now, I asked you about searches that were done

10   by Mr. -- by Officer Abanico and you said that he searched you

11   on November 18th, 2007, I believe it was?

12   **A.**    No.  September 13th, 2007.

13   **Q.**    I'm sorry.  September 13th, 2007.  I apologize for that.

14        I'm now going to show your deposition testimony.

15            **MR. CUNNINGHAM:**  Again, you know . . .

16                    (Pause in proceedings.)

17            **MR. CUNNINGHAM:**  Judge, he's exhibiting the transcript

18   to the jury.

19            **THE COURT:**  All right.  Hold on everybody.

20        Is this for impeachment, counsel?

21            **MR. LEWIS:**  It is, Your Honor.

22            **THE COURT:**  All right.  Then why don't you take -- Are

23   you moving this into evidence at this time.

24            **MR. LEWIS:**  We would move it into evidence, Your

25   Honor.

1          **THE COURT:**  Any objection to this portion being moved

2     into evidence?

3          **MR. CUNNINGHAM:**  Which portion, Judge?  I think that's

4     the problem.

5          **THE COURT:**  Well, do you have a copy of the

6     transcript, counsel?

7          **MR. CUNNINGHAM:**  No.

8          **THE COURT:**  Well, why doesn't counsel have a copy of

9     the transcript?

10          **MR. LEWIS:**  Your Honor, Mr. Cunningham was given --

11    was given a copy of his own client's deposition.  It's not my

12    responsibility to bring it to trial for him.

13          **MR. CUNNINGHAM:**  No, I was not given a copy of it.  I

14    was --

15          **THE COURT:**  All right.  Hold on.

16       Ladies and gentlemen, we're going to take our afternoon

17    break a little bit early this afternoon.

18       Please return at 2:35 promptly and we'll resume for the

19    rest of the afternoon.  Thank you.

20              (The jury was excused from the courtroom.)

21          (Open court, jury not present, at 2:21 PM:)

22          **THE COURT:**  All right.  Thank you.

23       Oh, hold on.

24                   (Pause in proceedings.)

25          **THE CLERK:**  You may be seated.

1    **THE COURT:**  During the deposition, where were you,

2  Mr. Cunningham?

3    **MR. CUNNINGHAM:**  I was in the Attorney General's

4  Office with Mr. Quinn and we were on the phone.

5    **THE COURT:**  The two of you were on the phone.  Your

6  client -- Mr. Trask; is it?

7    **THE WITNESS:**  Yes, sir.

8    **THE COURT:**  Was at -- was at the institution and this

9  was done with Mr. Trask and the reporter.  The two counsel were

10  together, just so the Court is clear.

11    **MR. LEWIS:**  Yes, sir.

12    **THE COURT:**  A transcript was prepared.

13    Now, was that transcript -- Do each side have a copy of

14  this transcript?

15    **MR. CUNNINGHAM:**  No.

16    **MR. LEWIS:**  Your Honor . . .

17    **MR. CUNNINGHAM:**  Judge, I do not have a copy.  I

18  didn't buy the transcript.  I didn't spend the extra 300 bucks

19  to get that one.  And I have a few pages of it that were

20  included in the exhibit.

21    I would -- I'm prepared to deal with that reality, Judge,

22  in a trial, but I've never seen a transcript text put up on the

23  screen for the jury to read as opposed to a witness being asked

24  if he was asked the questions and gave the answers from the

25  transcript when he can see the transcript in front of him.  I

1  don't think that we needed a copy for that to be accomplished.

2      **MR. LEWIS:**  Your Honor, it's -- This is the easiest

3  way to get the information out for all parties concerned.

4  It's -- We're using the courtroom technology that we notified

5  the Court we'd be using and allowed to use it.  We've tested

6  the system.  We have it up.  This is direct impeachment

7  evidence about the statement he read.

8      I know Mr. Cunningham didn't want his witness to go this

9  far but he opened the door.

10     **THE COURT:**  Here's what we're doing:

11     Objection's overruled.  Counsel can put up the transcript

12 onto the -- to the overhead and you can ask the witness

13 questions regarding it.

14     But what Mr. Cunningham indicated to me was that he was

15 going to basically use Mr. Trask for general overlay.  I did

16 interrupt him at one point during his direct testimony and say,

17 "Look, you seem to be going a little further."  Mr. Cunningham

18 indicated he was going to stop.

19     My understanding is that Mr. Cunningham is going to then

20 redirect when it comes to the individual claims against

21 Correctional Officer Abanico.  And so to the extent that you

22 move into those individual claims, what I'd ask is we go ahead,

23 let Mr. Cunningham bring him on back to the stand to testify on

24 direct.  You can impeach him then with this information.

25     As to what he talked about, some general activities or

1  the -- his understanding of how daily prison life runs and how

2  people are searched, you obviously can impeach him on that at

3  this time.

4      Now, I'm going to say this:  If for some reason

5  Mr. Cunningham does not put Mr. Trask back on, you can recall

6  him and continue with your impeachment to the extent that he's

7  already testified.

8      **MR. LEWIS:**  Thank you, Your Honor.  That was my

9  primary concern.

10     And I don't mean to take away anything from

11 Mr. Cunningham's testimony (sic).

12     **THE COURT:**  I --

13     **MR. LEWIS:**  I appreciate that, Your Honor.  That's

14 exactly what my concern was.

15     **THE COURT:**  So one way or another, you'll obviously be

16 able to impeach him to the extent you think it's appropriate.

17     But at this juncture, why don't we just focus on the

18 general information that was elicited from this witness.  If

19 you wish to impeach him, go ahead and then obviously reserve

20 your right to then go -- go into detail as to his own personal

21 claims against Abanico.

22     **MR. LEWIS:**  Yes, Your Honor.  We can wrap this one up

23 real quick with the jury.

24     **THE COURT:**  Good.

25     **MR. CUNNINGHAM:**  Thank you, Judge.

1    THE COURT: We'll start back up at 2:35.

2    MR. LEWIS: Yes, Your Honor. Thank you.

3         (Recess taken at 2:26 p.m.)

4         (Proceedings resumed at 2:42 p.m.)

5    (Proceedings were heard out of the presence of the jury:)

6    THE COURT: Counsel, I would just briefly direct the

7    attorneys' attention to Federal Rules of Evidence 613:

8    (reading)

9         "Witness' Prior Statement.

10        "(a) Showing or Disclosing the Statement During

11        Examination. When examining a witness about the witness'

12        prior statement, a party need not show it or disclose its

13        contents to the witness. But the party must, on request,

14        show it or disclose its contents to an adverse party's

15        attorney."

16   So I believe showing it on the overhead is up to counsel's

17   discretion in this matter, and I'll allow you to put it on the

18   overhead; however, prior to doing that, you'll need to show the

19   relevant portion to plaintiffs' counsel.

20   MR. LEWIS: Very well, Your Honor. Thank you.

21   MR. CUNNINGHAM: Judge, doesn't Rule 608 preclude the

22   publication of the text, impeachment text, certainly the entry

23   into evidence?

24   MR. LEWIS: And, Your Honor, not only is it

25   impeachment evidence, it's also a statement by a party

1  opponent.  So, therefore, it can be used for any purpose

2  allowed under FRE.  So it's not exactly controlled by the 600

3  series.

4       **THE COURT:**  This is neither reputation nor opinion

5  evidence nor is it specific instances of conduct.  So that

6  motion will be overruled.

7       All right.

8       **MR. LEWIS:**  Yes, Your Honor.  Thank you.

9       **THE COURT:**  Lisa, bring them back in.

10  (Proceedings were heard in the presence of the jury:)

11       **THE CLERK:**  Please be seated.

12       Okay.  We're back on the record in Civil 07-2809, Ivan

13  Cleveland versus Ben Curry.

14       **THE COURT:**  Thank you.

15                    (Pause in proceedings.)

16       **THE COURT:**  Just so that the jury understands,

17  Mr. Cunningham asked to bifurcate or split the testimony of

18  this witness into a general area, and then afterwards he'll

19  come back on to testify to any personal experiences he's had.

20       I've asked defense counsel to also sort of limit his

21  cross-examination to follow that particular way of presenting

22  this evidence.

23       So it will be a little bit disjointed, so I ask you to

24  bear with us.  Thank you so much.

25       **MR. LEWIS:**  Thank you, Your Honor.

1  Q.   Mr. Trask, you had commented that you believed that when I

2  asked you how many searches Officer Abanico had conducted, you

3  said approximately 20 searches between 2006 and 2008; correct?

4  A.   Yes, sir.

5  Q.   Do you remember the date of any of those specific

6  searches?

7  A.   The only date that I remember is the date that I

8  mentioned.

9  Q.   And was that date 9/13/2008?

10 A.   9/13/2007.  It was the day I went to the hole.

11 Q.   All right.  And do you recall that you had been deposed in

12 the case and there was a transcript made of that?

13 A.   Yes, sir.

14 Q.   I'm now going to show you part of that transcript from

15 your deposition.  I've shown this to opposing counsel.

16 Specifically I'm calling your attention to page 10.

17      Can you see that or do you want me to zoom in a little

18 closer?

19 A.   I have a copy of it.

20 Q.   All right.  So I'd like you to look at page 10.

21      **THE COURT:**  Of defendants'?

22      **MR. LEWIS:**  Of Defendants' Exhibit Bravo, Your Honor,

23 yes, B.

24      **THE COURT:**  Okay.

25

1    BY MR. LEWIS:

2    Q.   And I'd like you to look at page 14 -- oh, I'm sorry, line

3    14:  (reading)

4         "Q.   And you don't remember -- do you remember any

5         particular date -- the specific dates when those searches

6         occurred?

7         "A.   No.  Only date I remember is -- will be September 13,

8         2008, when I was accused of threatening his life and was

9         put in the hole."

10        You testified that Officer Abanico conducted a search on

11   you on September 13th, 2008 or 2007; correct?

12   A.   Yes, sir.

13        MR. CUNNINGHAM:  Well, objection.  That misstates the

14   testimony.

15        THE COURT:  That's correct.  I believe, Counsel, the

16   testimony was that this witness said 2007 and you've been

17   indicating that it was 2008.

18        MR. LEWIS:  My apologies.

19   Q.   You believe he conducted the search in September 13th,

20   2007?

21   A.   Yes.  I have documents here where I was locked up.

22   Q.   Was that the date that he allegedly threatened your life

23   and you were put in the hole afterwards?

24   A.   No.  That was the date he said I threatened his life.

25   Q.   Oh, I'm sorry.  That you alleged that he threatened your

1   life -- or his life -- that you threatened his life and then he

2   put you in the hole or he caused you to be put in the hole?

3   **A.**   Yes, sir.

4   **Q.**   In your deposition testimony it says here on page 10, it

5   says 2008.  Could that have been a mistake that you made --

6   **A.**   Yes, sir.

7   **Q.**   -- on that day?

8       So do you believe that really this testimony right here

9   where it says 2008 really was supposed to be 2007?

10  **A.**   Yes, sir.

11              **THE COURT:**  Can the jury see that?  Okay.

12              **MR. LEWIS:**  Am I in your way?  I apologize.

13              **A JUROR:**  Yes.

14              **MR. LEWIS:**  I am in your way?  Okay.  I'll try to work

15  the best I can around this.  That's not going to work.

16  **Q.**   All right.  So if you can see that this right here 2008

17  should be 2007 in your mind; correct?

18  **A.**   Yes, according to when I went to the hole.  2008 was not

19  the date.  It was 2007 --

20  **Q.**   2007.

21  **A.**   -- September 13th, 2007.

22  **Q.**   All right.  But you testified that on that date in your

23  mind, September 13th, 2007, Defendant Abanico was actually the

24  one who conducted the clothed body search of you after that

25  incident; correct?

1  **A.**   There was two searches done that day.  There was --

2  **Q.**   Well, I'd like to -- let me go here (indicating).

3      I'm calling your attention now to page --

4      **THE COURT:**  Wait.  Allow the witness to answer the

5  question.

6      **MR. CUNNINGHAM:**  I think he's going pretty far into

7  it, Judge.

8      **THE COURT:**  Go ahead.

9      **THE WITNESS:**  There was two searches done that day.

10  One search was done when I was accused of threatening his life,

11  clothing body search was done by Officer Abanico; and I was

12  taken to what they call the cage, and I was strip-searched and

13  searched again.

14  **BY MR. LEWIS:**

15  **Q.**   And you think that -- and it's your testimony that

16  Officer Abanico conducted that clothed body search; correct?

17  **A.**   Yes, sir.

18  **Q.**   I'd now like to call your attention to page 15 of the same

19  transcript, specifically line 11.  It says:  (reading)

20      **"Q.**  Did Abanico conduct either of those searches you

21      mentioned that you were searched up against the wall?  Did

22      Abanico conduct either one of those searches?

23      **"A.**  Abanico was present.  And I'm not -- I don't -- he

24      didn't do the searching.  He was present while another

25      officer in the corridor did the initial search, the

1          clothing body search."

2    **A.**    Did I --

3    **Q.**    Is that your testimony?

4    **A.**    Again, sir, that, "I'm not -- I don't," was I didn't

5    remember exactly who -- if he was present or he personally did

6    the search.  So -- but, yes, he was there and he could have

7    done the search.  That's why I said, "I'm not," because I

8    wasn't sure or not if he was the one that conducted the search;

9    but I know two body searches was conducted on me that day.

10   **Q.**    But you say here:  (reading)

11            "He was present while another officer in the corridor

12        did the initial search, the clothed body search."

13   So he didn't actually conduct the search on you on

14   November 13th -- I'm sorry, on September 13th, 2007, did he?

15   **A.**    Again, sir, I can't be for sure if it was him or another

16   officer that conducted the search.  It was really chaotic that

17   night because I was accused of threatening his life.  So I

18   really can't remember.

19            **MR. LEWIS:**  No further questions, Your Honor.

20            **THE COURT:**  All right.  Thank you.

21        Brief redirect?

22            **MR. CUNNINGHAM:**  Thank you, Judge.

23            **THE COURT:**  Remember, we're just talking now in

24   general terms.  You're going to have another opportunity as you

25   indicated.

1          MR. CUNNINGHAM:  Yes.  Yes.  And for the most part, I

2    will leave that, but I need to ask.

3                    **REDIRECT EXAMINATION**

4    BY MR. CUNNINGHAM:

5    **Q.**   You are as certain today that the date of that -- of

6    the -- when you went to the hole, whether he searched you or

7    not or was just present was in '07, not '08; right?

8    **A.**   I'm positive.

9    **Q.**   How do you know that?

10   **A.**   I have the paperwork where -- the 114 Lockup Order that

11   shows that I was locked up in the hole September 13th, 2007.

12   **Q.**   Okay.  And was it '08 when you got out of the hole?

13   **A.**   Yes, sir.

14   **Q.**   How long were you in the hole?

15   **A.**   For eight months.

16   **Q.**   Then what happened?

17   **A.**   I was transferred to another prison.

18   **Q.**   Was there ever a hearing held on the charge?

19          **THE COURT:**  This is going beyond --

20          **MR. CUNNINGHAM:**  All right.  We'll leave that then.

21   Thank you.

22          **THE COURT:**  -- the scope of cross-examination.

23          **MR. CUNNINGHAM:**  Okay.

24          **THE COURT:**  That's with leave to go into that if it's

25   relevant when you recall him on direct.

1    **MR. CUNNINGHAM:**  Thank you.

2    **Q.**   All right.  Counsel said, well, it turns out there's all

3    these different ways of searching; with the hand, without the

4    hand, with one hand, with two hands.  What are the ways that

5    you've been searched?

6    **A.**   The three ways that I mentioned.  I said it was just two

7    different ways, but either with the hand to the back or the

8    elbow to the back.

9    **Q.**   Let me put it this way:  Leave out the -- the third way

10   being the way Abanico searched you; right?

11   **A.**   Yes, sir.

12   **Q.**   Leave that out of it.  Just talk about how everybody else

13   searched you.

14   **A.**   Then I would say that would be a whole different way.  It

15   would be one other way.

16   **Q.**   What would that be?

17   **A.**   And that would be starting from the top, working to the

18   bottom.

19   **Q.**   But what about the two-hands/one-hand thing?

20   **A.**   Sometimes officers use one hand, and sometimes they use

21   two hands, but I wouldn't say it was two different methods.  If

22   we talk about methods, that would be like saying one officer

23   started at the legs and worked his way up or he started at the

24   waist and worked his way up.

25        When I say one way, I mean some officers used elbow in the

1  back, some officers used their hand in the back, and that's the

2  only way that I knew.

3  **Q.**   And then is the search always from the top down?

4  **A.**   Yes, sir.

5  **Q.**   And it goes down a leg and up a leg if it's one hand?

6  **A.**   Yes, sir.  Well, what they would do, they would work their

7  way down one side of the body, then they'd work their way down

8  the other side of the body.

9  **Q.**   Okay.  So if he searches you with only one hand and the

10 other hand or arm is in the back --

11 **A.**   Yes, sir.

12 **Q.**   -- he always goes from the top down both the inside and

13 the outside of the leg?

14 **A.**   Yes, he does.

15 **Q.**   Okay.

16 **A.**   He works his way down with one hand, again on one side of

17 the body.  Then work his way down on the other side of the

18 body.

19 **Q.**   Okay.  So in your experience he doesn't work his way up

20 the leg into the groin?

21 **A.**   No.

22 **Q.**   When he starts at the top of the leg, does he -- top of

23 the inside of the leg, does it come in contact with your groin?

24 **A.**   When you're talking about "he," who are we talking about?

25 **Q.**   Any officer.  A regular officer.  A normal officer.

1   A.   Briefly sweeping and moving on.  No lingering in that

2   particular area.

3   Q.   But do you normally get some physical contact that you

4   could feel that would represent detection of anything that

5   might be sewn into the underpants, for example?

6   A.   No.  I never had an officer squeeze my penis or my

7   scrotum.

8   Q.   Okay.  But what about an officer whose hand would come

9   right up to the top of your leg?

10  A.   It would be -- it would be a brief sweep to see if there

11  was any contraband and move on.

12  Q.   And that's what I'm talking about.  What you're calling a

13  brief sweep, when it was done in a normal fashion, would -- in

14  your mind, was it sufficient to detect whether there was

15  anything in your underpants?

16       MR. LEWIS:  Objection, Your Honor.  It calls for

17  speculation, Your Honor.  He's not conducting the search on

18  himself.  He's not a correction officer, and he's not licensed

19  or POST certified to give this testimony.

20       THE COURT:  Well, he can testify as to what happened

21  to him and what he felt.

22  BY MR. CUNNINGHAM:

23  Q.   Sir, did you ever -- well, never mind.

24       I'm asking that question.  In your mind when -- the sweep

25  of the crotch area, okay, including both the genitals and the

1  groin, the space between the legs behind the genitals --

2  A.   Right.

3  Q.   -- would they normally put their hand through there in

4  such a way as, in your mind, if there was something hidden in

5  there, they would get it, they would detect it?

6  A.   Let me try and explain where everybody can understand.

7  I've never had an officer search me that way and use his

8  fingers, right, in that area.  I've had an officer who swept

9  that area using his palms --

10  Q.   Okay.

11  A.   -- you know, to see if any contraband was there.  I've

12  never had an officer that lingered in that area, you know,

13  caressing my private parts with his fingers.

14  Q.   Okay.  Have you ever had an officer grab your private

15  parts and squeeze it?

16  A.   No, sir, other than Officer Abanico.

17  Q.   Either the penis or the scrotum, testicles?

18  A.   No, sir, other than Abanico.

19  Q.   All right.

20        THE COURT:  You know, Counsel, maybe I misunderstood

21  what's going on.  My understanding was that you just wanted to

22  talk to this witness at this juncture about the general conduct

23  of guards and basically daily prison life, and then you were

24  going to call him back with the other ones.  It seems like

25  you're sort of continuing about the questions, personal

1    questions.

2        MR. CUNNINGHAM:  I meant that as the general, Judge,

3    that what is the technique that he's used to from other

4    officers; and, you know, it does trench on the other subject

5    matter.  I'm not going to go any further with it at this point.

6        THE COURT:  All right.  Any further questions?

7        MR. CUNNINGHAM:  Wait just a moment, Judge.

8            (Pause in proceedings.)

9        MR. CUNNINGHAM:  No further questions.  Thank you,

10   Mr. Trask.

11       THE COURT:  All right.  With the understanding that

12   you get to cross-examine later on.

13       MR. LEWIS:  Yes, Your Honor.  We'll reserve our right

14   to cross-examine at a later date.

15       THE COURT:  All right.  Thank you.

16       MR. LEWIS:  Thank you, Your Honor.

17           (Witness excused subject to recall.)

18       THE COURT:  Your next witness, Counsel?

19       MR. CUNNINGHAM:  Our next witness is Ivan Cleveland,

20   Judge.

21       THE COURT:  All right.

22       THE CLERK:  Mr. Cleveland, if you'll please come take

23   the witness stand.  Will you stand and raise your right hand?

24       THE WITNESS:  Yes, ma'am.

25

1    **IVAN VERNORD CLEVELAND**,

2    called as a witness for the Plaintiffs, having been duly sworn,

3    testified as follows:

4         **THE WITNESS:**  Yes, ma'am.

5         **THE CLERK:**  Please be seated.

6         **THE COURT:**  Good afternoon, Mr. Cleveland.

7         **THE WITNESS:**  How you doing, sir?

8         **THE CLERK:**  Please state your full name for the Court

9    and spell your last name.

10        **THE WITNESS:**  Ivan Vernord Cleveland,

11   C-L-E-V-E-L-A-N-D.

12        **THE CLERK:**  Thank you.

13                    **DIRECT EXAMINATION**

14   BY MR. CUNNINGHAM:

15   **Q.**   Mr. Cleveland, are you a prisoner in the CDCR?

16   **A.**   Yes, sir.

17   **Q.**   And where are you housed these days?

18   **A.**   B Wing 127, CTF Central.

19   **Q.**   And CTF Central, that's Soledad; right?

20   **A.**   That's correct.

21   **Q.**   And what is Central the CTF as opposed to anything --

22   **A.**   California Training Facility.

23   **Q.**   Wait for my question.  Okay?

24   **A.**   Okay.

25   **Q.**   What's the Central part?  What does that refer to?

1  **A.**  I don't have any idea about that.

2  **Q.**  Are there other parts, like --

3  **A.**  Yes.

4  **Q.**  -- South, West, East?

5  **A.**  (Nods head.)

6  **Q.**  But this is Central, this is one self-contained unit; is

7  that fair?

8  **A.**  Yes, sir.

9  **Q.**  As Mr. Trask described it with that long corridor and the

10  different wings and the other places coming off the corridor?

11  **A.**  Yes, sir.

12  **Q.**  That's where you were living in 206 -- 2006 and 2007?

13  **A.**  Yes, sir.

14  **Q.**  And, all right, are you living in a different wing now

15  than you were then?

16  **A.**  Yes, sir.

17  **Q.**  What wing were you living in then?

18  **A.**  B Wing 127.

19  **Q.**  Okay.  And at that time were you familiar with the

20  defendant, Officer Abanico?

21  **A.**  Yes, sir.

22  **Q.**  And was he assigned to the wing you were living in?

23  **A.**  No.  Not to my knowledge he wasn't.

24  **Q.**  Okay.

25  **A.**  He wasn't assigned to F Wing.

1   **Q.**   You weren't assigned there?

2   **A.**   I was in F Wing at the time, 2006.

3   **Q.**   Oh, I'm sorry.  I thought you said --

4   **A.**   I'm in B Wing now.

5   **Q.**   B Wing now, okay.

6         And he was not an officer, a wing officer, at that time?

7   **A.**   No.

8   **Q.**   Okay.  Where did you first encounter Officer Abanico?

9   **A.**   Personally with my own experience?

10  **Q.**   Yes.

11  **A.**   2006.

12  **Q.**   Okay.

13  **A.**   In the hallway.

14  **Q.**   Okay.

15  **A.**   Corridor.

16  **Q.**   In the corridor?

17  **A.**   Yes.

18  **Q.**   And what were the circumstances?  What happened?

19         **THE COURT:**  Let me just be clear.  I'm sorry.

20      Mr. Cleveland, when you say "the corridor," you're

21  referring to that long corridor that Mr. Trask testified he

22  said was about a quarter mile long and that the different wings

23  spilled out into that corridor; is that correct?

24         **THE WITNESS:**  Yes, sir.

25         **THE COURT:**  All right.  Thank you.

**BY MR. CUNNINGHAM:**

Q.   Okay.  And you encountered him where?  He wasn't working in the unit you were living?

A.   No, sir.

Q.   So you encountered him in the corridor?

A.   Yes, sir.

Q.   And how did that come about?

A.   On my way to chow I was pulled over, stopped by Officer Abanico, and told to get against the wall.

Q.   Uh-huh.  And had you heard anything about him before that occasion?

A.   Yes, sir.

Q.   Okay.  Well, what kind of stuff had you heard?

A.   I had heard that --

        **MR. QUINN:**  Objection.  Hearsay.

        **THE COURT:**  Sustained.

**BY MR. CUNNINGHAM:**

Q.   Had you heard other prisoners talk about him as somebody who did unusual searches or wrongful searches?

        **MR. QUINN:**  Objection.  Hearsay.

        **THE COURT:**  Sustained, Counsel.

        **MR. CUNNINGHAM:**  Okay.

        **THE COURT:**  You have to have a basis for the hearsay testimony.

        **MR. CUNNINGHAM:**  All right.  I mean, I'm asking for

1    the witness' state of mind, Judge, as opposed to whether the

2    things he was told were true.

3             **THE COURT:** There's a way to phrase that, Counsel.

4             **MR. CUNNINGHAM:** Very well.

5   **Q.** When you -- strike it.

6      You had heard about him, correct, when he pulled you over

7    the first time?

8   **A.** Yes, sir.

9   **Q.** And had you had any other interaction with him in any

10   other circumstances before that day?

11   **A.** No, sir.

12   **Q.** And when he pulled you over on that day, what happened?

13   **A.** I was told to put my hands up against the wall. I

14   complied. I was told to bring my legs back. I complied. Come

15   back further. I complied.

16   **Q.** What was, I'm sorry, the last thing?

17   **A.** Put my legs back further.

18   **Q.** Further.

19   **A.** Yes.

20   **Q.** Uh-huh.

21   **A.** Where my body position would be where my buttocks was

22   sticking out further.

23   **Q.** Okay.

24   **A.** I complied.

25      Officer Abanico went into pulling my waistband to my pants

1    back to my buttocks, looked inside to see my buttocks, snapped

2    them back.  Put his elbow on my back.  Went to the inner

3    thighs, both inner thighs, grabbed the penis, squeezed; and

4    grabbed the genitalia, the testicles, and squeezed.

5         At that time I came off of the wall, and I squared off on

6    him really.  And I said, "Man, you're not supposed to be

7    touching me like that."

8         He says, "Sir, sir, get back against the wall."

9         I said, "Listen, man, you're not supposed to be touching

10   me like that."  I said, "That's an inappropriate way of

11   touching me."  I said, "I'm not letting you touch me like

12   that."

13   Q.   Okay.  Was there another officer present when this was

14   happening after you came off the wall?

15   A.   At that -- I'm not for sure.  If it was, he wasn't within

16   the area right there.  He was about 5 or 6 feet away facing the

17   inmates walking back and forth, but I'm not for sure how close

18   he was; but there's usually always officers present but, you

19   know, at that time, you know, but I'm not for sure the distance

20   of the officer.

21   Q.   Okay.  All right.  And then you said, "You're not supposed

22   to be touching me that way."

23   A.   Yes.

24   Q.   What did he say?

25   A.   He said, "Sir, get back against the wall.  Sir, get back

1  against the wall."  He always says "sir."

2  **Q.**   And then what happened?

3  **A.**   I got back against the wall after asking him not --

4  telling him -- not asking, telling him he shouldn't be touching

5  me that way.  He put his elbow back on my back, proceeded with

6  the search, squeezed again, and then let me go.

7  **Q.**   And did you say anything more to him then?

8  **A.**   At that moment I can't remember if I did or not.  It was

9  2006 and, you know, I know I went to a sergeant.

10  **Q.**   Right then?

11  **A.**   Yes.  I left him and went directly to a sergeant.

12  **Q.**   Okay.  Who was that sergeant?

13  **A.**   If I'm not mistaken, it was Sergeant Randall.

14  **Q.**   And what did you tell Sergeant Randall?

15  **A.**   I complained about what had just happened to me.

16        **MR. QUINN:**  Objection.  Hearsay.

17        **THE COURT:**  Overruled.  It's what he testified to.

18        **THE WITNESS:**  Yeah, I complained about what had just

19  happened to me to Sergeant Randall; and I told him to the

20  extent of it, and told him that I had been touched in this

21  manner, that I'd been groped and fondled by the CO.

22  **BY MR. CUNNINGHAM:**

23  **Q.**   And did he respond?

24  **A.**   Yes, he did, sir.

25  **Q.**   What did he tell you?

1          MR. QUINN:  Objection.  Hearsay.

2          MR. CUNNINGHAM:  Again, it's this witness' state of

3   mind what he was told, not whether the officer -- you know,

4   we're not trying to prove anything true or false from somebody.

5          THE COURT:  There's a way of asking these questions,

6   Counsel.  As posed, the objection is sustained.  Move on.

7          MR. CUNNINGHAM:  All right.

8   Q.   Did Sergeant Randall tell you he would do anything about

9   it?

10         MR. QUINN:  Objection.  Hearsay.

11         THE COURT:  Sustained.

12         MR. CUNNINGHAM:  I'm not following you, Judge.  All

13  right.

14         THE COURT:  You're eliciting from this witness the

15  statements of another person.  That is hearsay, Counsel.

16         MR. CUNNINGHAM:  Well, Judge, I'm not trying to prove

17  those statements are true.

18         THE COURT:  Proceed.

19         MR. CUNNINGHAM:  All right.

20  Q.   After your meeting with Sergeant Randall, did you do

21  anything else to follow up on this complaint -- on your

22  complaint about Abanico's search?

23  A.   Yes, sir.

24  Q.   What did you do?

25  A.   First I put together a grievance, a class action

1    grievance, because, like I had said before, I had already been

2    told about the incidents with other inmates.  So I put together

3    a grievance on my own.  I went out to the Administrative Yard,

4    and I asked anyone that had ever been searched inappropriately

5    or fondled by this officer to sign this grievance; and I

6    stipulated that, "If you have not, do not sign this grievance."

7    **Q.**   All right.  And showing you -- if I could approach,

8    Judge -- what's been previously marked as Plaintiffs' Exhibit

9    Number 1?

10         **THE COURT:**  Mr. Quinn, do you have a copy of the

11   exhibits?

12         **MR. QUINN:**  I believe so.

13         **THE COURT:**  All right.  We're marking at this time,

14   previously marked already is Plaintiffs' 1.

15        (Plaintiffs' Exhibit 1 marked for identification)

16                        (Pause in proceedings.)

17         **MR. QUINN:**  Your Honor, before we go down the road of

18   questioning, we request a sidebar, just a brief sidebar, to

19   address Exhibit 1.

20         **THE COURT:**  All right.

21         (Sidebar conference heard but not reported.)

22         **THE COURT:**  Madam Reporter, we'll put that sidebar on

23   the record at the end of today's testimony.

24   **BY MR. CUNNINGHAM:**

25   **Q.**   So the document there, does it have a number on it, a

1 serial number or some stamped number toward the top there?

2 **A.** Case number for this or a log number?

3 **Q.** Case. I think it's case.

4 **A.** You have a case number. You have a log number. The case

5 number is for the case and the log number is for the appeal.

6 Here's the appeal number right here (indicating).

7 **Q.** This is right here (indicating).

8 **A.** That's the log number.

9 **Q.** Okay. The log number?

10 **A.** Yes, it does, sir.

11 **Q.** And you were -- you assembled the whole document; correct?

12 **A.** Yes, sir.

13 **Q.** You wrote the body of the first several pages before the

14 signatures; is that it?

15 **A.** Yes, sir.

16 **Q.** And you had the interaction with the other prisoners that

17 you described in the preparation of the document; right?

18 **A.** 127 of them.

19 **Q.** Okay. And then what did you do with --

20 **MR. QUINN:** Objection, Your Honor. That's the subject

21 of the sidebar.

22 **THE COURT:** All right. Counsel, limit your inquiry

23 just as to what he did, not the parties that he interviewed.

24 **MR. CUNNINGHAM:** Right.

25 **Q.** What did you do with the document once it was completed?

1  **A.**   I submitted it to the appeals coordinator.

2  **Q.**   Okay.  And....

3                    (Pause in proceedings.)

4  **BY MR. CUNNINGHAM:**

5  **Q.**   What's the first response that you got from -- strike it.

6  I'm sorry.

7        Who did you submit it to, if you recall?

8  **A.**   I submitted it to the coordinator; but if I'm not

9  mistaken, it ended up in Sergeant Randall's hands somehow, one

10  of the sergeant's hands.

11  **Q.**   I'm sorry.  You said you submitted --

12  **A.**   I submitted it.  By the appeals process we submit it to

13  the appeals coordinator.

14  **Q.**   I see.  Okay.

15  **A.**   And they give it to -- designate it to either a sergeant

16  or a lieutenant to handle the process.

17  **Q.**   All right.  And then did you get interviewed by

18  Sergeant Randall about it?

19  **A.**   Yes, sir, I did.

20  **Q.**   Okay.  And did he prepare any written report about it to

21  your knowledge?

22  **A.**   At this time, no, not to my knowledge.

23  **Q.**   Let me give you this exhibit as well.  It's marked 6A1 for

24  identification, Plaintiffs' 6A1.

25  **A.**   (Witness examines document.)

1   **Q.**   After you spoke to him about it, spoke to Randall about

2   it, what happened next with respect to this grievance?

3   **A.**   It was partially granted.

4   **Q.**   And who partially granted it, if you know?

5   **A.**   All I can see here is the signature of a staff which I

6   can't understand.  There's another sergeant and I think it says

7   Keane or something.

8   **Q.**   And are you getting that from the pages that are in the

9   exhibit I just showed you?

10   **A.**   Yes, sir.

11   **Q.**   Okay.  And after the first -- the first set of pages in

12   the exhibit is the same petition that's Exhibit 1; is that

13   correct?

14   **A.**   Yes, sir.

15   **Q.**   And after that, is that, that next page, is that a page

16   that was given back -- I'm sorry.  Not that page.  Strike it.

17       Did you do anything else before you heard back from

18   administration about the appeal in order to pursue the

19   grievance against Officer Abanico?

20   **A.**   I don't understand.

21   **Q.**   Did you complain to somebody besides the 602?

22   **A.**   Oh, yes, without a doubt.

23   **Q.**   What did you do?

24   **A.**   I complained to Captain Guerrera.  I complained to a

25   couple other COs.

1  **Q.**   And did you write the Internal Affairs?

2  **A.**   I wrote to Internal Affairs twice on this matter.

3  **Q.**   Uh-huh.  And what happened with your letter to

4  Internal Affairs?

5  **A.**   I got a response back from Special Agent Brad Williams

6  stating about the staff misconduct, and informed that I

7  guess --

8          **MR. QUINN:**  Objection.  Hearsay.

9          **THE WITNESS:**  Well, I have it right here.

10  BY MR. CUNNINGHAM:

11  **Q.**   Did he take action on the complaint or did he return the

12  complaint to the institution?

13  **A.**   He returned the complaint to the institution.

14  **Q.**   Okay.  Were you ever contacted -- strike.

15      You said you wrote to them twice?

16  **A.**   Yes.  I wrote to Internal Affairs twice and got two

17  different special agents from the Internal Affairs.

18  **Q.**   Uh-huh.  And did they both return the complaint to the

19  institution?

20  **A.**   Yes.  With giving me a personal letter saying that they

21  were my agents.

22  **Q.**   That they?

23  **A.**   Were my special agents investigating that was supposed to

24  take over the situation.

25  **Q.**   But they -- instead of making an investigation, they

1  returned the complaint to the institution; is that what you're

2  saying?

3  **A.**  Yes, sir.

4  **Q.**  Okay.  Did you hear within the institution any response to

5  the letters to Internal Affairs?

6  **A.**  No, sir.

7  **Q.**  All right.  When -- strike it.

8  Did you do anything else?

9  **A.**  Yes, sir.

10  **Q.**  What else did you do about this?

11  **A.**  I wrote a letter to the Inspector General.  I wrote a

12  letter to the Warden.  I wrote a letter to the Associate

13  Warden.  I was so upset about the situation, any number --

14  there was even a number that came on the television about a

15  cooking commercial that had a telephone number on it, and I

16  sent them a copy just to get anybody to listen, you know.  I

17  sent -- Jay Leno had his address on TV, I sent him letters.  I

18  sent out over -- anywhere over between 15 and 20 letters to

19  different people that I just wanted to listen, different

20  lawyers, everybody, anybody that would hear what I was saying.

21  **Q.**  And did you send something to the court in Monterey

22  County?

23  **A.**  Yes, I did, sir.

24  **Q.**  And what was that?

25  **A.**  That was a Complaint stating that something had to be done

1    about the abuse to the Monterey County Court Superior.

2    **Q.**   And what all did you -- what all did you include in the

3    papers you sent to the court?

4    **A.**   I included signatures from 127 inmates.

5             **MR. QUINN:**  Objection, Your Honor.  Hearsay.

6             **THE COURT:**  Well, the signatures --

7             **MR. QUINN:**  And we've been over this previously.

8             **MR. CUNNINGHAM:**  I don't think this is what we were

9    talking about at all.  I mean, the actions --

10            **THE COURT:**  All right.  Just a minute.  I think I've

11   already ruled on this; and to the extent that it goes into the

12   signatures, the hearsay objection will be sustained.

13            **MR. CUNNINGHAM:**  All right.  But --

14            **THE COURT:**  The hearsay objection is sustained.

15            **MR. CUNNINGHAM:**  I understand.

16   **Q.**   My question is, then:  Did you send a copy of the petition

17   that you had prepared that is Case Number 3011 -- 06-3011 to

18   the court?

19   **A.**   Yes, sir.

20   **Q.**   And did you send -- showing you what's been marked

21   Plaintiffs' 2, do you recognize those documents?

22   **A.**   Yes, sir.

23   **Q.**   And were those also sent to the court?

24   **A.**   Yes, sir.

25   **Q.**   And had you prepared those documents in any way?

1    **A.**    What do you mean?

2    **Q.**    Did you have some part in the preparation of those

3    documents in Exhibit 2?

4    **A.**    Yes, sir.

5    **Q.**    And what did you do there?  What did you do?

6    **A.**    What I did was went to the library, typed -- wrote in a

7    paper-made personal affidavit.

8    **Q.**    And, so, then you -- did you leave part of it blank?

9    **A.**    Yes, sir.

10   **Q.**    Okay.  And was the blank part then filled in by others?

11   **A.**    Yes, sir.

12   **Q.**    And that document was also sent to the court --

13   **A.**    Yes, sir.

14   **Q.**    -- those documents?

15           And did you receive a ruling from the court?

16   **A.**    On the first -- the first one I received was a show cause

17   for informal level, informal response to the institution.

18   **Q.**    A paper came back from the court?

19   **A.**    Stating show cause on the Complaint, and that the

20   institution had to respond to it on an informal level.

21   **Q.**    And did they do that to your knowledge?

22   **A.**    Yes, sir.

23   **Q.**    And did you get a copy of their informal response?

24   **A.**    Yes, sir.

25   **Q.**    And did the informal response acknowledge the grievance?

1  A.    Yes, sir.

2  Q.    And did they explain -- what explanation did they give to

3  the court by way of informal response?

4  A.    The institution?

5  Q.    Yes.

6  A.    They stated that they did their own investigation and that

7  they didn't see that anything -- any rights were violated.

8  Q.    Did they -- was that in the form of a letter to the court?

9  A.    Yes, sir.

10  Q.    Okay.  And did it come from the institution or some other

11  place?

12  A.    It came from the institution, if I'm not mistaken.  I'm

13  not for sure.

14  Q.    Okay.  And, so, then did the court take any action?

15  A.    After they received that, the court denied my claim.

16  Q.    All right.

17        THE COURT:  Let me ask counsel.  This Monterey County

18  action, the State action, this was not removed to

19  Federal Court; was it?  This isn't the basis for this action?

20        MR. CUNNINGHAM:  No.

21        THE COURT:  All right.

22        MR. CUNNINGHAM:  No.

23  Q.    Did you get any further response within the institution or

24  through channels in the Department about the grievance?

25  A.    I don't understand the question.

1  Q.   What response, if any, did you get -- I'm sorry.  Let me

2  go back.

3       Nothing happened out of the conversation with

4  Sergeant Randall; correct?

5  A.   No, sir.

6  Q.   And then you -- did you write anything further in the

7  grievance as a result of that?

8  A.   Yes, sir.  Going to the second level.

9  Q.   Okay.  And, so, then did -- to your knowledge did the case

10 go to the second level?

11 A.   It did go to the second level.

12 Q.   And what response did you receive in the second level?

13 A.   Partially granted.  Same answer I got on the first level.

14 Q.   And what partial granting was there?  Do you see a letter

15 there?

16 A.   On the partially granted I received it received that the

17 inmate can't know the outcome of what goes on with the CO.

18 They can't tell you what kind of reprimand they give to the CO.

19 Q.   After the second level, were you -- did you have to go to

20 a higher level --

21 A.   Yes, sir.

22 Q.   -- with the case?

23 A.   Yes, sir.

24 Q.   Okay.  And what level is that?

25 A.   After the second level, you go to the direct appeal, which

1  is the third level in Sacramento.

2  **Q.**   And did you do that?

3  **A.**   Yes, sir.

4  **Q.**   And you sent them the same grievance?

5  **A.**   Exact same thing.

6  **Q.**   And what response did you get to that appeal?

7  **A.**   From the Sacramento appeal I got a deny.  They didn't

8  partially grant it.  They didn't -- they just denied it.

9  **Q.**   Uh-huh.  And did they explain it at that time?

10 **A.**   They gave an explanation but I don't have my paperwork

11 with me, so I can't, you know, state what they informed me of,

12 advised me of.

13 **Q.**   Let me see if I can't provide it for you.

14                    (Pause in proceedings.)

15        **MR. CUNNINGHAM:**   I don't have it in this file.

16 **Q.**   Did you receive a letter from -- I'm sorry -- the Chief

17 Deputy Warden, Mr. Cohen?

18 **A.**   Which one is it?

19 **Q.**   Chief Deputy Warden, Mr. Cohen, that's the -- that will be

20 the last couple pages in the Exhibit 6A1.

21 **A.**   (Witness examines document.)  "Response to the

22 Correspondence Addressed to Internal Affairs," no, I don't see

23 what you're talking about.

24 **Q.**   Let me see.

25                    (Pause in proceedings.)

1      **THE WITNESS:** Okay. That's what I just said,

2   Internal Affairs.

3   **BY MR. CUNNINGHAM:**

4   **Q.** So --

5      **THE COURT:** What are we referring to, Counsel?

6      **MR. CUNNINGHAM:** This is Exhibit 6A1, Judge, the last

7   two pages, a letter --

8      **THE COURT:** There seem to be Bates stamp numbers on

9   the bottom of these documents. If you could refer the Court to

10  which Bates stamp number you're referring to.

11     **MR. CUNNINGHAM:** 434 and 430 -- AGO434 and 435.

12     **THE COURT:** They're not in order.

13         (Pause in proceedings.)

14     **THE COURT:** You say they're the last --

15     **MR. CUNNINGHAM:** It should be the last or three of the

16  last two pages in 6A1.

17         (Pause in proceedings.)

18     **THE COURT:** The last pages I show are Bates

19  stamped 392, 393, 395, and 396.

20     **MR. CUNNINGHAM:** Are you in 6A1, Judge?

21     **THE COURT:** There only seems to be....

22         (Pause in proceedings.)

23     **THE COURT:** I see the last pages seem to be 376, 375.

24  All right. This is -- hold on just a second.

25         (Pause in proceedings.)

1          THE COURT:  All right.  I have it now.  Thank you.

2          MR. CUNNINGHAM:  That was 6A2, I think, the other one.

3   Thank you, Judge.

4          THE COURT:  434 and 435?

5          MR. CUNNINGHAM:  Yes, sir.

6          THE COURT:  Counsel, do you have copies of that?

7          MR. QUINN:  I actually don't.

8                    (Pause in proceedings.)

9   BY MR. CUNNINGHAM:

10  Q.   What was the title of that letter there?

11  A.   "Response to Your Correspondence Addressed to

12  Internal Affairs, Subject:  Inmate Cleveland Memorandum."

13  Q.   All right.  And did the Warden -- did the Chief Deputy

14  Warden then give you any indication that something would be

15  done about this petition that you filed?

16  A.   From reading this, no.

17  Q.   Do you recall receiving that letter?

18  A.   You know, I don't remember receiving this letter.

19  Q.   Uh-huh.  And does it explain why there is no response as

20  you're reading it now?

21  A.   Yes.

22  Q.   And then was there anything more for you to do with this

23  grievance after you received the director's denial and this

24  letter here?

25  A.   Once it goes through the director level, the third appeal,

1  as far as the institution is concerned, that's it.  You've done

2  everything.  You've advised everybody of the situation that

3  needs to be advised.

4  **Q.**  All right.  Did you then take another step, a different

5  step?

6  **A.**  Well, yes.  After I did the third-level appeal and there

7  was nothing done, I did a civil case.

8  **Q.**  And did that turn into this case?

9  **A.**  That turned into this case right here.

10  **Q.**  Did you have at a later time another occasion to --

11  another encounter with Officer Abanico?

12  **A.**  After 2006?

13  **Q.**  Yeah.

14  **A.**  Yes, sir.

15  **Q.**  And when was that?

16  **A.**  2007.

17  **Q.**  Okay.  And where did that occur?

18  **A.**  In the corridor.

19  **Q.**  Same corridor?

20  **A.**  Yes, sir.

21  **Q.**  Were you still living in the same housing unit?

22  **A.**  Yes, sir.  I was in F Wing.

23  **Q.**  And was he working in F Wing then?

24  **A.**  I don't recall Abanico ever working F Wing while I was

25  housed in F Wing.

1   Q.   All right.  When you were living in F Wing and coming and

2   going from F Wing, did F Wing officers sometimes give you

3   clothed body search, a random clothed body search, when you

4   were going out into the corridor?

5   A.   Not me, no.

6   Q.   No?  Did other officers sometimes at other points in the

7   corridor search you --

8   A.   Yes, sir.

9   Q.   -- now and then?

10  A.   Yes, sir.

11  Q.   Did any of them ever search you the way Abanico had

12  searched you that first time?

13  A.   No, sir.

14  Q.   All right.  And you've been down -- in 2006, how long had

15  you been in prison?

16  A.   Incarcerated in prison since 2000.  I was arrested in 1998

17  and I fought my case for two years in L.A. County Jail.

18  Q.   Uh-huh.

19  A.   This is my second term, so I did '92 to '96.

20  Q.   Okay.  Did you get -- in '92 to '96 did you get searched

21  by random clothed body searches?

22  A.   Yes, sir, all the time.

23  Q.   And did you get searched in L.A. County Jail?

24  A.   All the time, sir.  As a matter of fact, the L.A. County

25  Jail searches you maybe two to three times more than you would

1  be searched in prison.

2  **Q.**  And you have been -- so you had been in CDCR for five or

3  six years then; right?

4  **A.**  Yes, sir.

5  **Q.**  And had that all been at Soledad?

6  **A.**  Yes -- no.  Pleasant Valley is where I started.  I got

7  transferred from there to Folsom, from Folsom to Quentin, from

8  Quentin to Soledad.

9  **Q.**  So how long had you been at Soledad in October of '06?

10  **A.**  I got there in 2005.  I think March of 2005.

11  **Q.**  Okay.  And, now, when did this next encounter occur with

12  him?

13  **A.**  On 6/20th.

14        **THE COURT:**  I'm sorry, Counsel.  When you say "with

15  him" --

16        **MR. CUNNINGHAM:**  With Abanico.  I'm sorry, Judge.

17        **THE COURT:**  Thank you.

18        **THE WITNESS:**  June 20th.

19  **BY MR. CUNNINGHAM:**

20  **Q.**  Of '07?

21  **A.**  Of '07.  I'm sorry.

22  **Q.**  And in between those two times, did you sometimes see him

23  in the corridor?

24  **A.**  Oh, yes, sir.

25  **Q.**  Did he pull you over?

1    **A.**   Before June 20th?

2    **Q.**   Yeah.

3    **A.**   The only time he pulled me over before June 20th was 2006

4    when he did the --

5    **Q.**   On the occasion we've been talking about?

6    **A.**   Exactly.

7    **Q.**   Okay.

8    **A.**   But not until June -- 6/20 was I searched again by him,

9    2007.

10   **Q.**   Okay.  And now we're looking at what's been marked as

11   Plaintiffs' Exhibit 6A2.  Do you have that in front of you?

12   **A.**   Yes, sir.

13   **Q.**   That's a grievance that you prepared; is that right?

14   **A.**   Yes, sir.

15   **Q.**   All right.  And it's the same form of grievance and the

16   same process?

17   **A.**   Yes, sir.

18   **Q.**   And what did you -- what was it that had happened between

19   you and Abanico that you put into this grievance?

20   **A.**   That I had got stopped by Abanico and I had a court order,

21   of show cause from the Monterey County court.  Abanico read my

22   legal mail, which was a violation because they're not supposed

23   to read our legal mail.

24   **Q.**   I'm sorry.  He did what with it?

25   **A.**   He read my legal mail that was in my pocket, and it had

1   his name in it, Cleveland versus Abanico.  I was searched again

2   by him on that day.

3       Okay.  And then on the next day, on the 21st, I was

4   searched by him twice coming up from chow -- going to chow and

5   coming back.  And then on the 22nd again.

6   **Q.**   In those searches did he also grab and squeeze your

7   genitals?

8   **A.**   Yes.

9   **Q.**   And what did you do in response?

10  **A.**   On this -- on these incidents where I was grabbed, I just

11  shook my head and grit my teeth because in this incident, if

12  you keep complaining about this incident, you're going to the

13  hole.  So I filed an initial grievance on the fondling.  On

14  this one I filed a harassment because now I feel I was being

15  harassed.  Really I put that I was being clowned, so....

16  **Q.**   And reading this I don't see any mention of grabbing the

17  genitals.

18  **A.**   I just used the violations Eighth Amendment, and I stated

19  that this officer in my opinion needed help, mental help.

20  **Q.**   And you wrote a couple of extra pages describing your

21  feelings about what had happened, what should be done?

22  **A.**   Yes.  I stated that I feel it was retaliation.

23  **Q.**   All right.  And we don't have any further documents

24  besides the grievance.  Do you recall how -- what the response

25  from the institution was on this grievance in '07?

1   A.   Partially granted.

2   Q.   I mean, did you have an informal interview like you did

3   with Sergeant Randall in the other one?

4   A.   You know, Sergeant Randall is on this one, but he just

5   signed it off.  I don't remember talking to him.  He signed it

6   off.  Sergeant Randall is on this one in 2007.

7   Q.   I see.  Okay.  It has his name at the top of the second

8   page there?

9   A.   Yes, sir.

10  Q.   But he didn't write anything in there; right?

11  A.   No.  He just partially granted it.

12  Q.   Partially granted in that he talked to you?

13  A.   Yes, sir.

14  Q.   Okay.  And then did you go beyond that stage --

15  A.   Yes, sir.

16  Q.   -- with the grievance?

17  A.   Yes, sir.  I went to what is called Division F.

18  Q.   Did Randall -- when you spoke to him, did he make excuses

19  for Abanico?

20  A.   He just --

21          MR. QUINN:  Objection.  Hearsay.

22          THE COURT:  Sustained.

23  BY MR. CUNNINGHAM:

24  Q.   Did he give you some explanation of what, if anything,

25  could be done or that nothing could be done?  Or strike it.

1    When you were done with Sergeant Randall, did you have any

2    sense that anything was going to be done about Abanico?

3    **A.**   No.  No, I did not.

4    **Q.**   Did you have any sense that Abanico had even been talked

5    to by anybody, any supervisor or anything about the way he

6    searched you?

7            **MR. QUINN:**  Objection.  Calls for speculation.

8            **THE COURT:**  Overruled to the extent that he can

9    testify to his own personal knowledge.

10           **THE WITNESS:**  Can you repeat the question, please?

11   **BY MR. CUNNINGHAM:**

12   **Q.**   Did you have -- strike it.  Now, I lost the question.

13           **THE COURT:**  Did you have any sense that Abanico had

14   ever been talked to by anybody, any supervisor or anything

15   about the way he searched you?

16           **THE WITNESS:**  Yes.  I think a supervisor spoke to him

17   about it.

18   **BY MR. CUNNINGHAM:**

19   **Q.**   And was there any change in the technique that he used on

20   you the second time or that clutch of times, those couple of

21   days in a row, from the first time?

22   **A.**   It wasn't as hard.  It wasn't as aggressive as the first.

23   You know, the spots was the same, but it wasn't -- it wasn't

24   the same fondling motion.  It wasn't the same as the first

25   search, and I'm not going sit up here and make up something

1   onto Abanico.

2   **Q.**   Okay.  But it was a repetition of what happened the first

3   time?

4   **A.**   Oh, yes, sir, without a doubt.

5   **Q.**   What did you do the first time when he grabbed your

6   private parts?

7           **THE COURT:**  When you say "the first time" --

8           **MR. CUNNINGHAM:**  In the earlier event that we talked

9   about --

10          **THE WITNESS:**  2006.

11          **MR. CUNNINGHAM:**  -- for the first grievance that

12  turned into a petition.

13          **MR. QUINN:**  I just object on the grounds that it's

14  been asked and answered.

15          **THE COURT:**  Overruled.

16          **THE WITNESS:**  I squared off on him, and I would like

17  to explain what squared off means to the jury.

18      Turned around with my fist balled up face to face and

19  said, "You're not supposed to be touching me like that."

20  That's what "squared off" means, when an inmate says he

21  "squared off."

22  **BY MR. CUNNINGHAM:**

23  **Q.**   And to your knowledge is just that gesture, turn around

24  and square off with your fists --

25  **A.**   Uh-huh.

1   Q.   -- is that a violation in and of itself?

2   A.   Was I supposed to do that?

3   Q.   Yeah.

4   A.   No.

5   Q.   What did you -- what were you feeling at that moment when

6   you turned around?  What was going through your mind?

7   A.   Embarrassment, shame, embarrassment, my pride knowing that

8   I couldn't really do nothing about it even though I wanted to.

9   Q.   Were you angry?

10  A.   Very.

11  Q.   Did you have to control your anger?

12  A.   It wasn't easy but, yes, I did.

13  Q.   Did you -- were you in your own mind when you turned

14  around or when you spoke to him risking trouble with the

15  institution?

16  A.   Yes, sir.

17  Q.   What could have happened to you in your mind?

18  A.   I could have been -- I could have received SHU suit

19  program for that.  I could have been --

20  Q.   What's a SHU program?

21  A.   I could have been put in --

22        MR. QUINN:  Objection.  It calls for speculation.

23        THE COURT:  Overruled.

24        THE WITNESS:  That's what happens.  If you take a

25  defensive posture to a CO, you can be put in Ad.Seg. and then

1  sent to the SHU.  That's the rules.  That's what happens.  It's

2  not speculation.  That's the rules and that's what happens.

3  **BY MR. CUNNINGHAM:**

4  **Q.**  And the SHU is what, S-H-U?

5  **A.**  They send you to another prison.  It's a hole inside --

6  it's an Ad.Seg. inside of an Ad.Seg., you know, where you're in

7  a cage 23 and a half hours a day.  Your toothpaste is squeezed

8  into a cup.  There's no nothing.  You don't even have the

9  privileges that you have in Ad.Seg. so they belittle you from

10  even that.

11       **THE COURT:**  Well, let me just -- Mr. Cleveland, when

12  you referred --

13       **THE WITNESS:**  Yes, sir.

14       **THE COURT:**  -- to the term "SHU," were you referring

15  to the Security Housing Unit?

16       **THE WITNESS:**  Yes, sir.

17       **THE COURT:**  Thank you.

18       **THE WITNESS:**  Thank you.

19       **MR. CUNNINGHAM:**  S-H-U, yes.

20  **Q.**  So you knew you were risking that at the extreme; correct?

21  **A.**  Yes, sir.

22  **Q.**  And were you risking any lesser difficulty or sanction in

23  the institution?

24  **A.**  Explain.  I don't understand what you're talking about.

25  **Q.**  Did you -- the SHU -- being put in a SHU term, given a

1   term in the SHU would be the most severe --

2   **A.**   Punishment.

3   **Q.**   -- punishment you could get; right?

4   **A.**   Uh-huh.

5   **Q.**   Was there a lesser -- any lesser levels of punishment you

6   could have gotten?

7   **A.**   You could have received a 115 or you could have received a

8   warning, which is a 128.

9   **Q.**   Uh-huh.  Okay.  Did you get anything --

10   **A.**   No, sir.

11   **Q.**   -- from him?  No.

12         **THE COURT:**  When you're saying "from him" --

13         **MR. CUNNINGHAM:**  From Abanico, again, yes.  I'm sorry,

14   Judge.

15   **Q.**   And on this second occasion or this little series of

16   occasions two or three days running that resulted in the

17   grievance that is Plaintiffs' Exhibit 6A2, that one has a

18   number on it too; right?

19   **A.**   You're talking about 6A2?

20   **Q.**   Yeah.

21   **A.**   It has a log number.

22   **Q.**   What's that log number?

23   **A.**   07-02428.

24   **Q.**   Okay.  And were you -- did you have a similar kind of

25   reaction -- strike it.

1    What was your reaction the second time, the first of these

2    days when he pulled you over in June of '07?

3    **A.**    The reaction was to do the same thing, but it was

4    different circumstances because of the fact that I knew it was

5    a retaliation so I didn't do it.  I wasn't going to buy into

6    this.  You know, I wasn't going to let him get me now in a

7    situation where he could put me in the hole since he missed the

8    first opportunity.

9    **Q.**    Did you say anything to him while he was doing it?

10   **A.**    No.

11   **Q.**    Was there a Sergeant Paradale or Pardack?

12   **A.**    I don't recall that sergeant.

13   **Q.**    Let me ask you this first.  Let me show you on the

14   exhibit.

15        **THE COURT:**  Counsel, where are we going with this?

16        **MR. CUNNINGHAM:**  I'm just trying to get this out, what

17   happened with him.

18        **THE COURT:**  All right.

19   **BY MR. CUNNINGHAM:**

20   **Q.**    Do you recognize that name that's marked there?

21   **A.**    No.  I seen that and I don't recall that sergeant.  It's

22   been so long, it's been that long ago.

23   **Q.**    All right.  In the course of the events that happened and

24   the grievances that you filed, the one in '06 and one in '07,

25   the one in '07 you didn't -- you decided yourself, right, only?

1  You didn't go around and talk to others about it?

2  **A.**   No, I did not, sir.

3  **Q.**   Okay.  And in that period of time, did anyone from

4  administration ever come and sit you down and ask you what

5  happened?

6  **A.**   Not to my recollection, no.

7  **Q.**   All right.  Did you feel you had any opportunity besides

8  just these writings to persuade anyone that you were telling

9  the truth, anyone in the Administration, that this was true,

10  that this was a problem?

11  **A.**   I just wanted to -- at this time I wanted to create a

12  paper trail because what I had done before this hadn't worked;

13  and, like I said, I sent letters to all kind of agencies and

14  everything I can think of.  It didn't work.  So now I'm just

15  trying to keep a paper trail to protect me.

16       **MR. CUNNINGHAM:**  All right.  I have no further

17  questions, Judge.

18       **THE COURT:**  All right.  It's 3:46 but why don't you

19  start with your cross-examination.

20                    **CROSS-EXAMINATION**

21  **BY MR. QUINN:**

22  **Q.**   Good afternoon, Mr. Cleveland.

23  **A.**   How you doing, sir?

24  **Q.**   Good.

25       Did Abanico say anything of a sexual nature to you during

1   the searches?

2   **A.**   No, sir.

3   **Q.**   And he didn't touch you beneath the clothes; did he?

4   **A.**   Explain yourself.   Beneath the clothes?

5   **Q.**   He didn't touch your genitals or any area beneath the

6   clothing.

7   **A.**   Skin to skin?

8   **Q.**   Right.

9   **A.**   No, sir.

10  **Q.**   Did you seek any treatment for physical injuries following

11  the searches?

12  **A.**   Mentally or physically?

13  **Q.**   Physical injuries.

14  **A.**   No, sir.

15  **Q.**   Now, Inmate Trask earlier testified to how officers will

16  start at the top of the body, move down, move down to the leg,

17  and basically cover the entire body.   Is that your recollection

18  of how Officer Abanico conducted the searches?

19  **A.**   Can you repeat that?

20  **Q.**   The question is basically that -- referencing the

21  testimony by Inmate Trask earlier where he described how a

22  search is done, and how officers typically start from the top

23  and then move down to the bottom.   Is that your recollection of

24  how Officer Abanico conducted the searches?

25  **A.**   No.

1  **Q.**  How did Officer Abanico conduct the searches?

2  **A.**  With me?

3  **Q.**  Yes.

4  **A.**  With the elbow in the back.

5  **Q.**  Okay.  What I'm asking you is:  Did he begin from the top

6  of your body?

7  **A.**  No.

8  **Q.**  Where did he begin?

9  **A.**  He began by putting the elbow in the back.  First he got

10  the waist, pulled the pants back, looked at the buttocks, put

11  the elbow in the back.  And with him, he started on the inner

12  thigh with me.  Put the elbow in the back, right inner thigh,

13  left inner thigh, squeeze the penis, squeeze the testicles.

14  With me.

15  **Q.**  And how long did those searches last?

16  **A.**  Between three and four seconds.  Well, on that one three

17  to four seconds because I came off the wall.

18  **Q.**  At this time I'd like to, if I may, reference your

19  deposition testimony if you give me a moment.

20  **A.**  Yes, sir.

21                        (Pause in proceedings.)

22  **BY MR. QUINN:**

23  **Q.**  Mr. Cleveland, do you recall giving -- or me taking your

24  deposition on March 20th, 2013?

25  **A.**  Yes, sir, unfortunately, I do.

1  **Q.**   And at that deposition Mr. Cunningham and the court

2  reporter, you, and I were all present; is that correct?

3  **A.**   Yes, sir.

4  **Q.**   And before you answered those questions, you raised your

5  right hand and was sworn by the court reporter to tell the

6  truth; weren't you?

7  **A.**   Yes, sir.

8  **Q.**   And that's the same oath that you took today?

9  **A.**   Yes, sir.

10  **Q.**   And you did tell the truth during the deposition; is that

11  correct?

12  **A.**   To the best of my knowledge.

13  **Q.**   And after you finished testifying, you had a chance to

14  read your testimony to make sure it was accurate?

15  **A.**   No.  We didn't do that till a couple of days later.  I

16  think three or four days later or something.

17  **Q.**   But you recall that all the questions and answers you gave

18  were in a typed booklet titled "Deposition of Ivan Vernord

19  Cleveland"; is that correct?

20  **A.**   Yes.

21       **MR. QUINN:**  At this time I'm going to open the sealed

22  deposition of Mr. Cleveland.

23       **THE COURT:**  He moves to unseal the deposition.

24       **MR. CUNNINGHAM:**  No problem.

25       **THE COURT:**  There's no objection.

1                    (Pause in proceedings.)

2          **MR. CUNNINGHAM:**  Your Honor, again, for the record,

3   I'm going to object to the projection of the text from the

4   document rather than reading.

5                    (Pause in proceedings.)

6          **THE COURT:**  That objection will be overruled.  You can

7   proceed.

8   **BY MR. QUINN:**

9   **Q.**   So just to recall, you mentioned that the first search

10  lasted three to four seconds before you jumped off the wall; is

11  that correct?

12  **A.**   Yes, sir.

13  **Q.**   I'd just like to read you page 24, line 13 -- page 24,

14  line 11 --

15         **THE COURT:**  Why don't we mark that, if we haven't

16  marked it already, before we proceed?

17         **MR. QUINN:**  We can mark it as Exhibit C.

18         **THE COURT:**  Mark it as Exhibit C.  All right.

19  Exhibit C, page?

20         **MR. QUINN:**  Page 24.

21         **THE COURT:**  What lines?

22         **MR. QUINN:**  Lines 11 through 14.

23         **THE COURT:**  All right.  Thank you.

24       (Defendants' Exhibit C marked for identification)

25         **MR. QUINN:**  (reading)

1    "Q.  How long did that search last?

2    "A.  Between 60 and 70 seconds.

3    "Q.  So about the same length as the first search?

4    "A.  Yes, sir."

5    Q.  So the contact with -- or the first search lasted 60 or 70

6    seconds; is that correct?

7    A.  After I came back from off the wall?

8    Q.  Yes.

9    A.  The whole searching process was 60 to 70 seconds, yes,

10   sir.

11   Q.  And it's your recollection or your testimony that during

12   those 60 or 70 seconds, Officer Abanico only made contact with

13   the groin area?

14   A.  Inner thighs and groin area.  That's what I stated in the

15   deposition more than once.

16   Q.  Again, yes, you stated he never searched the back, the

17   thighs, the feet, never took off the shoes?

18   A.  No.  No, sir, he didn't do that.  He never took off the

19   shoes.  Never searched the back.

20   Q.  Never searched your thighs?

21   A.  Inner thighs.

22   Q.  Okay.  I'd like to read to you from page 24 --

23          THE COURT:  Just a minute.

24   BY MR. QUINN:

25   Q.  -- lines 6 through 8 -- or lines 5 through 8:  (reading)

1    "Q.   Never searched your chest?

2    "A.   Never.  Never searched my back, my thighs, never

3    searched my feet.  Never made me -- conducting taking off

4    the shoes."

5         MR. CUNNINGHAM:  Can he complete the answer, Judge?

6         THE WITNESS:  I answered that.  That's the way I

7    answered it just now.

8    BY MR. QUINN:

9    Q.   But you just responded that he -- today you're saying that

10   he did --

11   A.   The inner thighs.

12   Q.   Well, in your deposition you stated he never searched your

13   thighs.

14   A.   Because me and you assumed it was the outside thighs.

15   Q.   I didn't assume that.

16   A.   I did.

17   Q.   So it's your testimony that these searches were conducted

18   in a long hallway with officers present and inmates passing

19   through; is that correct?

20   A.   Yes, sir.

21   Q.   And with officers present in the hallway, other inmates

22   moving through the hallway, Abanico touched nothing other than

23   the groin area for 60 seconds?

24   A.   For me or for other inmates?

25   Q.   For you.

1   **A.** Yeah, the search lasted between 60 and 70 seconds. Not

2   all the time. I've been searched by him five times. So I'm

3   not going to say all the time they lasted 60 or 70 seconds, but

4   the majority I would say 60 to 70 seconds in total.

5   **Q.** I'll direct you to page 31, line 13 through 17,

6   question --

7   **A.** Which number, sir?

8   **Q.** Page 31, lines 13 through 17.

9   **A.** Okay.

10  **Q.** (reading)

11      "**Q.** But, again, these searches lasted roughly a minute at

12      the most?

13      "**A.** Roughly a minute.

14      "**Q.** 80 seconds?

15      "**A.** At the most."

16      Did I read that correctly?

17  **A.** Yes. I don't feel that 80 seconds is that much from 60 or

18  70 seconds.

19  **Q.** But that's your testimony then; is that --

20  **A.** Yes, sir.

21  **Q.** That Officer Abanico in a long hallway with other officers

22  present, other inmates present, maybe was in contact with your

23  groin for 80 seconds?

24  **A.** Yes, sir.

25  **Q.** Do you have any witnesses to that?

1   **A.**   Here on how he searched me?

2   **Q.**   Anywhere.

3   **A.**   I have witnesses, but they're not here.  I have 127

4   witnesses.

5   **Q.**   None of them are here today?

6   **A.**   No.

7   **Q.**   And during your deposition, you claimed that every time

8   that Abanico touched you, it was inappropriate; is that

9   correct?

10   **A.**   I felt it was, yes.

11   **Q.**   And, yet, on your -- in the 602 --

12   **A.**   Which one, sir?

13   **Q.**   The one entitled 07-2428.

14        **MR. CUNNINGHAM:**  Which exhibit?  6A2?

15        **MR. QUINN:**  It's Plaintiffs' Exhibit 6A2.

16        **THE WITNESS:**  07-2428?

17   BY MR. QUINN:

18   **Q.**   Yes.

19   **A.**   Okay.  Yes, sir.

20   **Q.**   The 602 references four searches within a three-day

21   period:  6/20/07, 6/21/07 -- two on 6/21/07, one on 6/22/07.

22   And yet despite the testimony that "every time Abanico touched

23   me it was inappropriate," that 602, which was written on

24   6/23/07, does not include any reference to Abanico fondling and

25   touching you; does it?

1   **A.**   No.  It has something to do with guard brutality and an

2   Eighth Amendment violation.

3   **Q.**   Right.  But there's no mention of any molestation or

4   fondling?

5   **A.**   I feel that it was brutality.  That's just my opinion.

6   **Q.**   But, again, just to clarify, three searches -- four

7   searches within a three-day period --

8   **A.**   Yes, sir.

9   **Q.**   -- you prepare a complaint and you do not mention any

10   molestation, fondling or abuse, physical abuse or sexual abuse,

11   by Abanico in that 602?

12   **A.**   No, sir, I did not.

13        **MR. QUINN:**  Okay.  That is all.

14        **THE COURT:**  Anything further?

15        **MR. QUINN:**  That's it.

16        **MR. CUNNINGHAM:**  That's it?

17        **THE COURT:**  All right.  Do you have redirect, Counsel?

18        **MR. CUNNINGHAM:**  (Nods head.)

19        **THE COURT:**  It's 3:58.  How long do you anticipate

20   your redirect?

21        **MR. CUNNINGHAM:**  Ten to fifteen minutes.

22        **THE COURT:**  What would the jury like to do?  Would you

23   like to go for the redirect or shall we call it quits for today

24   and start up first thing tomorrow morning at 9:00?

25        **A JUROR:**  Start tomorrow.

1    **THE COURT:**  All right.  Then we'll take our afternoon

2    recess at this time.  I'll ask you all to be here a little bit

3    early so that we can promptly start at 9:00 a.m.

4        Thank you so very much.

5        **THE WITNESS:**  Thank you, Judge.

6        **THE COURT:**  Have a good evening.

7        (Proceedings were heard out of the presence of the jury:)

8        **THE COURT:**  At this time I think Mr. Cleveland can

9    step down subject to being recalled tomorrow morning.

10                    (Pause in proceedings.)

11        **THE COURT:**  All right.  A couple of things.

12        Madam Reporter, can you bring me back 15:55:51.

13                    (Pause in proceedings.)

14        **THE COURT:**  All right.  During cross-examination....

15                    (Pause in proceedings.)

16        **THE COURT:**  All right.  During cross-examination:

17    (reading)

18        "Q.  Do you have any witnesses to that?

19        "A.  Here on how he searched me?

20        "Q.  Anywhere.

21        "A.  I have witnesses, but they're not here.  I have 127

22        witnesses.

23        "Q.  None of them are here today?

24        "A.  No.

25        "Q.  And during your deposition, you claimed that every

1     time that Abanico touched you, it was inappropriate; is

2     that correct?

3     "A.  I felt it was."

4    To the extent that counsel's elicited testimony regarding

5 the 127 witnesses that he has indicated were witnesses to this,

6 you may ask Mr. Cleveland tomorrow morning as to who saw him,

7 who else saw this happen and under what circumstances.

8     **MR. CUNNINGHAM:**  Who else saw the particular search as

9 opposed --

10     **THE COURT:**  That's correct?

11     **MR. CUNNINGHAM:**  -- to the 127?

12     **THE COURT:**  Yes.

13     **MR. CUNNINGHAM:**  Okay.

14     **THE COURT:**  Now, then, to the extent that we have some

15 exhibits, let's go through those.

16    Madam Clerk, I'll let you call the exhibits, the numbers,

17 and we'll go from there.  That's probably the easiest.

18     **THE CLERK:**  Okay.  For defendants, Exhibit B, which is

19 the Trask deposition, and Exhibit C, which is the Cleveland

20 deposition, have now been marked for identification.

21     **THE COURT:**  All right.  Do you wish the pieces that

22 you cross-examined to be moved into evidence?

23     **MR. QUINN:**  Yes, Your Honor.

24     **THE COURT:**  All right.  Then what I'm going to do is

25 I'm going to ask you -- where do we have a Xerox machine?  Do

1  we have one here?

2       **THE LAW CLERK:** Hallway.

3       **THE COURT:** Okay. Take the exhibits, go into the

4  hallway, mark the portions that you used for cross-examination,

5  and then have them marked and move those into evidence.

6    Ms. Clark, is that all right with you?

7       **THE CLERK:** That's fine.

8       **THE COURT:** All right. I have to check, you know.

9      (Defendants' Exhibits B and C received in evidence)

10       **THE COURT:** Any other defense exhibits that we need to

11  discuss?

12       **MR. QUINN:** With regard to the copying, I thought we

13  were just going to move the entire depo into evidence.

14       **THE COURT:** Well, it's not relevant.

15       **MR. LEWIS:** Portions --

16       **THE COURT:** The portions that you used for impeachment

17  I'll allow you to move into evidence; but the whole deposition,

18  no. You have the witness here. It becomes hearsay.

19    Any other defense?

20       **THE CLERK:** No. That's all for the defense,

21  Your Honor.

22       **THE COURT:** All right. Why don't we move through the

23  plaintiffs'.

24       **THE CLERK:** Okay. The plaintiffs have Exhibit 1, 2 --

25       **THE COURT:** Let's start --

1      **THE CLERK:** Okay. Exhibit 1.

2      **THE COURT:** I'm a slow guy.

3   All right. Exhibit 1. Given my prior motion in limine

4   ruling as to everything except 405 and 406, which is the first

5   page -- I'm looking at the Bates numbers --

6      **MR. QUINN:** I don't have it in front of me.

7      **THE COURT:** All right. The staff complaint, the first

8   page and the second page, I'm going to allow that to be moved

9   into evidence; but the portion thereafter, the handwritten part

10  which talks about the other inmates and the listing of the --

11  I've forgotten how many numbers there are now -- but the other

12  inmates, we discussed that is hearsay and as such I won't allow

13  that in.

14  Now, if counsel wishes to include in the staff complaint

15  the handwritten portion, pages 1, 2, and I guess 3 and 4 signed

16  by Mr. Cleveland, if the references to the previously ruled

17  hearsay parts is excised and the parties agree to it, I'll

18  allow that to come into evidence.

19  But at this juncture all I'm going to allow right now is

20  page 1 and 2 of Plaintiffs' 1 to be admitted into evidence at

21  this time.

22      (Plaintiffs' Exhibit 1 received in evidence)

23      **THE COURT:** The next plaintiffs'?

24      **MR. CUNNINGHAM:** Judge, you're saying the references

25  over where he says, "See next page," or whatever, that that's

**PROCEEDINGS**

1    out, the ones you just called, 2, 3, 4?

2            THE COURT:  Mr. Cunningham, these two pages

3    (indicating).

4            MR. CUNNINGHAM:  Okay.  All right.  I follow you.

5            THE CLERK:  Okay.  Exhibit 2.

6            THE COURT:  Exhibit 2.

7        Exhibit 2, the first page, Mr. Cleveland's statement may

8    come in.  The others are hearsay pursuant to my motion in

9    limine ruling at this time.  So you may allow the first page,

10   Mr. Cleveland's statement, to come in.  All right?

11           MR. CUNNINGHAM:  All right.

12           THE LAW CLERK:  Just the first page?

13           THE COURT:  Just the first page at this juncture.

14           MR. CUNNINGHAM:  Without prejudice to some possibility

15   that further parts --

16           THE COURT:  Something may happen.

17           MR. CUNNINGHAM:  -- will be tied up.  Okay.

18        (Plaintiffs' Exhibit 2 received in evidence)

19           THE COURT:  Next one, Madam Clerk?

20           THE CLERK:  Exhibit 6A1.

21           THE COURT:  All right.  Now, then, 6A1 and 1 appear to

22   be the same document.

23           MR. CUNNINGHAM:  The first two pages are the same, the

24   ones you admitted.  6A1 goes on to include the rest of whatever

25   we had.

1       THE COURT:  That's also in Number 1, too.

2       MR. CUNNINGHAM:  No.  You just have up through the

3   signatures in Number 1, and Number 2 and Number 6A1 there's

4   responses, there's a number, there's the letters from the

5   Internal Affairs.  There's a bunch of different stuff in there,

6   Judge.

7       THE COURT:  All right.  This was the Memoranda of

8   Determination of Staff Complaint; the Office of

9   Internal Affairs response; the memorandum 9/20/06 signed by the

10  Deputy Chief Warden; the letter from Mr. Cleveland to Brad

11  Williams, Special Agent; an envelope; another letter from

12  Mr. Cleveland; a response from the Office of Internal Affairs

13  dated October 10th, 2006; proof of service; Mr. Cleveland's

14  Retaliation Request, Monterey Division, and its conclusion.  It

15  looks like there's a whole series of documents.

16    What's defendants' position?

17      MR. QUINN:  Well, I don't have them in front of me.

18  It was a little unclear when he was going through them what --

19      THE COURT:  Did the parties exchange exhibits here?

20      MR. CUNNINGHAM:  Yes.

21      MR. QUINN:  We did; but as we were going through them,

22  I didn't have some of them and they were handed to me, like 434

23  and 436 or something were not in the materials that I had.

24  So --

25      THE COURT:  All right.  What I'm going to do at this

1  juncture is:  My ruling is as to 6A1, pages 1 and 2, can come

2  in at this juncture; however, since they are contained in

3  Plaintiffs' 1, are you withdrawing 6A at this juncture?

4      **MR. CUNNINGHAM:**  Well, if that's the only part -- if

5  we're only getting those first two pages, yeah.

6      **THE COURT:**  All right.  And then if you wish other

7  parts of it, you'll need to pull them out and re-mark them as

8  other documents, and you can then ask the witness as to what

9  they are and then you can move them individually into evidence.

10      **MR. CUNNINGHAM:**  All right, Judge.

11      **THE COURT:**  All right.

12      **MR. CUNNINGHAM:**  Yes, sir.

13      **THE COURT:**  The next plaintiffs' exhibit?

14      **THE CLERK:**  6A2.

15      **THE COURT:**  That's a different complaint.

16      **MR. QUINN:**  It's AGO373 as best I can glean.

17      **MR. CUNNINGHAM:**  I'm sorry.  What are we talking

18  about, 6A2?

19      **THE COURT:**  6A2, Second-Level Staff Complaint.  I show

20  Bates numbers 373, 374, 375, and 376.

21      **MR. QUINN:**  That's correct.

22      **THE COURT:**  Objection?

23      **MR. QUINN:**  (Shakes head.)

24      **THE COURT:**  Moving that into evidence?

25      **MR. CUNNINGHAM:**  Yes.

## PROCEEDINGS

1    THE COURT:  6A2 will be moved into evidence.

2        (Plaintiffs' Exhibit 6A2 received in evidence)

3        THE CLERK:  And that's all, Your Honor.

4        THE COURT:  At this time?

5        THE CLERK:  Yes.

6        THE COURT:  All right.  Then you'll make photocopies

7    of the transcript portions.

8        MR. LEWIS:  Yes, Your Honor.

9        MR. QUINN:  Yes.

10       THE COURT:  All right.  Anything else we need to take

11   up at this time?

12       MR. CUNNINGHAM:  I'm sorry, Judge?

13       THE COURT:  Anything else we need to take up at this

14   time?

15       MR. CUNNINGHAM:  I don't have anything, Your Honor.

16       THE COURT:  All right.  Ms. Jaffe, I believe, gave

17   both of you the proposed closing instructions; and I ask you to

18   review them so that after submission of the evidence, we can

19   promptly move to take a look at those, finalize the

20   instructions, and get them to the jury and allow me to read

21   them to the jury.

22       All right, Counsel --

23       MR. CUNNINGHAM:  Judge, can we have a continuing order

24   for showers for them to come in?

25       THE COURT:  I think we did that already; did we not?

1    MR. CUNNINGHAM:  Well, the order was as of today, but

2  what I'm asking is if they could have a shower tonight, too,

3  and --

4    THE CORRECTIONAL OFFICER:  Your Honor, that's already

5  been addressed.  They will be showered every evening for the

6  entire court proceedings.

7    THE COURT:  Thank you so much.

8    MR. CUNNINGHAM:  Thank you, Sergeant.

9    THE COURT:  All right.  I'll see counsel at

10  8:30 tomorrow morning.

11    MR. LEWIS:  8:30, Your Honor, yes.

12    THE COURT:  Thank you very much.  Court's in recess.

13    (Proceedings adjourned at 4:13 p.m.)

14    ---oOo---

15    <u>**CERTIFICATE OF REPORTERS**</u>

16    I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled matter.

18  DATE:  Monday, November 4, 2013

19

20  _____

21    Jo Ann Bryce, CSR No. 3321, RMR, CRR
        U.S. Court Reporter

22

23  _____

24    Candace Yount, CSR No. 2737, RMR, CCRR
        U.S. Court Reporter

25