UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nandor J. Vadas, Magistrate Judge

| | | |
|---|---|---|
| IVAN VERNORD CLEVELAND, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| VS. | ) ) | NO. C 07-02809 NJV |
| BEN CURRY, WARDEN, et al., | ) ) | |
| Defendants. | ) ) ) | |

San Francisco, California
Tuesday, November 5, 2013

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

      LAW OFFICE OF DENNIS CUNNINGHAM
      115 A Bartlett Street
      San Francisco, California  94110
  BY: **DENNIS CUNNINGHAM, ATTORNEY AT LAW**

      THE LAW OFFICES OF JEFF WOZNIAK
      179 11th Street - 2nd Floor
      San Francisco, California  94103
  BY: **JEFF WOZNIAK, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Candace Yount, CSR No. 2737, CCRR
              Official Reporters

1   **APPEARANCES**:  (CONTINUED)

2   For Defendants:
                    OFFICE OF THE ATTORNEY GENERAL
3                   State of California
                    455 Golden Gate Avenue - Room 11000
4                   San Francisco, California  94102
            BY:   **MICHAEL J. QUINN, DEPUTY ATTORNEY GENERAL**
5                 **KYLE A. LEWIS, DEPUTY ATTORNEY GENERAL**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

Tuesday, November 5, 2013

**PLAINTIFFS' WITNESSES**                                **PAGE**  **VOL.**

**CLEVELAND, IVAN (RECALLED)**
(PREVIOUSLY SWORN)                                        161     2
Redirect Examination by Mr. Cunningham                   161     2
Recross-Examination by Mr. Quinn                         169     2

**MORRIS, ROBERT**
(SWORN)                                                  171     2
Direct Examination by Mr. Wozniak                        171     2
Cross-Examination by Mr. Quinn                           209     2
Redirect Examination by Mr. Wozniak                      217     2

**HUFF, DEMETRIUS DWAYNE**
(SWORN)                                                  220     2
Direct Examination by Mr. Cunningham                     220     2
Cross-Examination by Mr. Lewis                           242     2
Redirect Examination by Mr. Cunningham                   249     2

**TRASK, KENNETH (RECALLED)**
(PREVIOUSLY SWORN)                                       255     2
Direct Examination by Mr. Cunningham                     255     2
Cross-Examination by Mr. Lewis                           270     2
Redirect Examination by Mr. Cunningham                   281     2

**JONES, DESMOND**
(SWORN)                                                  298     2
Direct Examination by Mr. Wozniak                        298     2
Cross-Examination by Mr. Quinn                           313     2
Redirect Examination by Mr. Wozniak                      314     2

**ABANICO, IRWIN**
(SWORN)                                                  315     2
Direct Examination by Mr. Cunningham                     316     2

**CURRY, BENJAMIN**
By Deposition                                            350     2

# I N D E X

## E X H I B I T S

| PLAINTIFFS' EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 6D | 189 | 398 | 2 |
| 6B | | 398 | 2 |
| 6C | | 398 | 2 |
| 6E | | 399 | 2 |
| 10 | 253 | 399 | 2 |
| 11 | 335 | 399 | 2 |
| 12 | 337 | 400 | 2 |
| 13 | 339 | 400 | 2 |

**PROCEEDINGS**

1    Tuesday - November 5, 2013                          8:45 a.m.

2                          **P R O C E E D I N G S**

3                                  ---oOo---

4         (Proceedings were heard out of presence of the jury:)

5              **THE COURT:**  Good morning, everyone.  Please be seated.

6              **ALL COUNSEL:**  Good morning.

7              **THE CLERK:**  Calling Civil 07-2089, Ivan Cleveland

8    versus Ben Curry.

9         Counsel.

10             **MR. CUNNINGHAM:**  Morning, Your Honor.  Dennis

11   Cunningham for the plaintiffs.

12             **THE COURT:**  Mr. Cunningham, good morning.

13             **MR. QUINN:**  Good morning.  Michael Quinn for the

14   defendants.

15             **THE COURT:**  Good morning.

16             **MR. CUNNINGHAM:**  Judge, I asked that we be heard

17   before the jury this morning because I really think this thing

18   of Warden Curry's appearance should be established so we can

19   call him.

20             **THE COURT:**  Well, it appears to me -- I mean, did you

21   subpoena him?

22             **MR. CUNNINGHAM:**  I didn't subpoena him, Judge.  He's a

23   party.  He's --

24             **THE COURT:**  He's not --

25             **MR. CUNNINGHAM:**  -- a named party --

**PROCEEDINGS**

1       **THE COURT:** Excuse me. He's not on your witness list.

2       **MR. CUNNINGHAM:** Yes, he is, and he was originally on

3  the very first witness list back in October when we had the

4  pretrial.

5       **THE COURT:** But did you discuss this about -- with

6  defense counsel?

7       **MR. QUINN:** (Shaking head.)

8       **MR. CUNNINGHAM:** No.

9       **THE COURT:** Well, you had an obligation to subpoena

10  your witnesses.

11                        (Pause in proceedings.)

12       **THE COURT:** Have you attempted to subpoena him now?

13       **MR. CUNNINGHAM:** We tried yesterday. Wouldn't give us

14  a way to do it. He's retired. They don't have -- They

15  declined to take the subpoena.

16       **THE COURT:** Do you have his current address.

17       **MR. QUINN:** I don't know his address, no. I mean --

18  You know, Your Honor, it's the second day of trial.

19       **THE COURT:** No, I understand. And -- And -- On the

20  other hand, I need to make sure that we have -- To be blunt,

21  let's not try this a second time. Okay?

22      What I'm going to suggest is that the parties discuss this

23  sometime during the break and see if you can come to a mutual

24  agreement as to how to get Warden Curry here. If not, then

25  bring it back up at lunchtime and I'll do it; all right?

1      **MR. CUNNINGHAM:** All right, Judge. I mean, you

2  know --

3      **THE COURT:** I --

4      **MR. CUNNINGHAM:** -- I won't go on and on about it

5  but --

6      **THE COURT:** All right. I want the parties to

7  understand: Plaintiff has 595 minutes left and defendant has

8  691 minutes left as of this morning.

9      **MR. CUNNINGHAM:** How does that -- We have to divide

10  that by six people.

11      **THE COURT:** You do. So be judicious with your time.

12      **MR. CUNNINGHAM:** Yes, sir.

13      **THE COURT:** Do we have the jury all ready, Lisa?

14      **THE CLERK:** I'll check and see if they're all here

15  now.

16      **THE COURT:** Check and then we'll get started.

17      **THE CLERK:** Okay.

18              (Pause in proceedings.)

19      **THE CLERK:** All the jury's not here yet.

20      **THE COURT:** Oh, all right. Okay. Well, they weren't

21  told to be here any earlier so --

22      **THE CLERK:** Yes. It's 8:45.

23      **THE COURT:** How many?

24      **THE CLERK:** One.

25      **THE LAW CLERK:** I'm going to go to chambers to let

 1    them in because they're going in back.

 2          THE COURT:  Okay.  Well, as soon as we get the witness

 3    done.

 4          THE CLERK:  All right.  Go ahead.

 5                    (Pause in proceedings.)

 6          THE COURT:  Okay.  Let's start.

 7                    (Pause in proceedings.)

 8          MR. CUNNINGHAM:  Judge, we have another small issue

 9    which is that --

10          THE COURT:  Well, we don't have the clerk here.

11          MR. CUNNINGHAM:  Oh, I'm sorry.

12          THE COURT:  So wait until Miss Clark gets back.

13          MR. CUNNINGHAM:  This is just a scheduling matter.

14          THE COURT:  I'd like -- She needs to be here because

15    she keeps the minutes.

16          MR. CUNNINGHAM:  All right.

17                    (Pause in proceedings.)

18       (Proceedings were heard in the presence of the jury:)

19          THE COURT:  Good morning, everyone.

20          THE JURORS:  Good morning.

21          THE COURT:  Thank you for being here promptly.

22       By the way, feel free to spread out if you like during the

23    trial.  You don't have to all cluster unless it's safety in

24    numbers, you know.

25       Okay.  Thanks so much.  Why don't we proceed.

1    All right.  We have --

2         MR. CUNNINGHAM:  Mr. Cleveland's testimony can resume,

3    Judge.

4         THE COURT:  Please.

5         MR. CUNNINGHAM:  Redirect.

6                    **IVAN CLEVELAND**,

7    called as a witness for the Plaintiff, having been previously

8    duly sworn, testified further as follows:

9         THE COURT:  Just remind you, Mr. Cleveland, you remain

10   under oath.

11        THE WITNESS:  Yes, sir.

12                    **REDIRECT EXAMINATION**

13   BY MR. CUNNINGHAM:

14   **Q.**   Good morning.

15   **A.**   Good morning, sir.

16   **Q.**   Yesterday, when Mr. Quinn was asking you some questions,

17   you spoke about testimony in the deposition about one of the

18   events, I think it was the second one, taking 40 or 60 or 80

19   seconds.

20        You remember that?

21   **A.**   Yes, sir.

22   **Q.**   And you had also talked about the physical search itself

23   taking three or four seconds; right?

24   **A.**   Yes, sir.

25   **Q.**   When you're referring to the 40 or 60 or 80 seconds, what

1    does that time span refer to?

2    **A.**    The complete search after the coming off the wall from the

3    four seconds.

4    **Q.**    So from the time you're stopped and pulled over?

5    **A.**    From the time you're pulled over to the time the end of

6    the search is.

7    **Q.**    So when you came off the wall -- And this is the second

8    time, now, right, in '07?

9    **A.**    Yes, sir.

10   **Q.**    And then there was a period of time there when there was

11   some kind of back and forth going on between you and Abanico?

12   **A.**    What, as far as confrontation?

13   **Q.**    Yes.

14   **A.**    Yes, sir.

15   **Q.**    Okay.  And that's when you're referring to the whole time

16   span of up to 80 seconds?

17   **A.**    Yes, sir.

18   **Q.**    And -- And when you . . .  When you said you had 127

19   witnesses, you weren't saying -- Well, were you saying that

20   there was 127 guys standing right there watching that?

21   **A.**    No, sir.

22   **Q.**    No.  The 127 referred to what?

23        **MR. LEWIS:**  Objection, Your Honor.  We've been over

24   this.

25        **THE COURT:**  Well, you opened it up, I think, yesterday

1    to some extent.

2         **THE WITNESS:**  Can you repeat the question, sir?

3    **BY MR. CUNNINGHAM:**

4    **Q.**   What -- What -- When you said you had 127 witnesses, what

5    were you referring to?

6    **A.**   I was referring to inmates that have been violated in that

7    same manner and who have witnessed other inmates being violated

8    in that same manner.

9    **Q.**   And were you --

10        **MR. LEWIS:**  Objection, Your Honor.  This is getting

11   beyond what we had talked about, Your Honor.  We asked the

12   question of were there witnesses, he said 127, not to that

13   search.

14        **THE COURT:**  All right.  Why don't you move on,

15   counsel.

16   **BY MR. CUNNINGHAM:**

17   **Q.**   The 127 referred to the signs on the petition?

18        **MR. LEWIS:**  Your Honor, objection.

19        **THE COURT:**  Sustained.

20       Move on, counsel.

21   **BY MR. CUNNINGHAM:**

22   **Q.**   All right.  Counsel asked you . . . about whether you

23   received any medical treatment; right?

24   **A.**   Yes, sir.

25   **Q.**   And did you have a -- a -- Strike it.

1     Well, did you have a physical -- Strike that.

2     When he grabbed you as you described, did it hurt?

3 **A.**   A little.

4 **Q.**   And you -- you didn't need a doctor to examine you

5 physically for that.

6 **A.**   No, sir.

7 **Q.**   Did you have other treatment?

8 **A.**   Mental health treatment.

9 **Q.**   All right.  And what did that consist of?

10 **A.**   A lot of therapy.  They put me on medication for paranoia

11 and depression, Celexa.

12     What became of it is, I've been given a single cell

13 because of this.  I've gotten numerous chronos stating that I

14 can't work certain jobs, do the certain kind of searches, strip

15 searches.

16     I don't take showers with other inmates or I take showers

17 by myself or I birdbath, which is washing up in the sink,

18 because of the paranoia due to this.  I have nightmares late at

19 night.  I've hit my head twice on the bed --  on the top bunk

20 from waking up from cold sweats and nightmares.

21 **Q.**   What's in the nightmare?

22 **A.**   Seeing him come in through my door, touching me in that

23 manner.

24 **Q.**   Did you say to him --

25 **A.**   The defendant, Abanico.

1   **Q.**   Yes.

2   **A.**   And I've talked to all the psychiatrists concerning this

3   matter.

4   **Q.**   Um-hmm.  And -- And how long did the -- did this treatment

5   go on?

6   **A.**   It -- It's still going on.

7   **Q.**   All right.  And you're consulting a psychologist every so

8   often there?

9   **A.**   Yes.

10  **Q.**   Have you . . .  Has your condition improved over the time

11  in between?

12  **A.**   A little, it has.  I've been taught to stop the defendant

13  at the door of coming in the cell in through the dreams.

14  Through the dreams, he had -- I had got to the point where I

15  was waking up where he was touching and fondling me I would

16  wake up in a cold sweat.

17      I've been taught through meditation through one of the

18  psychs to control the dream where I can wake up and stop the

19  defendant coming at -- in the cell door, in the dream.

20  **Q.**   All right.  And so it -- Are you -- All right.  Never

21  mind.

22      Now, did you . . .  Were you --

23      **MR. CUNNINGHAM:**  Judge, I think I have to reopen the

24  direct here a little bit, if I may, because there is a followup

25  on the first search that I need to have him describe.

1    THE COURT:  All right.  It's a limited inquiry into

2  the first search, as you indicated.

3    But don't go past that.

4  BY MR. CUNNINGHAM:

5  Q.  Were you asked -- When you filed the 602 after the first

6  search, did you -- was there some followup with you by

7  Lieutenant Biggs?

8  A.  Yes, sir.

9  Q.  What happened with Lieutenant Biggs?

10 A.  It was called in.  I was in my cell, called to . . . the

11 office where the COs are.  There's a long line there.  I was

12 stood in line with the other inmates who were being

13 interviewed.  There was an interview.

14    There was Biggs and two other COs, Correctional Officers.

15 One had a video came, the other one was sitting down taking

16 notes, and Biggs was asking the questions.

17 Q.  What were the questions?

18 A.  The questions --

19    MR. QUINN:  Objection:  Hearsay.

20    THE COURT:  Sustained.

21 BY MR. CUNNINGHAM:

22 Q.  Were you -- Were you interviewed along with the others?

23 A.  Yes, sir.

24 Q.  And what were the questions to you?

25 A.  The --

1    **MR. QUINN:**  Objection:  Hearsay.

2    **MR. CUNNINGHAM:**  Judge, how's it hearsay?  It's not --

3  We're not trying to prove any truth in the content of the

4  statement.

5    **THE COURT:**  You can ask him what he said.

6    **MR. CUNNINGHAM:**  What he said?

7    **THE COURT:**  Do you expect -- I'll let the parties

8  approach.

9    **MR. CUNNINGHAM:**  I'm sorry.

10     (Sidebar conference heard but not reported.)

11    **THE COURT:**  Madam Reporter, we'll take the side bar

12  conference after the -- at the break.

13    **THE REPORTER:**  Great.

14  BY MR. CUNNINGHAM:

15  **Q.**  When you were called down to the office with the other

16  prisoners, when it came your turn, you were questioned by

17  Lieutenant Biggs; is that right?

18  **A.**  Yes, sir.

19  **Q.**  And what did you tell him at that time?  Without saying

20  what he said.

21  **A.**  I told him that I had a retaliation request typed up

22  because of the situations that occurred with interviews

23  previous.  And I said, "My property is packed because I'm

24  prepared to go to the hole."  I put my hands behind my back for

25  them to put me in the hole because he was saying, "We'll put

1    you in the hole for your protection."

2              **MR. QUINN:**  Objection:  Hearsay.

3              **THE COURT:**  Overruled at this time.

4    **BY MR. CUNNINGHAM:**

5    **Q.**    And -- And did you hear him questioning the other inmates?

6    **A.**    The one in front of me.  Not all of the inmates but the

7    one in front of me, you know, because the door is open so the

8    officers are right there.  So the one in front of me, I did.

9    **Q.**    All right.  And -- And were -- Was any -- Was there any

10   threat that you heard?

11   **A.**    Yes.

12   **Q.**    From Biggs?

13   **A.**    Yes.

14   **Q.**    And what -- And was -- Did that condition what you told

15   him when you came in there and said you're ready to go to the

16   hole?

17   **A.**    Yes.

18   **Q.**    Okay.  And . . . was the -- When you could see the other

19   interviews, were they being videotaped?

20   **A.**    Yes.

21   **Q.**    Was yours videotaped?

22   **A.**    Yes.

23   **Q.**    And did other inmates speak to you about what had happened

24   in there?

25   **A.**    Yes.

1  **Q.**   Oh, okay.  And did that condition your responses to

2  Lieutenant Biggs?

3  **A.**   Yes.  Well, I was upset they had spoke to him because they

4  recanted their statements.  So I was upset because they had

5  signed a petition.

6       **MR. CUNNINGHAM:**  All right.  I have nothing further,

7  Your Honor.

8       **THE COURT:**  All right.

9       **MR. CUNNINGHAM:**  Thank you.

10            (Pause in proceedings.)

11       **THE COURT:**  Recross -- Counsel, recross only on those

12  issues that had . . .

13       **MR. QUINN:**  Yes, Your Honor.

14       Just a moment.  Just a few questions.

15                 **RECROSS-EXAMINATION**

16  **BY MR. QUINN:**

17  **Q.**   Officer Biggs, who you mentioned earlier, he's not a

18  defendant in this case; is he?

19  **A.**   I don't know.  I don't think he is.

20  **Q.**   And the --

21       **A JUROR:**  Can't hear.  The air conditioning is really

22  loud.

23  **BY MR. QUINN:**

24  **Q.**   I'll repeat the question.

25       Officer Biggs is not a defendant in this case; is he?

1   **A.**    I don't think so.

2   **Q.**    And you don't have a copy of that videotape that you

3   referenced earlier; do you?

4   **A.**    No.

5               **MR. QUINN:**  Okay.  Thank you.

6               **THE COURT:**  All right.  Anything further?

7               **MR. CUNNINGHAM:**  Nothing, Judge.

8               **THE COURT:**  Mr. Cleveland, you're free to step down.

9               **THE WITNESS:**  Thank you very much.

10                        (Witness excused.)

11              **THE COURT:**  Next witness.

12              **MR. CUNNINGHAM:**  Your Honor, our next witness is going

13  to be Mr. Morris.  Mr. Wozniak is going to question him.

14      But Mr. Wozniak has a case down the hall where a witness

15  may be called that he represents, so he may be called away.  If

16  that happens, we'll start another witness, if that's all right

17  with the Court, and --

18              **THE COURT:**  Well, I'd like to keep the continuity of

19  this, so --

20              **MR. WOZNIAK:**  If I can clarify.  It's not going to be

21  till this afternoon that that witness would be called.

22              **THE COURT:**  We've got plenty of time between now and

23  the afternoon.

24              **MR. WOZNIAK:**  Yes.

25              **MR. CUNNINGHAM:**  Yes.  I wasn't even sure of that,

1    Your Honor.  We'd better get done before noon.

2         **MR. WOZNIAK:**  The plaintiffs call Mr. Morris.

3         **THE COURT:**  Ladies and gentlemen of the jury, if for

4    some reason the air conditioning goes on and you can't hear,

5    please feel free to raise your hand or say "I can't hear."

6    We'll either pause until it turns off or we'll ask the witness

7    and the counsel to speak louder.  But it's better to have the

8    air conditioning going rather than 85 degrees in here.  All

9    right.

10        **THE CLERK:**  Raise your right hand.

11                        **ROBERT MORRIS**,

12   called as a witness for the Plaintiff, having been duly sworn,

13   testified as follows:

14        **THE CLERK:**  Please be seated.

15      Please state your full name for the Court and spell your

16   last name.

17        **THE WITNESS:**  My name is Robert Morris, M-O-R-R-I-S.

18        **THE CLERK:**  Thank you.

19        **THE COURT:**  Mr. Morris, pull that microphone a little

20   closer to you.

21        **THE WITNESS:**  Yes, sir.

22        **THE COURT:**  Thanks so much.

23                     **DIRECT EXAMINATION**

24   BY MR. WOZNIAK:

25   **Q.**   Good morning, Mr. Morris.

1   **A.**   Good morning.

2   **Q.**   Are you a prisoner in CDCR currently?

3   **A.**   Yes, sir.

4   **Q.**   How long have you been a prisoner?

5   **A.**   28 years, sir.

6   **Q.**   Where are you from originally?

7   **A.**   I'm from Modesto.

8   **Q.**   Modesto, California.

9        And where are you currently -- Which facility are you

10  currently in?

11  **A.**   I'm in Folsom State Prison.

12  **Q.**   And at Folsom State Prison, are you involved in any

13  activities?

14  **A.**   Yes, sir.  I was part of the executive body for the

15  veterans group, which I'm still a part of.

16  **Q.**   And what does the veterans group do?

17  **A.**   It's an organization that helps other veterans inside that

18  are fixing to be released to be able to work on, you know,

19  getting benefits and help them -- it's sort of support when

20  they get out.

21  **Q.**   And so you served in the military?

22  **A.**   Yes, sir, I did.

23  **Q.**   And what branch?

24  **A.**   U.S. Army.

25  **Q.**   And you said you've been in prison for almost 29 years;

1  correct?

2  **A.**    Yes, sir.

3  **Q.**    And in that time, you've been searched.

4        Can you make a guess how many times you've been searched?

5  **A.**    Man, I -- I couldn't.  I couldn't even put a number on it.

6  **Q.**    But safe to say more than a thousand times?

7  **A.**    Yeah, easy to say that.

8  **Q.**    And can you describe the normal process of a search.

9        And when we're talking searches right now, I'm just

10  talking clothed-body searches that have been discussed in this

11  case so far.

12  **A.**    The majority of searches that I've been through, or for

13  the most part almost all of the searches, it's always been like

14  a karate chop.  It goes up by -- on the inside.

15  **Q.**    Well, if we can step back and kind of go through step by

16  step --

17  **A.**    Okay.

18  **Q.**    -- and I can . . .

19        Typically, when you -- when an officer pulls you over to

20  search you, what is -- what do they first ask you to do?

21  **A.**    They ask you to get on the wall.

22  **Q.**    And can you describe the process of getting on the wall.

23  **A.**    They don't need to.  Everybody pretty much knows the

24  process of that.

25  **Q.**    Can you tell us?

1    A.    It's spread-eagle like this (indicating) on the wall, and

2    they kick your feet out so they have complete control over

3    your -- so they can be able to throw you off balance or

4    whatever.

5            MR. WOZNIAK:    And if the record can reflect Mr. Morris

6    raised his hands kind of in an up-against-the-wall position, I

7    guess would be fair to say, over his head.

8    BY MR. WOZNIAK:

9    Q.    And once they have you up against the wall, what part of

10    the body do they typically start at?

11    A.    They usually start at the top, underneath the -- Well,

12    underneath the armpits, and then they work their way down.

13    Q.    Okay.  And you just described a judo chop.  And when you

14    were talking about the judo chop, what part of the search would

15    that be referring to?

16    A.    That would be below the belt.

17    Q.    And can you show us what a judo chop looks like?

18    A.    It's usually -- Usually what they do is, they run their

19    hand across your waistline and in your back, and then they go

20    down into the inner thigh, then they work their way down, and

21    then they come up the other side to the inner thigh, and that's

22    pretty much the end of the search.

23    Q.    And let's go to June 21st, 2007.

24            At that time, what facility were you in?

25    A.    I was in CTF.

1  **Q.**  And CTF is known as --

2  **A.**  Sol -- Soledad, yes, sir.

3  **Q.**  And at that time, where were you housed?

4  **A.**  I was in C-302.

5  **Q.**  Would that be C Wing?

6  **A.**  Yes, sir, C Wing.  I'm sorry.  C Wing 302.

7  **Q.**  And on June 21st, 2007, at some point did you go to the

8  Counselor's Office?

9  **A.**  Yes, sir.  I just came in from the yard and there was a --

10  a note left from -- or passed for me to go to the Counselor's

11  Office.

12      So I had to go up to my house and get in the blues,

13  because that's where they make you go to the Counselor's

14  Office, and I came out to go.

15  **Q.**  And when you say blues, you're talking about the --

16  **A.**  I'm talking about the dress.

17  **Q.**  Like right now you're in oranges.

18  **A.**  I'm in oranges.  This would actually be a blue and blue

19  pants.

20  **Q.**  And what do you wear when you're in the yard?

21  **A.**  If you're in the yard, you can wear shorts or T-shirt.

22  **Q.**  Okay.  So you got into your blues, and then where did --

23  where did you go next?

24  **A.**  I -- I left the Wing and went over and stood in front of

25  the Counselor's Office.

1  **Q.**  And when you -- You say you left the Wing.  We talked

2  about -- yesterday about the corridor.

3  **A.**  Yes, sir.

4  **Q.**  Did you have to go into the corridor from C Wing?

5  **A.**  Yes, sir.  You have to go in the corridor to go anywhere

6  from the buildings.

7  **Q.**  So you left C Wing, went into the corridor, and then down

8  to the Counselor's Office?

9  **A.**  Right.  The counselor was going toward West Gate.  It

10  was -- When I went out of the -- When I went out of the -- the

11  Wing, I went left, and it was probably approximately maybe

12  60 feet or more, somewhere around there.  I -- You know, I

13  can't really remember exactly the distance.

14  **Q.**  Okay.

15  **A.**  I haven't been over there for six years, so it's --

16  **Q.**  Fair enough.

17  **A.**  That's the last place I'm thinking of.

18  **Q.**  And were you with anyone else?

19  **A.**  There was another inmate that was going over at the same

20  time.  His name was Mr. Escobar.

21  **Q.**  And are you friends with Mr. Escobar?

22  **A.**  No.  Just an acquaintance.

23  **Q.**  So he just happened to be going to the same place --

24  **A.**  Yes.

25  **Q.**  -- that you were?

1  **A.**   Yes, sir.

2                    (Pause in proceedings.)

3  **BY MR. WOZNIAK:**

4  **Q.**   And at some point on your way to the Counselor's

5  Office -- And -- And let me ask you this:

6       The Counselor's Office, is this like -- What does the

7  Counselor's Office do.  What happens there?

8  **A.**   Counselor's Office is the ones that handles your -- your

9  C files.  And the counselors are the ones that prepares your

10 Board reports for the Board and, usually, your packets, so when

11 you go, that you have what they have.

12 **Q.**   And -- And what is a C file?

13 **A.**   A C file is all the information on everything, the

14 activities that I've been in, involved in, and the infractions

15 I've been involved in, or whatever or whoever during their time

16 at prison.

17 **Q.**   Okay.  And when you say the Board, what are you referring

18 to?

19 **A.**   I'm talking about the Board of Prison Terms.

20 **Q.**   Okay.  Is that where you go if you have a parole hearing?

21 **A.**   Yes, sir.

22 **Q.**   Okay.  And at some point as you got to the Counselor's

23 Office, did you encounter Officer Abanico?

24 **A.**   Yes, sir.  He was standing across about midway between

25 C Wing and the Counselor's Office, and he called me and Escobar

1  back over there to be searched before we go in to the

2  Counselor's Office.

3  **Q.**  And so when Officer Abanico called you to be searched,

4  this is when you put your hands up against the wall?

5  **A.**  Yes, sir.

6  **Q.**  Okay.  You kind of know the drill; right?

7  **A.**  Yes, sir.

8  **Q.**  And what -- what happened next?

9  **A.**  He started his search.  And when he got into the lower

10  part, he cupped my scrotum and squeezed my penis And I -- and I

11  came off the wall on him.

12  **Q.**  So where did he start in the search?

13  **A.**  He started from the top down, sir.

14  **Q.**  So he started like a normal search.

15  **A.**  Yes, sir, he did.

16  **Q.**  And so there was nothing when the search started that

17  caused you any kind of suspicion or any --

18  **A.**  No.

19  **Q.**  No reaction?

20  **A.**  No, sir, not at all.

21  **Q.**  And so he started at the top.  Did he go to the middle of

22  your body after that?

23  **A.**  Yes, sir.

24  **Q.**  And then he got to your groin area.  Did he go down your

25  leg first or did he just go to your groin area?

1   **A.**   He went to the groin area, sir.

2   **Q.**   And this is when you say that he -- he squeezed your

3   penis.

4   **A.**   Yes, sir.

5   **Q.**   And anything else he did?

6   **A.**   Yes, sir.  He squeezed my sack.

7   **Q.**   Your sack in this --

8   **A.**   My -- My scrotum.

9   **Q.**   And would this be commonly referred to as your balls?

10  **A.**   Yes, sir.

11  **Q.**   Okay.  And so once he squeezed your scrotum and your

12  penis, you came off the wall?

13  **A.**   Yes, sir, I did.

14  **Q.**   And what happened then?

15  **A.**   He ordered me back on the wall.

16  **Q.**   How would you describe his reaction?

17  **A.**   There was a smirk on his face.  It's like he thought it

18  was funny.

19  **Q.**   And was Mr. Escobar next to you at this time?

20  **A.**   Yes, sir.  He was on the wall also.

21  **Q.**   Okay.  And what happened after -- So you pulled away,

22  Officer Abanico smirked at you, and then what happened next?

23  **A.**   He ordered me back on the wall.

24  **Q.**   And then what happened after that?

25  **A.**   I got back on the wall.

1 **Q.** Okay. And did he continue to search at that point?

2 **A.** Yes, sir, he did.

3 **Q.** And where did he kind of pick up his search?

4 **A.** On the lower part of my body.

5 **Q.** Still in the groin area?

6 **A.** Yes, sir.

7 **Q.** And -- And what happened at that point?

8 **A.** He pinched my penis again.

9 **Q.** And if we can go back to the first time that he squeezed

10 your scrotum and your penis.

11 How long did that last?

12 **A.** You know, it was a -- I couldn't really es -- I told the

13 Attorney General in my deposition, you know, when you're --

14 something like that happens, you're never really thinking about

15 a time. Maybe one, two seconds.

16 **Q.** So it was brief.

17 **A.** You know, it's -- it's -- it's just an estimate. I can't

18 give you --

19 **Q.** But it was enough time for you to react --

20 **A.** Yes, sir.

21 **Q.** -- and to feel it was something inappropriate.

22 **A.** Yes, sir, it was.

23 **Q.** And you just mentioned a deposition.

24 You had your deposition taken in this case?

25 **A.** Yes, sir, I did.

1    Q.    And do you remember the date of that deposition?

2    A.    No, sir, I don't.  I can look and see here.

3          (Searching through documents.)

4          THE COURT:  And for the record, Mr. Morris, what are

5    you looking at?

6          THE WITNESS:  I am looking at the deposition that was

7    taken by the Attorney General, sir.

8          THE COURT:  All right.  Thank you so much.

9          THE WITNESS:  And it was March 27th, 2013, sir.

10   BY MR. WOZNIAK:

11   Q.    Okay.  So a little bit earlier this year.

12   A.    Yeah.

13   Q.    But years after the incident occurred.

14   A.    Right.  Yes, sir.

15   Q.    So the second time that Officer Abanico -- Did he squeeze

16   your scrotum the second -- in the second episode as well or was

17   that --

18   A.    He groped it.

19   Q.    -- your penis?

20         He groped it.

21   A.    Yes, sir, he did.

22   Q.    And how long did that last?

23         THE COURT:  I'm sorry, counsel.  You said the second.

24   Referring to the same search over a long period of time, or was

25   there now a second search?  Perhaps there --

1      MR. WOZNIAK:  There's only one search.

2      THE COURT:  Okay.

3      MR. WOZNIAK:  There's the first kind of incident

4  within the search.

5      THE COURT:  And then he came off the wall and went

6  back.

7      MR. WOZNIAK:  Yes.

8      THE COURT:  Thank you.

9      MR. WOZNIAK:  Of course.

10  BY MR. WOZNIAK:

11  Q.   So the -- When you got back on the wall after the first

12  time you came off --

13  A.   Yes, sir.

14  Q.   -- and Officer Abanico squeezed your penis the second

15  time --

16  A.   Yes, sir.

17  Q.   -- how long did that last?

18  A.   Again, I -- I -- It was just enough to get a reaction and

19  pull me off the wall again.

20                  (Pause in proceedings.)

21  BY MR. WOZNIAK:

22  Q.   You said you came off the wall again?

23  A.   Yes, sir, I did.

24  Q.   And the second time you came off the wall, what did you

25  do?

1  **A.**   I refused to get back on the wall for him after he ordered

2  me back on the wall.

3  **Q.**   You refused to be searched anymore.

4  **A.**   Yes, sir, I did.

5  **Q.**   Okay.  Mr. Escobar is next to you still at this point.

6  **A.**   Yes, sir, he is.

7  **Q.**   What happened with Mr. Escobar?  Did you see any

8  interaction between Officer Abanico and Mr. Escobar at this

9  point?

10  **A.**   No, sir, I didn't.  I was -- I was kind of like in a rage

11  in my mind of what he had just done.  I -- I'll be honest with

12  you, I was just trying to get away from the situation.

13  (Pause in proceedings.)

14  **BY MR. WOZNIAK:**

15  **Q.**   Was there another Correctional Officer around while the

16  search occurred?

17  **A.**   Yes, sir, there was.  In C -- In CTF Soledad, when --

18  usually when one officer is searching an inmate, there's always

19  a backup officer behind him.

20  **Q.**   And what did that -- Did that officer in -- When you came

21  off the wall the first time, did that officer, the one who

22  was -- the second officer, did that officer do anything?

23  **A.**   Yes, sir.  He walked away.

24  **Q.**   When you say walked away, you mean he just --

25  **A.**   He walked away from Mr. Abanico as a backup.

1  **Q.** Did you see any kind of expression from that officer? Did

2  you see any reaction to what was happening?

3  **A.** I don't recall, sir. I'll be honest with you. It's --

4  It's been so long.

5  **Q.** Okay. Were there any other Correctional Officers around?

6  **A.** Yes, sir, there was.

7  **Q.** And who would that be?

8  **A.** That was Captain . . . I . . . I have to -- Guerrera, I

9  believe her name was.

10 **Q.** And where was Captain Guerrera at that time?

11 **A.** She was standing in front of the gym, which is directly

12 across from C Wing.

13 **Q.** And how far away is that from where you were?

14 **A.** Approximately 30 feet, sir.

15 **Q.** Were there a lot of other prisoners in the corridor at

16 this time?

17 **A.** No, sir. They had just brought yard in, and it was -- it

18 was -- I believe it was, like, around 2:30, 3 o'clock in the

19 afternoon, after the yard came in. And that's when all the

20 Wings and what have you does their showers and what have you,

21 and then pretty much the program's over until night -- dinner

22 and night yard.

23 **Q.** So this is one of the times that was discussed yesterday.

24 There's times when the corridor is very busy and there's times

25 when the corridor is pretty empty.

1    A.    Yes, sir.

2    Q.    This was an empty time.

3    A.    Yes, sir.

4                    (Pause in proceedings.)

5           MR. WOZNIAK:  Can I have a brief moment, Judge?

6                    (Pause in proceedings.)

7           MR. WOZNIAK:  Thank you, Judge.

8    BY MR. WOZNIAK:

9    Q.    Going back to the search.

10         When you pulled away the second time and refused to be

11   searched any further by Officer Abanico, at any time before

12   that did -- did Officer Abanico say anything sexual?

13   A.    No, sir, he didn't.

14   Q.    And then what happened right after this?

15   A.    After the incident?

16   Q.    Yes.

17   A.    I walked away from him and went over and sat in front of

18   the Counselor's Office waiting to be admitted.

19   Q.    And were you admitted?

20   A.    Yes, sir, I was.

21   Q.    And you got the paperwork you went to go get and --

22   A.    Yes, sir, I did.

23   Q.    -- then you returned back --

24   A.    Yes.

25   Q.    -- to your cell?

1   **A.**   Yes, sir.

2   **Q.**   How were you feeling at this point?

3   **A.**   This -- This is rather embarrassing.

4   **Q.**   Okay.

5   **A.**   It's an embarrassing thing.

6   **Q.**   And how were you feeling at the point right after -- you

7   know, once you got your paperwork and went back to your cell?

8   Were you just sitting in your cell?

9   **A.**   No.  I was -- I was pretty -- I was pretty -- pretty hot,

10  pretty mad.

11  **Q.**   You were -- Is it fair to say you were pissed off?

12  **A.**   That's putting it very lightly.

13  **Q.**   And were you feeling any other emotions as well?

14  **A.**   Yes, sir, I was.

15  **Q.**   Did you feel violated?

16  **A.**   Yes, sir, I did.

17  **Q.**   And in the 20 -- Well, I guess at this -- at this point,

18  you had been in prison for . . .

19  **A.**   22 years, sir.

20  **Q.**   22 years?

21  **A.**   Yeah.

22  **Q.**   Had you ever felt similarly violated by a corrections

23  officer?

24  **A.**   Never, sir.

25  **Q.**   I'll ask you a couple general questions about the dynamic

1  between yourself and Corrections Officers.

2  **A.**    Yes, sir.

3  **Q.**    How would you describe that relationship?

4  **A.**    I have a very good rapport with Correctional Officers,

5  sir.  I -- I'm considered what they call OG.  That's old guy

6  that's been down for quite awhile.

7        And we -- There's -- There are those of us that takes the

8  time to mentor young people in there to help them get theirself

9  ready to go to the streets, and I happen to be one of those

10 guys.

11 **Q.**    And is there -- is there a trust between the Correctional

12 Officers and yourself?

13 **A.**    There is, sir.  There's also a line that's drawn, too.

14 You know what I mean?  There's some guys that -- that are not

15 watched as near as others are, you know.

16       Correctional Officers, you can take a building that has

17 300 guys in it and have three Correctional Officers.  And

18 within a month, that Correctional Officer will know just about

19 every name of every individual that lives in that building.

20 It's his job to know them, so they know their habits, they know

21 what they do and, you know, how they . . .

22 **Q.**    And is it fair to say that Correction Officers are people

23 like anyone else?  They have --

24 **A.**    Yes, sir, they are.

25 **Q.**    They have their own personalities.

1    **A.**   Yes, sir.

2    **Q.**   And their own ways of doing things just like the

3    prisoners.

4    **A.**   Yes, sir.  There's some Correctional Officers that I have

5    the very utmost respect for, sir.

6    **Q.**   Now, did you file a complaint against Officer Abanico from

7    this incident of June 21st, 2007?

8    **A.**   Yes, sir, I did.

9    **Q.**   And --

10       **MR. WOZNIAK:**  If I may approach the witness, Your

11    Honor, and show him D?  Sorry, 6D.

12       **THE WITNESS:**  (Examining document.)

13       **THE COURT:**  This is 6D?

14       **MR. WOZNIAK:**  6D.

15       **THE COURT:**  Has that already been marked?

16       **MR. CUNNINGHAM:**  It was marked, Judge.

17       **MR. WOZNIAK:**  I believe it was marked.

18       **THE COURT:**  Was 6D marked?

19       **THE CLERK:**  No.

20       **THE COURT:**  All right.  Let's make sure it's marked

21    and . . .

22       **MR. WOZNIAK:**  We're talking about this.  It has a

23    thing.

24       **THE COURT:**  All right.  But it --

25       **THE CLERK:**  It's marked now.

1    (Plaintiff's Exhibit 6D marked for identification)

2       THE COURT:  And Mr. Quinn, you have a copy of 6D?

3       MR. QUINN:  I'm looking for it.

4    What's the -- What's the . . . the Bates label -- Bates

5    number?

6                   (Counsel confer.)

7       MR. QUINN:  Yes, we have it.

8       THE COURT:  All right.  Thank you.

9    Proceed, counsel.

10      MR. WOZNIAK:  Thank you, Judge.

11   Q.  Mr. Morris, I'm showing you what's been marked as

12   Plaintiff's Exhibit 6D.

13   A.  Yes, sir.

14   Q.  I'm going to switch.  I'll give you my copy of this and

15   I'm going to work off the Court's copy.

16   So you filed a complaint against Officer Abanico for the

17   incident of June 21st, 2007?

18   A.  Yes, sir.

19   Q.  And is this what is known as a 602?

20   A.  Yes, sir, Inmate Appeal.

21   Q.  And when you filed this, do you know what date you filed

22   this complaint on?

23   A.  Yeah.  6/22/07.

24   Q.  So it was the day after.

25   A.  Yes, sir, it was.

1  Q.  And did you have to go through any kind of process to

2  figure out how to file this thing, or who to file it to?

3  A.  No.  I've -- You know, I've -- I've -- This is not the

4  first 602 that I've wrote, but . . . I knew that when I -- when

5  I was in there writing this 602, there was a good chance I'd be

6  thrown in ad seg.

7  Q.  And ad seg is what we talked about yesterday.

8  A.  The hole, right.

9  Q.  Did you even know Officer Abanico's name?

10  A.  No, sir, I did not.

11  Q.  So you had to find out what his name was.

12  A.  Yes, sir.

13  Q.  And in this 602, you talk about (reading):

14        "Officer Abanico first groped my scrotum and

15        pinched the tip of my penis."

16        Is that correct?

17  A.  Yes, sir.

18  Q.  And I'm going to just -- And then you -- On the last line

19  of the first paragraph here (reading):

20        "Continued his search of me again.  Again he

21        groped my scrotum and smashed my penis."

22  A.  Yes, sir.

23  Q.  Now, you used the word "smashed" in the 602.

24  A.  That was an air -- It was an air of rage at the time.

25  When I wrote the 602, I was mad.

1   **Q.**   And when you were deposed in this matter -- Which you

2   remember; correct?

3   **A.**   Yes, sir.

4   **Q.**   There was a long conversation about the word "smashed."

5   **A.**   Yes, sir.

6   **Q.**   Do you remember that?

7   **A.**   Yes, sir, it was.

8   **Q.**   And -- And is it your recollection during that deposition

9   that you said clearly it was a pinch, not a smash?

10   **A.**   Yes, sir.

11   **Q.**   And so you acknowledge today that Officer Abanico did not

12   smash your penis.

13   **A.**   Yes, sir.  He pinched.

14   **Q.**   But there's -- there's a long bureaucratic process, which

15   we're going to go into shortly.

16   **A.**   Yes, sir.

17   **Q.**   And you didn't change the language that you used in this

18   first 602 throughout that process; is that correct?

19   **A.**   Yes, sir.

20   **Q.**   You kept the language -- You kept your original narrative

21   kind of the same.  You used the same words.

22   **A.**   Yes, sir.

23   **Q.**   So I'm not going to try to belabor this too much, but

24   let's talk about the process of the 602.

25       So you filed the 602 on June 22nd, '07.

1  A.    Yes, sir.

2  Q.    And did you get a confirmation that the 602 had been

3  filed?

4  A.    After I got it back from the C&D formal -- informal --

5  informal formal level as bypassed.

6  Q.    And if we're looking on the first page here of 6D, when

7  you say the informal and formal level, those are the two bottom

8  boxes --

9  A.    Yes, sir.

10 Q.    -- on the first page?

11       And there's a stamp that says "Bypass" on both of those;

12 right?

13 A.    Yes, sir.

14 Q.    So now if we turn to Page 3 of this exhibit --

15 A.    (Turning to document.)

16 Q.    -- this shows "First level, P granted," which I assume is

17 partially granted, with a date of June 26, '07.

18       Is this when you got something back from them?

19 A.    Yes, sir.

20 Q.    Okay.  And at any point where you . . .  Were you brought

21 in for a meeting with anyone --

22 A.    Yes, sir.

23 Q.    -- regarding this?

24 A.    Yes, sir, I was.

25 Q.    And who was that with?

1    **A.**   That would be Sergeant Randall.

2    **Q.**   And how long did this meeting last?

3    **A.**   It couldn't have been more than probably 15 minutes.

4                    (Pause in proceedings.)

5    **BY MR. WOZNIAK:**

6    **Q.**   And in this meeting, what was discussed?

7    **A.**   What was in the material on the 602.

8    **Q.**   Okay.  And when you left that meeting, did you have the

9    impression that Sergeant Randall was going to investigate what

10   happened?

11   **A.**   No, sir, I didn't.

12   **Q.**   Did you -- Did you leave that meeting feeling like

13   Sergeant Randall wasn't going to do anything?

14   **A.**   Yes, sir.

15                   (Pause in proceedings.)

16   **BY MR. WOZNIAK:**

17   **Q.**   So once you had the meeting with Sergeant Randall, is this

18   part of the first-level review?

19   **A.**   Yes, sir.

20   **Q.**   Okay.  And you can see Sergeant Randall's name is signed

21   there -- right? -- or staff signature on the first box --

22   **A.**   Yes, sir.

23   **Q.**   -- on Page 3?

24        So then we have the F box and the G box.  And this is the

25   second-level review.

1       And you say in here that your appeal was partially

2   granted.

3       Do you know what that means, "partially granted"?

4   **A.**    No, sir.  That was the clarification that I was basically

5   asking for in the F box of the appeal.  I didn't under -- You

6   know -- I mean, I -- I just -- I didn't understand the

7   "partially granted."  What part was granted and what part was

8   not granted?

9   **Q.**    Because you also, through this process, were in the

10  mindset that you would never be told what would happen; is that

11  correct?

12  **A.**    Yes, sir.

13  **Q.**    So you file your complaint and you go through this process

14  but anything ever happens in terms of Officer Abanico being

15  retrained, being reprimanded, you were never going to know

16  about that.

17  **A.**    Yes, sir.

18  **Q.**    So if we look at the third box here on Page 3, this is the

19  second level where it indicates once again that it was

20  partially granted.  And this is August 13th of '07.

21  **A.**    Yes, sir.

22  **Q.**    Do you see that?

23  **A.**    Yes, sir.

24  **Q.**    And then in Box H, this is when you're requesting a

25  Director's Level Review.

1    Can you explain to us what a Director's Level Review is.

2 **A.**   It is the last level that you can go through through CDCR

3 as far as your appeal process without going into another --

4 having to bring your --

5 **Q.**   And what did you --

6 **A.**   -- your complaints into the courts.

7 **Q.**   And when you go to a Director's Review, you're reaching

8 out to Sacramento; is that correct?

9 **A.**   Yes, sir.

10 **Q.**   And you actually see there is an address there for

11 Director's Review submittal of documents at this address in

12 Sacramento.

13 **A.**   Yes, sir.

14 **Q.**   And Box H, when you requested Director's Level Review,

15 what is the date that that was submitted?

16 **A.**   9/14/07, sir.

17 **Q.**   So there's -- Okay.  And at this point, had you talked to

18 Mr. Escobar, the person that was next to you during the search,

19 about what happened?

20 **A.**   Yes, sir, I did.

21 **Q.**   And had you asked him to write a letter or a declaration

22 about what he witnessed?

23 **A.**   Yes, sir, I did.

24 **Q.**   And did you attach that letter or declaration when you

25 requested the Director's Level Review on 9/14/07?

1 A. Yes, sir, I did.

2 Q. And that letter is reflected on the next page; is that

3 correct?

4 A. Yes, sir, it is.

5    MR. QUINN: Objection, Your Honor.

6   This is similar to what we talked before about

7 declarations from nonparties. It's hearsay.

8    MR. WOZNIAK: I haven't gone into the substance of it.

9    THE COURT: All right. Why don't you move on,

10 counsel.

11    MR. WOZNIAK: I'm moving on. Already turned the page,

12 Judge.

13 Q. Now, this gets to September 14th, some months after the

14 initial incident.

15   Was there something else that you did the day after the

16 incident regarding the Monterey -- or the Monterey County

17 courts?

18 A. Yes, sir. I filed a -- a paper to the County of Monterey

19 for relief to keep -- to stop any kind of forward retaliation

20 while I was in the appeal process.

21 Q. And this is -- It's Bates-stamped AGO or AG358.

22   You filed this motion the same day that you filed the

23 initial 602, June 22nd, 2007.

24 A. Yes, sir, I did.

25 Q. And why did you file this motion?

1   **A.**   Because I knew that if I didn't have some sort of

2   protection from the courts when I filed the 602, there was a

3   good chance of being thrown in the hole.

4   **Q.**   So you filed this because you were worried and you wanted

5   some -- you wanted to reach out to an outside entity, the

6   Monterey County courts, State Court, to offer you some kind of

7   protection from something that may happen.

8   **A.**   Yes, sir.

9   **Q.**   There was no -- the day after the incident, there was no

10  retaliation that you had experienced at that point.

11  **A.**   No, sir, there hadn't been.

12       **MR. QUINN:**   Objection:  Leading, Your Honor.

13       **THE COURT:**   Overruled.

14  Proceed.

15  **BY MR. WOZNIAK:**

16  **Q.**   Did you ever hear anything back from the Monterey courts?

17  **A.**   No, sir, I didn't.

18  **Q.**   Now, if you'd turn to page what's marked here as AG365.

19  It's a memorandum.

20  **A.**   (Turning to document.)

21  **Q.**   And we've got one, two, three, four -- Let's just go

22  through the first three because those are . . .

23       These first three memorandums, which are 365, 361 and 362,

24  did you receive these three letters?

25  **A.**   Yes, sir.

1  **Q.**   And looking at the first one, can you explain to me what

2  you learned from this letter.  This is 365.  It's a memorandum.

3  It's undated at the top, but it has Appeals Coordinator and

4  other signature of 3/7/07 on it.

5  **A.**   I learned that CDCR wasn't going to do anything to

6  discipline the officer for his action.

7  **Q.**   And how -- How did this tell you that?

8  **A.**   (Reading):

9         "The appeal does not meet a requirement of

10        assignment staff complaint referred to."

11        And they just keep passing it on, passing it on,

12  passing it on.

13  **Q.**   Well, let's -- let's go one pass at a time here.

14  **A.**   All right.

15  **Q.**   So turn to the next page, 361.

16  **A.**   (Turning to document.)

17  **Q.**   This is dated August 2nd, '07, about a month after the

18  first memorandum.

19        This is for -- This is a memorandum regarding the appeal

20  from the previous memorandum; is that correct?

21  **A.**   Yes, sir.

22  **Q.**   And what did you learn from this memorandum?

23  **A.**   It's the same rhetoric.  It was -- It was just -- They

24  were just passing the buck, man.  They just -- They didn't want

25  to do anything about it.

1  Q.   It does describe, does it not, what partially granted

2  means under the "Finding" section; is that correct?

3  A.   Somewhat, yes.

4  Q.   And can you read that -- that sentence for us, "Your

5  appeal is partially granted . . ."

6  A.   It says (reading):

7          "Your appeal is partially granted at the first

8       level as an inquiry of your allegation has been

9       conducted.  All staff personnel matters are

10      confidential in nature."

11 Q.   And then you can read the next sentence as well.

12 A.   (Reading):

13         "As such, results of any inquiry investigation

14      will not be shared with staff members of the public or

15      inmates."

16 Q.   So --

17 A.   (Reading:)

18         "Although you have the right to submit a staff

19      complaint, a request for administrative action

20      regarding staff placement, documentation of staff

21      members, personal file and -- is beyond the scope of

22      the staff complaint process."

23 Q.   So what you learned from this was "partially granted"

24 means an inquiry has happened; is that correct?

25 A.   Yeah.  It -- It means that they're -- they're slow playing

1    things.

2    **Q.**    And you also learned from this that nothing was going to

3    be shared with you.

4         **MR. QUINN:**  Objection:  Argumentative; prejudicial

5    "slow" -- regarding the word "slow playing."

6         **THE COURT:**  Overruled.  You can cross-examine.

7    **BY MR. WOZNIAK:**

8    **Q.**    Let's turn to the next memorandum, September 5th of '07.

9    **A.**    (Turning to document.)

10   **Q.**    This is the appeal to your appeal; is that correct?

11   **A.**    Yes, sir.

12   **Q.**    And we can just show it here.

13        This states, under "Findings" -- If you could just read

14   that first line there.  "Your appeal is partially

15   granted . . ."

16   **A.**    (Reading):

17            "Your appeal is partially granted at the first

18       level" --

19   **Q.**    I think "second level" it says?

20   **A.**    Second level, excuse me.  (Reading):

21            ". . . as an inquiry into your allegation has

22       been conducted."

23   **Q.**    We can stop there.

24        So those were the three memorandums you got regarding your

25   complaint from -- Are these internal memorandums?

1    A.    Yes, sir.

2    Q.    And if we turn to the next page --

3    A.    (Turning to document.)

4    Q.    -- this is a letter from the Inmate Appeals Branch

5    addressed to you from October 23rd of '07.

6    A.    Yes, sir.

7    Q.    And what did you learn from this memorandum -- or this

8    letter?

9          THE COURT:  Counsel -- Counsel, I'm sorry, but where

10   are we going with this?

11         MR. WOZNIAK:  I'm just showing the process he went

12   through, Judge, to follow through on his complaint.  I can be

13   briefer about it.

14         THE COURT:  So he took it up the chain of command and

15   it was denied.

16         MR. WOZNIAK:  That is -- That is the conclusion.

17         THE COURT:  All right.  Thank you.

18         MR. WOZNIAK:  We'll make this brief.

19         THE WITNESS:  Yes, sir.

20   BY MR. WOZNIAK:

21   Q.    AG363 is the end here, the Director's Level appeal

22   decision.

23   A.    (Turning to document.)

24   Q.    And that was the last you received regarding your

25   complaint; is that correct?

1    A.    Yes, sir.

2    Q.    And then this case arose shortly thereafter?

3    A.    Yes, sir.

4    Q.    Now, in your deposition, you talked about a lot of

5    different subjects.

6         But one of the things you talked about was what you

7    learned about Officer Abanico after the first incident with

8    him, or observations you had about Officer Abanico after the

9    first incident with him.

10   A.    Yes, sir.

11   Q.    And was there any particular behavior that Officer Abanico

12   exhibited that -- that came to your attention while you were

13   still at CTF?

14   A.    Yes, sir.

15   Q.    Could you explain that to us.

16   A.    Yes, sir.  Periodically, at that time, I believe Officer

17   Abanico was an S&E, so they would put him in a Wing if they

18   needed his help in certain Wings.

19        THE COURT:  Mr. Morris, I'm sorry to interrupt, but

20   you indicated the term "S&E."

21        Can you explain with what that is.

22        THE WITNESS:  I believe that's a security escort.  I'm

23   not sure what the full definition -- I know it has something to

24   do with security, sir.

25        THE COURT:  Thank you so much.

1    **THE WITNESS:**  That that day he was working our Wing.

2    And it was shower time, 3 o'clock shower time, and he posted on

3    the third tier, almost in front of my office of 303, and he

4    stood there and peered in -- stayed there, peered in at the

5    showers while the individuals were showering.  So he got a

6    names called the Shower Shark.

7    **BY MR. WOZNIAK:**

8    **Q.**   And there are typically officers around when prisoners are

9    showering?

10   **A.**   Not -- Not peering in the showers like that, no, sir.

11   **Q.**   They're -- Are they in the proximity of the showers?

12   **A.**   No, sir.  Usually what they're doing at that time, they're

13   either handing out mail or they're down there on the first

14   floor in Control, or releasing individuals out of their houses

15   for showers.

16   **Q.**   Are they close enough to the showers that, if an incident

17   occurred, they'd be able to respond quickly?

18   **A.**   Uh . . .  On the first tier?  Yeah.  The buildings -- The

19   buildings are big, but it doesn't take them that long to

20   respond to an incident.

21   **Q.**   So you found Officer Abanico's actions regarding the

22   showers to be abnormal?

23   **A.**   Yes, sir, I did.

24   **Q.**   Now, going back to . . .

25        Did you seek any kind of help related to the incident from

1    June 21st, '07?

2    **A.**    Can you explain yourself on that, sir?

3    **Q.**    Did you -- Did you go talk to anybody about what happened?

4    **A.**    After -- After the time it happened?

5    **Q.**    Yes.

6    **A.**    I -- I don't -- Right now, I don't recall, sir.

7    **Q.**    Okay.

8    **A.**    I don't.

9    **Q.**    Did you -- Did you take part in any kind of classes

10   related to the incident?

11   **A.**    I -- Yeah.  I mean, I -- An anger management class.

12   **Q.**    And you started doing anger management shortly after the

13   incident?

14   **A.**    I started anger management in -- I think it was 2007.

15   2008, I left Folsom -- I mean, I went to Folsom 2008.  It was

16   early 2009, sir, yes, sir.

17   **Q.**    Okay.  And --

18              **MR. LEWIS:**  Objection, Your Honor.  That answer's a

19   little unclear.  What was he talking about?  2007, 2008 or 2009

20   when he started the class?

21              **THE COURT:**  Well, you can cross-examine over it.

22              **THE WITNESS:**  I can clarify that if you like.

23              **MR. WOZNIAK:**  Are both of you making objections or

24   just one of you?

25              **THE COURT:**  Counsel, direct your comments to the

1    Court.

2         **MR. WOZNIAK:**  Yes, Your Honor.

3    **BY MR. WOZNIAK:**

4    **Q.**   You started taking anger management classes in 2009.  Is

5    that what you said?

6    **A.**   Yes, sir.

7    **Q.**   And were those classes related to what happened to you in

8    June 21st of 2007?

9    **A.**   Yes, sir.

10   **Q.**   And I think there's, you know, kind of a general

11   understanding of what anger management is, but within the

12   context of the anger management classes that you're involved

13   in, how would you describe these classes?

14   **A.**   They're -- They're individuals that has . . . things they

15   need to work on, you know, for -- to improve theirself and to

16   learn to control your anger.

17   **Q.**   Would you consider them similar to therapy sessions?

18   **A.**   Yes, sir.

19   **Q.**   Are there therapists at the anger management sessions?

20   **A.**   There is a psychiatrist there.

21   **Q.**   And that's -- that's a CDCR employee psychiatrist?

22   **A.**   Yes, sir.

23   **Q.**   Okay.  And have you talked specifically about the incident

24   with Officer Abanico at these anger management classes?

25   **A.**   No, sir, I haven't.

1  **Q.**  And why is that?

2  **A.**  Because it's -- it's something that was hard to talk

3  about.

4  **Q.**  Are there any other reasons why you haven't talked about

5  it?

6  **A.**  I don't think any man wants to talk to another person

7  about someone fondling their genitals unless it was something

8  that, you know, they wanted to happen to them.

9  **Q.**  So even though you haven't specifically talked about it,

10  you have found them to be -- the classes to be helpful.

11  **A.**  Yes, sir.  Yes, sir.

12  **Q.**  Now, Mr. Cleveland is over here that just testified.

13     Do you know Mr. Cleveland?

14  **A.**  Yes, sir, I do.

15  **Q.**  And Mr. Cleveland -- Did you ever discuss your interaction

16  with Officer Abanico with Mr. Cleveland?

17  **A.**  Not -- Not at the time of the action, no, sir.

18  **Q.**  At some point, did you --

19     **MR. WOZNIAK:**  Excuse me, Judge.

20     (Plaintiffs' counsel confer.)

21     (Pause in proceedings.)

22     **MR. WOZNIAK:**  No further questions.

23     **THE COURT:**  All right.  Before cross-examination, I

24  just have a couple real quick questions.

25     Mr. Morris, Mr. Cleveland, you and Mr. Trask described the

1  hole, and you used two terms.  "Ad seg," which I believe is

2  Administrative Segregation, and the SHU, the Security Housing

3  Unit.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Do you know if there's a difference

6  between the two?

7          THE WITNESS:  The SHU is when you have a disciplinary,

8  and they give you, like, a -- It's called a SHU term, where

9  they send you to either Pelican Bay, Corcoran, New Folsom or

10  somewhere where they have a SHU.

11      Ad seg and the hole is like being in jail in prison

12  waiting for disciplinary.

13          THE COURT:  All right.  So one is a kind of a waiting

14  cell and the other is a disciplinary cell.

15          THE WITNESS:  Yes.  Well, they're all disciplinary

16  cells, sir.

17          THE COURT:  And usually that's a -- that's solitary

18  confinement.

19          THE WITNESS:  Yes, sir.

20          THE COURT:  Okay.  And then the either thing is,

21  because there's been a lot of testimony about this, if the

22  Correctional Officer could take you over to the wall there.

23      And Lisa, could we raise the screen for a moment.

24          MR. WOZNIAK:  You're going to have him show --

25          THE COURT:  Yeah.  I'd like you to show the jury --

1  When you're up against the wall, can you show the jury what you

2  mean by that physically.

3      THE WITNESS:  Would you like me to stand against the

4  wall, sir?

5      THE COURT:  Please.

6      THE WITNESS:  (Approaching side of courtroom.)

7      MR. WOZNIAK:  Judge, one thing to notice:  He won't be

8  able to move his legs like you would in a typical situation

9  because of the chains.

10     THE COURT:  All right.  Why don't you . . .

11    Now, you indicate that during the -- the search procedure,

12 your legs would be moved.  Is that left to right or from the

13 wall backwards?

14     THE WITNESS:  From the wall backwards, sir.

15     THE COURT:  All right.

16     THE WITNESS:  And then they kick your legs out into a

17 span which I can't go far as I usually would because of the

18 chain.

19     THE COURT:  But it would be a little bit further than

20 what you could right now.

21     THE WITNESS:  Yes, sir.

22     THE COURT:  And is that a standard procedure

23 regardless of who is searching you.

24     THE WITNESS:  It all depends on the guard, sir.

25     THE COURT:  All right.  Thank you.  Take -- Take your

1  seat again.

2          MR. WOZNIAK:  And just could we have a brief side bar

3  about --

4          THE COURT:  Hold up.

5          MR. WOZNIAK:  -- an issue before cross-examination?

6          THE WITNESS:  (Resuming seat.)

7          THE COURT:  And I'll allow counsel to direct on any

8  question that I have.

9          MR. WOZNIAK:  I have no other questions.

10          THE COURT:  All right.  Brief side bar.

11          (Sidebar conference heard but not reported.)

12          THE COURT:  Oh, by the way, was the jury able to see

13  that?

14          THE JURORS:  (Nodding heads.)

15          THE COURT:  Okay.  I just wanted to make sure.

16      All right.  Do you have any -- Counsel, you have no

17  further questions about what I -- what I asked; is that

18  correct?

19          MR. WOZNIAK:  No, Your Honor.

20          THE COURT:  Cross-examination, counsel.

21          MR. QUINN:  Just briefly, Your Honor.

22                    **CROSS-EXAMINATION**

23  BY MR. QUINN:

24  Q.   Good morning, Mr. Morris.

25  A.   Good morning.

1  **Q.**   As you stated during your testimony, Abanico searched you

2  on one occasion.

3  **A.**   Yes, sir.

4  **Q.**   And how long did the -- The conflict with the groin, you

5  testified, lasted one and a half or two seconds; is that right?

6  **A.**   I -- You're the one that was asking for the time on it.

7  I -- I was telling you during the deposition that I didn't

8  have -- I didn't time it, but you're the one that kept pressing

9  for the time.

10 **Q.**   But it was your testimony that the contact lasted for

11 roughly one and a half, two seconds; is that correct?

12 **A.**   Well, that's kind of what you squeezed me into saying,

13 yes, sir.

14 **Q.**   And Abanico, he didn't say anything of a sexual nature to

15 you during the search; did he?

16 **A.**   No, sir, he didn't.

17 **Q.**   And he never touched you beneath the clothes during the

18 search.

19 **A.**   No, sir, he didn't.

20 **Q.**   And you never sought any medical treatment for physical

21 injuries after the search.

22 **A.**   No, sir, I didn't.

23 **Q.**   And you testified -- Your attorney asked you about the --

24 the 602 that you prepared following the search by Abanico and

25 the Monterey Superior Court proceeding that you initiated

1  following the search; is that correct?

2  **A.**   Yes, sir, the following day.

3  **Q.**   And it was your testimony at the deposition that during --

4  with regard to those materials that you prepared, that you were

5  more concerned with creating a consistent story rather than an

6  accurate story.

7       Do you recall that testimony?

8       **MR. WOZNIAK:**  Objection, Judge.

9       If he wants to impeach him off of the deposition

10  testimony, the process we followed yesterday about where he's

11  be impeaching him from should be followed.

12       **THE COURT:**  All right.  No speaking objections.

13       **MR. QUINN:**  So I can proceed by . . .

14       **THE COURT:**  Proceed.

15       **MR. LEWIS:**  We need the screen up again.

16            (Screen raised.)

17       **MR. CUNNINGHAM:**  Judge, could we just ask that if

18  they're going to display the text, that anything outside of the

19  actual part that they're using be blocked out so that there's

20  not an extraneous text showing on the screen?

21       **MR. QUINN:**  That's fine.

22       **THE COURT:**  All right.

23       **MR. QUINN:**  As we did yesterday, I'm just going to

24  open the sealed deposition of Mr. Morris which was taken on

25  March 27th, 2013.

1      THE COURT:  All right.  You can --

2      MR. WOZNIAK:  No objection.

3      THE COURT:  Move to unseal it?  Counsel, move to

4  unseal it?

5      MR. QUINN:  Oh.  I'd like to move to unseal it.

6      THE COURT:  Motion's granted, no objection.

7      MR. QUINN:  And I'm just going to read beginning on

8  from Page 62, Line 5 of the deposition:

9      "Q. Were you also mad when you wrote the declaration to the

10     Monterey Superior Court where you also used the term

11     'smashed the penis'?

12     "A. No, sir.  I went off what the 602 says to keep it

13     consistent.

14     "Q. Even if -- Even it was inaccurate?

15     "A. It had to be.  It has to be consistent.  Once you start

16     it, you start it.  You say this and then you say this.

17     Then you say this and you say that.  Why change?  Do you

18     understand what I'm saying?  I'm trying to clarify myself

19     to you now.  You're not fully getting it."

20         We went off the record, the deposition will show,

21  between Line 17 through 21.

22         I took up another question starting on Line 23:

23         "One last question.  You said he" -- Mr. Morris

24     -- "said there was a concern of being consistent.  So

25     is it -- During the preparation of 602 and the

1    preparation of the declaration that was submitted to

2    the Monterey Superior Court, the concern was more

3    consistency rather than accuracy.  Is that fair to

4    say?

5    "A.Yeah, you can say that if you want to."

6    Q.   Did I read that correctly, Mr. Morris?

7    A.   You read it correctly, sir, but you're not saying --

8         THE COURT:  There's no question -- There's no

9    question.

10        MR. QUINN:  No further questions, Your Honor.

11        THE COURT:  All right.  Okay.  Any redirect of

12   Mr. Morris?

13        MR. WOZNIAK:  Just one question.

14        MR. QUINN:  We would just reserve the issue that we

15   discussed on the side bar for --

16        THE COURT:  All right.  Why don't we -- Why don't we

17   do this.  It's a little bit early, but why don't we go ahead

18   and take our morning 15-minute break.  That way, we can take up

19   a few quick things and then come back and continue the

20   testimony from here.

21        So I'll ask the jurors to be in their places by 20 after

22   10:00.

23        Do we have anything that the -- Did the food truck show

24   up?

25        THE CLERK:  I'm going to check.

1          **THE COURT:**  Okay.

2                          (Pause in proceedings.)

3          **THE CLERK:**  Yes.

4          **THE COURT:**  Okay.

5          **THE CLERK:**  All rise.

6          **THE COURT:**  You have snacks back there.

7          **MR. CUNNINGHAM:**  Catered affair.

8          **THE COURT:**  Catered affair.

9      (Proceedings were heard out of presence of the jury:)

10         **THE COURT:**  All right.  A couple of -- A couple brief

11     things.

12         We had a side bar regarding hearsay by -- a hearsay issue

13     by a party by the name of -- I think it's Correctional Officer

14     Biggs.

15         **MR. CUNNINGHAM:**  Biggs, yes.  Lieutenant Biggs.

16         **THE COURT:**  Why don't we put that back on the record.

17                         (Pause in proceedings.)

18         **MR. QUINN:**  Well, I mean, the -- the -- the assertion

19     by defendants -- Or the argument by defendants was that the

20     statements by Officer Biggs constitute hearsay and should not

21     be admitted.

22         **THE COURT:**  And is Officer Biggs a -- a defendant in

23     the matter?

24         **MR. QUINN:**  No, he's not.

25         **THE COURT:**  Then do you intend to call Officer Biggs?

1        MR. QUINN:  No, we do not.

2        THE COURT:  Were you intending to call Officer Biggs?

3        MR. CUNNINGHAM:  He was a John Doe defendant, Judge,

4    and we put him on the witness list, and I haven't made a

5    decision as to whether or not we'll call him.

6        THE COURT:  Do you have subpoenas?

7        MR. CUNNINGHAM:  No, he's not subpoenaed.

8        THE COURT:  All right.  The hearsay objection is

9    granted.

10        All right.  And then the next thing is that you had had --

11    There was an issue about impeachment of this witness.

12        You had two specific areas you wanted to impeach the

13    witness with, a 1987 search and a 2009 search.  The 1987 search

14    was for possession of marijuana.  The 2009 search was for

15    possession of a cellphone charger in your -- in your -- in his

16    cell.

17        Is that correct, counsel?

18        MR. QUINN:  Correct.

19        I think at this point we would like to refrain from

20    raising that issue.

21        THE COURT:  All right.  So it's no longer before the

22    Court.

23        And counsel --

24        MR. CUNNINGHAM:  Neither one?  Neither one?

25        MR. QUINN:  Just a moment, Your Honor.

1                  (Pause in proceedings.)

2        **MR. QUINN:** Yeah. We're going to hold off.

3        **THE COURT:** All right. Thank you.

4        **MR. CUNNINGHAM:** Judge, let me say also, there -- in

5 the letter they wrote about, you know, to inform me that they

6 wanted to use the stuff --

7        **THE COURT:** Well, they've withdrawn their request.

8        **MR. CUNNINGHAM:** I know. I just wanted to say -- to

9 point out to the Court there was a similar request as to

10 plaintiff Mr. Jones.

11        **THE COURT:** We'll take it up when Mr. Jones takes the

12 stand.

13        **MR. CUNNINGHAM:** Okay.

14        **THE COURT:** Anything further at this time we need to

15 talk about?

16        **MR. CUNNINGHAM:** No, Your Honor.

17        **MR. QUINN:** No, Your Honor.

18        **THE COURT:** All right. How many more witnesses do you

19 have?

20        **MR. CUNNINGHAM:** We have one, two, three and the

21 Warden, and possibly the officer.

22        **THE COURT:** All right. Well, let's -- let's -- So we

23 have three more of the --

24        **MR. CUNNINGHAM:** Plaintiffs.

25        **THE COURT:** -- plaintiffs.

1    How many witnesses do you have?

2        **MR. QUINN:**  We plan to call two at this point.

3        **THE COURT:**  All right.  So we have basically another

4  potential six witnesses.

5        **MR. QUINN:**  Depending on . . .  We've --

6        **THE COURT:**  All right.

7        **MR. QUINN:**  -- mentioned Curry over and over again.

8        **THE COURT:**  I understand.

9        **MR. QUINN:**  There's no subpoena.

10       **THE COURT:**  I understand.

11    Actually, I've asked my clerk to take a quick look at

12  that.  I'm going to talk to her now during the break.

13    I would suggest that perhaps the parties discuss whether

14  or not Warden Curry can be made available for the trial.

15  Otherwise, I'll rule on it, as I said before.

16    So let me go and take a look at that and we'll take a

17  recess until 20 after.

18             (Recess taken at 10:09 a.m.)

19          (Proceedings resumed at 10:21 a.m.)

20    (Proceedings were heard in the presence of the jury:)

21        **THE COURT:**  Anything further with Mr. Morris?

22        **MR. WOZNIAK:**  Yes, Your Honor.

23            (Pause in proceedings.)

24           **REDIRECT EXAMINATION**

25

1  BY MR. WOZNIAK:

2  **Q.**  Hello again, Mr. Morris.

3  **A.**  Hello.

4  **Q.**  I want to bring your attention to a passage from the

5  deposition.  This is line 9 through 15.  I'm going to read this

6  to you:  The question was:  (reading)

7       "**Q.**  For the record we'll mark as Exhibit B, on the --

8       beginning on the seventh line of the 602, the sentence

9       says, quote, 'When CO Abanico continued to search me

10      again, he groped my scrotum and smashed my penis."

11  You answer:  (reading)

12      "**A.**  Pinched.  I didn't see it on that line.  I apologize.

13      Or maybe it was misprinted on my part, but it was a pinch.

14      Not a smash.  It was a pinch."

15  And it's your testimony today, Mr. Morris, that it was a

16  pinch?

17  **A.**  Yes, sir.

18  **Q.**  I wanted to ask you a couple other questions about

19  searches.  I know you were up on the wall here.  We talked

20  about how your legs would be more spread out typically when

21  you're up against the wall when you have no chains on; is that

22  correct?

23  **A.**  Yes, sir.

24  **Q.**  And we talked about the judo chop earlier going up your

25  leg.

1   A.   Yes, sir.

2   Q.   Now, what is the purpose of the search up the inner thigh?

3   A.   The search up the inner thigh is to check for contraband.

4   Q.   Okay.  Such as weapons?

5   A.   Such as weapons or whatever else an individual might be

6   trying to hide.

7   Q.   And you talked about how you've been searched thousands of

8   times.  Can you just describe quickly for us, when the hand in

9   the judo chop position goes up your inner thigh, does it touch

10  your scrotum typically?

11  A.   No, sir, it does not.

12  Q.   And just to clarify, we're talking about the searches

13  you've experienced thousands of times, not the search that

14  Officer Abanico performed?

15  A.   Yes, sir.

16  Q.   So on the non-Abanico searches when the judo chop hand

17  goes up your thigh, it doesn't touch your scrotum?

18  A.   No, sir, it doesn't.

19  Q.   And if something was hidden in your groin area, would they

20  be able to find it in the typical way that they do it?

21  A.   Yes, sir, they would.

22       MR. WOZNIAK:  No further questions.

23       THE COURT:  All right.  Any brief redirect or recross?

24       MR. QUINN:  At this time we'd just like to have a

25  brief sidebar to cover a single issue.

1    THE COURT:  All right.

2       (Sidebar conference heard but not reported.)

3    MR. QUINN:  No further questions, Your Honor.

4    THE COURT:  All right.

5  Mr. Morris, you may step down now.  Thank you.

6    THE WITNESS:  Sure.

7       (Witness excused subject to recall.)

8    MR. CUNNINGHAM:  Judge, the plaintiffs will call

9  Mr. Demetrius Huff as the next witness.

10    THE CLERK:  Will you please raise your right hand?

11             DEMETRIUS DWAYNE HUFF,

12  called as a witness for the Plaintiffs, having been duly sworn,

13  testified as follows:

14    THE WITNESS:  Yes, ma'am.

15    THE CLERK:  Please be seated.

16  Please state your full name for the Court and spell your

17  last name.

18    THE WITNESS:  Demetrius Duane Huff.  My last name is

19  H-U-F-F.

20    THE CLERK:  Thank you.

21             DIRECT EXAMINATION

22  BY MR. CUNNINGHAM:

23  Q.  Good morning, Mr. Huff.

24  A.  How you doing?

25  Q.  You're a plaintiff in this action?

1   **A.**   Yes, sir.

2   **Q.**   And you were at Soledad in 2006-2007?

3   **A.**   Yes, sir.

4   **Q.**   Are you still there?

5   **A.**   Yes, sir.

6   **Q.**   And how long have you been in prison?

7   **A.**   I caught my commitment phase in 1993.  So 20 years.

8   **Q.**   All right.  And where are you from?

9   **A.**   I'm from -- I was born in Louisiana, but I grew up in

10  Los Angeles County.

11  **Q.**   How old were you when you came to Los Angeles?

12  **A.**   1969, like 4, 4 or 5.

13  **Q.**   Okay.  And do you have family in LA now?

14  **A.**   Well, my parents retired.  They moved back to Louisiana.

15  So, yeah, I have relatives in -- not Los Angeles but other

16  surrounding counties.

17  **Q.**   All right.  And in 2006 where were you living in Soledad?

18  **A.**   2006?  I believe I was in F Wing.

19  **Q.**   During the time of the events that we have in the case?

20  **A.**   Yes, sir.

21  **Q.**   Okay.  And was Officer Abanico assigned to F Wing then?

22  **A.**   No, sir.

23  **Q.**   Did you have occasion to encounter him in the corridor

24  sometime in August of '06?

25  **A.**    Yes, sir.

1 **Q.** And where was that in the corridor that that happened?

2 **A.** I can't remember what particular area he was working in in

3 the corridor that day, but he was -- I encountered him in the

4 hallway in the corridor. I don't know where his station was.

5 **Q.** Did you know him from before that?

6 **A.** Prior to August?

7 **Q.** Yeah.

8 **A.** Yeah. I had a run-in with him in late July.

9 **Q.** Of '06?

10 **A.** Yes, sir.

11 **Q.** Okay. And what happened at that time?

12 **A.** He pulled me over in the corridor. I believe I was going

13 eastbound, and he pulled me over and searched me.

14 **Q.** And what happened in the search?

15 **A.** What do you mean?

16 **Q.** Did anything happen unusual in the search that time?

17 **A.** Well, the way he searched me, yeah.

18 **Q.** And can you describe it for us, what was the way he

19 searched?

20 **A.** He pulled me over in the corridor. I resumed the

21 position. You know, you get against the wall and you spread

22 eagle, and he resumed his search; and when he got to my groin

23 area, he held them momentarily and squeezed them.

24 From the beginning to end, the search was just hard, firm.

25 And when he pulled my groin area, I jumped off the wall. I

1   hollered at him.  I asked him what is he doing.  I let him know

2   that wasn't cool.

3   **Q.**  Was there another officer there?

4   **A.**  Well, when the officers are doing search, there's always

5   officers right next to them.

6   **Q.**  Okay.  Do you remember the other officer responding in any

7   way when you came off the wall?

8   **A.**  The other officer responding to me?

9   **Q.**  Yeah.

10   **A.**  No.  When one officer is doing a search, the other officer

11   is just right there to watch his back or watch more or less

12   directing traffic if there's anybody in the area.

13   **Q.**  So he had his back to you where you're being searched, the

14   second officer?

15   **A.**  Well, I can't say where --

16   **Q.**  You don't even know that?

17   **A.**  Well, I mean, he's there, but I don't know his position --

18   **Q.**  Okay.

19   **A.**  -- or where he's at, but he's close proximity to the other

20   CO that's searching me.

21       **THE COURT:**  Just so we keep a clear record and also so

22   the jury understands, please wait to the end of each response

23   before answering.  All right?

24       **THE WITNESS:**  Yes, sir.

25       **THE COURT:**  Thank you so much.

BY MR. CUNNINGHAM:

Q.    But my question is, on that occasion -- well, strike it.

Was that the first time that Officer Abanico had searched you?

A.    The first time was in late July.

Q.    Yes.

A.    Yes, sir.

Q.    Okay.  And you came off the wall?

A.    Yes, sir, I did.

Q.    And at the time you came off the wall, did the second officer do anything?

A.    No, sir.

Q.    And what did Abanico do?

A.    Well, he directed me to get back against the wall and asked me -- well, he stated am I refusing a direct order.  And the dialogue that he and I are having is that I'm letting him know, "That wasn't cool what you did"; and, you know, I'm just telling him how I felt.  And, you know, I hadn't been searched like that before, "And I'm just letting you know that wasn't cool."  And I was reluctant to get back against the wall.

Q.    And you had been searched many times in your time in the system before then; right?

A.    Yes, sir.

Q.    Had anything like that happened to you from any other officer's search?

1   **A.**   No, sir.

2   **Q.**   So when he told you to get back on the wall, what

3   happened?

4   **A.**   I got back against the wall reluctantly.

5   **Q.**   Yes.

6   **A.**   Yes, sir.

7   **Q.**   And then what happened?

8   **A.**   Well, he continued to search.

9   **Q.**   And did he -- and how did he do the second search or the

10  second time that search?

11  **A.**   Well, he continued to search.  I can't say where he

12  started the second search, but he continued, and then it was

13  just hard and rough, you know, throughout.

14  **Q.**   And did he get back into the groin area with his hands the

15  second time?

16  **A.**   Well, I can't say if he did or not.

17  **Q.**   You don't recall?

18  **A.**   No.  I just remember him continuing the search.

19  **Q.**   Okay.  And did you take any action about that search

20  afterwards?

21  **A.**   Not at that particular time, but later on because he

22  continued to search me.

23  **Q.**   You got searched again by him?

24  **A.**   Yes, sir.

25  **Q.**   Okay.  How long was it before the second time?

1    **A.** Well, I can't say how long it was the second time because

2    he searched me a couple of times before I filed a grievance in

3    August.

4    **Q.** Okay.

5        **THE COURT:** I'm sorry, Counsel. I'm a little bit

6    confused. Are we talking about the same incident or separate

7    and discrete incidences?

8        **MR. CUNNINGHAM:** No, I think we're talking -- we're

9    going to a separate incident now.

10        **THE COURT:** All right. Thank you.

11        **MR. CUNNINGHAM:** Separate incidents.

12    **Q.** In other words, there were a series of days when he

13    searched you that led up to a time in August when you filed the

14    602; is that correct?

15    **A.** Yes, sir.

16    **Q.** All right. And was the same -- did he use the same

17    gesture? Did he rub you? Was he -- did he push hard on your

18    groin?

19    **A.** You mean in August?

20    **Q.** In the following searches, yes.

21    **A.** Well, all of the searches were hard, rough, and

22    aggressive, and I just felt like he was just feeling me up

23    every time he searched me.

24        And, you know, I would resume the position. He was, you

25    know, put your hands on the wall, spread eagle; and he would go

1  through the motions, but I felt like he was caressing me hard

2  and feeling me up, and that's how I felt every time he searched

3  me.

4  **Q.**  Uh-huh.  And you saw Mr. Morris assume the position

5  against the wall just a few minutes ago; correct?

6  **A.**  Yes, sir.

7  **Q.**  Did you have that same -- did he have you in that same

8  position?

9  **A.**  Yes, sir, but my hands were, like -- I'm a little taller,

10  so my hands are higher against the wall.

11  **Q.**  Okay.  But were you -- are you leaning at that same angle?

12  **A.**  Yeah.  With your legs spread eagle, yes, sir.

13  **Q.**  So your weight is on your hands so that you can't really

14  make a move without pulling away?

15  **A.**  Yes, sir.

16  **Q.**  And can you recall or can you estimate the number of times

17  he pulled you over and searched you as you've described before

18  you filed the 602?

19  **A.**  Well, CO Abanico searched me from 2006 and this went on

20  till 2008.

21  **Q.**  Okay.  But in August of 2006 you filed a 602; right?

22  **A.**  No.  What I did was I filed a grievance; and at this

23  particular time they had been -- you know, people knew what was

24  going on in the corridor with Officer Abanico.  And then I

25  encountered Ivan Cleveland, and I'm not sure if I encountered

1  him on the yard or in the corridor; and he knew through talk

2  with the inmates that, you know, I had got violated by

3  CO Abanico, and he asked me did I want to be a part of the

4  grievance.

5  **Q.**  Okay.  So that's the grievance that you made at that time?

6  **A.**  Yeah.  I believe --

7      **THE COURT:**  Mr. Huff, let me ask you a real brief

8  question.

9      **THE WITNESS:**  Yes, sir.

10     **THE COURT:**  Is there a difference between a grievance

11 and a 602?

12     **THE WITNESS:**  Well, yeah.  I didn't -- at that

13 particular time I didn't file the formal 602 complaint with the

14 institution.

15     **THE COURT:**  Okay.

16     **THE WITNESS:**  I think Mr. Cleveland was getting

17 grievance and names and petitions of individuals that had been

18 violated by CO Abanico.  So what I did was I signed that

19 grievance.

20     **THE COURT:**  All right.  Thank you.

21 **BY MR. CUNNINGHAM:**

22 **Q.**  And that's the -- that was a handwritten grievance; is

23 that right?

24 **A.**  Yes, sir.

25 **Q.**  And it was on a form that he had prepared that left you a

1  box to describe what happened to you?

2  **A.**   Yes, sir.

3  **Q.**   All right.  Let me just see if I can get that document.

4                    (Pause in proceedings.)

5           **MR. CUNNINGHAM:**  Excuse me just a minute, Judge.  I'm

6  sorry.  I thought I had this right here.

7                    (Pause in proceedings.)

8           **MR. CUNNINGHAM:**  I still don't have it.

9  **Q.**   Were you contacted by anybody in Administration about the

10  grievance after you filed it, after you gave it -- after you

11  filed it?

12  **A.**   The grievance, no, sir.

13  **Q.**   All right.  You did ultimately file a 602; right?

14  **A.**   Yes, sir.

15  **Q.**   When was that?

16  **A.**   I believe the -- excuse me.  Can I look?

17  **Q.**   Yes.

18  **A.**   (Witness examines document.)  Okay.  I filed a 602

19  September 15th, 2007.

20  **Q.**   All right.

21           **MR. CUNNINGHAM:**  Judge, we're going to refer to --

22  we're referring to Exhibit 6B at this point.

23           **THE COURT:**  D as in dog or B as in boy?

24           **MR. CUNNINGHAM:**  B as in boy.  I'm sorry.

25                    (Pause in proceedings.)

1    BY MR. CUNNINGHAM:

2    Q.   And when did you file that one?

3         Can I have 6B?

4    A.   I filed it September 15th, 2007.

5         THE COURT:  Has that been marked 6B, Madam Clerk?

6         THE CLERK:  Yes, Your Honor.

7         THE COURT:  All right.  Proceed.

8         MR. CUNNINGHAM:  If I may approach the witness, Judge.

9         THE COURT:  Please.

10   BY MR. CUNNINGHAM:

11   Q.   Looking at the exhibit that's been marked 6B, the

12   beginning pages of that exhibit, I think the first three pages,

13   do you recognize that?

14   A.   Yes, sir.

15        MR. LEWIS:  And, Your Honor, if I can ask maybe the

16   Bates numbers at the bottom of the page?

17        MR. CUNNINGHAM:  I'm sorry.  Sure.  It's 292, 293,

18   294.  I think they're -- 292, 294, and 293 is the way we have

19   them.

20   Q.   And you added a whole page of narrative and description

21   into the complaint there, right, a whole handwritten page?

22   A.   Yes, sir.

23   Q.   And we've heard about a bypass.  Your grievance was

24   stamped "Bypass"; is that right?  Or your 602, I'm sorry, was

25   stamped with a "Bypass"; right?

1    **A.**    Yeah, it was bypassed at the informal level.

2    **Q.**    Okay.  So you didn't have or did you have any informal

3    discussion with any local sergeant or anybody like that as the

4    way it was described before?

5    **A.**    No, sir, other than your appeal going through the appeal

6    process.  So I'm assuming that when you go through the appeal

7    process, it goes to the appeals coordinator.

8    **Q.**    And then he's the one that stamps -- he or she put the

9    "Bypass" on there?

10   **A.**    I'm assuming they do, yes, sir.

11   **Q.**    Uh-huh.  And, so, did there come a time when somebody from

12   Administration came to talk to you about the 602?

13   **A.**    No, no one ever talked to me about the 602.  So what

14   happens is, you run the course of your 602 and it's a long,

15   lengthy process for your 602.  So once it gets to the directive

16   level, which is Sacramento, then you'll get a response back.

17   **Q.**    Okay.  But before that you got something called a

18   screening?

19   **A.**    Oh, I'm sorry.  I sure did.  I don't have that.

20   **Q.**    You don't have the screening response that you wrote?  I'm

21   sorry.  What was the screening?

22   **A.**    A lot of times when you file a 602, they screen you out

23   for various reasons.  So -- let me find it first.

24        They screen you out for various reasons, and I responded

25   that they screened me out.  They screened my appeal out.

1  Q.   Uh-huh.  Do you see there the page which is entitled

2  "Screening at the First Level"?

3  A.   Well, I see it says "Screen Response."  This is what I

4  handwritten -- I handwrote.

5  Q.   That's what you wrote?

6  A.   Yes, sir.

7  Q.   Okay.  In the --

8       THE COURT:  Mr. Cunningham, I don't know if we can

9  streamline this a little bit, but it strikes me that what

10  you're looking for is that they ran it up the chain of command

11  and his complaint was denied.

12  BY MR. CUNNINGHAM:

13  Q.   It was denied all the way; right?

14  A.   Ultimately it was denied.

15  Q.   And when they sent it back for screening, did they say

16  that it was improperly submitted after the screening?

17  A.   (Witness examines document.)

18  Q.   Look at this page (indicating).

19  A.   I have that page.

20  Q.   Yeah, okay.

21  A.   (Witness examines document.)  So you want me to respond to

22  it?

23  Q.   Yes.

24  A.   It says, "The enclosed documents are being returned to you

25  for the following reasons."  Then they give you the reasons.

1    It says:  (reading)

2            "Staff complaints shall not be combined with other

3       appeal issues per Administration Bulletin 9810."

4    Q.   Okay.  So it said to resubmit it?

5    A.   Well, the latter part it says:  (reading)

6            "Comments:  The hiring authority has received the 602

7       and it will be processed as a disciplinary appeal."

8       And it says:  (reading)

9            "Remove excess pages and submit a new appeal

10      within" -- "with the 115."

11   Q.   Uh-huh.  Had you gotten a 115 from Abanico --

12   A.   Yes.

13   Q.   -- in the meantime?

14   A.   Yes, sir.

15   Q.   And was that after you filed the 602 or not?  The 602 is

16   about the 115; right?

17   A.   The 602 is about the 115.

18   Q.   Okay.  And 115 is what?

19   A.   It's a disciplinary infraction.

20   Q.   And it's written up just like a 602 only it's a separate

21   type of document and the officer writes it?

22   A.   Yes, sir.

23   Q.   Okay.  And what was the subject of the -- and I'm sorry.

24   You had a 115 against you by Abanico?

25   A.   I received a 115 from Abanico, CO Abanico.

1  Q.  And what was the subject of the 115?

2  A.  The subject of the 115 was that CO Abanico said the reason

3  he pulled me over was for having a manufactured earring in my

4  ear.

5  Q.  And did you have a manufactured earring in your ear?

6  A.  No, sir.

7  Q.  And was Abanico -- what happened then when he pulled you

8  over?

9  A.  What do you mean?

10  Q.  I mean, what did he say about the earring?

11  A.  He didn't say anything about the earring because I didn't

12  have one.

13  Q.  What did he do?

14  A.  Well, I was on my way -- I was on my way to my job

15  assignment in the culinary, and I believe it was between

16  2:30 or 3:30, and I was on my way to work with another inmate,

17  Inmate Johnson, and we seen at this particular time CO Abanico

18  was working in front of G Wing.  And I seen him and that

19  particular day I wasn't -- you know, I wasn't in a good mood.

20  And, so, like I said, this had been going on since 2006.  So

21  when he pulled me over, I was just fed up with him, and he

22  pulled me over and put me against the wall and he searched me.

23      Prior to that, when he told me he was going to search me,

24  I refused to let him search me.

25  Q.  Prior to that day you mean or prior to that --

1   **A.**   No.   That day.

2   **Q.**   That day right then and there?

3   **A.**   That day coming out of F Wing on my way to the culinary

4   when he ordered me to get against the wall to be searched, I

5   refused to be searched by him.

6   **Q.**   And then what happened?   Was there another officer

7   present?

8   **A.**   Yes, sir.

9   **Q.**   Who was that?

10  **A.**   CO Officer Lisk.

11  **Q.**   Okay.   And what happened when you refused to be searched?

12  **A.**   Well, I was frustrated with the guy.   I was fed up with

13  him.   I didn't want to be searched.   So he said I was refusing

14  a direct order, and I just was adamant about refusing a direct

15  order.

16       And at this particular time I didn't get against the wall.

17  I was -- I had my back against the wall, and we were having a

18  dialogue about me getting against the wall, and I'm not getting

19  against the wall because I didn't want him searching me

20  anymore.

21  **Q.**   All right.   And he had searched you, roughly, how many

22  times before --

23       **THE COURT:**   It sounds like there are two officers

24  present.

25       **MR. CUNNINGHAM:**   Yes.

1    **THE COURT:**  Just so that the record is clear, we're

2    now talking about the actions of Correctional Officer Abanico;

3    is that correct?

4    **MR. CUNNINGHAM:**  Yes, when he has his back to the wall

5    and he's talking with Abanico.

6    **Q.**   Okay.  What was the other officer doing when that

7    happened?

8    **A.**   Well, they're both in front of me, and she -- well, he's

9    in front of me and she's on the right side of him, and

10   they're --

11   **Q.**   When you -- I'm sorry.  When you say "she," who was that?

12   Do you know her name?

13   **A.**   Officer Lisk.

14   **Q.**   L-I-S-K?

15   **A.**   Yeah.  I believe that's how you spell it, yes.

16   **Q.**   And how did that dialogue end or where did it go from the

17   dialogue when you were facing him and telling them you wouldn't

18   be searched by Abanico?

19   **A.**   Well, he and I are having a heated discussion about me not

20   getting against the wall and me disobeying a direct order,

21   which I'm adamant about it because I'm not going to let him

22   search me anymore, and I'm just refusing at that point.

23       So I can see she's kind of taken aback and I can she's

24   kind of shook up and nervous.  And I knew her prior, too, from

25   working in the wing.  So what she was saying is, she was just

1  like, "Mr. Huff, just get against the wall."

2      And I said, "I don't mind being searched, but I don't want

3  him searching me.  I said you can search me."

4      And she said, "Okay."  You know, she just wants me to get

5  against the wall and she wants the situation calmed down, but

6  I'm adamant about him not searching me and she's trying to

7  defuse the situation.

8      So when I turned against the wall, I'm under the

9  impression that she's going to search me; and when I got

10 against the wall, he searched me and put the handcuffs on me.

11 **Q.**  Did he do the same thing in the search that he had done

12 before?

13 **A.**  Well, like I said, the July search was the only one

14 where --

15          **THE COURT:**  Just answer the question --

16          **THE WITNESS:**  I'm sorry.

17          **THE COURT:**  -- that is posed.

18 **BY MR. CUNNINGHAM:**

19 **Q.**  Was it -- well, let me go back.

20     Since the July search, we're already talking in the next

21 year now; right?

22 **A.**  Yes, sir.

23 **Q.**  And, roughly, how many times had he pulled you over and

24 searched you in that time lag, that several months?

25 **A.**  I mean, he -- I mean, it was so many I can't put a number

1    on it because it was often, it was frequent; and I just felt

2    like this guy was harassing me, and I just felt like he was

3    just like punking me and bullying me, you know what I mean?

4    And I felt inferior at that time. And, you know, he was just

5    bothering me constantly.

6        And I never gave him a reason for him to pull me over as

7    many times as he had pulled me over. So, like I said, this

8    particular day I was just fed up with the guy and I didn't want

9    anything to do with him. I didn't want him searching me.

10   **Q.** Okay. And, so, you were ready to risk going to the hole

11   for disobeying a direct order?

12   **A.** Well, I was ready to go to the hole.

13   **Q.** And what happened? He put handcuffs on you?

14   **A.** Yeah, he -- well, I think he went through the search -- he

15   searched me. He put the handcuffs on me. And at this point

16   the -- I don't know who hit the alarm, but the alarm went off

17   in the corridor. And at this point when the alarm goes off in

18   the corridor, they clear the corridor because, you know, the

19   alarm going off. So other officers come into the hallway. And

20   I'm assuming whoever pulled the alarm, they direct you to where

21   the situation's been going on.

22   **Q.** Where something's happening?

23   **A.** Yes, sir.

24   **Q.** Okay. That caused the alarm to be rang?

25   **A.** Yes, sir.

1  **Q.**  And then what happened to you?  You're handcuffed now.

2  **A.**  They took me to the holding tank in the corridor.

3  **Q.**  What they call the cage?

4  **A.**  The cage, yes, sir.

5  **Q.**  Where is that located in the corridor, at one end or the

6  other or halfway down the middle?

7  **A.**  I would say it's halfway down in the middle by the north

8  gate right directly across from the culinary.

9  **Q.**  Okay.  And how long did you spend in the cage?

10  **A.**  Probably an hour and a half.

11  **Q.**  Uh-huh.  And did you get served with a 115?

12  **A.**  Yes, I did.

13  **Q.**  While you were still there that day or next day?

14  **A.**  No.  This is -- this is the reason for the 115 because I

15  didn't get against the wall; and, like I said, Abanico

16  fabricated the paperwork.  He said that he pulled me over for

17  having a manufactured earring, and I didn't have one.

18  **Q.**  Okay.  And did you go to court on the 115?

19  **A.**  Well, I went -- I talked to the senior hearing officer.

20  **Q.**  Yes.  Was that a 115 hearing?

21  **A.**  That's a 115 hearing.

22  **Q.**  Uh-huh.  And what happened in the 115 hearing?

23  **A.**  My 115 was dismissed.

24  **Q.**  And did anybody testify besides yourself?

25  **A.**  Yes, sir.

1  **Q.**   Who was that?

2  **A.**   Officer Lisk.

3  **Q.**   And were you present when she testified?

4  **A.**   Yes, sir.

5  **Q.**   And was there some discussion of the earring?

6  **A.**   Yes, sir.

7  **Q.**   And was it established, as far as you know, that you

8  didn't have an earring?

9  **A.**   It was established I didn't have an earring, and it was

10  also established that the senior hearing officer asked -- I

11  referred -- I told -- I asked the senior officer to ask CO Lisk

12  two questions, and he asked her those two questions.  And they

13  were pertaining to the earring and -- can I look at the

14  paperwork?

15  (Witness examines document.)

16      **THE COURT:**  Just so the record is clear, the witness

17  is looking at 6B.

18      **MR. CUNNINGHAM:**  Exhibit 6B, correct.

19      **THE WITNESS:**  (Witness examines document.)  I don't

20  have the disposition, but on the disposition they have the two

21  questions that I asked the senior hearing officer asked

22  CO Lisk, and one was referring to the earring.

23                  (Pause in proceedings.)

24  BY MR. CUNNINGHAM:

25  **Q.**   But he asked the questions that you asked him to ask, and

1  she responded as you expected; is that right?

2      **THE COURT:** Maybe we can tighten this up a little bit,

3  Counsel, and move on.

4  **BY MR. CUNNINGHAM:**

5  **Q.** Well, as a result of Officer Lisk's testimony, you were

6  exonerated of the 115; is that right?

7  **A.** Yes, sir.

8  **Q.** Okay. And then did you hear back -- strike it.

9      You filed the 602 that is the front of Plaintiffs'

10  Exhibit 6B; correct?

11  **A.** Yes, sir.

12  **Q.** And we discussed that you got back a screening response.

13  You wrote a protest to the screening response; correct?

14  **A.** Yes, sir.

15  **Q.** And that's in there at AGO pages 295 and 296?

16  **A.** (Witness examines document.) Yes, sir.

17  **Q.** And you protested that -- strike it.

18      What was your protest in the screening response?

19  **A.** Well, my protest in the screening response is -- can I

20  read it or --

21      **THE COURT:** I mean, I think it's pretty clear,

22  Counsel, that for all of these plaintiffs they ran their

23  appeals through the process to Sacramento. In each case it was

24  denied by the California Department of Corrections and

25  Rehabilitation.

1    MR. CUNNINGHAM:  Yes.

2  Q.  At every stage; correct, Mr. Huff?

3  A.  Yes, sir.

4  Q.  All right.

5            (Pause in proceedings.)

6    MR. CUNNINGHAM:  All right.  I have no further

7  questions, Judge.

8    THE COURT:  All right.  Thank you.

9    Cross-examination?

10    MR. LEWIS:  Yes, Your Honor.

11            **CROSS-EXAMINATION**

12  BY MR. LEWIS:

13  Q.  Good morning, Mr. Huff.

14  A.  How you doing?

15  Q.  You claim that Officer Abanico conducted a clothed body

16  search on you sometime in July 2006 at the Correctional

17  Training Facility?

18  A.  Late July.

19  Q.  And this search was conducted in the corridor, in the main

20  corridor of the prison building; correct?

21  A.  Yes, sir.

22  Q.  When he was conducting the search, Officer Abanico started

23  at your upper body, didn't he, after you were spread eagle

24  against the wall?

25  A.  Well, I said in the deposition that he started from my

1   arms and he goes through the routine.

2   **Q.**   And what is the routine?  Does he start like at the

3   outside and then move in as you described?

4   **A.**   It depends if you have long sleeves or short sleeves.

5   Pretty much I think I had long sleeves on.  So they would go

6   through the -- well, you seen how you spread eagle.  They would

7   go through your arms and they would go through the routine,

8   your body, your chest, your groin, and your inner thighs, and

9   go down to your ankles.

10  **Q.**   And then by going through the routine, does that mean that

11  he would feel along your body?

12  **A.**   Yes, sir.

13  **Q.**   Okay.  And, so, you said he went down towards your groin

14  area in the bottom.  Was this like a methodical search, start

15  at the top, go down?

16  **A.**   Yes, sir.

17  **Q.**   And you contend that during this search in July 2006 that

18  he allegedly grabbed your groin and your genitals; correct?

19  **A.**   Yes, sir.

20  **Q.**   And this alleged grabbing lasted a second or two; correct?

21  **A.**   Yes, sir.

22  **Q.**   And after searching your groin area, he then, meaning

23  Officer Abanico, then continued to go down and search your

24  legs?

25  **A.**   Well, he also -- what made me jump off the wall was when

1  he grabbed my groin area momentarily, he also rubbed against my

2  buttocks as well, and that really had me excited.  I'm, like,

3  "Man, what are you doing," and I was just letting him know that

4  wasn't cool how he was searching me.

5  **Q.**  But this grabbing lasted like a second or two you said?

6  **A.**  Momentarily, yes, sir.

7  **Q.**  And the entire search lasted less than a minute; didn't

8  it?

9  **A.**  Most searches last less than a minute.

10  **Q.**  And you contended another correctional officer was present

11  during this search, but you can't remember who it was?  And

12  we're talking about the July 2006 search.

13  **A.**  No, I can't remember who it is, but all officers are

14  present when another officer is searching an inmate.

15  **Q.**  Okay.  And were there other prison officials or other

16  people kind of in the corridor at this time?

17  **A.**  The corridor's always crowded; some days more or less, you

18  know.

19  **Q.**  Officer Abanico didn't say anything of a sexual nature to

20  you during this search; did he?

21  **A.**  No, sir.

22  **Q.**  And he didn't touch your genitals or your buttocks beneath

23  your clothing; did he?  It wasn't skin-to-skin contact; was it?

24  **A.**  No, sir.

25  **Q.**  Aside from this July 2006 search, you can't recall how

1   many clothed searches Officer Abanico conducted on you; can

2   you?

3   **A.**   He harassed me and bothered me for nearly two years.  So

4   it was quite a bit.

5   **Q.**   And I'd ask you to answer my question.  I asked you:  You

6   can't recall how many other searches Officer Abanico conducted

7   on you; can you?

8   **A.**   No.  There were a lot, though.

9   **Q.**   You can't recall the dates of those searches; can you?

10  **A.**   No, because getting searched is just routine.  You go with

11  the protocol, so it's normal in prison.

12  **Q.**   But you do recall that these searches were conducted in

13  the corridor; weren't they?

14  **A.**   Everything's in the corridor.  Mostly everything's in the

15  corridor.

16  **Q.**   All right.  And during these searches, all these other

17  searches, an officer was present; correct?

18  **A.**   Yes, sir.

19  **Q.**   And while conducting these other searches, he would also

20  methodically start at the top of your body with your arms and

21  move down; correct?

22  **A.**   Yeah, he would go through the routine.

23  **Q.**   And these searches also lasted around a minute?

24  **A.**   Approximately the same, yes.

25  **Q.**   And then during these later searches, aside from this

1  July 2006 search, Officer Abanico didn't grope your genitals or

2  squeeze your testicles like he did during the July 2006 search;

3  did he?

4  **A.**   No.  What he would do was he would go -- I felt -- I

5  always felt like he was feeling me up and caressing me real

6  hard.  So all the searches were firm, hard, and direct.

7        And, no, he wouldn't -- they weren't like the July search.

8  He wouldn't stay at the groin area.  What he would do, he would

9  rub them real hard, when he's going through his routine from

10  the top of the arm through your chest area; and I felt like --

11  and I always felt like the guy was feeling me up and violating

12  me.

13  **Q.**   And would he sweep across you like?

14  **A.**   He's rubbing me real hard and caress -- it's like a hard

15  caress.

16  **Q.**   Would you say it was like a fluid motion sweeping across

17  you?

18  **A.**   Yeah, it was fluid.

19  **Q.**   Okay.

20  **A.**   But it was firm and hard all the time.

21  **Q.**   And those later searches where he didn't grab your

22  testicles but swept across you, those lasted, that contact with

23  your groin area generally lasted a second or two, right, that

24  sweep?

25  **A.**   No.  They were fluid.  I mean, two seconds or a second,

1    that's a long time.  So I would say when he's going through it,

2    it's real hard, firm, and I felt like he was caressing me and

3    it was just fluid.  He was just, like, so he wouldn't miss that

4    part, he would get it all the time.

5    **Q.**    And would he sway -- would that sweep last less than a

6    second?

7    **A.**    Well, a second is long.  So fluid is like he's going

8    through it.

9    **Q.**    Okay.  And during these later searches, Officer Abanico

10   didn't say anything of a sexual nature to you; did he?

11   **A.**    No, he's never said that.

12   **Q.**    And during these later searches, he never touched your

13   genitals or your buttocks underneath your clothes, meaning

14   skin-to-skin contact?

15   **A.**    No, sir.

16   **Q.**    And you haven't suffered any physical injuries from

17   Officer Abanico's clothed body searches; have you?

18   **A.**    No, sir.

19   **Q.**    And you never sought medical treatment after the searches?

20   **A.**    No, but it's -- can I explain why?

21   **Q.**    Well, if you just answer the question.  Have you --

22   **A.**    No.

23   **Q.**    You have not?

24   **A.**    No.

25         **THE COURT:**  The witness can explain his answer.

1   BY MR. LEWIS:

2   Q.   And now please explain.

3   A.   Well, the reason being in prison there's certain things

4   that you can do and say, and you have to protect yourself.  So

5   for me, if I -- if I'm seeking psychiatric help, that would

6   hinder me in the Board hearing when I'm trying to get paroled

7   and released and I'm trying to continue to have a good program.

8       So if I have a psychological problem and I'm in the Board

9   hearing, I mean, they would use that against me.

10      So, you know, basically I sucked it up.  I mean, I didn't

11  like it, but I was going through the appeal process; and I'm

12  just hoping that the appeal process is working.  And we're here

13  in court today, and it was a long -- it was a long process.

14  Q.   And you never sought medical or psychiatric help after

15  these searches; did you?

16  A.   Well, no.  I tried to help myself.

17  Q.   And would you say Officer Abanico -- well, some officers,

18  they do their searches differently; don't they?

19  A.   I mean, searches are routine in prison.  So, yes.  Yes.

20  Q.   But you admit that Officer Abanico is pretty thorough in

21  his searches; correct?

22  A.   If that's how you want to say it.

23  Q.   Would you --

24  A.   Yes.

25  Q.   Would you admit that Officer Abanico is pretty thorough in

1   his searches?

2   **A.**   Yeah.   Yes.

3         **MR. LEWIS:**   No further questions, Your Honor.   Thank

4   you.

5         **THE COURT:**   All right.   Thank you very much, Counsel.

6                   <u>**REDIRECT EXAMINATION**</u>

7   **BY MR. CUNNINGHAM:**

8   **Q.**   Would you say he was beyond thorough?

9       Oh, I'm sorry.

10         **THE COURT:**   Just one moment.

11         **MR. CUNNINGHAM:**   Sure.

12              (Pause in proceedings.)

13         **THE COURT:**   Why don't you proceed.   Thank you.

14         **MR. CUNNINGHAM:**   Thank you, Judge.

15              (Pause in proceedings.)

16         **THE COURT:**   You may proceed.   Sorry.

17   **BY MR. CUNNINGHAM:**

18   **Q.**   Would you say Officer Abanico was beyond thorough when he

19   searched you?

20   **A.**   I would say he was.

21   **Q.**   And have other officers sometimes searched you thoroughly?

22   **A.**   Yes, sir.

23   **Q.**   Is there a range of the rigor or the completeness or

24   the -- you know, the approach that different officers have?

25   **A.**   Yes, sir.

1  **Q.**   Some are pretty casual, some are pretty firm, pretty

2  rigid; right?

3  **A.**   Yes.

4  **Q.**   And they go up -- they do everything they could do in

5  terms of making sure there's no contraband on your body?

6        **MR. LEWIS:**   Objection, Your Honor.   Leading.

7  **BY MR. CUNNINGHAM:**

8  **Q.**   Are there searches --

9        **THE COURT:**   Hold on.

10        **MR. CUNNINGHAM:**   Okay.   Thanks, Judge.

11                    (Pause in proceedings.)

12        **THE COURT:**   Overruled.

13  **BY MR. CUNNINGHAM:**

14  **Q.**   Are they complete searches in terms of being able to

15  detect any contraband?

16  **A.**   Yes, some are more thorough than others.

17  **Q.**   Okay.   Has anyone ever searched you the way Abanico did

18  all those times?

19  **A.**   Not even remotely close, no.

20  **Q.**   And on other -- the first time he did it, you came off the

21  wall; right?

22  **A.**   Yeah, July, late July, yes, sir.

23  **Q.**   Okay.   And did you -- did you come off the wall any other

24  time later before that last time with Lisk?

25  **A.**   No, I didn't come off the wall; but seeing how he was

1  bothering me constantly and harassing me, I mean, we would have

2  dialogue, you know, when I'm on the wall and I'm just

3  expressing my displeasure about what's going on but I'm going

4  through the routine.

5  **Q.**  And submitting?

6  **A.**  Every time.

7  **Q.**  And what was his end of the dialogue?  Did he talk to you

8  about what you were complaining about?

9  **A.**  Well, in my deposition Mr. Quinn asked me about certain

10  dialogue that he and I would have, but now --

11  **Q.**  That you and Abanico would have?

12  **A.**  Yeah.  And a lot of times I couldn't remember what he

13  said, but he would be -- he was more like -- he would always

14  use the word "sir," "sir" a lot.

15  **Q.**  And did he say, "Sir, I'm not feeling you up"; or, "Sir,

16  I'm not -- you're not -- your complaint is wrong"?

17  **A.**  Well, it would be like, "Sir, get against the wall"; or,

18  "Sir, you're disobeying a direct order"; or, "Sir, get against

19  the wall."  Like that nature.

20  **Q.**  In other words, he didn't respond to what you were

21  saying --

22  **A.**  Yeah.

23  **Q.**  -- specifically?

24  **A.**  Well, I'm complaining at that time.

25  **Q.**  And would it be right to say that he pulled you over every

1    time he saw you, just about every time he saw you in that

2    period between July and the next year when you filed the 602?

3    **A.**   No, I wouldn't say that because some days, like I say,

4    some days the corridor is more crowded than other days.  So a

5    lot of times, like I say, guys on the facility knew what was

6    going on.  So some days you see a guy pulled over, and what you

7    do is you just speed up.

8         And what I would see Abanico, sometimes I'd get in the

9    crowd because I didn't want him bothering me, or I'd get close

10   to and wall and I'd just kind of push right passed him.  But,

11   no, he didn't search me all the time.

12   **Q.**   And you didn't -- I take it you didn't keep a record of

13   the times he did search you?  You didn't go back to your cell

14   and write a journal or anything like that?

15   **A.**   No, I didn't do that because I had -- I was part of the

16   grievance with Ivan Cleveland.  So, like I say, during the

17   appeals process or grievance, you just have to be patient and

18   hopefully somebody will hear your plea.

19        So I had the 602 in and I had the grievance in, and I had

20   talked to Lieutenant Biggs about what was going on.  So I felt

21   like my complaint and a lot of other complaints just went on

22   deaf ears.  Nobody would hear, you know, hear your complaint.

23   So you have to wait for the appeal process.

24   **Q.**   Okay.  And when you talked to Lieutenant Biggs, was that

25   before or after you filed the 602?

1    **A.**    I talked to Lieutenant Biggs at my 115 hearing; and what I

2    did was in my 115 hearing, I brought all my evidence and

3    documents, and I was trying to explain to him that -- how

4    Abanico was searching guys, how he was harassing me, and how I

5    felt uncomfortable with the searches.  And he basically just

6    dismissed me.

7    **Q.**    And in terms of the grievance, the document I was looking

8    for before and couldn't find, I found a copy of it at least.

9         **THE COURT:**  Has it been marked?

10        **MR. CUNNINGHAM:**  This would be a part of -- a piece of

11   6B.

12        **THE COURT:**  Well, you say "it's a piece of."

13        **MR. CUNNINGHAM:**  I mean it's a page from 6B.

14        **THE COURT:**  Is it part of 6B?

15        **MR. CUNNINGHAM:**  I can't tell you, Judge.  I thought

16   it was and I couldn't find it.

17        **THE CLERK:**  Make it 10.

18        **MR. CUNNINGHAM:**  All right.  Make it -- we'll call it

19   Plaintiffs' 10.

20        **THE COURT:**  All right.  Thank you.  We'll mark that as

21   Plaintiffs' 10.

22        (Plaintiffs' Exhibit 10 marked for identification)

23   **BY MR. CUNNINGHAM:**

24   **Q.**    Showing you what's now been marked as Plaintiffs' 10.

25   When you referred to the grievance, is that the grievance you

1    meant -- you were talking about?

2    **A.**    Yes.   This is the grievance that Ivan Cleveland made and I

3    signed it.

4    **Q.**    He made -- this is your writing in the box in the bottom

5    half of the page?

6    **A.**    Yes, sir.

7    **Q.**    And the other part was the form that he gave you to use?

8    **A.**    Yes, sir.

9    **Q.**    Okay.   Thank you.

10        **MR. CUNNINGHAM:**   I have no further questions,

11   Your Honor.   Thank you.

12        **THE COURT:**   All right.   Thank you.

13        **MR. LEWIS:**   Mr. Huff, thank you for your time.

14   Your Honor, we have no further questions.   Thank you.

15        **THE COURT:**   Mr. Huff, you may stand down now.

16           (Witness excused subject to recall.)

17        **THE COURT:**   Where's that document?   Oh, you have it.

18        **THE CLERK:**   Yes.

19        **THE COURT:**   I just wanted to make sure you have it.

20               (Pause in proceedings.)

21        **THE COURT:**   Mr. Cunningham, your next witness, please.

22        **MR. CUNNINGHAM:**   Our next witness is going to be

23   Kenneth Trask.   I'm just conferring for a second.

24               (Pause in proceedings.)

25        **MR. CUNNINGHAM:**   We're going to recall Mr. Trask at

1    this time, Judge.

2         THE COURT:  All right.

3                    **KENNETH TRASK**,

4    called as a witness for the Plaintiffs, having been previously

5    duly sworn, testified further as follows:

6         THE COURT:  Mr. Trask, I want to remind you you're

7    still under oath.

8         THE WITNESS:  Yes, sir.

9                    **DIRECT EXAMINATION**

10   BY MR. CUNNINGHAM:

11   Q.   Good morning, Mr. Trask.

12   A.   Good morning.

13   Q.   You testified previously yesterday for some period of

14   time; correct?

15   A.   Yes, sir.

16   Q.   All right.  In your own case --

17   A.   Yes, sir.

18   Q.   -- what's the first time that you encountered

19   Officer Abanico at Soledad?

20   A.   In my own case?

21   Q.   Yeah.  I mean, between you and him, you know, what's the

22   first time that you were searched by Officer Abanico, roughly

23   speaking if you don't know the date?

24   A.   Because I don't remember the date, but it had to be

25   around -- on or around approximately June 22nd.

1  **Q.**  Of?

2  **A.**  Of 2007.

3  **Q.**  Okay.  Before that, had you known him?

4  **A.**  Yes.

5  **Q.**  All right.  Had you ever been pulled over by him?

6  **A.**  I'm not sure if I had or not, but --

7  **Q.**  Okay.

8  **A.**  -- let me try and explain how I knew him.

9  **Q.**  Okay.  Please do.

10  **A.**  I'm one of the guys in the prison that people who don't

11  know how to do 602s, come to.  Most people in the prison don't

12  know how to do 602s.  So I'm one of those guys that help guys

13  that don't know how to file complaints or know how to read or

14  know how to respond to certain situations.  I'm one of the guys

15  that help them do that.

16      How I knew about Officer Abanico, that I was approached by

17  other inmates who were encountering searches or being pulled

18  over by Abanico and telling me what they were doing.

19  **Q.**  Okay.

20  **A.**  So that's how I knew about Abanico.  Guys were coming to

21  me and asking me to help them to file a 602.

22  **Q.**  But at the point where you filed the grievance in June --

23  I'm sorry, the 602 in June of '07, that's the first time that

24  you personally encountered him?

25  **A.**  I believe so, yes, sir.

**Q.**   Now, did we ask the other day or yesterday how long you've been in prison?

**A.**   Yes, sir.

**Q.**   And where are you from?

**A.**   I'm from Los Angeles.

**Q.**   And do you have family in Los Angeles?

**A.**   Yes, sir.  I have a wife, I have a daughter, and I have two granddaughters.

**Q.**   Uh-huh.  And where do they live?

**A.**   They live right now in the San Fernando Valley.

**Q.**   And do you see them?  Do they visit you?

**A.**   Yes, sir.

**Q.**   And are you working on parole?

**A.**   Yes, sir.  I've done a number of things -- a number of things since I've been in prison.  I've -- I got a GED.  I have a high school diploma.  I've taken college courses.

I'm active in the Muslim community.  I speak, read, write, teach Arabic.

I have a number of certificates in different areas where I've been seeking self-help.

I'm a tutor in school helping, you know, inmates to read.

Outside of that, I've been working on myself trying to get out of prison.

One time during this whole thing I was trying to get a single-cell status because of how I felt about things that

1  happened to me; but recently I've been moved to a prison down

2  in Corcoran called the SAPO Ground where they, you know, have a

3  lot of group therapy things going on.  And I'm in a cell now

4  with seven other inmates, and I'm learning how to get out there

5  hopefully.

6  **Q.**  You're able to cope with living with seven other guys?

7  **A.**  Yes, sir.  Yes, sir.

8  **Q.**  And --

9  **A.**  Which no way I would have been able to do in the past

10  years.

11       **THE COURT:**  Let me just ask you, is that more like a

12  dormitory setting?

13       **THE WITNESS:**  It's a dormitory setting that has over a

14  hundred people in a setting, but in each section it has beds in

15  it for eight people.

16       **THE COURT:**  Like a pod?

17       **THE WITNESS:**  Like a pod but in this particular case,

18  it has a door so you can be locked into that section and you

19  are locked in, you know, during counts and when it's time to

20  lock up at night.

21       **THE COURT:**  Okay.  Thank you.

22  **BY MR. CUNNINGHAM:**

23  **Q.**  And how long have you been living in that setting?

24  **A.**  I've been there, I think, since June of this year.

25  **Q.**  And before that, you were single cell?

1  **A.**  Yes.  I had been single cell for the last -- before that,

2  I was single -- I was single cell for about 18 months when I

3  was in Delano.

4  **Q.**  Was being in that status in the single cell, you had to

5  seek that out; right?  You had to --

6  **A.**  Well, in my case I was in Delano, I was working as the

7  head porter in the building, which is a janitorial position;

8  and the officers allowed me, you know, to have my own cell, and

9  I had my own cell for 18 months.

10  **Q.**  Do you -- can you say what -- strike it.

11       When you were searched by Abanico, did you have any

12  physical injury from that?

13  **A.**  Well, as I said in my affidavit, the only physical injury

14  that I had was temporary when he squeezed my scrotum.

15  **Q.**  Okay.  And what about psychological?

16  **A.**  Well, shortly after that encounter with Abanico, I was

17  accused of threatening his life, and I was put in

18  Administrative Segregation, the hole, and I spent 18 [sic]

19  months in the hole.

20       During that time in the hole, I'd written to

21  psychologists, doctors, and telling them about bad dreams that

22  I was having, not trusting Administrative staff, not trusting

23  officers, not wanting to be around the inmates.  I just wanted

24  to be to myself.

25  **Q.**  Was that -- I'm sorry.

1    Are you saying you were in the hole 18 months or eight

2 months?

3 **A.**  Eight months.

4 **Q.**  Eight months.  And did there -- that was based on a 115

5 that he filed; is that correct?

6 **A.**  Yes.  That was based on a 115 that he filed on

7 September 13th, 2007.

8 **Q.**  Uh-huh.

9 **A.**  In his complaint he said that I on that night, it was the

10 beginning of Ramadan, and he said -- as a matter of fact, it

11 was the first night of Ramadan of 2007, he said that I came out

12 of the building, which I did.  I tried to get one of the

13 inmates out of the building that I was sponsoring.  That was

14 one of the things that I do.  Abanico refused to let him out.

15    So --

16 **Q.**  Sponsoring?  I'm sorry.  Sponsoring for what?

17 **A.**  Sponsoring introducing him to Islam.  You know, taking him

18 to the mosque and showing him how to participate in the fast

19 for the month, and things like that.

20 **Q.**  He's like somebody that was possibly coming to Islamism?

21 **A.**  Yes, sir.  At the time it was a young man that was a

22 gangbanger that was trying to change his life.

23 **Q.**  Uh-huh.  And there is a mosque established at the prison?

24 **A.**  Yes, sir.

25 **Q.**  You're allowed to go there and practice?

1   A.   Yes, sir.

2   Q.   And what happened when you came out of the building and

3   met Abanico?

4   A.   Well, when I came out of the building and met Abanico, the

5   first thing he asked me was for my ID.  I showed him my ID, and

6   he asked me some more questions.  But before I showed him my

7   ID, I told him, "You know who I am and you know where I'm going

8   because of the encounter that we had before."  He didn't need

9   to know -- he didn't need my ID because he knew who I was.

10      After he took my ID, looked at the ID, gave the ID back to

11  me and told me to go ahead and go over where -- to the chapel

12  where I was going, I at that time tried to get another inmate

13  out.

14  Q.   That same inmate you were talking about --

15  A.   Yes, sir.

16  Q.   -- that you were mentioning?

17  A.   Abanico refused to allow him to come out.

18      So at that time I told the inmate, "Don't worry about it.

19  I'm going to go and talk to Lieutenant Shahid and we're going

20  to kill this stuff off right now."

21  Q.   Okay.  Had you talked to Lieutenant Shahid about this

22  prior?

23  A.   Yes, sir.

24  Q.   And --

25  A.   One of the reasons why I'd been communicating with

1    Lieutenant Shahid is because I was writing Abanico up

2    regularly, so --

3    Q.   From other inmates?

4    A.   From other inmates and for myself.

5    Q.   Okay.

6    A.   So I think the night before I had talked to Lieutenant

7    Shahid about a write-up that I wrote on Abanico pertaining to

8    him taking -- I call it stealing inmates' food, which I have a

9    copy of.

10        Lieutenant --

11   Q.   I'm sorry.  Were any of those write-ups that you made

12   before that day about improper searches?

13   A.   Yes, sir.  I wrote -- I wrote a group appeal.  A group

14   appeal is when I write an appeal, and I get the signatures of

15   inmates who experience the same thing.

16        I wrote this appeal for the inmates only in D Wing because

17   Abanico was working at D Wing.  And that appeal had been filed,

18   and I had 90 signatures on that appeal claiming unprofessional

19   conduct, harassment, verbal abuse, aggressive actions against

20   the inmates housed in D Wing.

21            MR. LEWIS:  Your Honor, here we go again.

22            THE COURT:  Sustained.

23        Move on.

24            MR. CUNNINGHAM:  Okay.  Well, just I'll --

25   Q.   Showing you what's been marked Plaintiffs' Exhibit 6E, is

1  that the appeal you're referring to, the group appeal?

2  **A.**   Yes, sir.

3  **Q.**   Okay.  At least on the top of those pages?

4  **A.**   Yes, sir.

5  **Q.**   Okay.

6        **THE COURT:**  So let me be clear.  This is a document

7  that this witness prepared?

8        **MR. CUNNINGHAM:**  Yes.  Yes.

9        **THE COURT:**  You're referring to --

10       **MR. CUNNINGHAM:**  It has that other element to it that

11  we discussed.

12       **THE COURT:**  All right.  You're referring to -- which

13  of plaintiffs' exhibits is this?

14       **MR. CUNNINGHAM:**  6E.

15       **THE COURT:**  Thank you.

16     Has that been marked, Madam Clerk?

17       **THE CLERK:**  Yes, it has, Your Honor.

18       **THE COURT:**  Thank you.

19  **BY MR. CUNNINGHAM:**

20  **Q.**   And was this group appeal processed through the system as

21  we've been hearing other prisoners tell us?

22  **A.**   Yes, sir.  It had been -- it was being processed.  It

23  hadn't been finished yet.  It was being processed.  It

24  continued to be processed while I was sitting in the hole, and

25  I had to respond to it from the hole.

1  Q.   It was still pending at the time of the incident you were

2  speaking of before?

3  A.   Yes, sir.

4  Q.   I didn't mean to interrupt that narrative.  You said when

5  he refused to let your young friend out with you, you were

6  going to a Ramadan service, sir?

7  A.   Yes, sir.

8  Q.   And you said you would go talk to Shahid and you said, "We

9  will kill this right here right now"; is that right?

10 A.   Yes.  And that was because the night before

11 Lieutenant Shahid told me if I had any more problems with

12 Abanico, instead of writing him up, to come and talk to him.

13 So I chose that night --

14       MR. LEWIS:  Objection, Your Honor.  Hearsay.

15       THE COURT:  Sustained.

16 BY MR. CUNNINGHAM:

17 Q.   So as a result of the conversation with Shahid that you

18 had, this was what you were going to do, then, at that point?

19 A.   Yes, sir.  I was going town to talk to the lieutenant

20 about asking Abanico to release the inmate that I was trying to

21 get out of the building.

22 Q.   Okay.  And you were already cleared?  He'd already --

23 A.   Yes, sir.

24 Q.   -- checked your ID?

25 A.   Yes, sir.

Q.   And, so, then when you said that, what happened?

A.   Abanico started hollering saying that, "Ah, he said he's going to kill me.  He said he's going to kill me."  Hits alarm, told me to get down.  I got down, got on the wall.  Searched me.  All the officers rushed me, had me put my hands behind my back after Abanico searched me.  Took me down to the cage. Made me come out of my clothes.

     And I'd like to explain a little bit about the cage because we've talked -- I've heard a lot about the cage.  The cage is about the size of a phone booth, and inmates are told to enter the cage.  Most of the time when you're in the cage, you have to strip naked and go through a -- go through a body search.

     So not only was I searched in the corridor by Abanico, I was again stripped naked in the cage where I stayed for a few hours before the 114 was written.  The 114 is a report that they write to send you over to the hole.

     The 114 was written, and I was placed in the hole, and I was placed in the hole and charged with threatening the life of a public official.  That case went to the District Attorney. The District Attorney refused to prosecute; and, so, I had to stay in the hole for eight months to see what the prison was going to do with it.

Q.   And what -- did the prison finally take action on the 115?

A.   Yes, sir, it did.

**Q.** So the 115 is separate from the 114; right?

**A.** Yes. 114 is a lockup order that they write out to say that this individual is a threat to maybe the prison or threat to himself or whatever. In this case I was deemed a threat to the safety and security of the institution.

**Q.** Okay. Are you saying it was eight months before they had a hearing on the 115?

**A.** Yes, sir.

**Q.** And what happened in the hearing?

**A.** I was exonerated.

**Q.** All right. And released and then transferred I think you told us?

**A.** No. After I was exonerated, during my classification hearing -- so what happens is you sit in the hole until you have a hearing.

I sat in the hole for eight months. Then I had a hearing with ICC, which is main classification; and at that classification the Warden sits in on the classification.

The first question was did I -- was I a threat to any of his officers on the line, which I responded to no. He asked me was -- did I feel that the officers on the line were a threat to me, and I answered yes. So he put me up for transfer.

**Q.** And that was in the -- like around the spring-summer of '08?

**A.** That was eight months after I was there. I was

1  transferred out of Soledad April 24th, 2008.

2  **Q.**  All right.  And had you spent any time in Soledad out of

3  the hole before the transfer?

4  **A.**  No, sir.

5  **Q.**  Okay.  Now, when he searched you after -- after he rang

6  the alarm, did he grab your private parts?

7  **A.**  No, sir.

8  **Q.**  But he had on previous occasions?

9  **A.**  Yes, sir.

10  **Q.**  And how many times did Abanico pull you over and search

11  you before you got sent to the hole roughly?

12  **A.**  I would say around 20 times.

13  **Q.**  Over the period of time --

14  **A.**  Yes, sir.

15  **Q.**  -- after that first time when you first met him?

16  **A.**  Yes, sir.

17  **Q.**  And were those searches all the same?

18  **A.**  May I back up a minute?

19  **Q.**  Yes.

20  **A.**  Because during the time when Abanico was on that line, he

21  had searched me numerous of times.  So up until the point that

22  I wrote the 602, I had been searched by him a number of times.

23  **Q.**  Okay.

24  **A.**  So I said I couldn't remember, but I had been.

25  **Q.**  Okay.  And what would happen during those searches?

**A.**    He would have me get against the wall in the position that Mr. Morris showed.  He would have me back up, spread my -- spread my legs, get my legs apart, and then he would commence to searching me.

He would start at the top, work his way down to the groin area, the penis.  He would squeeze the penis, squeeze the testicles, and go down the leg.

Now, in my case, I never came off the wall because my -- I was trying to get out of prison as I'm still trying to do.  So my response to his actions was turn around with my head and tell him, "You know, man, don't do that."  You know, I never came off the wall because I knew coming off the wall, what it would mean for me and I didn't want to endure going to the hole --

**Q.**    Or to risk any kind of --

**A.**    -- or to risk anything that was going to hurt me when I go to the Board.

**Q.**    And in all the time you were in prison, were you ever searched like that before?

**A.**    No, sir.  I've been searched thousands of times by who knows how many officers.  No officer has ever squeezed my penis or my testicles in the same way or in any way the way Abanico did.

**Q.**    Using the fingers I think you said?

**A.**    Using the fingers, yes, sir.

1   Q.   And do other officers sometimes search you in a strong

2   way?

3   A.   Yes, sir.  As I said, the last time I've had officers

4   where you see the position that Mr. Morris was in, I had

5   officers have me scoot back so far that I'm almost laying down

6   with my hands on the wall that low.

7   Q.   Uh-huh.

8   A.   So, yes, I've been searched by numerous officers very

9   aggressively, but never felt up the way -- or in the way

10  Officer Abanico was doing.

11  Q.   And in those thorough searches, the aggressive searches,

12  do they run the hand all the way up and touch your groin, the

13  space behind your --

14  A.   A sweep motion with the palm, yes, sir, they do.

15  Q.   Uh-huh.  Okay.  And are those searches, in your mind,

16  complete enough that they would find something --

17  A.   Yes, sir.

18  Q.   -- they would feel it if it was there?

19  A.   Yes, sir.

20      MR. CUNNINGHAM:  I have no further questions,

21  Your Honor.

22      THE WITNESS:  Excuse me, Your Honor, may I --

23      THE COURT:  There's no questions pending.

24      MR. CUNNINGHAM:  Oh, I'm sorry.  Let me --

25  Q.   Did I miss something that we spoke about?

1    A.   Yes, sir.

2    Q.   What did it have to do with?

3          MR. QUINN:  Objection.  Calls for narrative.

4          THE WITNESS:  Can we do it after?

5          MR. CUNNINGHAM:  I'm sorry.  It was something that

6    happened --

7    Q.   Something in your deposition?

8    A.   Yes, sir.  I'm pretty sure they're going to cover it but,

9    yes, something in my deposition.

10   Q.   Well, let's see if they cover it and if they don't, we'll

11   come back to it.

12         MR. CUNNINGHAM:  Thank you, Judge.

13         THE COURT:  Cross-examination.

14         MR. LEWIS:  Thank you, Your Honor.

15                   <u>CROSS-EXAMINATION</u>

16   BY MR. LEWIS:

17   Q.   So when we -- good morning, Mr. Trask.

18   A.   Good morning.

19   Q.   So when we talked I think it was yesterday --

20   A.   Yes, sir.

21   Q.   -- I'm sorry, we had talked about the 9/13 and it turns

22   out it was the September 13th, 2007, search --

23   A.   Yes, sir.

24   Q.   -- is the one that resulted in the administrative charge,

25   and then you were placed in Administrative Segregation; am I

1   correct?

2   **A.**   Yes, sir.  I had the dates mixed up at the deposition.

3          **THE COURT:**  Just so I'm clear, we're now talking about

4   the incident preceding Ramadan where this inmate was seeking to

5   have another inmate accompany him?

6          **MR. LEWIS:**  Yes, Your Honor.

7   **Q.**   We are talking about the September 13th, 2007, incident

8   where you were escorting a sponsored inmate to the Ramadan.

9   **A.**   Yes, sir, that's the same thing.

10  **Q.**   Okay.  Thank you.

11         And during that search, that was conducted in the building

12  corridor; correct?

13  **A.**   That was conducted in the corridor, yes, sir.

14  **Q.**   And then --

15  **A.**   When you asked -- excuse me, because I need some

16  clarification.  When you say "search," you're talking about

17  after --

18  **Q.**   The pre-kill remark search.

19  **A.**   After, yes, sir.

20  **Q.**   Okay.  And that --

21         **MR. CUNNINGHAM:**  Excuse me.  I think that misstates

22  the testimony.  I thought his testimony was he wasn't searched.

23  Just his pass was inspected or his ID was inspected.

24         **THE WITNESS:**  No.  We're talking about after my pass

25  was inspected and after Abanico accused me of stating that I

1  was going to kill him, a search did take place and Abanico was

2  the one that did that search.

3  **BY MR. LEWIS:**

4  **Q.**   And that search, that was conducted in the corridor?  And

5  thank you for clarifying that.

6  **A.**   Yes, sir.

7  **Q.**   And that was conducted in the corridor; correct?

8  **A.**   Yes, sir.

9  **Q.**   And during that search, did he start by searching your

10  upper body when you were up against the wall spread eagle?

11  **A.**   Yes, sir.

12  **Q.**   And did he search your arms?

13  **A.**   Yes, sir.

14  **Q.**   And then your chest, armpits?  What else did he search?

15  Did he go down?

16  **A.**   My whole body.

17  **Q.**   So he went down in a methodical way down the body?

18  **A.**   Yes, sir.

19  **Q.**   And at one point he had contact with your groin area and

20  you alleged that he grabbed and caressed you, caressed your

21  penis?

22  **A.**   Not that search, sir, no.

23  **Q.**   Okay.  Not that search?

24  **A.**   Right.

25  **Q.**   Because there were other officers present, is that your --

1    **A.**   There were numerous officers present because he hit his

2    alarm.  And when you hit your alarm, a lot of officers respond

3    to that particular alarm.

4    **Q.**   And the first search that he did that day, the other

5    searches that he did, you contend that he squeezed and caressed

6    your groin area; correct?

7    **A.**   Yes, sir.

8         **MR. CUNNINGHAM:**  Objection.  Not that day.

9         **THE WITNESS:**  No, sir.

10        **MR. LEWIS:**  I'm talking about these other searches.

11        **MR. CUNNINGHAM:**   I thought you just said first

12   search --

13        **THE COURT:**  Hold on, Counsel.

14                  (Pause in proceedings.)

15        **THE COURT:**  All right.  The question is:  (reading)

16        "And the first search that he did that day, the other

17     searches that he did, you contend that he squeezed and

18     caressed your groin area; correct?

19        "No, sir."

20        **MR. LEWIS:**  And, thank you, Your Honor.  I think

21   there's a little bit of confusion here.

22   **Q.**   So on September 13th, 2008, when you were searched by

23   Officer Abanico, how many times do you allege you were searched

24   on that day?

25   **A.**   Just that one time.

1   **Q.**   Just that one time.

2      And you contend that during that search, Officer Abanico

3   did not caress your groin area like he had allegedly done

4   before?

5   **A.**   No, sir, because, again, of all the officers being

6   present.

7   **Q.**   Do you know the names of any of those officers that were

8   present?

9   **A.**   Well, in the 115, the officer that escorted me to the

10   cage, I think his name was Rodriguez.  I'm not sure.  You'd

11   have to look at the 115.

12   **Q.**   And you don't -- has Officer Rodriguez told you anything

13   about whether or not that was appropriate?

14   **A.**   What was?

15      **MR. CUNNINGHAM:**  Objection.  Vague.

16      **THE WITNESS:**  What?

17   **BY MR. LEWIS:**

18   **Q.**   About the search that was conducted on you.

19      **THE COURT:**  And it calls for hearsay.

20      **MR. CUNNINGHAM:**  In addition.

21      **MR. LEWIS:**  I'll move on, Your Honor.

22      **THE COURT:**  Thank you.

23   **BY MR. LEWIS:**

24   **Q.**   When conducting this 9/13/08 search, he started your body,

25   he moved down and methodically searched your entire body;

1    correct?

2          **THE COURT:**  '08 or '07?

3          **MR. LEWIS:**  '07, Your Honor.  I'm sorry.  There's

4    confusion because of the transcript.

5    **Q.**   After -- in every other search that he did, aside from

6    that one that day, he methodically started at the top and then

7    moved down; correct?

8    **A.**   Yes, sir.

9    **Q.**   And then you contend that in every other search that he

10   would methodically get down to your groin area and that he

11   would caress and squeeze -- he would allegedly caress and

12   squeeze your groin; correct?

13   **A.**   Yes, sir.

14   **Q.**   Then you testified that this contact during these other

15   searches would last two, three seconds?

16   **A.**   Well, I can't say exactly how long they last.  If you're

17   talking about the search, the whole search --

18   **Q.**   No.  Just the contact with the groin area.

19   **A.**   I would say three to four seconds, yes.

20   **Q.**   Three to four or would you say --

21   **A.**   I would say three to four seconds.  Maybe it could have

22   been less.  I don't know.

23   **Q.**   Could it be two to three seconds?

24   **A.**   Yes, sir.

25   **Q.**   Do you remember testifying to two to three versus three to

1    four during your deposition?

2    **A.**    I may have.  I don't remember.

3    **Q.**    Do you remember if you said two to three seconds?

4    **A.**    I think I might have said two or three seconds or three or

5    four seconds.

6    **Q.**    After searching your groin area, Officer Abanico would

7    then continue down to your legs; wouldn't he?

8    **A.**    Well, after searching my groin area, there would be words

9    between me and Abanico about what he just did.

10   **Q.**    At every single search?

11   **A.**    Most of the time, yes, sir.

12   **Q.**    But you never documented this; did you?

13   **A.**    I documented it in my appeal, yes, sir --

14   **Q.**    And you --

15   **A.**    -- and I talked about it in my --

16   **Q.**    But you never documented specific dates?

17          **THE COURT:**  Well, he can answer.  He can finish

18   answering the question.

19          **THE WITNESS:**  I documented it in the appeal that I

20   wrote.  Again, I didn't use those words because of being in

21   prison, and prison is a different world.  You can't say certain

22   things.  If you say certain things, particularly in writing and

23   say it to Administration, you can end up in the hole.

24       So the way that I documented it, I used words like

25   "unprofessional conduct," "searches," "being very aggressive."

1   And, so, that way I can get in front of the lieutenant and

2   explain to the lieutenant exactly what was going on.  So that

3   would be between me and the lieutenant that was hearing my

4   complaints.

5   **BY MR. LEWIS:**

6   **Q.**   But you never wrote down the dates that these searches

7   happened?

8   **A.**   No, I didn't write down the dates because I wasn't

9   familiar with all the dates.  These happened, you know, through

10  the time that Abanico was working in the corridor.  We don't

11  keep dates of the times that officers search us.

12  **Q.**   But this appeared to be quite an abnormal search; didn't

13  it?

14  **A.**   All the searches that Abanico did was abnormal.

15  **Q.**   But you never recorded the dates of these searches?

16  **A.**   No, sir.

17  **Q.**   And Abanico, Officer Abanico, never said anything sexual

18  to you during these clothed searches; did he?

19  **A.**   No, sir.

20  **Q.**   And he never touched your chest or your groin area or your

21  buttocks underneath your clothing; did he?

22  **A.**   No, sir.

23  **Q.**   And you contend that these alleged searches of the groin

24  area sometimes caused you pain; don't you?

25  **A.**   Yes, sir.

1   **Q.**   And you said that pain was momentary and had to do with

2   what you were feeling; correct?

3   **A.**   Yes, sir.  Any man that's been kicked in the groin or hit

4   in the groin or had his groin squeezed or whatever, he

5   understands when I say "temporary pain."  It's not a pain that

6   I had to go to seek medical help for.

7   **Q.**   But this happened to you about 20 times you say?

8   **A.**   I would say he searched me during that time about 20

9   times, yes, sir.

10  **Q.**   And, so -- and after each one you experienced some pain?

11  **A.**   Not all the time, no, sir.

12  **Q.**   But you never sought medical help?

13  **A.**   No.

14  **Q.**   Now, you've filed at least four complaints on your own

15  against Officer Abanico; haven't you?

16  **A.**   Maybe more.  I don't remember.

17  **Q.**   So aside from this incident regarding searches, you have

18  accused him of stealing inmate food?

19  **A.**   Yes, sir.

20  **Q.**   And you've accused him of preventing you from getting into

21  medical appointments?

22  **A.**   Yes.  Can we deal with these one at a time?

23  **Q.**   Yes.

24  **A.**   The inmate food, that was a 602 that I was asked to

25  withdraw; however, before I can withdraw it, someone in

1   Administration -- you're asking me, sir, about the 602s and I'd

2   like to explain them.

3   **Q.**   That's fine, but I'm --

4         **THE COURT:**  Let the witness just briefly explain.

5         **THE WITNESS:**  Okay.  That particular 602, when it was

6   given to Administration, someone in Administration, and I don't

7   know who, signed my name on the 602, signed my number, and

8   dated and withdrew the 602 against my knowing.  And I have a

9   copy of that 602 with the signature of whoever signed it that's

10  different from my signature.

11  **BY MR. LEWIS:**

12  **Q.**   So you're alleging that someone else in the correctional

13  facility --

14  **A.**   Yes, that's exactly what I'm alleging.

15  **Q.**   -- forged your name and withdrew your complaint?

16  **A.**   And I took actions.  My actions was to write to the appeal

17  coordinator and tell the appeal coordinator that someone signed

18  my name and withdrew my 602.  I have a copy of that as well.

19       And the next day, which was September 12th of 2007, I had

20  a talk with Sergeant Ivey pertaining to this whole thing about

21  my signature being forged.  On September 13th, 2007, I was put

22  in the hole.

23  **Q.**   After -- and in addition to this food incident, you also

24  have alleged in a complaint, a 602 complaint against

25  Officer Abanico, that he prevented you from getting to medical

1    appointments; correct?

2    **A.**   Yes, sir.  I filed a 602 on that as well.

3    **Q.**   And you also filed a complaint against him for the alleged

4    false rules violation report that we've been talking about?

5    **A.**   What do you mean?

6    **Q.**   Where you threatened him.

7    **A.**   Yes, that was a false --

8    **Q.**   So you have a bit of a bias against him; don't you?

9    **A.**   I wouldn't say that I have a bias against him.  I'm saying

10   that I'm one of those inmates in the prison that, just like he

11   would do, if he breaks -- if I break rules, he write me up.  If

12   he break rules, I write him up.

13   **Q.**   And did you ever follow through on that rules violation

14   issue where you alleged that he was -- that he falsified a

15   report on you?

16   **A.**   Yes, sir.  I wrote a 602 on it that went through the

17   system, and it went through the appeals system first inside the

18   prison, and later it went through the -- I filed a 1983 against

19   Abanico and it went through the courts, and he was given

20   qualified immunity.

21   **Q.**   So you filed a lawsuit against Officer Abanico; didn't

22   you?

23   **A.**   Yes, sir.

24   **Q.**   And you filed a lawsuit alleging that he falsely accused

25   you of a disciplinary violation?

1    **A.**    Yes, I did.

2    **Q.**    And, in fact, that court found in Officer Abanico's favor;

3    didn't he?

4    **A.**    The court found that Abanico -- gave him qualified

5    immunity; however, the institution didn't find Abanico's --

6    found Abanico falsified that document.  As a matter of fact,

7    the lieutenant that heard the hearing said that the inmates --

8              **MR. LEWIS:**  Objection.  Hearsay.

9              **THE COURT:**  Sustained.

10   **BY MR. LEWIS:**

11   **Q.**    And, in fact, the court has dismissed your case; hasn't

12   it?

13   **A.**    In that particular case, yes, sir.

14   **Q.**    And judgment was found in Officer Abanico's favor; wasn't

15   it?

16   **A.**    He was granted summary judgment, yes, sir.

17             **MR. LEWIS:**  No further questions, Your Honor.  Thank

18   you.

19                        **REDIRECT EXAMINATION**

20   **BY MR. CUNNINGHAM:**

21   **Q.**    In the 602 that you were just discussing, was the -- did

22   the lieutenant reject the 602?

23   **A.**    No, sir.  The lieutenant -- what do you mean?  Which 602

24   are we talking about?

25   **Q.**    The one that counsel was just referring to before the --

1 the one where you went to the hole.

2 **A.** That particular 602 went through the system, went through

3 the three levels that we talked about -- first, second, and

4 third -- and it was denied on all levels, which caused me to

5 then take it into the courts.

6 **Q.** Into court.

7 And the one before that where the lieutenant talked to you

8 about Abanico, did he tell you something that made you

9 satisfied about that grievance?

10 **A.** No, sir.

11 **Q.** And what was your understanding of what was done with that

12 grievance then --

13 **A.** Well --

14 **Q.** -- or that 602.

15 **A.** -- what took place is out of the inmates that signed the

16 complaint, three of us was interviewed out of the number that

17 was on the 602. Three people were interviewed, and that was

18 the end -- that basically was the end of it. They found that

19 there was no inappropriate actions taken.

20 **Q.** And did you get some report back from the -- or see some

21 report back from the investigation where the other two inmates

22 plus yourself were the ones that were interviewed out of

23 however many signed it?

24 **A.** Yeah. Let me look for that.

25 **Q.** Just answer "yes" or "no" here.

1   **A.**   Yes, sir, I did.

2   **Q.**   And was there something unusual that struck you in that

3   report --

4   **A.**   Yes, sir.

5   **Q.**   -- about the interview with the other inmates?

6   **A.**   Yes, sir.

7   **Q.**   Prisoners?

8   **A.**   What struck me as odd is that Officer Belvins -- I mean,

9   excuse me, Inmate Belvins and Kent --

10       **MR. LEWIS:**  Objection, Your Honor.  Speaking about

11   other inmates that are not party to this case.

12       **THE WITNESS:**  Sir --

13       **THE COURT:**  All right.  Hold up.

14       **MR. CUNNINGHAM:**  What --

15       **THE COURT:**  Just stop.

16       **MR. CUNNINGHAM:**  Okay.

17       **THE COURT:**  All right.  That objection is sustained.

18   Move on, Counsel.

19   **BY MR. CUNNINGHAM:**

20   **Q.**   In the report was there something unusual in your mind

21   about the portions of the report that referred to the interview

22   with those two other inmates?

23   **A.**   Yes, sir.

24   **Q.**   And without quoting it, what was the unusual thing about

25   those?

1      MR. LEWIS:  Objection, Your Honor.  We're talking

2  about other inmates here again.  He's asking about the report

3  as it pertains to other inmates.

4      THE COURT:  Why don't you approach for a moment?

5      (Sidebar conference heard but not reported.)

6      THE COURT:  Defendants' motion or objection re hearsay

7  is granted.

8  Move on, Counsel.

9  BY MR. CUNNINGHAM:

10 Q.   Was there something else in your deposition that was a

11 variance that you wanted to talk about besides the things we

12 discussed --

13     MR. LEWIS:  Objection, Your Honor.  Calls for a

14 narrative.

15 BY MR. CUNNINGHAM:

16 Q.   -- or did we get to it?

17     MR. LEWIS:  No question.

18     THE COURT:  Proceed by question and answer.

19 BY MR. CUNNINGHAM:

20 Q.   Did we get to the thing that was concerning you when I

21 started to break before?

22 A.   No, sir.  Things relating to my deposition that I had with

23 Mr. Quinn.

24 Q.   But he didn't bring it up and we didn't bring it up;

25 right?

1    **A.**   No, sir.

2    **Q.**   It's not in the record yet?

3    **A.**   Well, it is on the record yesterday.  It was on the record

4    yesterday what Mr. Quinn impeached me on, pertaining to that.

5    **Q.**   And what was the subject of impeachment?

6    **A.**   Whether or not I said that particular night that Abanico

7    searched me.

8    **Q.**   The night that you went to the hole?

9    **A.**   Yes, sir.

10   **Q.**   All right.  You straightened that out today.  You said he

11   searched you after he rang the alarm; right?

12   **A.**   Yes.  And they said that I said he didn't, but on

13   page 4 --

14        **THE COURT:**  I think we've gone over -- we've gone over

15   this; right?  It's been asked and answered.

16   **BY MR. CUNNINGHAM:**

17   **Q.**   Well, and you did answer it correctly in the deposition?

18   **A.**   Yes.  I said Abanico was the one who searched me that

19   night.

20        **MR. CUNNINGHAM:**  All right.  Thank you, Judge.  That's

21   all.

22        **THE COURT:**  All right.  Anything.

23        **MR. LEWIS:**  Nothing further, Your Honor.  Thank you,

24   Mr. Trask.

25        **THE COURT:**  All right.  Thank you.  Mr. Trask, you may

1   step down.

2                    (Witness excused.)

3        **MR. CUNNINGHAM:**  Would you like to break, Judge, at

4   this point?

5        **THE COURT:**  It's 11:53.  Why don't we go ahead and

6   take our lunch recess.  If everybody could be here so that we

7   can resume promptly at 1:00 p.m.

8        Thank you so much.

9        (Proceedings were heard out of the presence of the jury:)

10       **THE COURT:**  I have a couple of things.  Well, let's

11  wait.  They can hear us in there.

12       Are they toddling off, so to speak, Lisa?

13       Give them just a couple minutes and then -- do you want me

14  to do this now or before lunch -- before they come back?  I've

15  got about 10, 15 minutes.  Can we do this now, ma'am?

16       **THE CLERK:**  Yes.

17       **THE COURT:**  Thank you.

18       **THE CLERK:**  Proceed.

19       **THE COURT:**  Just give them a few seconds to leave.

20  I'm a little bit concerned that they can hear.

21                    (Pause in proceedings.)

22       **THE CLERK:**  Do you want me to check on them?

23       **THE COURT:**  Yes.

24       **THE CLERK:**  I have to go this way.

25       **THE COURT:**  Thank you.

1          (Pause in proceedings.)

2          **THE CLERK:**  They're still in there.  There's about

3    five of them.

4          **THE COURT:**  That's what happens when you feed them.

5          **THE CLERK:**  We're not feeding them lunch.

6          **THE COURT:**  No, but they've got snacks in there.

7    Well, all right.

8          **THE CLERK:**  Turn the mic off.

9          **THE COURT:**  Yeah.

10    Two things I want to talk about.  I want to talk about the

11    cross-examination of Mr. Trask, and I also want to talk about

12    the subpoena for Warden Curry.

13    I'm a little bit concerned about the cross-examination of

14    Mr. Trask inasmuch as defense counsel went into the issue that

15    Mr. Trask had filed a 1983 action against Mr. Abanico and that

16    the matter was dismissed at summary judgment.

17    The impression that I think that was obviously given to

18    the jury was that somehow the court vouched for or agreed with

19    Officer Abanico regarding the charges and somehow that that in

20    itself would lend the jury to believe that the court has

21    endorsed and believes the testimony of Officer Abanico.

22    I think that's improper.  I note also for the record there

23    was no objection.

24          **MR. CUNNINGHAM:**  Counsel didn't object, yes, you're

25    right, Judge.

1      **THE COURT:**  You didn't object to it.

2      **MR. CUNNINGHAM:**  You're right, Judge.

3      **THE COURT:**  But I think that needs to be addressed.

4  And, so, what I'm going to ask the parties is to discuss

5  that during the lunch break and come back with a proposed

6  remedy; and if not, then I'll decide on what needs to be done.

7  Second of all, in terms of Warden Curry, I will note that

8  in the joint pretrial statement filed September 17th, 2013, on

9  page 3, the witnesses to be called, I note that it says,

10  "Defendants plan to call the following witnesses to testify,"

11  and that includes Warden Benjamin Curry.

12  Reviewing Federal Rules of Civil Procedure 26(a)(3)(A)(1),

13  in general:

14  In addition to the disclosures required by Rule 26(a)(1)

15  and (2), a party must provide to the other parties and promptly

16  file the following information about the evidence that it may

17  present at trial other than solely for impeachment.

18  One, the name and, if not previously provided, the address

19  and telephone number of each witness separately identifying

20  those the party expects to present and those it may call if the

21  need arises.

22  Now, counsel for plaintiff, and I again looked to the

23  joint statement, witnesses to be called, plaintiff plans to

24  call the following witnesses, I won't go into detail, but it is

25  not in the plaintiffs' witness list here that it intends to

1  call Warden Benjamin Curry.

2       And I note in *United States versus Bond*, though a criminal

3  matter, it, however, is instructive as to this issue,

4  552 Fed. 3d 1092, the court held:  (reading)

5       "Here Bond essentially argues that Johnson's testimony

6       would have been favorable to him and that the Government,"

7       quote, "suppressed such evidence in violation of *Brady*,"

8       and, again, obviously this is a civil matter and we're

9       talking here about a criminal matter, "by failing to call

10      Johnson as a witness after indicating that it would."

11      The court goes on, and this is the part I think is

12  instructive:  (reading)

13      "However, it is elementary that litigants are not

14      required to call every witness identified on their witness

15      list.  The witness list simply provides notice to the

16      court and to opposing counsel the witnesses who may be

17      present at trial."

18      So what I take from that is because defendants said they

19  may call the witness, Warden Curry, they need not call him.

20  It's up to plaintiff, if they wish to have somebody such as

21  Warden Curry, to be -- to notify the Court by putting them on

22  their witness list and subpoenaing them.

23      However, defense counsel, or defendants I should say, the

24  rule talks about the parties and not counsel, failed to give

25  the address and telephone number of Warden Curry; and, as such,

1  I will instruct you to provide that information, you must have

2  it somewhere, your clients must have it, to plaintiffs' counsel

3  and plaintiffs' counsel can proceed as he sees fit.

4      All right.  We'll start up at 1:00 p.m.

5          MR. CUNNINGHAM:  All right.

6          THE CLERK:  Court's in recess.

7              (Luncheon recess taken at 12:01 p.m.)

8  **Afternoon Session**                              **1:07 p.m.**

9      (Proceedings were heard out of presence of the jury:)

10         THE COURT:  All right.  We have a couple of issues

11 that we needed to resolve before the jury coms back in.

12         MR. CUNNINGHAM:  Yes.

13         THE COURT:  The first one is Warden Curry.  How are we

14 going doing on that?

15         MR. QUINN:  Well, we've spoken to the opposing

16 counsel, plaintiffs' counsel, Mr. Cunningham, several times and

17 suggested that the parties use the deposition.

18     I spoke with Mr. Curry.  He has a trip planned from

19 Thursday the 7th through November 15th.  He is -- Tomorrow,

20 he's -- he has duties with his granddaughter or has to take

21 care of his granddaughter.  He also lives in Atascadero so it

22 would be very difficult for him -- it's in the San Luis Obispo

23 area.

24         THE COURT:  Right.

25         MR. QUINN:  You notice, Your Honor, that we didn't put

1   his address or his telephone number in the September submission

2   that we provided, but the plaintiffs had wanted his address or

3   contact information.

4       You know, respectfully, maybe they should have sought it

5   before --

6           **THE COURT:**  No, I understand.

7           **MR. QUINN:**  -- the second day of trial.

8           **THE COURT:**  I understand.

9       He's your witness and the case law is clear:  You should

10  have subpoenaed him.

11      You know, if you get the address currently in Atascadero,

12  you still have to find him and subpoena him.  Could be a motion

13  to quash, no notice, which you may very well do.  I don't know.

14          **MR. QUINN:**  There is a requirement for reasonable

15  notice as well --

16          **THE COURT:**  Reasonable notice.

17          **MR. QUINN:**  -- which typically is 10 days, my

18  understanding.

19          **THE COURT:**  10 days.  And I don't know who would

20  represent him, perhaps the AG's office.  I don't know on that

21  issue.

22      It may be, given the lateness of the request, counsel's

23  suggestion that we use the deposition testimony in lieu of live

24  testimony might be the way to go.

25          **MR. CUNNINGHAM:**  I understand that, Judge.

1    And certainly I am chagrined with myself, obviously, that
2    I overlooked that step in the process of notifying him.  And
3    I -- I didn't take it amiss that they didn't have give me his
4    address because usually they never want to give you address of
5    department personnel.  They say, "Get in touch with the
6    department.  They'll do it."  And I've done that a number of
7    times before.
8        In this particular case, I think that, you know, the
9    deposition will get us part of the way there and not all the
10   way.
11       If . . .  Let's say we served him tonight in Atascadero
12   and he had to leave his granddaughter behind and come up here
13   tomorrow.  He might or might not show; they might or might not
14   come in with a motion to quash.
15       **THE COURT:**  Well, you know, at this late -- At this
16   late juncture, given everything that I've heard, the motion is
17   denied.  I -- There's -- Simply, it's too late.  You should
18   have done this before.
19       **MR. CUNNINGHAM:**  I --
20       **THE COURT:**  It's clear that it's your responsibility
21   to subpoena the witnesses that you want.  That wasn't done
22   here.
23       **MR. CUNNINGHAM:**  That's right, Judge.  And he is a
24   party, and I did expect him to be here, and he's chosen not to
25   attend the trial, and that came as a great surprise to me.

1    And I -- You know, it -- It's not wrong to say that I

2  should have been discussing that with Mr. Quinn back up the

3  line so -- but -- but, you know, the fact of relying on his

4  presence I don't think is that much amiss.

5        **THE COURT:**  It's my understanding that -- Counsel

6  indicated that Mr. Curry's presence was never discussed.

7        **MR. CUNNINGHAM:**  That's right.  That's what I'm

8  saying.  I do -- I do agree that we -- I had not talked to him

9  about the intention to call him or the need to make sure he was

10 there.

11    I took it for granted he'd be here because it was his

12 case, you know.  It's about him and . . . you know, it still

13 is.

14                    (Pause in proceedings.)

15        **THE COURT:**  When was it that you decided not to call

16 him?

17        **MR. QUINN:**  That we decided not to?  I mean --

18        **THE COURT:**  Yeah.

19        **MR. QUINN:**  I don't know if it's appropriate for us to

20 get into our internal litigation strategies, but -- I mean, the

21 understanding -- the witness list was created.

22        **THE COURT:**  You did put him on there.

23        **MR. QUINN:**  It was an expansive list.

24    But the portion of the case that you read said -- or

25 something you read earlier today said, just because someone's

1  on a witness list doesn't necessarily guarantee the fact

2  they'll be at trial.

3      **THE COURT:**  Well, but, I mean, it is a little bit

4  disturbing, I have to say, inasmuch as he was a -- he's -- he's

5  a named defendant in the matter.  And I guess --

6      **MR. QUINN:**  The department is sued all the time and,

7  you know, unfortunately, and people like Matthew Cade, or the

8  current Director, are named in, you know, literally hundreds,

9  thousands of lawsuits and they don't come to court and testify.

10  I mean, so . . .

11      **MR. CUNNINGHAM:**  I --

12      **MR. QUINN:**  We really -- When you asked the question

13  when did we decide not to bring him in, it's our belief that we

14  can establish our case and present our case through the

15  witnesses that we plan to call -- the two witnesses we plan to

16  call at this point.

17      **THE COURT:**  All right.

18      **MR. CUNNINGHAM:**  Judge, I can only point out that with

19  respect to the presence and absence and the intention of

20  calling or not calling, the situation with the Defendant

21  Abanico and Curry are identical except that Curry chose not to

22  come, or they chose to keep him away.

23      I didn't talk about either of them beforehand with

24  Mr. Quinn of my intention to call them.  I had the intention.

25      Certainly, you know -- I mean, hindsight is killing me at

1  this point, but -- but that's -- that's the circumstance, and

2  it -- I mean, he's a lead defendant in the case.  We took --

3        **THE COURT:**  I --

4        **MR. CUNNINGHAM:**  -- his deposition for a whole day.

5  You know, the case is about him.

6        **THE COURT:**  I understand that, but they don't have an

7  obligation to call --

8        **MR. CUNNINGHAM:**  No, they don't have an obligation to

9  call.

10        **THE COURT:**  -- the defendants.  They also don't

11  have -- In a civil case, they don't even to have the party --

12  party present.

13              (Pause in proceedings.)

14        **THE COURT:**  But I think it's clear that the -- it's --

15  that litigants are not required to call every witness

16  identified on their witness list.  The witness list simply

17  provides notice to the Court and to opposing counsel the

18  witnesses who may be present at the trial.

19        But as I indicated before, there was a requirement under

20  the Federal Rules an address be provided, which wasn't done, so

21  I'm going to still order -- I'm not going to order you to make

22  him present, but counsel has a right to have that address and

23  he can proceed from there.

24        **MR. QUINN:**  Okay.  Well, with the understanding that,

25  you know, a motion to quash could be filed --

Proceedings

1          THE COURT:  I understand.

2          MR. QUINN:  -- and reasonable notice applies.

3          THE COURT:  I understand that.  I understand that.

4     And I'm going to order that that address be kept

5 confidential and only to be -- to be used by -- by counsel and

6 a process server, if necessary, and that that address not be

7 disseminated to anyone else.

8          MR. QUINN:  Okay.

9          MR. CUNNINGHAM:  All right.

10          THE COURT:  But I think the record is clear that, you

11 know, you did not serve him.

12          MR. CUNNINGHAM:  Can we get a time certain by which

13 time we'll get the address, Judge?

14          THE COURT:  Let's make it by at least close of --

15 close of business today.

16          MR. QUINN:  (Nodding head.)

17          THE COURT:  By close of business today.

18          MR. CUNNINGHAM:  Okay.  Thank you.

19          THE COURT:  Well, by close of business, now with ECF,

20 you get that, so no later than 6 p.m. today.

21     Then what about the issue -- I have now the order in Trask

22 vs. Abanico, 81-695-TEH, but I assume that's what you're

23 referring to.

24          MR. LEWIS:  Yes, Your Honor, that was.

25          MR. CUNNINGHAM:  Judge, we discussed it quickly over

# Proceedings

1  the lunch break and agreed, I think, that whatever admonition

2  the Court feels he ought to give, he ought to give, and we

3  don't have any problem with what you're going to say.

4      Right, counsel?

5      **MR. LEWIS:**  Yes, Your Honor.

6      There were substantive findings.  There was also a grant

7  to qualify immunity.  You can see the order.

8      **THE COURT:**  All right.  I haven't had a chance to look

9  at it.  I'm going to take a look at the order, and then I'll --

10  I'll instruct the jury either first thing tomorrow morning or

11  the end of today.

12      **MR. LEWIS:**  Yes, Your Honor.

13      **THE COURT:**  But I need to take a look at this.

14      **MR. LEWIS:**  Yes, Your Honor.

15      **THE COURT:**  All right.  Why don't we proceed then.

16      (Proceedings were heard in the presence of the jury:)

17      **THE COURT:**  All right.  Good afternoon, ladies and

18  gentlemen.

19      I'm sorry we started a little bit late but as my initial

20  jury instructions indicated, every once in awhile we have to

21  take things outside the presence of the jury.

22      We were here discussing some matters, though I think we're

23  ready to proceed now.

24      All right.

25      **MR. WOZNIAK:**  Plaintiff calls Desmond Jones.

1      THE CLERK:  Hi.  Would you take stand and raise your

2  right hand.

3                        **DESMOND JONES**,

4  called as a witness for the Plaintiff, having been duly sworn,

5  testified as follows:

6      THE CLERK:  Please be seated.

7      Please state your full name for the Court and spell your

8  last name.

9      THE WITNESS:  Desmond Jones, J-O-N-E-S.

10      THE CLERK:  Thank you.

11                    **DIRECT EXAMINATION**.

12  MR. WOZNIAK:

13  Q.   Good afternoon, Mr. Jones.

14  A.   Good afternoon.

15  Q.   Mr. Jones, how old are you today?

16  A.   36.

17  Q.   And what age did you go into CDCR custody?

18  A.   16 years old.

19  Q.   And where are you from originally?

20  A.   North Carolina.

21  Q.   Does your family still live there?

22  A.   Yes.

23  Q.   What -- What family do you still have there?

24  A.   My mother, four sisters, one brother.  My -- My stepfather

25  died of a brain tumor.

1  **Q.**  Sorry to hear that.

2      And where are you currently housed?

3  **A.**  Chuckawalla Valley State Prison.

4  **Q.**  That's Chuckawalla?

5  **A.**  Yeah, Chuckawalla.

6  **Q.**  And where is Chuckawalla in the State of California?

7  **A.**  Riverside County.

8  **Q.**  Okay.  So down south probably --

9  **A.**  Um-hmm.

10  **Q.**  -- from here.

11      And how long have you been at Chuckawalla?

12  **A.**  Since 2009.

13  **Q.**  And what are you -- Are you involved in any activities at

14  Chuckawalla?

15  **A.**  Yes, I am.

16  **Q.**  Could you describe those activities for us.

17  **A.**  I'm in Celebrate -- Celebrating Recovery, which is a

18  12-Step program based on biblical principles.

19      I'm --

20      **THE COURT:**  I'm sorry.  Did you say Celebrating

21  Recovery?

22      **THE WITNESS:**  Yes.

23      **THE COURT:**  Okay.  Thank you, sir.

24      **THE WITNESS:**  I'm involved in an impulse civic class

25  which is -- teaches how to control urges, impulses to act

1    violently or criminally.

2       And I'm also getting into a parenting program and --

3    **MR. WOZNIAK:**

4    **Q.**   I'm sorry.  What was that?

5    **A.**   Parenting program.

6    **Q.**   Parenting.

7    **A.**   Your parents.

8    **Q.**   In general, would you describe these activities you're

9    involved in stuff that you're doing to make yourself a better

10   person?

11   **A.**   Yeah.  Yes, I do.

12   **Q.**   We're always working on ourselves; right?

13   **A.**   Yes.

14   **Q.**   Now, in August of 2006, where were you housed?  What

15   facility?

16   **A.**   CTF.

17   **Q.**   Okay.  And CTF we've been talking about is Soledad; right?

18   **A.**   Yes.  Sorry, yeah.

19   **Q.**   And what Wing -- You call them Wings; right?  What Wing

20   were you housed in at CTF?

21   **A.**   F Wing.

22   **Q.**   F Wing.  "F" as in "Frank"?

23   **A.**   Yeah, "F" as in "Frank."

24   **Q.**   And was there an incident on August 3rd, 2006, with you

25   and Officer Abanico?

1   A.   Yes, there was.

2   Q.   And about what time of the day did this occur?

3   A.   I seem to recollect, like, 7:30 I was getting out.

4   Q.   You talk about your memory.  It's now obviously 2013.

5   A.   Yes.

6   Q.   It's been some years.  Are some of the smaller details --

7   Do you have some trouble remembering some of the smaller

8   details like the specific date sometimes?

9   A.   Yes, I do.

10  Q.   Okay.  So on this day, on August 3rd -- I'm sorry.

11       Tell me again what time it was?

12  A.   Around 7:30.

13  Q.   In the morning or evening?

14  A.   Evening time.

15  Q.   In the evening.  And where were you going?

16  A.   I was going back to F Wing.  I just had gotten off.

17  Q.   Where were you coming from?

18  A.   The culinary.

19  Q.   And that was your job?

20  A.   Yes, it was.

21  Q.   Working in the kitchen?

22  A.   Yes.

23  Q.   Okay.  And at some point you came into contact with

24  Officer Abanico?

25  A.   Yes, I did.

**Q.** And what -- what happened when you came into contact with him, or can you just kind of go step by step what happened.

**A.** Well, we were -- As I was going down the corridor back to F Wing, Abanico, C.O. Lynch and I believe Sergeant Engstrom (phonetic) was in the hallway.

Abanico pulled me over. We know the routines. I got on the wall and --

**Q.** If I can stop you right there.

When you say you got on the wall, we saw Mr. Morris here earlier up against the wall. Was it a similar position --

**A.** Yes, it was.

**Q.** -- as to what we saw earlier?

And like we saw, your legs were spread pretty wide?

**A.** Yes.

**Q.** Sorry. Please continue about what happened.

**A.** After Abanico pulled me over to the wall, he commenced a search. When he got down to my left leg, he was coming up and that's when he reached between my -- he reached between my legs and grabbed my dick and . . .

**Q.** I think the --

**A.** Or you all --

**THE COURT:** Let's use "penis."

BY MR. WOZNIAK:

**Q.** Let's use the word "penis." I think we all understand but . . .

1    When the search began, where did -- where did -- where did

2  Officer Abanico start the search?  Did he start up in your neck

3  area?

4  **A.**   As far as -- As far as I can remember, he started on my

5  upper body.  He -- He searched the pockets.  And he -- And he

6  went down the right leg, and then went over to the left leg.

7  And as he was coming up, that's when he grabbed me.

8  **Q.**   Okay.  And when you say he was coming up, did he first go

9  down your leg?

10 **A.**   Yes.

11 **Q.**   And then he came back up on the inside of your leg?

12 **A.**   Yes, he did.

13 **Q.**   Was this -- Did he have two hands on your leg or was

14 one -- was it a one -- We talked -- We heard testimony

15 earlier --

16 **A.**   Oh.

17 **Q.**   -- about a one-hand search or two-hand search.

18    Was this a one-hand search or two-hand search?

19 **A.**   I believe it was a two-hand search.

20 **Q.**   And you say he came up the inside of your leg and . . .

21 and he grabbed your penis?  Is that how you described it?

22 **A.**   Yes, he did.

23 **Q.**   And with his fingers?

24 **A.**   No.  With his whole hand (indicating).

25 **Q.**   Just like you would squeeze a tennis ball, for example?

1    **A.**    Yes.

2         **THE COURT:**  The record will reflect the witness took

3    his right hand and in a grasping motion closed his right fist.

4    **MR. WOZNIAK:**

5    **Q.**    And what did you do when he squeezed your penis?

6    **A.**    I -- I turned around on him.

7    **Q.**    So -- And we -- We've also heard a lot of testimony about

8    this.

9         So you came off the wall and turned on him?

10   **A.**    Yes, I did.

11   **Q.**    And did you say anything to him?

12   **A.**    Yes.  Yes, I did.

13   **Q.**    And what did you say to him?

14   **A.**    So the -- the exact words?  Because, you know, there's a

15   lot of profanity.

16   **Q.**    We're here for the truth, so use your exact words.

17   **A.**    All right.  I told him, "Don't" -- I told him, "Look, I'm

18   not a motherfucking homosexual.  Don't be grabbing on me like

19   that."

20        And then after -- I walked a way after that.

21   **Q.**    You said he walked away after that?

22   **A.**    No.  I walked a way.

23   **Q.**    You walked away.

24        Did anybody else -- Did Officer Abanico respond to you

25   when you said that to him?

1   **A.**   No, he didn't.

2   **Q.**   No, he did not.

3       Did the other officers who were there respond to you?

4   **A.**   Yes.  Sergeant Engstrom responded.

5   **Q.**   And what did he say?

6   **A.**   He told --

7           **MR. QUINN:**  Objection:  Hearsay.

8           **THE COURT:**  Sustained.

9       Move on, please.

10          **MR. WOZNIAK:**  Judge, if I could, this is -- This

11  doesn't go to the truth of whether he's a homosexual or not.

12  This is something he said and his mindset.

13      This is not being offered for the truth whatsoever.  The

14  issue here is the comment about being a homosexual and that's

15  not what we're discussing here.

16          **THE COURT:**  Did the other officers there respond to

17  you?

18          **THE WITNESS:**  Yes, Sergeant Engstrom responded.

19          **THE COURT:**  And what did he say?

20          **MR. WOZNIAK:**  I understand it's an out-of-court

21  statement but it's not being offered for the truth.

22          **THE COURT:**  What's it being offered for, counsel?

23          **MR. WOZNIAK:**  To show his mind at the end of this

24  thing -- at the end of the search, because you'll see, as the

25  questions go through, that this left him -- you know, it was --

1   It was a pretty horrible situation.  And it goes to how he

2   experienced the situation.

3       It's not being offered to establish whether -- his gender

4   identity in any way.  And that's the subject of the

5   conversation.

6       **MR. QUINN:**  The question didn't reference gender

7   identity or gender --

8       **MR. WOZNIAK:**  I should say sexual orientation.

9       **MR. QUINN:**  -- sexual orientation.

10      **THE COURT:**  Sustained.

11      **MR. WOZNIAK:**  The question was because he was --

12      **THE COURT:**  Objection's sustained.

13      Move on.

14  **MR. WOZNIAK:**

15  **Q.**  You walked away from the search after you pulled off the

16  wall; is that correct?

17  **A.**  Yes, I did.

18  **Q.**  And when you -- After you had this interaction, the verbal

19  interaction with the other officers there --

20  **A.**  Yes.

21  **Q.**  -- were you left with the impression that they -- that --

22  that you felt that you had been attacked for something

23  regarding homosexuality?

24  **A.**  Yes, I did.

25  **Q.**  Where did you go when you walked away?

A.    I -- I was basically going back to F Wing.  The Sergeant,
he stopped me and called me back.

Q.    And which -- This is Sergeant Lynch?

A.    No.  Sergeant Engstrom.

Q.    Engstrom.

      He called you back, and then what happened?

A.    Then he put me back on the wall and there was a discussion
about -- about my complaining of the search and seizure, and
the way you -- the way Abanico had grabbed me.  That doesn't
make what he did wrong.

      So my response was, "You keep saying this protocol and
procedure don't make it right, either."

           MR. QUINN:  Objection:  Hearsay with regard to the
first part of the witness' statement.

           THE COURT:  Overruled.

      Proceed.

MR. WOZNIAK:

Q.    Did you then file a 602 complaint?

A.    Yes, I did.

Q.    And what day did you file that complaint on?

A.    I filed it the same night.

           MR. WOZNIAK:  If I may approach the witness and show
him Plaintiff's Exhibit C6, which I believe has been marked.

                (Counsel confers with witness.)

1    MR. WOZNIAK:

2    Q.    That document that you have in front of you right now, is

3    that the 602 that you filed that day?

4          I should qualify.  Is that the 602 you filed the same day

5    as the incident with Officer Abanico?

6    A.    Yes, it is.

7    Q.    And that date is August 3rd, 2006, as --

8    A.    Yes.

9    Q.    -- as written at the top there.

10         Now, if you go down to Section C here on the first page --

11   A.    Yes.

12   Q.    -- the informal level section, it's signed by you; is that

13   correct?

14   A.    Yes, it is.

15   Q.    Then there's a signature underneath that.

16         Do you recognize that signature?

17   A.    Yes, I do.

18   Q.    And whose signature is that?

19   A.    That's Lieutenant Chavez.

20   Q.    And did -- Did you speak with Lieutenant Chavez regarding

21   this complaint?

22   A.    Yes, the following morning.

23   Q.    The following morning, so on August 3rd.

24   A.    Yeah.  No.  August 4th.

25   Q.    Oh, sorry.  Yes.  See, I mess up dates, too.

1    **A.**    (Laughing.)

2    **Q.**    And after your discussion, you -- you -- did you describe

3    to Officer Chavez what happened?

4    **A.**    Yes, I did.

5    **Q.**    And at the end of that discussion, what impression were

6    you left with?

7    **A.**    That if I didn't withdraw the 602, he was going to

8    retaliate against me and put me in the hole.

9    **Q.**    So what did you do after that?

10   **A.**    I withdrew the 602.

11                      (Pause in proceedings.)

12           **MR. WOZNIAK:**  Could I have one moment, Judge?

13                      (Pause in proceedings.)

14   **MR. WOZNIAK:**

15   **Q.**    You wrote the 602.  And what did you do next in terms of

16   seeking some kind of help for what you went through?

17   **A.**    I immediately went to the law library, researched the

18   issue, and filed a petition for writ of habeas corpus in

19   Monterey Superior Court.

20   **Q.**    Do you remember the -- the date that that was?

21          I can make this easy for you.  I'm referring to what's

22   marked Bates AG264.  In the exhibit in front of you, I think

23   it's about five pages in.

24   **A.**    (Turning to document.)

25   **Q.**    Yeah.  It's the fifth page.

1    **A.**   Yes.

2    **Q.**   And is that -- Is this the document that you filed with

3    the Court?

4    **A.**   Yeah.  Yes.  It's a motion in support of habeas corpus.

5    **Q.**   And if you can turn to -- to the page that's Bates-stamped

6    268, which is the end of this --

7    **A.**   (Turning to document.)

8    **Q.**   -- filing.

9         What is the date on this?

10   **A.**   (Examining document.)  It was dated November 5th, 2006.

11   **Q.**   Okay.  And if you could just tell us briefly:

12        What was -- What were you seeking in filing this?

13   **A.**   Some -- Some type of protection.

14   **Q.**   Against Officer Abanico?

15   **A.**   Yes.

16   **Q.**   Okay.  You got a response from the Court about a month

17   later?

18   **A.**   (Turning to document.)

19   **Q.**   And that's the next exhibit that we have here.

20   **A.**   Yes.

21   **Q.**   And what did this order tell you you were supposed to do,

22   or what did you take from this order?

23   **A.**   Well, basically, I took from the order that the Court was

24   giving me permission to refile the issue with the

25   administration.

1  **Q.**  And that's to file another 602?

2  **A.**  Yes.

3  **Q.**  And so what did you do next?

4  **A.**  I refiled the 602.

5  **Q.**  And that 602 that you subsequently filed regarded the same

6  incident; right?

7  **A.**  The same one.

8  **Q.**  And I think that we don't have to go through the whole

9  process of the appeals and --

10 **A.**  Yeah.

11 **Q.**  -- all that stuff.

12 **A.**  Yeah, it was a long time.

13 **Q.**  Bottom line, was everything denied?

14 **A.**  Yes, it was.

15 **Q.**  And I think if you turn to what is marked as Bates 275 and

16 276, which is a letter from Director's Level appeal decision,

17 this was kind of the last -- This was the all -- the final

18 denial; is that correct?

19 **A.**  Yes, it -- Yes, it is.

20 **Q.**  Now, you say that you've been in custody since you were 16

21 years old.

22 **A.**  Yes.

23 **Q.**  And during this time, you've been searched thousands of

24 times?

25 **A.**  Yes.

1    **Q.**   And you described what happened with Officer Abanico on

2    August 3rd, 2006.

3         Have you ever experienced a search like that before?

4    **A.**   No.

5    **Q.**   Have you ever felt violated like you felt that day?

6    **A.**   No, I have not.

7    **Q.**   And when you get searched, the officers that search you,

8    they go into your groin area; is that correct?

9    **A.**   Yes, they do.

10   **Q.**   And when they go into your groin area, they're thorough

11   enough, if you had something hidden in there, they would find

12   it?

13   **A.**   Yes.

14   **Q.**   Now, at some point, you spoke to Mr. Cleveland about this

15   incident; is that correct?

16   **A.**   Yes.

17   **Q.**   And you filled out an affidavit in your name?

18   **A.**   Yes, I did.

19   **Q.**   And -- And if you -- I think this would be the fourth page

20   of this exhibit.

21   **A.**   (Turning to document.)

22   **Q.**   You're getting too far in there.

23         You want Page 4.

24                        (Counsel assists witness.)

25

1    **BY MR. WOZNIAK:**

2    **Q.**   Is that the affidavit that you filled out?

3    **A.**   Yes, it is.

4    **Q.**   And that's your signature at the bottom there?

5    **A.**   Yes.

6    **Q.**   And this -- this describes the incident; right?

7    **A.**   Yes.

8          **MR. WOZNIAK:**  Could I have one moment, please.

9                 (Pause in proceedings.)

10          **MR. WOZNIAK:**  No further questions.

11          **THE COURT:**  Cross-examination.

12                   **<u>CROSS-EXAMINATION</u>.**

13   **MR. QUINN:**

14    **Q.**   Good afternoon, Mr. Jones.

15    **A.**   Good afternoon.

16    **Q.**   Just a few questions.

17        Just to confirm:  There was one search by Abanico on --

18   Officer Abanico on August 6th, 2006; is that correct?

19    **A.**   Say again?  Repeat the question?

20    **Q.**   I'm sorry.

21        There was one search by Officer Abanico performed on you

22   on August 6, 2006; is that correct?

23    **A.**   It was August 3rd.

24    **Q.**   August 3rd.  I'm sorry.

25        There were no other searches by Officer Abanico upon you;

1  is that correct?

2  **A.**    No.  He only searched me once.

3  **Q.**    Okay.  And how long did the contact with the groin last

4  during that single search by Officer Abanico?

5  **A.**    It was, I would say, like, two -- two to three seconds.

6  **Q.**    Okay.  And did Officer Abanico say anything of a sexual

7  nature to you during the search?

8  **A.**    No, he did not.

9  **Q.**    Did he touch you beneath the clothes during that search?

10  **A.**    (Shaking head.)

11  **Q.**    Did you suffer any physical injuries during the search --

12  or following the search?

13  **A.**    No.

14         **MR. QUINN:**  Okay.  No other questions.  Thank you.

15         **MR. WOZNIAK:**  I have some brief redirect, Your Honor.

16                **REDIRECT EXAMINATION**.

17  **MR. WOZNIAK:**

18  **Q.**    Was there a second incident when Officer Abanico attempted

19  to search you?

20  **A.**    Yes, there was.

21  **Q.**    And did you refuse to be searched by him a second time?

22  **A.**    Yes, I did.

23  **Q.**    Were you searched by another officer, then?

24  **A.**    Yes, I was.

25  **Q.**    And -- And do you know that officer's name?

1    **A.**    Lieutenant Padilla.

2    **Q.**    And was that a -- what we call a normal search?

3    **A.**    Yes, it was.

4         **MR. WOZNIAK:**  No further questions.

5         **THE COURT:**  All right.  May the witness step down?

6         **MR. QUINN:**  Yeah.  I have no questions.

7         **THE COURT:**  All right.  May the witness step down?

8    Thank you very much, sir.

9         **THE WITNESS:**  You're welcome, Your Honor.

10              (Witness excused.)

11             (Pause in proceedings.)

12        **THE COURT:**  Plaintiff's next witness.

13        **MR. CUNNINGHAM:**  Our next witness will be Officer

14   Abanico, Judge.

15        **THE COURT:**  All right.

16        **THE CLERK:**  Would you raise your right hand.

17                 <u>**IRWIN ABANICO**</u>,

18   called as a witness for the Plaintiff, having been duly sworn,

19   testified as follows:

20        **THE CLERK:**  Please be seated.

21        **THE WITNESS:**  Thank you.

22        **THE CLERK:**  Please state your full name for the Court

23   and spell your last name.

24        **THE WITNESS:**  Irwin Abanico, A-B-A-N-I-C-O.

25        **THE CLERK:**  Thank you.

1                  **DIRECT EXAMINATION**.

2 **MR. CUNNINGHAM:**

3   **Q.**   Sir, how are you employed these days?

4   **A.**   (Leaning forward.)

5   **Q.**   How are you employed?

6   **A.**   How am I employed?

7   **Q.**   Where do you work?

8   **A.**   I work for California Department of Corrections and

9 Rehabilitation, sir.

10   **Q.**   Department of Corrections what?

11   **A.**   Rehabilitation.

12   **Q.**   Rehabilitation.  I'm sorry.

13   **A.**   Yes.

14   **Q.**   And how long have you worked there?

15   **A.**   Nine years just -- Nine years.

16   **Q.**   So you came to work there in about -- in 2004, 2005?

17   **A.**   Yes, sir.

18   **Q.**   And when were -- Were you assigned to CTF Soledad at some

19 point?

20   **A.**   Say it again, sir?

21   **Q.**   Were you assigned to Soledad?

22   **A.**   I'm still there, sir.  I'm still there right now.

23   **Q.**   Yes.  And you're still there now.  But is that the only

24 place you've worked?

25   **A.**   Yes, sir.  After the Academy, yes.

1  **Q.**   Yes.  Okay.  So you went there straight from the Academy.

2  **A.**   Yes, sir.

3  **Q.**   And how long did you spend in the Academy?

4  **A.**   Four months, sir, 16 weeks.

5  **Q.**   Okay.  And where -- what were you doing before you went to

6  the Academy?

7  **A.**   I worked for the County of Santa Clara while awaiting my

8  appointment with CDC.  And prior to that, I was a marine.

9  **Q.**   How long were you in the Marine Corps.?

10  **A.**   Four years active, one-year reservist, sir.

11  **Q.**   Are you still in the reserve?

12  **A.**   No, sir.

13  **Q.**   Okay.  And you live in the area of Soledad?

14  **A.**   Negative, sir.

15  **Q.**   Where do you live?

16  **A.**   San Jose.

17  **Q.**   And do you have -- Are you married and have a family?

18  **A.**   Yes, sir.

19  **Q.**   Uh-huh.  And do you have any other job besides the CDCR?

20  **A.**   No, sir.

21  **Q.**   Do you get to work overtime at CDCR?

22  **A.**   Sometimes.

23  **Q.**   Uh-huh.  So -- And you get paid extra for that; correct?

24  **A.**   Yes, sir.

25  **Q.**   Okay.  What's the base salary in the position that you

1  have?

2  **A.**   As an officer?

3  **Q.**   Yes.

4  **A.**   I haven't looked at my stub for a very long time, sir, so

5  I couldn't tell you exactly how much.

6  **Q.**   Last time you knew, what was it?

7           **MR. QUINN:**  I would just object on relevance grounds.

8           **THE COURT:**  Overruled.

9           **THE WITNESS:**  The last time I checked, I would

10  say . . . a good -- approximately 5,000 a month before taxes.

11  **MR. CUNNINGHAM:**

12  **Q.**   All right.  And do you still have the rank of Correctional

13  Officer?

14  **A.**   Yes, sir.

15  **Q.**   And in 2006 -- Strike it.

16       What -- What was your first job when you started -- when

17  you came from the Academy to Soledad?

18  **A.**   I was Tier Officer on first watch, which is from 10:00 at

19  night till 6:00 in the morning.

20  **Q.**   Okay.  And during that -- those hours, are all the

21  prisoners locked in?

22  **A.**   Yes.

23  **Q.**   And how many officers are on the tier during that first

24  watch?

25  **A.**   Just one.

1 **Q.** Okay. And then did you get your -- have your assignment

2 changed to a different shift?

3 **A.** Yes, sir.

4 **Q.** And what was that?

5 **A.** I was assigned to Charlie Wing Security door.

6 **Q.** Security . . .

7 **A.** Door.

8 **Q.** Okay. And what did that mean your job was?

9 **A.** To make sure that -- that the Wing are secured and all the

10 inmates coming out, either for chow, for yard, or if they have

11 a pass.

12 **Q.** Okay. And were -- Are -- Are you still the only officer

13 assigned to the tier at that point?

14 **A.** Are you talking about my first job or my second job, sir?

15 **Q.** No.

16 When you -- When -- Well, your first job, you were on the

17 first watch; right?

18 **A.** Yes, sir.

19 **Q.** And you said you worked alone in the tier then.

20 **A.** Yes, sir.

21 **Q.** Then the second job you were switched to, what was it?

22 **A.** Second job, I switched to Charlie Wing at third watch.

23 Third watch means from 2:00 in the afternoon till 10:00 at

24 night.

25 **Q.** Okay. And so that's a different Wing. Charlie Wing is

1    C Wing?

2    **A.**    Charlie Wing is C Wing, sir.  C is Charlie.

3    **Q.**    Yes.  So how many officers are working during the first

4    watch?

5    **A.**    First watch?  One, sir.

6    **Q.**    Okay.  I know I have this wrong.  I'm sorry.

7          The third watch is when you were working at Charlie Wing.

8    **A.**    Yes, sir.

9    **Q.**    How many officers are working then?

10   **A.**    Three, sir.

11   **Q.**    And do they have -- each one have separate duties or do

12   they all do the same thing?

13   **A.**    We all have different duties, sir.

14   **Q.**    And what was -- What was your duties?

15   **A.**    My duties as Charlie Wing Security is to make sure the

16   door's secure only for inmate passes or for chow or if they

17   have a ducat.  A ducat's a pass.  If they don't have a pass,

18   chow time or yard time, I don't let them out.

19   **Q.**    Was it part of your assignment, then, when you're watching

20   the door on the third watch to make random searches of the

21   prisoners coming out of that Wing?

22   **A.**    Yes.  It's every custody's job to do searches of inmates

23   at any time, sir.

24   **Q.**    At any time.

25   **A.**    Yes, sir.

1   **Q.**   So --

2   **A.**   If they have a reason to search, yes, they will.

3   **Q.**   So it's your -- It's up to you when you do or don't search

4   anybody; is that right?

5   **A.**   Yes, sir.  It's up to the individual if they want to

6   search or not, sir.

7   **Q.**   And your -- Are you searching only the prisoners that are

8   in the Wing you're assigned to or you can search any prisoner?

9   **A.**   Any prisoner in the whole institution, sir.

10   **Q.**   At that point, you're -- you're in what they call the

11   Central Facility; right?

12   **A.**   Yes, sir.

13   **Q.**   That's distinguished from the North Facility and the South

14   Facility, other sections of the -- of the institution at

15   Soledad; correct?

16   **A.**   Right, sir.

17   **Q.**   But they're very separate; am I right?

18   **A.**   Yes, sir, they're separate.

19   **Q.**   So -- And you have a whole staff in Central right up to a

20   Captain or maybe an Associate Warden that are in charge of just

21   that facility; correct?

22   **A.**   Yes, sir.

23   **Q.**   So . . .

24   Do you -- Were you, as a third watch officer assigned to

25   security, do you have -- were you instructed in -- or directed

1  by any Supervisor as to the number of searches you should be

2  performing during the shift?

3  **A.**  Can you say that again, sir?

4  **Q.**  Were you -- Was there a given number of searches or a --

5  like, a range?  You should do at least 10 or at least 20 or

6  whatever, like that?  Was there some number that you were given

7  of how many searches to do?

8  **A.**  No, sir.

9  **Q.**  What instruction were you given as to when to search and

10  how to decide when to search?

11  **A.**  When there's a massive movement, I do random search of

12  inmates.  I just pick them out of the crowd with no preference

13  to who I pick.

14  **Q.**  Is there --  And when there's massive movement, how long

15  does it usually last?

16  **A.**  It depends, sir.

17  **Q.**  And what does it depend on?

18  **A.**  Is it for chow movement?  Is it for . . . group?  Is it

19  for classes?  Is it for school?  Is it for yard?  Which one --

20  **Q.**  Okay.  When they go -- Do they go out to chow, breakfast,

21  early in the morning?

22  **A.**  I couldn't tell you that, sir.  I was third watch, which

23  is from 2:00 in the afternoon till 10 p.m.

24  **Q.**  Okay.  So you never worked that middle watch where they

25  get out in the morning?

1  **A.**   In the morning, sir, no, sir, not at that time.

2  **Q.**   Okay.  So what kind of things were prisoners released from

3  the Wing for during your watch?

4  **A.**   Either for DOT, which is medical, or the yard, or pretty

5  much chow.

6  **Q.**   Okay.

7  **A.**   And they have ducats to go to Chaplain or see -- go to

8  church on Sundays or any given days.

9  **Q.**   Well, would it be safe to say the massive movement would

10  be to yard or to chow?  That's when everybody would go?

11  **A.**   Yes, sir.

12  **Q.**   Okay.  And during those times, did you have any assignment

13  as to the number of searches to make?

14  **A.**   Say again, sir?

15  **Q.**   Did you have any assignment or instruction or direction as

16  to how many searches you were supposed to make?

17  **A.**   No, sir.

18  **Q.**   Okay.  And in that position, you're responsible, first of

19  all, to a Sergeant?

20  **A.**   I'm responsible for a Sergeant?

21  **Q.**   To a Sergeant.  You have to answer to a Sergeant?

22  **A.**   As of my chain of command, yes, the Sergeant is my first

23  in command.

24  **Q.**   Okay.  And where is that Sergeant located?

25  **A.**   In his office, sir.

1    Q.   And the office is down the corridor from C Wing?

2    A.   His office at that time was in -- all the way down, one

3    door down in the corridor.

4    Q.   Okay.  Would that be within hearing distance of where you

5    are at the entrance to C Wing?

6    A.   Everything in the corridor, sir, is hand distance.

7            MR. QUINN:  Objection:  Calls for speculation.

8            MR. CUNNINGHAM:  Okay.

9            THE COURT:  The objection's overruled.  The witness

10    can testify to his own personal knowledge.

11    MR. CUNNINGHAM:

12    Q.   Is the Sergeant -- Strike it.

13        With that assignment as Security Officer from C Wing in

14    the -- in the third watch, do you stay in a position at the

15    door of C Wing?

16    A.   Yes, sir.  The door inside or outside the door, either

17    one, sir.

18    Q.   Okay.  But you're right around the area of the door is

19    where -- you're stationed there and you don't move down the

20    corridor or up the corridor?

21    A.   No, sir.  I do not leave pretty much that area.  But I'm

22    still in -- If I go off the area, I've got 5 feet for all --

23    pretty much around the area, sir.

24    Q.   Okay.  So -- So is the -- From that doorway to the

25    Sergeant's office, is it further away than the back wall of the

1  courtroom?

2  **A.**   I would say yes, sir.  I would say yes, sir.

3  **Q.**   It's even further.

4  **A.**   It's farther, sir.

5  **Q.**   Okay.  Now, at the Academy, you had been trained in, among

6  other things, search techniques; is that correct?

7  **A.**   Yes, sir.

8  **Q.**   And you were trained in a number of techniques, if I'm not

9  mistaken, not just clothed-body searches; is that right?

10  **A.**   Define "techniques," sir.

11  **Q.**   I'm sorry?

12  **A.**   Define "techniques."

13  **Q.**   Define techniques?

14  **A.**   Yes, sir.  What do you mean by "techniques," sir.

15  **Q.**   Oh, I'm sorry.  I'm -- I'm not talking about techniques.

16  I'm talking about type of search.

17      You have a clothed-body search, you have a strip search;

18  correct?

19  **A.**   All clothed-body search, yes, sir.

20  **Q.**   And were there any other kind of search you were taught

21  about?

22  **A.**   No, sir.

23  **Q.**   Okay.  And you were taught that the clothed-body search is

24  used as a -- on a random basis as a means of security in a

25  corridor or passageway where there was a lot of prisoner

1  traffic; is that fair?

2  **A.**   Yes, sir.

3  **Q.**   And did you -- Strike.

4      Were you given a handbook at the Academy that included

5  instruction on the techniques of doing a clothed-body search?

6  **A.**   Are you asking me if we were given a lesson plan about

7  searches, sir?

8  **Q.**   A lesson plan, yeah.

9  **A.**   Yes, sir, a lesson plan.

10 **Q.**   And what did the lesson plan consist of?

11 **A.**   What do you mean, sir?

12 **Q.**   What was in the lesson plan?

13 **A.**   Searches, sir, how to do searches properly.

14 **Q.**   And it was broken down pretty good; right?

15 **A.**   Yes, sir.

16 **Q.**   Step by step?

17 **A.**   Yes, sir.

18 **Q.**   Um-hmm.  And did it -- Was there any . . . mention in the

19 lesson plan about checking in the groin area?

20 **A.**   Yes, sir.

21 **Q.**   And what did it tell you?

22 **A.**   Check the groin area for contraband, sir.

23 **Q.**   Uh-huh.  And did it tell you how to do the check?

24 **A.**   Yes, sir.

25 **Q.**   And how was your -- were you taught to do the check?

1    **A.**   You cup the groin, sir.

2    **Q.**   And when you say "cup the groin," what does it mean?  Can

3    you show me with your hands?

4    **A.**   There's so many ways of cupping, sir.  You can cup this

5    way (indicating); you can also cup this way (indicating).

6         **MR. CUNNINGHAM:**  All right.  For the record, the

7    witness is showing his hand palm up on a flat basis and also

8    with the fingers elevated in the area.

9    **BY MR. CUNNINGHAM:**

10   **Q.**   Is that correct?

11   **A.**   Yes, sir.

12   **Q.**   Did they teach you -- Now, the -- the groin area is where

13   the two legs come together, right, at the top of the thighs?

14   **A.**   Right, sir.

15   **Q.**   And you can't really get your palm up into that space

16   where the V is between the legs; can you?

17   **A.**   That's the reason why we toil -- we tell the inmates to

18   spread their legs apart, sir.

19   **Q.**   Uh-huh.  So you can get your hand all the way up in there?

20   **A.**   Yes, sir, we tell them.

21   **Q.**   When you -- Strike it.

22        When you search -- When you're searching, you go up the

23   legs with your two hands; right?

24   **A.**   I don't search with two hands.

25   **Q.**   You search with one hand only.

1   **A.**   Yes, sir.

2   **Q.**   And when you heard the testimony yesterday about one-hand

3   and two-hand searches from Mr. Trask, you're a one-hand

4   searcher; is that right?

5   **A.**   Yes, sir.

6   **Q.**   And is that up to you to choose which way you're going to

7   do it?

8   **A.**   In the lesson plan, you're always taught to search one

9   hand, sir.

10  **Q.**   The lesson plan was only one hand.

11  **A.**   We were always taught to search with one hand.

12  **Q.**   And what do you do with the other hand?

13  **A.**   I put it against their back so, if anything happens, I can

14  react to it.

15  **Q.**   Okay.  And so how -- What -- What -- By what technique do

16  you search the legs with one hand?

17  **A.**   What do you mean by "technique," sir?

18  **Q.**   What's the process?  What procedure do you do?

19              (Pause in proceedings.)

20  **MR. CUNNINGHAM:**

21  **Q.**   What steps do you take with your hand?  What movements do

22  you make?

23  **A.**   When I do my search, sir?

24  **Q.**   Yes.  In the legs.

25  **A.**   Oh, doing just the legs.

1    **Q.**   Strike it.

2       When you -- Did -- Yes, just the legs. I'm sorry.

3    **A.**   So you don't want me to explain my whole search, just the

4    legs, right, sir?

5    **Q.**   Just the legs at this point, yes.

6    **A.**   All right, sir.

7       While my -- If I was going to search the right side, I

8    have my left hand on the back. With my free hand, which is my

9    right hand, I start the search outside the leg, the inside, the

10    back.

11    **Q.**   So you're going to search the -- the leg on the side where

12    your hand is?

13    **A.**   The side --

14    **Q.**   Yeah.

15    **A.**   -- the front, the back, and then the side.

16    **Q.**   And that's from the hip all the way down to the foot?

17    **A.**   You said the leg, sir. You didn't say the hip.

18    **Q.**   I'm sorry. From -- From where the leg begins at the hip

19    area down to the foot.

20    **A.**   From the hip area?

21    **Q.**   Yeah. From -- Well, where do you start on the leg?

22    **A.**   I will -- If I'm going to search waist down, I start with

23    the belt, sir.

24    **Q.**   All the way from the waist.

25    **A.**   Yes, sir.

1   Q.   From the top of the pants all the way down.

2   A.   Yes, sir.

3   Q.   So are you saying you go -- you go down and come up, or

4   you go down and then come up and go down again and go down

5   again?

6   A.   I go down one side.  I'm going to go up the other side.

7   I'm going to go down the other side and go up the other side,

8   sir.

9   Q.   That's both legs.

10  A.   That's one leg, sir.

11  Q.   Okay.  So you're saying you're going to do four sides of

12  the leg?

13  A.   There is four sides of the body, yes, sir.

14  Q.   The left, the right, the inside, the outside, back to

15  front.

16  A.   Yes, sir.

17  Q.   Okay.  So there's four strokes or whatever, four

18  movements --

19  A.   Pat-down.

20  Q.   -- up and down.

21  A.   For a pat-down, yes, sir.

22  Q.   Pat-down.

23  A.   Yes, sir.

24  Q.   And you're rubbing against the body with your hand in

25  order to feel if there's anything between the leg and the --

1   and your hand; right?

2   **A.**   You are not rubbing, sir.  You're patting down.

3   **Q.**   Do -- Do you keep patting like this (indicating)?

4   **A.**   Yes, sir.  The reason why you pat down, you don't rub

5   your -- you don't rub your hand, in case if they have any

6   sharps, you know, that's in -- that's bulkier.

7   **Q.**   Okay.  If there was a -- if there was something taped to

8   his arm and you were going down his arm, you might get stabbed.

9   **A.**   Right, sir.

10  **Q.**   Okay.  So you pat from the top; is that right?

11  **A.**   Up -- For the leg?

12  **Q.**   I'm sorry.  You pat on the outside --

13  **A.**   Yes, sir, on the outside.

14  **Q.**   -- down the whole expanse of the leg.

15  **A.**   Yes.

16  **Q.**   And down four sides of the leg.

17  **A.**   Yes, all four sides.

18  **Q.**   And -- And you go down, up, down, up --

19  **A.**   Yes, sir.

20  **Q.**   -- down -- Okay.  And do you . . .

21       When do you cup the groin?

22  **A.**   At the very last, sir.

23  **Q.**   All right.

24  **A.**   After I search the other leg.

25  **Q.**   Okay.  When you are searching the inside of the leg, when

1   you're patting down the inside of the leg, do you go all the
2   way up to the groin?
3   **A.**   Sometimes, yes, sir.  That's where you cup the groin.
4   **Q.**   All right.  Then do you . . .  You turn your hand to cup
5   it?
6   **A.**   What do you mean, sir, I turn my hand?
7   **Q.**   You turn -- Your hand is patting this way flat
8   (indicating); right?
9   **A.**   Yes, sir.
10  **Q.**   And -- And then at some point you turn it to cup.
11  **A.**   I would search going down the inside.
12  **Q.**   Yes.
13  **A.**   Then I would go inside and search the corner, yeah, or
14  search the groin area.
15  **Q.**   All right.  Now -- And you've heard all these prisoners
16  say, when you searched them, when you were at the groin area,
17  you grabbed their penis or you grabbed their testicles or both.
18  **A.**   I don't grab their penis, testicle or both, sir.
19  **Q.**   And so . . .  All right.  And -- And are you saying you
20  never have done that?
21  **A.**   I never grabbed, pinched their penis or the groin areas,
22  or their scrotum, sir.
23  **Q.**   You know you had a number of complaints against you for
24  the way you searched; right?
25  **A.**   Because I do my job correctly, sir.

1  **Q.**   Yes.  But there were a number of them; weren't there?

2  **A.**   Yes, sir.

3  **Q.**   In between 2006, about the summer of 2006 and the fall of

4  2007, there were 15 or 20 602s filed against you --

5       **MR. QUINN:**  Objection, Your Honor.

6  **MR. CUNNINGHAM:**

7  **Q.**   -- for the way you search; is that right?

8       **MR. QUINN:**  Objection --

9       **THE WITNESS:**  You know what, sir.  I put --

10      **THE COURT:**  There's an objection.

11  Why don't you come to the side.

12      **MR. CUNNINGHAM:**  Okay.

13       (Sidebar conference heard but not reported.)

14      **THE COURT:**  Don't go away.  I want to look at the

15  screen.

16  (Proceedings were heard in the presence of the jury:)

17      **THE COURT:**  At this time, defendant's objection is

18  sustained and counsel can rephrase his question.

19      **MR. CUNNINGHAM:**  All right.

20  **MR. CUNNINGHAM:**

21  **Q.**   Isn't it true, Officer Abanico, that you've had -- you had

22  back at that time, 2006 and '07, a number of complaints,

23  multiple complaints, 602 complaints, about the way you search

24  prisoners at Soledad?

25  **A.**   I wouldn't know because 602s doesn't come to me, sir.

1    **Q.**   You never received any 602s that named you as -- in some

2    kind of grievance or some kind of complaint?

3    **A.**   The Supervisor, the Sergeant, get the 602s and he answers

4    them.  I don't answer 602s, sir.

5    **Q.**   So you never saw the 602s.

6    **A.**   I seen a 602 after . . . after they told me about it.

7    **Q.**   Who is "they"?

8    **A.**   Litigation -- Inmate Appeals, I believe.

9    **Q.**   I'm sorry?

10   **A.**   Inmate Appeals.

11   **Q.**   Inmate Appeals.

12        So when the -- when the 602 is filed, Inmate Appeals comes

13   to you to ask you about it; is that correct?

14   **A.**   No, sir.

15   **Q.**   What is the process that's happened?

16   **A.**   Say it again, sir.

17   **Q.**   What -- What -- I think you just said Inmate Appeals

18   asks -- either calls you in or comes to you to talk about the

19   complaints, right, the 602s?

20   **A.**   When I get a 602, I'm noticed by the Inmate Appeals I have

21   a 602.  That's it.

22   **Q.**   Uh-huh.  And do you have an interview?

23   **A.**   No, sir, not -- It depends on the 602, sir.

24        **MR. CUNNINGHAM:**  All right.  Can we get this marked as

25   Plaintiff's next in order.

1        **THE CLERK:**  11.

2        **MR. CUNNINGHAM:**  11.

3        (Plaintiff's Exhibit 11 marked for identification)

4        **THE COURT:**  Can you show it to counsel, please.

5        **MR. CUNNINGHAM:**  It is AG0 --

6        **THE COURT:**  Just show it to him.

7        **MR. CUNNINGHAM:**  -- 368.

8                (Pause in proceedings.)

9    **MR. CUNNINGHAM:**

10   **Q.**   I'm showing you this document that's been marked or will

11   be marked as Plaintiff's 11.

12       Are you familiar with that document?

13   **A.**   (Examining document.)  Yes, sir.

14   **Q.**   And that's -- What is that document?

15   **A.**   That's a Notice of Interview, Complaints Against Staff,

16   CDC 602.

17   **Q.**   And it's directed to you; is that correct?

18   **A.**   Yes, sir.

19   **Q.**   And you signed it to show that you received it; right?

20   **A.**   Yes, sir.

21   **Q.**   Uh-huh.  So do you remember an interview that was -- that

22   you had with the -- pursuant to that 602?

23   **A.**   Right now, sir, I cannot recall.  I believe I was

24   interviewed but I'm not sure if it was about this.

25   **Q.**   Okay.  Which interview this referred to.

1   **A.**   This one right here, sir?

2   **Q.**   Yeah.

3   **A.**   This is concerning . . .

4      (Examining document.)

5      This is not telling me what kind of interview.  All it

6   says is pretty much the date of the interview and location.

7   **Q.**   It's just notifying you to show up for an interview.  Is

8   that fair?

9   **A.**   Yes, sir.

10   **Q.**   And it doesn't tell you . . .

11              (Pause in proceedings.)

12   **MR. CUNNINGHAM:**

13   **Q.**   It does tell you at the top the number of the -- the log

14   number of the 602; right?

15   **A.**   Correct, sir.

16   **Q.**   This one is -- refers to Number 07-2429; correct?

17   **A.**   CTF Charlie 07-02429, yes, sir.

18              (Pause in proceedings.)

19           (Plaintiff's counsel confer.)

20      **MR. CUNNINGHAM:**  Can we call this one -- I'll let you

21   decide.

22      **THE CLERK:**  12.

23      **MR. CUNNINGHAM:**  12 or 11A?  12.

24      **THE CLERK:**  Whatever you like.

25      **THE COURT:**  Just do it sequentially.

1          **MR. LEWIS:**  Can we see that?

2          **MR. CUNNINGHAM:**  All right.  12.  12.

3      It's the same.  I'll show you.

4      (Plaintiff's Exhibit 12 marked for identification).

5                  (Counsel confer.)

6  **MR. CUNNINGHAM:**

7  **Q.**  I'm showing you what's marked now Plaintiff's 12.  That's

8  the same kind of notice; right?

9  **A.**  Say again, sir?

10 **Q.**  Is that the same type of notice to you?

11 **A.**  The same type of notice?  What do you mean?

12 **Q.**  The Notice to Appear for an interview.

13 **A.**  Yes, a different log number.  If it's the same -- I don't

14 know if it's the same number or not, the log number.

15 **Q.**  The log number on that one is blocked out; right?

16 **A.**  Negative, sir.  It's right here (indicating).

17 **Q.**  Okay.  What's the number there?

18 **A.**  It's CTF 08-00202.

19 **Q.**  And what's the date on that one?

20 **A.**  The date on that one is January 17th, '08.

21 **Q.**  Okay.  What's the date on Plaintiff's 11?

22 **A.**  January (sic) 11, '07.

23 **Q.**  Okay. . . .  I'm sorry.  Did you say January?

24 **A.**  July 11, '07.

25 **Q.**  Thank you.

1      So do you remember how many of these notices you received

2  from July '06 through January '08?

3  **A.**   No, sir.

4  **Q.**   Were there more than 10?

5  **A.**   I can't answer that, sir.

6  **Q.**   All right.

7  **A.**   I don't know.

8  **Q.**   Were there more than five?

9  **A.**   I don't know, sir.

10  **Q.**   Okay.  And did you appear for these interviews?

11  **A.**   I believe so, yes, sir.

12  **Q.**   And do you -- Was it a different person that interviewed

13  you each time or the same person?

14  **A.**   I can't recall, sir.

15  **Q.**   What rank was the person that interviewed you typically in

16  those -- in those interviews?

17  **A.**   Once again, sir, I can't recall.

18  **Q.**   Would it have been just a Sergeant or would it have been

19  an Associate Warden or -- or do you -- can you say that?  What

20  rank the person would be.

21  **A.**   Higher than an officer, sir.

22  **Q.**   Higher than an officer.

23  **A.**   Yes.

24  **Q.**   Higher than a -- That means a Sergeant, a Lieutenant, a

25  Captain, an Associate Warden, a Chief Deputy Warden?

1    **A.**    Pretty much it would be a Sergeant.  It could be a

2    Lieutenant, it could be a Captain or . . .

3    **Q.**    Do you recall that, in several of the interviews -- that

4    you had several interviews in which the subject was the same?

5    **A.**    I don't recall, sir.

6    **Q.**    Are you saying you have no recollection of any interviews

7    that you had that were about searches where there was a

8    complaint that you had grabbed the genitals of a prisoner?

9    **A.**    I can't recall that at the moment, sir.

10    **Q.**    Okay.

11                        (Plaintiff's counsel confer.)

12                        (Pause in proceedings.)

13            **MR. CUNNINGHAM:**  Excuse me, Judge.

14                        (Pause in proceedings.)

15            **MR. CUNNINGHAM:**  13.

16        (Plaintiff's Exhibit 13 marked for identification).

17    **MR. CUNNINGHAM:**

18    **Q.**    So here's another one now we've marked Plaintiff's 13.

19        That's the same kind of document; right?

20            **MR. QUINN:**  Your Honor, could we --

21            **THE WITNESS:**  Yes.

22            **MR. CUNNINGHAM:**  I'm sorry, counsel.

23                        (Counsel confer.)

24            **MR. LEWIS:**  Your Honor, we have to have a side bar.

25            (Sidebar conference heard but not reported.)

1  MR. CUNNINGHAM:

2  Q.   I'm sorry.  This is the third one that we have here marked

3  Plaintiff's 13.

4       That's another notice for an interview on a 602; correct?

5  A.   Yes, sir.

6  Q.   And what's the serial number on that one, the log number?

7  A.   CTF Sara 07-00147.

8  Q.   Okay.  And the date?

9  A.   It is January 25th, '07.

10 Q.   Okay.  So we have at least three -- Well, strike it.

11      Let me ask you this:  You see where, on the bottom of this

12 page, the -- there's some signatures that have been redacted;

13 correct?

14 A.   Sir?

15 Q.   The signatures have been covered up on this document.

16      Your -- Your signature is there; right?

17 A.   Yes, sir.

18 Q.   And above that and below that, there are two places for

19 the signatures but the signatures are covered up; right?

20 A.   Yes, sir.

21 Q.   Okay.  When you get the notice, are the signatures covered

22 up?

23 A.   No, sir.

24 Q.   So you know who's giving you the notice at that time;

25 right?

1    **A.**    Yes, sir.

2    **Q.**    And in this one that's marked Plaintiff's 11, the

3    signatures are not removed; correct?

4    **A.**    Yes, sir.

5    **Q.**    Okay.  And so we have Sergeant Randall as the interviewer

6    and another one.  I think that's -- Well, I can't read the

7    signature.

8         Do you recognize this -- this signature here (indicating)?

9    **A.**    Do I recognize the signature?  No, sir, with the name.

10        Ran -- Randlall (phonetic)?

11   **Q.**    Is there -- Well, there's Randall; right?

12   **A.**    I can see that as an L-A-L-L.

13   **Q.**    Okay.

14   **A.**    So it's Randlall.

15   **Q.**    Did you have a Sergeant Randall you reported to sometimes?

16   **A.**    You know what?  I can't recall.

17   **Q.**    You don't remember him.  And --

18        **MR. CUNNINGHAM:**  Hang on just a minute, Judge, please.

19             (Pause in proceedings.)

20   **MR. CUNNINGHAM:**

21   **Q.**    A Sergeant Prudale.  Do you remember him?

22   **A.**    Excuse me sir?

23   **Q.**    Sergeant Prudale?

24   **A.**    Prundale?

25   **Q.**    Yeah.  Prudale or Prundale?

1   **A.**   Negative, sir.  No, sir.

2   **Q.**   So you don't remember any of the interviews you had as a

3   result of these notices or any notices like these; is that

4   correct?

5   **A.**   I can't recall at this moment, sir.

6   **Q.**   Okay.  And you say you're not -- Well, strike it.

7       In any of those interviews, were you shown the 602s that

8   had been filled out by prisoners?

9   **A.**   Say it again, sir?

10   **Q.**   Were you shown the paper that the 602 was on?

11   **A.**   Was I shown a 602 in the interview, sir?

12   **Q.**   Yes.

13   **A.**   I don't recall it, sir.

14   **Q.**   Okay.  And do you recall being told in any of the

15   interviews that they were about complaints about grabbing or

16   squeezing private parts on inmates during searches?

17   **A.**   You ask me if I recall getting a notice about searches,

18   sir?

19   **Q.**   I'm talking about in the interviews, are -- Well, you said

20   you didn't remember the interviews particularly.

21       I'm sorry.

22       You said you didn't remember the interviews.  Do you --

23   Are you saying you also don't remember that the interviews were

24   about grabbing inmates' testicles and penis?

25   **A.**   I don't remember the interview, sir.

1    **Q.**   Okay.  Do you remember having an interview or a

2    conversation with Warden Curry?

3    **A.**   I can't recall that.  I don't know.

4    **Q.**   You don't recall any meeting with Warden Curry.

5    **A.**   No, sir.

6    **Q.**   Okay.  So is it fair to say that you don't recall any kind

7    of conversation, interview or other discussion that you had

8    with a member of the chain of command above you at the prison

9    during those years that was about allegations by prisoners that

10   you'd grabbed their private parts during searches?

11   **A.**   I don't recall on the day that we work.  I leave

12   everything at work and I don't -- Pretty much, if I do that

13   day, that day pretty much asks.

14       Once I leave the gate, sir -- Once I leave the gate of the

15   institution, my work ends right there and I go on to my

16   personal life.

17   **Q.**   So, in any event, you've never gotten in any trouble about

18   it; right?  You weren't disciplined; you weren't reprimanded.

19   Is that right?

20   **A.**   I was never dis -- I was never put any kind of action,

21   told what to do, or a disciplinary action towards me.

22   **Q.**   And specifically the Warden never told you to find a way

23   of searching people that didn't make them mad?

24   **A.**   Say it again, sir?

25   **Q.**   The Warden or anybody else never told you to find a way of

1  doing these clothed-body searches that doesn't --

2          MR. QUINN:  Objection:  Leading and argumentative.

3          THE COURT:  Overruled.

4          MR. CUNNINGHAM:  Did you overrule it, Judge?

5          THE COURT:  I did.

6  MR. CUNNINGHAM:

7  Q.  You never were told, "Find a way to do these searches that

8  doesn't make prisoners mad at you, doesn't upset them"?

9  A.  Nobody has told me to do my -- do my searches unless for

10  the lesson plan which I learned from the Academy, sir.

11          MR. CUNNINGHAM:  All right, then.  I have no further

12  questions.

13          THE CLERK:  Let me have those documents.

14          MR. CUNNINGHAM:  Oh, yeah.

15          THE CLERK:  Thank you.

16                  (Pause in proceedings.)

17          THE COURT:  Mr. Cunningham, are you through with this

18  witness?

19          MR. CUNNINGHAM:  I'd say yes.

20          THE COURT:  I think it's a good time now to take our

21  afternoon break.

22      15 minutes.  If everybody could be back in the jury room,

23  let's say, by 2:40; all right?  Thank you so much.

24                  (Recess taken at 2:24 p.m.)

25                  (Proceedings resumed at 2:41 p.m.)

1    (Proceedings were heard in the presence of the jury:)

2        **THE CLERK:**  Okay.  We're back on the record in Civil

3    07-2809, Cleveland versus Curry.

4    Counsel?

5        **MR. CUNNINGHAM:**  I believe I have no further -- well,

6    let me ask you one more thing.

7    **Q.**   You --

8        **MR. QUINN:**  Your Honor, just to clarify, I mean, at

9    the end of the last session --

10       **THE COURT:**  I understand.  I'll allow counsel to ask a

11   question.

12   **BY MR. CUNNINGHAM:**

13   **Q.**   You got on-the-job training about searches with the other

14   officers at Central in October of '06; isn't that right?

15   **A.**   I don't know the exact date.

16   **Q.**   But you did get it?

17   **A.**   I believe, yes, I got it, but I don't know the exact date

18   of that on-the-job training.

19   **Q.**   But it was shortly after you started working at Central;

20   right?

21   **A.**   On-the-job training for searches is pretty much done at

22   least once a year at least.  So if it's done '06, it means that

23   '06 for that on-the-job training is due for that day.  So I'm

24   not sure exactly what month it is, but usually on-the-job

25   training is due every year.

1  **Q.**   If I tell you we have a couple documents that reported

2  that the staff at Central received on-the-job training in

3  searches in the week of October 2nd to 8th, 2006, and that you

4  got yours on October 3rd, 2006, would that refresh your

5  recollection?

6  **A.**   For that long, like I said, sir, we get our training every

7  year so I can't tell you if it's that date or not.

8  **Q.**   Okay.

9  **A.**   So --

10 **Q.**   But you did get it every year?

11 **A.**   Not every year, sir, but at least -- I would say at

12 least -- they teach us at least every other year, at least

13 sometimes we go on the line and teach every -- the line staff

14 how to conduct searches or other materials due to on-the-job

15 training.

16 **Q.**   Okay.  And you get the same training everybody else gets;

17 right?

18 **A.**   Yes, sir.

19        **MR. CUNNINGHAM:**   Thank you.  Nothing else, Your Honor.

20 Thank you.

21        **THE COURT:**   All right.  Thank you.

22        **MR. QUINN:**   Your Honor, we don't have any questions at

23 this time.  Just we'd like to reserve the right to call

24 Officer Abanico during our -- when we're presenting our

25 evidence.

1          THE COURT:  All right.

2          MR. CUNNINGHAM:  Can we be heard sidebar then, Judge?

3          THE COURT:  All right.

4          (Sidebar conference heard but not reported.)

5          MR. CUNNINGHAM:  Give us just a minute, Judge.

6                    (Pause in proceedings.)

7          THE COURT:  Let me ask you so we're clear, is this

8    witness free to step down at this time?

9          MR. LEWIS:  Yes, Your Honor.

10         THE COURT:  Mr. Cunningham?

11         MR. CUNNINGHAM:  Yes.

12         THE COURT:  All right.  You're free to step down at

13   this time.

14         THE WITNESS:  Thank you, sir.

15              (Witness excused subject to recall.)

16         MR. CUNNINGHAM:  Perhaps the Court wants to explain

17   that he would be recalled in the other --

18         THE COURT:  I think counsel already requested that.

19         MR. CUNNINGHAM:  I thought for the jury.

20         THE COURT:  I'm sorry, Counsel?

21         MR. CUNNINGHAM:  That there was no cross-examination

22   at this time because.

23         THE COURT:  No, they intend to call him as their

24   witness in chief.

25         MR. LEWIS:  Yes, Your Honor.

1   **MR. CUNNINGHAM:** So after we rest.

2   **THE COURT:** Yes.

3   **MR. CUNNINGHAM:** Sorry.

4   So, Judge, our next and last item of evidence is going to

5   be reading of excerpts from the deposition of Warden Curry

6   since he has not made himself available here.

7   **THE COURT:** All right. Ladies and gentlemen,

8   Warden Curry is not, I believe, going to testify in this

9   matter, either as a witness for the defense or as a witness for

10  the plaintiffs. In lieu of that, the parties have elected to

11  read excerpts from his deposition; and at the closing of the

12  case, I will instruct you in regards to that testimony.

13  All right? Thank you so much.

14  (Pause in proceedings.)

15  **MR. CUNNINGHAM:** Judge, I might at some other time, if

16  I was going to do this, I might have them in a different order

17  but I'm just going to take it chronologically through the

18  deposition as it's printed out here, except I'll need another

19  copy.

20  **THE COURT:** Counsel, let me suggest or I might say, do

21  you wish to have cocounsel on the stand and to read the

22  questions and answers that way? Perhaps it makes it a little

23  easier if that's how you'd like to proceed.

24  **MR. CUNNINGHAM:** Well, I could do it, Judge. Either

25  way. Do you have a preference?

1          THE COURT:  Let me ask defense counsel?

2          MR. LEWIS:  My only concern would be, Your Honor,

3    because we are kind of going on the fly, it would be kind of

4    difficult for us to figure out.  Maybe if we were standing next

5    to each other and pointing out the testimony that we're using.

6          THE COURT:  The only thing is sometimes it's easier,

7    then we know who's asking the question and then we know what

8    the response is.  So I would suggest, just for clarity for the

9    jurors, that one party ask the question and the other party --

10          MR. CUNNINGHAM:  All right.  That's fine, Judge.

11          MR. LEWIS:  Very well.  We'll just have to do page and

12    line number.

13          THE COURT:  All right.

14          MR. CUNNINGHAM:  Sure.

15                    (Pause in proceedings.)

16          MR. CUNNINGHAM:  Judge, we have a sealed copy of the

17    Warden's deposition here that I will ask leave, then, to open

18    and I'll give to you if you want.

19          THE COURT:  All right.  That will be fine.

20                    (Pause in proceedings.)

21          MR. WOZNIAK:  What we're discussing, Judge, the

22    logistical issue that I have where I have to step out for a

23    second.

24          THE COURT:  Perhaps the paralegal can stand up.

25          MR. CUNNINGHAM:  Okay.  Do you want to do it, Doug?

1        (Pause in proceedings.)

2        **THE COURT:**  All right.  The ladies and gentlemen of

3    the jury I have in front of me Cleveland versus Curry, et al.,

4    the current case before you a copy of the Deposition of

5    Benjamin Curry taken Friday, January 29th, 2010, at 10:05 a.m.

6    at the Correctional Training Facility in Soledad, California.

7        It's my understanding that -- could you state your name,

8    sir?

9        **MR. LUBES:**  Douglas Lubes.

10       **THE COURT:**  And Mr. Lubes will be reading the answers

11   that Warden Curry gave at that time and Mr. Cunningham will be

12   asking the questions.

13       **MR. CUNNINGHAM:**  One second, Judge.

14       (Pause in proceedings.)

15       **THE COURT:**  And when you ask the questions, if you're

16   not -- obviously, this is a relatively long deposition.  As

17   defense counsel suggested, could you please state the page and

18   the line numbers you are asking?

19       **MR. CUNNINGHAM:**  Yes, sir.  Yes.

20               **BENJAMIN CURRY,**

21   called as a witness for the Plaintiffs, having been duly sworn,

22   was examined and testified through **DEPOSITION TESTIMONY** as

23   follows:

24       **(Transcript of deposition testimony as read by Dennis**

25   **Cunningham and Douglas Lubes:)**

1    **MR. CUNNINGHAM:** And we'll start on page 5, question

2  at line 7: (reading)

3      **"Q.** And do you know the subject of the lawsuit? Is that

4      fair?"

5      **MR. LUBES:** Just a moment.

6      **MR. CUNNINGHAM:** Oh, I'm sorry.

7                    (Pause in proceedings.)

8      **MR. LUBES:** I'm sorry. Which line?

9      **MR. CUNNINGHAM:** Your answer is at line 9 on page 5:

10  (reading)

11      **"A.** That is a guess."

12      **MR. CUNNINGHAM:** Line 9.

13      **MR. LUBES:** I'm on page 5.

14      **THE COURT:** Why don't you take the original deposition

15  here. Use that one. You can answer it from there.

16      **MR. CUNNINGHAM:** Okay. Let me ask it again:

17  (reading)

18      **"Q.** Do you know the subject matter of the lawsuit? Is

19      that fair?

20      **"A.** I have read the Complaint.

21      **"Q.** All right. How long ago did you receive it?"

22      **MR. CUNNINGHAM:** At line 19: (reading)

23      **"A.** I'm not sure exactly how long ago. Within the last

24      six months.

25      **MR. CUNNINGHAM:** All right. And at 24: (reading)

1       "Q.  When did you leave CTF?

2       "A.  When did I retire?

3       "Q.  Yeah.

4       "A.  June 29th of 2009.

5       "Q.  All right.  And before that you were the Warden

6     here?"

7         THE COURT:  You're now on page?

8         MR. CUNNINGHAM:  I'm sorry.  We're going on to page 6,

9  I'm sorry, at 3:  (reading)

10     "Q.  Okay.  And before that you were the Warden here;

11    correct?

12     "A.  Yes.

13     "Q.  And how long were you the Warden?

14     "A.  Approximately three years.

15     "Q.  All right.  And where did you work before that?

16     "A.  California Men's Colony.

17     "Q.  And had you worked in this facility, meaning Soledad,

18    before you were Warden here?

19     "A.  No.

20     "Q.  And do you know the dates you came to work here?

21     "A.  Yes.

22     "Q.  When was that?

23     "A.  May 22nd, 2006."

24        MR. CUNNINGHAM:  All right.  And down a couple of

25  lines:  (reading)

1    "Q.   How long did you work for the Department?

2    "A.   35 years.

3    "Q.   And did you come up through the ranks?

4    "A.   Yes.

5    "Q.   Starting as a correctional officer?

6    "A.   Yes.

7    "Q.   And before you were a Warden, did you have

8    supervisory positions in other places?

9    "A.   Yes."

10       THE COURT:  You're now on page 7; is that correct?

11       MR. CUNNINGHAM:  Page 7, yes.

12       THE COURT:  Can you give the line numbers so everyone

13   can keep up?

14       MR. CUNNINGHAM:  Sorry about that, Judge.  It was just

15   a continuation, 1, 2, and 3 there.

16       All right.  Still on page 7, line 6:  (reading)

17    "Q.   When you first came here, did you come to a situation

18    where you were -- where the levels of -- administrative

19    levels immediately below you were already filled or did

20    you fill the Associate Warden and various positions like

21    that with your own people?

22    "A.   The institution had vacancies, and I tried to fill

23    them to the best of my ability.

24    "Q.   And were those vacancies across the board or was it

25    just --

1    "A.  They were across the board.

2         MR. CUNNINGHAM:  Okay.  And the bottom of page 7, line

3    24:  (reading)

4    "Q.  Had you ever been a Warden before you were here?

5    "A.  No."

6         MR. CUNNINGHAM:  And on page 9:  (reading)

7    "Q.  People you knew from other places that you brought

8    in?"

9         MR. CUNNINGHAM:  That's line 5:  (reading)

10   "A.  I looked for people wherever I could find them.  It

11   didn't matter to me if I knew them or not.  What mattered

12   to me was their skill level because this place needed

13   people with skills.  It had been devoid of those for many

14   years."

15        MR. CUNNINGHAM:  All right.  Question on page 10 at

16   line 15:  (reading)

17   "Q.  I thought that you said when you were counting them,

18   you had one" --

19        MR. CUNNINGHAM:  I'm sorry.  This wouldn't be clear

20   here.

21        Up at the top of page 10 -- bottom of page 11 -- I mean,

22   the bottom of page 9:  (reading)

23   "Q.  The administrative structure, you have a set of

24   Associate Wardens; is that right?

25   "A.  Yes, Associate Wardens and Chief deputy Wardens.

1    There are two of those."

2        MR. CUNNINGHAM:  Okay.  Skip down line 4:  (reading)

3    "Q.  And how many associates?

4    "A.  North Facility, Central Facility, South Facility,

5    Business Services, and Healthcare.  Five."

6        MR. CUNNINGHAM:  And at line 15 on page 10:  (reading)

7    "Q.  I thought you had said, when you were counting them,

8    you had one Associate Warden, that is at North, one at

9    Central, one at South?

10   "A.  Those Associate Wardens in those three facilities ran

11   those three facilities, yes.

12   "Q.  Okay.

13   "A.  They were responsible for the operation of those

14   facilities, but they reported to a Deputy Warden who had

15   overall responsibility for the operation of that part of

16   the prison.

17   "Q.  Okay."

18       MR. CUNNINGHAM:  And up to page 11 at the top:

19   (reading)

20   "A.  And they reported to me.

21   "Q.  Both Chief Deputies?

22   "A.  Yes."

23       MR. CUNNINGHAM:  All right.  On page 11 at line 14:

24   (reading)

25   "Q.  Okay.  The -- what our case is about is about matters

1    that were raised, complaints by inmates that came through

2    the grievance procedure; correct?

3    **A.**  602 appeal process.

4    **Q.**  Uh-huh.

5    **A.**  Uh-huh.

6    **Q.**  And can you explain what does that mean?  I have some

7    understanding of how the process works.  I can see it

8    reflected in the papers, but --

9    **A.**  Yeah.

10   **Q.**  -- but who are the people, what is the chain of

11   authority or command that responds to 602 complaints?

12   **A.**  The way the process works is the inmate files the

13   appeal.  They go to the appeals coordinator.  It's a

14   first-level response, and at that first level of response

15   the appeals coordinators go through those appeals and they

16   separate them out.  They separate them out based on

17   timeliness.  For instance, healthcare issues that are

18   covered under the *Armstrong* remedial plan have a shorter

19   time line for response than other inmate appeals.  So

20   they're prioritized.  They're expedited because you have

21   to get Medical's involvement as well, which is sometimes

22   problematic because of the administrative issues.

23   **Q.**  Uh-huh.

24   **A.**  The next priority is citizens complaints; and by

25   "citizens complaints," I'm talking about any complaint by

an inmate or an outside person against a peace officer or

employee.  Okay.  Those complaints are reviewed by the

appeals coordinators with one of the Chief Deputy Wardens,

and it depends on where the inmate is housed or where the

incident occurred as to which Deputy Warden would review

that citizens complaint."

          **MR. CUNNINGHAM:**  All right.  Over on page 15, question

at line 14:  (reading)

     **"Q.**  And this is the deputy who has been assigned, the

chief deputy has reviewed it.

     **"A.**  Right.

     **"Q.**  And --

     **"A.**  And the appeals coordinator puts it into place.

     **"Q.**  Decides which ones have to go to the Warden?

     **"A.**  He takes them all to the Deputy Warden.

     **"Q.**  Deputy Warden.

     **"A.**  Okay.  And if those Deputies weren't there, then

rarely, but on some occasions, I did myself review those."

          **MR. CUNNINGHAM:**  Going on:  (reading)

     **"Q.**  Okay."

          **MR. CUNNINGHAM:**  Bottom of page 15:  (reading)

     **"A.**  Now I stay out of that process as much as I can

because if those -- if that Deputy develops enough

information that they feel an Internal Affairs

investigation is warranted, then they present that case to

1   me and I have to authorize its referral to Central Intake

2   in headquarters with a request for an Internal Affairs

3   investigation.  Okay.

4       "That essential intake unit is comprised of a person

5   out of the Inspector General's office, a person out of the

6   Bureau of Independent Review, a person out of the

7   Headquarters Legal Division, and I'm talking personal

8   legal."

9       **MR. CUNNINGHAM:**  All right.  Over on page 20, at line

10  11:  (reading)

11      **"Q.**  Okay.  Well, it would be right to say -- would it be

12  right to say, then, that in a case where a prisoner

13  complains about the conduct or actions of a staff member,

14  that that process essentially there is a review and an

15  inquiry of some -- on some -- to some extent in the

16  institution and then a decision is made whether or not to

17  go that further step of asking for an Internal Affairs?

18      **"A.**  Yes.  Well, the answer is that we normally would

19  collect enough information on a staff complaint to

20  determine whether or not there was merit to the complaint

21  itself; and in an institutional setting, nothing is as it

22  seems, nothing.  And inmates particularly who are

23  incarcerated not necessarily with their blessing, they are

24  here against their own will -- they are here against their

25  own -- they are restrained against their own will,

1   basically their interpretation of events and circumstances

2   are not always clear.  That works both ways, too, and I

3   know that."

4       MR. CUNNINGHAM:  All right.  I'm just going to go to

5   line 19 on page 21 there:  (reading)

6       "Q.  Uh-huh.

7       "A.  And that doesn't necessarily have to be the

8   Internal Affairs lieutenant or the Security Squad sergeant

9   or any of those folks.  We would use folks that were in

10  and around the area that knew exactly the players involved

11  and knew what the process and procedures were for at that

12  particular area.  In my view, they are the best people to

13  tell you if you have got a problem or not."

14      MR. CUNNINGHAM:  On page 23 at line 13 -- 14:

15  (reading)

16      "Q.  When a person files -- when a prisoner fills out a

17  602, who does he give it to?

18      "A.  He can give it to the program unit staff or he can

19  send it directly to the appeals coordinator through the

20  institution's mail.

21      "Q.  Okay.  And the appeals coordinator is -- is the first

22  reviewer, is that fair, the first one?

23      "A.  Well, let's say that he sent it to the appeals

24  coordinator.  Then, yes, he would be the first to review

25  it.

1  "Q. Does he sometimes just give it to the sergeant in the

2  cellblock?

3  "A. He could, yes.

4  "Q. And that person forwards it on; is that right?

5  "A. It depends. He could have -- it's --

6  "Q. He can review it?

7  "A. He can review it. He can have it responded to at the

8  informal level, too. It just depends on what is the

9  issue.

10  "Q. Okay.

11  "A. If the appeal is accepted as a formal appeal, then

12  it's logged and it's given a log number and it's tracked.

13  The facility captains, most of them, not all but most,

14  will also track their informal appeals. Okay. They do

15  that internally within their own unit.

16  "Q. So it doesn't happen that the -- that the immediate

17  supervisor is -- can make up the final decision; is that

18  fair to say?

19  "A. He can respond.

20  "Q. To the inmate?

21  "A. Yeah. At that informal level or -- at the informal

22  level. It would be difficult for them to respond at the

23  first level because before it can be handled at the first

24  level, it goes to the appeals coordinator who assigns a

25  log number and sends it out to a division head, Associate

1   Warden, who forwards it to the particular facility captain

2   in that area or correctional captain who assigns it to

3   somebody to respond to in their area.

4   **"Q.** And then while it's going on, what -- and when we're

5   still on the informal level, if the prisoner accepts what

6   the supervisor says, then that's the end of it. If he

7   doesn't, then he can forward that on, then it goes to the

8   appeals coordinator?

9   **"A.** Then he can forward it, sure.

10   **"Q.** Okay.

11   **"A.** He doesn't have to accept it. He can be dissatisfied

12   with the response. He can document his dissatisfaction

13   and forward it.

14   **"Q.** And he can -- and then that can keep on happening?

15   We have seen this process.

16   **"A.** Yes.

17   **"Q.** All the way up to the director?

18   **"A.** Yeah. You probably have it right there -- here.

19   **"Q.** Okay."

20   **MR. CUNNINGHAM:** At line 19: (reading)

21   **"Q.** Okay. So we have a situation with the complaint and

22   complaints about this one officer, Abanico.

23   **"A.** Uh-huh.

24   **"Q.** Did you know him?

25   **"A.** I know him as a correctional officer, yeah.

1     **"Q.** Did you know him before you came here to work?

2     **"A.** Nope.

3     **"Q.** Did you meet him here in the course of dealing with

4     the complaints about him or separately from that?

5     **"A.** Abanico made an appointment and came and saw me at

6     some point. I don't know where in the complaint process,

7     but obviously his motivation to come see me had to do with

8     the fact that he knew people were being questioned about

9     the complaints."

10     **MR. CUNNINGHAM:** I'm sorry, going on: (reading)

11     **"Q.** If somebody writes a complaint about a particular

12     officer and gives it to a supervisor or gets it to the

13     appeals coordinator, the officer is advised of the

14     complaint; is that correct?

15     **"A.** Ultimately, yes.

16     **"Q.** And --

17     **"A.** They're given a copy of it, too, I believe.

18     **"Q.** And when you -- when you're at the informal level, is

19     it -- does it sometimes happen that, say, a supervisor or

20     a captain might just talk to the officer or talk to the

21     two of them and straighten it out; and then -- and if the

22     prisoner accepts that, then that's the end of it?

23     **"A.** You mean resolve the issue?

24     **"Q.** Yes.

25     **"A.** That's possible.

1  "Q.  Yes.  So do you have a recollection of when or

2  roughly when Abanico came to see you?

3  "A.  I do not.

4  "Q.  Was it after you were aware that there were several

5  complaints against him?

6  "Well, let me change that, my approach here.  Let me

7  change my approach here a little bit.

8  "At some point I take it you became aware that there

9  were a number of complaints against this officer; is that

10  fair?

11  "A.  Sure.  I meet with the MAC on a regular basis, the

12  Men's Advisory Council.

13  "Q.  Okay.

14  "A.  And several individuals that are housed --

15  incarcerated here had no qualms about contacting me.  I

16  didn't discourage that at all.  It's a form of -- of

17  information gathering to me.

18  "And sometimes I took the complaints real seriously,

19  and sometimes I felt like, based on my experience, that

20  there was a little sour grapes maybe.  It just depended on

21  what the circumstances were.

22  "Q.  And then did you -- do you recall when you first

23  heard about the complaints against Abanico -- how you

24  first heard about the complaints against Abanico?

25  "A.  I don't remember exactly how I first heard about it.

1     "Q.   Okay.

2     "A.   I did subsequently become aware of it, though.

3     "Q.   That there were multiple complaints?

4     "A.   That there were -- there were more than one,

5     several."

6          THE COURT:  Counsel, don't forget to --

7          MR. CUNNINGHAM:  The page.  We're continuing here,

8     Judge.

9          THE COURT:  Oh, all right.

10         MR. CUNNINGHAM:  This is all continuing.

11    Still on page 28, line 7:  (reading)

12    "Q.   And at some point did you --

13    "A.   But I believe -- and I -- well, I would be

14    speculating because I don't have a clear recollection.

15    "Q.   Whatever your best recollection is, we'd be glad to

16    have it.

17    "A.   I believe that there was a complaint filed, and I

18    don't even remember who the inmate was; but what I

19    remember about it is that it had attached to it a long

20    list of other names, and I recall at that point I started

21    to ask some questions about it.

22    "Q.   Did there -- the list of other names being other

23    people who were subscribing to the complaint; is that

24    fair?

25    "A.   Yeah.  I would say --

1    **"Q.** Supporting it?

2    **"A.** Supporting it, yes, as factual.  Now, whether or not

3    they had some personal contact with the officer, I did not

4    know.

5    **"Q.** Uh-huh.

6    **"A.** But I recall the list, and it was quite lengthy, too;

7    about 150 names or so on it.

8    **"Q.** I have seen" --

9    **MR. CUNNINGHAM:**  Still on page 29, line 3:  (reading)

10   **"Q.** I have seen that in here, yes.

11   **"A.** Yeah.

12   **"Q.** And I take it that's a fairly unusual occurrence; is

13   that fair?

14   **"A.** In my experience, it is an unusual occurrence, but

15   this institution is different than any other institution

16   I'd ever worked at, too."

17                   (Pause in proceedings.)

18        **MR. CUNNINGHAM:**  All right.  Skipping down, page 30,

19   line 15:  (reading)

20   **"Q.** And the fact that this institution has that character

21   in terms of long-term occupancy and the consequences

22   thereof, including these kinds of relations with staff, is

23   there some special policy in the Department that

24   designates this institution for that or is it just a

25   tradition, or how did that come about?

1    "A.  I can't tell you how that came about.  I can just

2    tell you what I found."

3        MR. CUNNINGHAM:  And up on page 31, then, line 3:

4    (reading)

5    "Q.  So there's a culture here that you learned when you

6    came here?

7    "A.  Yes.

8    "Q.  Okay.

9    "A.  This institution has had change in waves that have

10   affected the culture going back before I started with this

11   Department."

12       MR. CUNNINGHAM:  Over on page 35, line 18:  (reading)

13   "Q.  Is this facility rated at the highest level of

14   security?

15   "A.  No.

16   "Q.  Or is it less security?

17   "A.  Medium.

18   "Q.  Medium.

19   "A.  This is far outside of yes, no, and --

20   "Q.  Right.

21   "A.  This is a tri-facility meaning it has three

22   distinctly different, when I first got here, levels of

23   inmate prisoners."

24       MR. CUNNINGHAM:  Okay.  You can stop there.

25                   (Pause in proceedings.)

1     **MR. CUNNINGHAM:**  All right.  Over on page 45, we're

2  making progress, at line 3:  (reading)

3     **"Q.**  So if -- if we have a prisoner in a wing, D Wing,

4     F Wing, he -- he's going to be dealing with line officers,

5     correctional officers?

6     **"A.**  Yes.

7     **"Q.**  A Sergeant, a lieutenant?

8     **"A.**  Facility captain.

9     **"Q.**  A captain, NA --

10    **"A.**  NAW.

11    **"Q.**  And an" --

12    **MR. CUNNINGHAM:**  Line 18 -- line 19, 45:  (reading)

13    **"A.**  I am aware that there was one complaint that had a

14    number of names signed to it.

15    **"Q.**  All right.  And were you aware there were a number of

16    other complaints over a period of time that were

17    individual complaints --

18    **"A.**  No.

19    **"Q.**  -- in addition to the one with all the --

20    **"A.**  No.

21    **"Q.**  -- signatures?

22    **"A.**  No.  My first recollection is the large-scale

23    complaint that had all the names associated to it.  That's

24    when I believe I first became aware of it.  I subsequently

25    had conversations with MAC, which during those meetings it

1  was brought to my attention that there were some concerns

2  there that I should be aware of."

3      **MR. CUNNINGHAM:** All right.  On page 47 at the bottom,

4  25: (reading)

5  **"Q.** Okay.  When you learned of the mass grievance, who

6  did you talk to about it?

7  **"A.** Colleen Knoll.

8  **"Q.** Anybody else?

9  **"A.** I might have.  I don't remember if I talked to anyone

10  else.  I may have talked to the Security Squad lieutenant.

11  I did have a conversation with the In-Service Training

12  lieutenant and/or sergeant, Sergeant Keane and Jim

13  Peterson I believe is his last name, as to how the

14  searches were actually being done.

15  **"Q.** Uh-huh.

16  **"A.** Colleen, I believe, in fact I'm pretty sure she

17  assigned someone to gather information at some point in

18  the complaint process involving Abanico, a supervisor.

19  She told me that Abanico was doing his job the way he had

20  been trained to do that, which initially I had a little

21  issue with.

22  **"Q.** What was the issue?

23  **"A.** Because the manner in which he -- the method in which

24  he actually used to conduct clothed body searches.  And

25  the information I was getting from Mrs. Knoll was that he

1  is doing it exactly as how the Academy had taught him to

2  do that.

3      "Now, I never went to the Academy, I am pre that if

4  you will.  My Academy existence was two weeks at a Chino

5  institution on grounds there with 40 other guys that was

6  hired the same day, and I -- I just don't remember them

7  teaching us in that Academy how to do clothed body

8  searches.  I believe I got that on the job from another

9  officer, although I wouldn't testify to that because I

10  just don't remember.  It's been 35 years.

11  **Q.**  I understand, but --

12  **A.**  But my point to you is that the way I was told that

13  they were doing it is not my recollection of how I was

14  taught nor how I did it.

15  **Q.**  What was the difference?

16  **A.**  Well, it had to do with cupping the genitals.  I

17  don't recall -- I don't remember being taught to do that.

18  I don't remember doing that.  In fact, I can tell you

19  adamantly that I did not do that, but I also knew that the

20  training had evolved over the years.

21      "And based on the number of incidents where both

22  dangerous narcotic contraband had been discovered on

23  prisoners affixed in and around that genital area may have

24  had a great deal to do with why the policies were changed.

25      "At any rate, I questioned that, I questioned that

1  with In-Service Training and I asked them to contact the

2  Academy and get a copy of the lesson plan that they were

3  using."

4      MR. CUNNINGHAM:  All right.  Staying with it:

5  (reading)

6      "Q.  So your questioning at this stage is about the

7  methodology that's used in these searches, and what would

8  be the expectation -- what would the expectation be as to

9  how they were done?

10      "A.  Well, the expectation has to be that they performed

11  those searches as they were trained to in the Academy.

12  You can't deviate from that."

13      MR. CUNNINGHAM:  All right.  I'm sorry.  I guess we've

14  got to have this page:  (reading)

15      "Q.  Did Ms. Knoll tell you how she knew how -- I mean --

16  well, let me back up.

17      "She's seen -- from your answers I thought you were

18  saying she was assuring you that Abanico was not out of

19  line.

20      "A.  She told me that Abanico was doing his job, that he

21  was performing his duties according to how he was trained.

22      "Q.  And did she --

23      "A.  That's when I contacted IST and I said, 'I want to

24  know.'

25      "Q.  "I want to know what was the training"?

1  "**A.** What this training is. And I had a spirited

2  conversation with Lieutenant Peterson on the telephone

3  about that.

4  "**Q.** Uh-huh.

5  "**A.** Because Peterson wasn't a youngster either. He had

6  nearly 30 years in, and he wasn't that far removed from my

7  generation, and I felt like his experience would have been

8  similar to mine. So I questioned it. He assured me that,

9  yeah, it has changed and this is how they're teaching them

10  to do it."

11  **MR. CUNNINGHAM:** All right. Going on: (reading)

12  "**Q.** What about -- and what about in speaking with

13  Mrs. Knoll, what about -- what information did she give

14  you about how she knew that Abanico's practice was

15  according to Hoyle as opposed to out of line the way --

16  "**A.** You would have to ask her that. I don't know the

17  answer to that.

18  "**Q.** You didn't get information from her, then, as to --

19  "**A.** I presume she had gotten it from whoever she assigned

20  to do the supervisor -- supervisorial review of the

21  issues.

22  "**Q.** Uh-huh.

23  "**A.** That's what my expectation would have been.

24  "**Q.** Not that she had talked to him or his supervisor?

25  "**A.** You mean Abanico himself?

1    **"Q.**  Yes.  Yeah.  Right.

2    **"A.**  I don't know if she did or not."

3       **MR. CUNNINGHAM:**  Okay.  Down to line 23:  (reading)

4    **"Q.**  Was there," on 51, "Was there anyone -- anything

5    written up at that stage that you could look at besides

6    the complaint itself or the petition, any reports?

7    **"A.**  No.  There was a report that was generated.  I don't

8    recall reading it, although I might have.  I can't tell

9    you that I remember that right now.

10      "My recollection is more vivid of my conversations

11   with her and, you know, we had an exchange about that

12   process; and while I was talking to her, I knew I was

13   talking to someone who had never done that.

14   **"Q.**  Never done?

15   **"A.**  A clothed body search.

16   **"Q.**  Uh-huh.

17   **"A.**  I told you I hired Colleen because of her business

18   services knowledge.

19   **"Q.**  Got it.

20   **"A.**  So when I was talking to her, my conversation with

21   her was from someone who had to -- someone who wasn't --

22   who was overseeing the process.  So I asked some pretty

23   pointed questions.  I remember doing that.  And she was

24   just as direct in her responses to me and it came down to:

25   Well, that's the way he was trained in the Academy and

1   that's the way they are training them in the Academy.   And

2   I said, 'Hmm.'"

3       **MR. CUNNINGHAM:**  Going on:  (reading)

4   "**Q.**  Would I be right to understand, then, that your

5   question, the question you were left with after talking to

6   her was more about how are we doing these things?

7   "**A.**  Are we really doing this, that was my question.

8   "**Q.**  Uh-huh.  As opposed to:  What about this guy that

9   everyone's mad at?

10  "**A.**  Well, it was more about the procedure.

11  "**Q.**  Okay.

12  "**A.**  You know, I --

13  "**Q.**  Let me ask you this:  Once you had talked to Peterson

14  and you understood or it was brought home to you that this

15  is what we do now and we've got a basis for experience and

16  we've built it into the routine and we're training them

17  this way, then did you not have a question as to, well, if

18  everybody's doing it, how come there is all this problem

19  with this one guy?"

20      **MR. CUNNINGHAM:**  There was an objection:  (reading)

21      "Compound.

22      "I know the question is long.

23      "Can you rephrase the question?

24  "**A.**  Well, I think what you're asking me is" --

25      **MR. CUNNINGHAM:**  Wait.  Where are you?

1       **MR. LUBES:**  Line 20.

2       **MR. CUNNINGHAM:**  (reading)

3   **"Q.**  Okay.  Uh-huh."

4       **MR. CUNNINGHAM:**  Then there's more objection:

5   (reading)

6           "Ask me --

7   **"Q.**  My question is:  Here, let me try to break it down."

8       **MR. CUNNINGHAM:**  That's line 25, going over onto

9   page 54:  (reading)

10  **"Q.**  After you talked with Ms. Knoll and you talked to

11  Lieutenant Peterson and you are -- you were, I take it

12  from what you said, satisfied you -- that, yes, this was

13  the cupping of the genitals and the focus on the

14  possibility of contraband being hidden in that particular

15  part of a prisoner's body as a concern that is ongoing in

16  the security system, and particularly in the use of random

17  clothed body searches when the population is moving

18  around; is that fair?"

19      "Objection.

20      "Objection.

21  **"A.**  I think I know where he's going here.

22      "So let him answer.

23      "Rephrase the question.

24  **"Q.**  You knew, then, that this was -- this new -- this

25  methodology you had not been taught and you were not that

1    familiar with was being used and was standard; is that

2    fair?

3    "A.  Well, my impression was that it had become the

4    standard.

5        MR. CUNNINGHAM:  All right.  Question, line 6:

6    (reading)

7    "Q.  And that this was -- could you expect that all

8    your -- strike it.

9        "A certain number of officers have that as part of

10   their" --

11       MR. CUNNINGHAM:  This is part of the question.

12   There's a type change here:  (reading)

13       "A certain number of officers have that as part of

14   their assignment in their daily work, right, to do random

15   clothed body searches?

16   "A.  Theoretically.  Those that had gotten the same

17   training he had would have performed those searches the

18   same way."

19       MR. CUNNINGHAM:  Now line 19:  (reading)

20   "Q.  Where there are -- and in particular in this I think

21   there was a hallway where prisoners passed by?

22   "A.  They're random.  They're random in nature or specific

23   based on circumstances; but, yes, you would expect others

24   to have employed the same methodology."

25       MR. CUNNINGHAM:  At line 24, then, on page 55:

1  (reading)

2      **"Q.**  And there are -- and you expect that there are

3      certain locations in the prison where this goes on on a

4      regular basis, everybody knows it's going to happen and

5      they're all so advised; correct?"

6          **MR. CUNNINGHAM:**  An objection:  (reading)

7          "You can answer.

8      **"Q.**  Where are these searches used, random searches?

9      **"A.**  Random searches are used throughout the institution

10      in several different areas.

11      **"Q.**  And?

12      **"A.**  They are a security tool.

13      **"Q.**  Okay."

14                      (Pause in proceedings.)

15          **MR. CUNNINGHAM:**  Okay.  On page 57 at line 12:

16  (reading)

17      **"Q.**  Okay.  But -- but you would expect, would you not,

18      that there was a level of it that made -- that was

19      consistent with the reasonable degree of security from

20      that point of view from the standpoint or the possibility

21      of smuggled contraband?

22          "Objection.

23          "If you could respond."

24          **MR. CUNNINGHAM:**  Answer, line 20:  (reading)

25      **"A.**  I know what he's getting at.

1   "If you understand the question, you can respond.

2   "THE WITNESS:  Yeah, I do understand the question."

3   MR. CUNNINGHAM:  Line 25:  (reading)

4   "A.  And my response is this:  There are individuals

5   assigned -- officers assigned to those different sections.

6   During the course of their routine duties, you would

7   expect that they would conduct clothed body searches.

8   "Q.  Okay."  At line 6, "And, so, back to the question I

9   was trying to get at with my long question.  Once you

10  were -- once you had made your inquiry about the use of

11  this technique, then was there an issue in your mind as to

12  why this particular officer had so many people upset about

13  the way he did it compared with anyone else?

14  "A.  Not necessarily."

15              (Pause in proceedings.)

16  MR. CUNNINGHAM:  Continuing on line 14, page 58:

17  (reading)

18  "Q.  And why would that not draw your attention to that

19  circumstance?

20  "A.  Because this is a guy that was pretty fresh out of

21  the Academy.  Okay.  He had not been around or exposed to

22  the inmate population for a great deal of time, and I

23  believe that there is a culture here that was -- they had

24  become lax to a certain extent in the conducting of those

25  clothed body searches.

1       "This is a guy that I felt was performing that

2    particular technique by the letter, while others that may

3    not have been as motivated or found it uncomfortable would

4    have done whatever it took to get by, which didn't

5    necessarily lend itself to security either.

6    "Q.  And did you reach that conclusion before or after

7    Abanico came to see you?

8    "A.  I would have to say I reached that conclusion after

9    he came to see me; and my conversation with him revolved

10   around the issue that you were trying to get at, and I --

11   I told him that he was going to have to find a way to be

12   thorough without generating so much hate and discontent.

13   "Q.  Okay.  And had you" --

14     MR. CUNNINGHAM:  Question, going on, question, line 10

15  on page 59:  (reading)

16   "Q.  Had you ever had a mass grievance like that before?

17   "A.  Yes.  I have seen those in my career at other places.

18   I have.

19   "Q.  Had -- by the time he came to see you, were you still

20   not aware of the other individual complaints that came up

21   or any number of them up to that point?

22   "A.  I'm not sure of the exact number, but I was aware

23   that I had been told there was other complaints, too.

24   "Q.  Uh-huh.

25   "A.  And I was told that prior to Abanico coming to see

1     me.

2        **"Q.** And besides Ms. Knoll, did you have anybody else --

3     leaving aside Peterson, was there anybody else you talked

4     to at that stage?

5        **"A.** I believe I talked to the Security Squad lieutenant,

6     Mike Biggs, about it."

7                    (Pause in proceedings.)

8         **MR. CUNNINGHAM:** Excuse me, Judge. I've got to look

9     here.

10                   (Pause in proceedings.)

11        **MR. CUNNINGHAM:** All right. Over on page 65 at line

12    2: (reading)

13       **"Q.** Let me ask you. I want to follow-up on this, the

14    idea of the difference between Abanico and anybody else.

15    And I think I'm mindful of the answer that you gave that

16    you had at least an impression as -- or about the stage

17    when he came to see you or after you had that conversation

18    that maybe -- strike it.

19       "You had an impression or drew a conclusion that it

20    was a situation of he was a little gung ho and everybody

21    else was maybe sort of lax, and that that was the

22    explanation for the fact that he in particular had been

23    singled out for this complaint; is that a fair description

24    of your position at that point?

25       **"A.** I was convinced after my conversation that he was

1    performing his duties according to how he had been

2    trained.

3    "Q.  And given that there was no way around it, the

4    peculiar nature of the complaint here having to do with

5    the sexual aspect of what was being asserted in terms of

6    the prisoners focusing on this one officer and complaining

7    about his approach to this activity, that given that this

8    was -- that there was -- that the focus of it was

9    sexuality or an assertion that there was -- that there was

10   a basis -- that was the basis of the impropriety and there

11   was an element of molesting going on, to use a word, this

12   was" --

13       MR. CUNNINGHAM:  And there's an objection.  (reading)

14   "Q.  -- this was at the heart of it; right?

15       "Let him rephrase.

16       "Understand."

17       MR. CUNNINGHAM:  Line 11, page 66:  (reading)

18   "Q.  This is a particular -- I'm sorry.  The question got

19   a little lost.  I agree, but this is a particular -- this

20   was the gravamen, this was the main point that this is a

21   sexual thing that this guy is doing, and he -- he's -- you

22   know, he's got something going on.

23   "A.  Certainly the allegation of that got my attention.

24   "Q.  And that's a real problem in a situation like this,

25   isn't that right, and a danger --

1        "Objection.

2    **Q.**  -- in a prison setting and in a circumstance where a

3    lot of people are complaining about one officer in

4    particular?"

5        **MR. CUNNINGHAM:**  Then another objection.  (reading)

6    **Q.**  Let me try it a different way."

7        **MR. CUNNINGHAM:**  Question -- I'm sorry, by

8    Mr. Cunningham, question.

9        **THE COURT:**  Counsel, this is starting to get a little

10   confusing.  If you could find the question and answers that are

11   pertinent, that would perhaps speed this along a little bit.

12       **MR. CUNNINGHAM:**  I'm trying to do it, Judge, really.

13              (Pause in proceedings.)

14       **MR. CUNNINGHAM:**  Line 6 on page 67:  (reading)

15   **Q.**  It got your attention you said, the sexual aspect?

16   **A.**  Uh-huh.

17   **Q.**  And why would that -- why would that particularly get

18   your attention?

19   **A.**  Because it's a threat of the security of the

20   institution.

21   **Q.**  And the threat is what?

22   **A.**  The safety issue to other employees, not to mention

23   the abuse of the inmate population.

24   **Q.**  And the safety question, the safety issue, tell me if

25   I'm wrong, it centers around the possibility that it would

1    make somebody mad and there would be an altercation?

2    "A.  In a very preliminary response, that's only one

3    issue."

4        MR. CUNNINGHAM:  All right.  Now, on page 68, line 3:

5    (reading)

6    "Q.  So further safety issues you can articulate -- I

7    mean, I understand you --

8    "A.  Retaliation against the known involved staff, a more

9    vulnerable staff.  Okay.  That comes to my mind.  That

10   certainly is something that is in my experience.  The

11   perpetration of that act on others is a concern, a very

12   real concern.

13   "Q.  Perpetration by the same officer?

14   "A.  If he's guilty of the allegation, that is definitely

15   a concern.  His safety is also called into some question.

16   Okay?

17   "Q.  Did you ever hear subsequently that his safety was

18   compromised, he got hurt?

19   "A.  No.  In what way?

20   "Q.  He got beat up?

21   "A.  No."

22                    (Pause in proceedings.)

23       MR. CUNNINGHAM:  All right.  On page 70, line 4:

24   (reading)

25   "Q.  I guess my question is, then, generally -- well,

1    strike it.  Strike it.  It's not easy.

2         "Is it right to say, then, that when you got the

3    conclusion that you described earlier, there was more

4    of -- it was a question of him being, I used the term

5    'gung ho' before, by the book, being a stickler starting

6    out having that approach?

7         "Objection.

8    **Q.**  In comparison to others who may have had a lax

9    approach, you didn't -- did you at that point, after you

10   talked to him, feel that the possibility of him having a

11   psychological problem that may -- that gave substance to

12   the allegation about sexual -- about sexuality was laid to

13   rest?

14   **A.**  After I talked to him?

15   **Q.**  Yes."

16        **MR. CUNNINGHAM:**  Another objection.

17        **THE COURT:**  Counsel, if you could find the sections of

18   the transcript where there's a question and a response, I think

19   we would move this along a little faster.

20        **MR. CUNNINGHAM:**  Well, all right.  Question on

21   page 71, line 7:  (reading)

22   **Q.**  Yeah.  That made him -- that made him -- that made

23   him a problem for you in the context of these complaints

24   over and above the issue of sticklerism or training?

25   **A.**  From a purely layman's perspective, I'm not a

1    psychologist, I did not believe he had a psychological

2    issue when I finished talking to him."

3                    (Pause in proceedings.)

4        **MR. CUNNINGHAM:**  All right.  Page 72 at the bottom,

5    line 23:  (reading)

6    **"Q.**  You came to the conclusion -- is it right to say that

7    you came to the conclusion that the allegation in --

8    these -- this -- these allegations joined by all the

9    people that signed the group appeal and whatever ones you

10   were aware of at that time were just off base and that

11   they were -- that the assertion that there was a sexual

12   motivation the way he was doing this was just wrong, just

13   groundless?

14   **"A.**  I do not believe there was a sexual motivation to do

15   this; and I believe, too, that even though at some point

16   during the process I started to question the number of

17   names on that appeal and I started to believe that all the

18   names on that appeal were not necessarily those that were

19   complaining about the officer's approach but more likely

20   were individuals that had signed a piece of paper that was

21   stuck in front of them through peer pressure, which could

22   not have surprised me in this environment.

23   **"Q.**  And --

24   **"A.**  That led me to wonder or question how many actually

25   had an issue.

1    "**Q.** Uh-huh."

2    **MR. CUNNINGHAM:** Same line: (reading)

3    "**A.** And I believed at that point that it was far fewer

4    than the original complaint contained.

5    "**Q.** Okay. From what I can tell," going on, "the

6    paperwork, there were two different prisoners, Trask and

7    Cleveland, made the allegation on behalf of a group, on

8    behalf of some number of prisoners besides themselves; and

9    Cleveland, who was at least by the number, I'm unsure of

10   the dates, was later -- if I'm not mistaken, was the one

11   who appended all the signatures.

12   "**A.** I don't know who did that.

13   "**Q.** Okay. My question at this point, then, is: Did you

14   take -- having that impression or that notion coming to

15   you, well, maybe this is, you know, this is another

16   source, there's another source of this multiplicity of

17   names besides direct knowledge on the part of all those

18   prisoners and maybe a questionable source --

19      "Objection."

20   **MR. CUNNINGHAM:** Going on: (reading)

21   "**Q.** The reason for it -- I don't mean there was a reason

22   beside the merits of the allegation that it was ascribed

23   to by so many prisoners and an unworthy reason; right?

24   And the reason which your experience told you was -- you

25   know, indicated that the number of complaints was kind of

1  bunk; isn't that right?

2      "Objection.

3      "Objection."

4      **MR. CUNNINGHAM:**  Now over to line 11:  (reading)

5  **"Q.**  I'm trying to get to this point:  Just to go back,

6  this is on 75, "where you were at that point, you did come

7  to that conclusion, you just told me that; isn't that

8  right?

9  **"A.**  I certainly --

10      "Objection, again.  Misstates the testimony."

11      **THE COURT:**  Counsel, if you could --

12      **MR. CUNNINGHAM:**  Should I not read the objections,

13  Judge?

14      **THE COURT:**  Try not reading --

15      **MR. CUNNINGHAM:**  Questions that were objected to.

16      **THE COURT:**  -- questions that were objected to and

17  there are no answers that are forthcoming.  We could move this

18  along a little bit faster.  Please try to find the portions of

19  the transcript that you believe are relevant that have a

20  question and an answer.

21      **MR. CUNNINGHAM:**  Yes, sir.

22                  (Pause in proceedings.)

23      **MR. CUNNINGHAM:**  And question on page 3 -- I mean,

24  page 76, line 3:  (reading)

25  **"Q.**  As a matter of fact, you came to the conclusion that

1  the veracity was low level?

2  **A.**  I suspected that the complaint may have been

3  generated for the purpose of possibly hiding some other

4  type of activities.

5  **Q.**  And what possible kind were you thinking?

6  **A.**  Criminal activity, the involvement of moving

7  contraband from one point in the institution to another

8  for personal gain.

9  **Q.**  And did it make sense to you in thinking of that and

10  contemplating that that somehow Abanico was frustrating

11  that by the way he was conducting himself?

12  **A.**  I did.

13  **Q.**  And it was only him and, therefore, they went after

14  him?

15  **A.**  I felt that there was a possibility.

16  **Q.**  That he -- of this?

17  **A.**  That he had been targeted.

18  **Q.**  And what steps did you take, if any, to learn more

19  about that possibility?

20  **A.**  I talked to the Security Squad lieutenant.

21  **Q.**  And he is?

22  **A.**  Asked for his input.

23  **Q.**  Uh-huh.  And who was that?

24  **A.**  Mike Biggs.

25  **Q.**  Security Squad for the whole institution?

1    "A.   Yes.

2    "Q.   And what kind of input did you get from him?

3    "A.   I was told that Abanico was doing his job.

4    "Q.   And did he tell you how he knew that?

5    "A.   No.  He did not tell me specifically how he knew

6    that, but the relationship between the Security Squad

7    lieutenant and the Warden of any institution is such that

8    that's a question you don't have to ask.  That goes

9    without saying.

10   "Q.   You expect him to be in touch and have his sources

11   and be on top of it?

12   "A.   He better know.  Whatever he tells me, he needs to

13   have personal knowledge of or at least -- at the very

14   least knowledge from a source that is impeccable to me.

15   "Q.   Okay.  And your testimony is that he assured you that

16   he himself in turn was assured that Abanico was doing his

17   job?

18   "A.   That's what he said.  He told me that Abanico was

19   doing his job.  I don't know where he got that from."

20       MR. CUNNINGHAM:  Page 78 on line 13:  (reading)

21   "Q.   Would it have been your understanding that he made

22   his own inquiry before you had that conversation with him

23   to make sure that he was up-to-date and on top of things

24   to be able to come in and give you an opinion like that?

25   "A.   I don't have knowledge of whether he did or he

1   didn't.  I would have been surprised, however, had he not.

2   "Q.  And you would expect that he would have?

3   "A.  Yes.

4   "Q.  And because, again, that's the way things are done?

5   "A.  Yes.

6                (Pause in proceedings.)

7       MR. CUNNINGHAM:  All right.  I'm at page 79, line 1:

8   (reading)

9       "Q.  Okay.  To your knowledge, and I realize this would

10      likely not be specific, but in terms of knowing how things

11      work, who in the chain of command would you expect to have

12      been his source, Biggs' source, just by office and

13      position?  Who would -- who would -- if you were doing his

14      job and you had to go to the Warden and tell him, 'Don't

15      worry'" --

16      MR. CUNNINGHAM:  Then there's a series of objections,

17  and the answer is -- he said:  (reading)

18      "Do you understand what he's asking?

19      "Yes.  I cannot give you -- two, I cannot give you

20      names."

21      MR. CUNNINGHAM:  Question, page 80, line 3:  (reading)

22      "Q.  I understand.

23      "A.  All right.  I would have contacted other officers in

24      that area that worked with him.  I would have had contact

25      with supervisors that supervised him.  I would have had

1    contact with inmate sources that were in and around that

2    area.  I would have utilized the information that I knew

3    from supervision of my own unit those individuals that may

4    be involved or suspected of being involved in criminal

5    activities and whether or not any of those names matched

6    up.

7    "Q.  In other words, people that -- that they had their

8    eye on for possible criminal activities were mixed up in

9    generating this complaint against --

10   "A.  I know that will shock you, Counselor, but some of

11   these folks really do maintain their involvement in

12   criminal activity."

13                  (Pause in proceedings.)

14        **MR. CUNNINGHAM:**  Question on page 82 at line 13:

15   (reading)

16   "Q.  Okay.  If there had been not 3 or 4 but 15 or 20 who

17   gave the specific information, would that have caused you

18   to question your own hypothesis?

19   "A.  That may have.

20   "Q.  Is it right to say, then, that it never came to that

21   in your recollection?

22   "A.  I don't have information that supports 15 or 20 other

23   individual complaints.

24   "Q.  Uh-huh.

25   "A.  That's not my recollection of it.

1      **"Q.** Did you ever --

2      **"A.** But, again, you have a complaint process, too."

3      **THE COURT:** Counsel, let me ask you this: How much

4  more of this testimony do you intend to go through? It's a

5  relatively lengthy transcript.

6      **MR. CUNNINGHAM:** It is lengthy, Judge, but, you know,

7  and I'm playing this on the fly so I'm just trying to make sure

8  I get in everything that would, you know, without having a

9  chance to prepare it, would be relevant. Some of it's more

10  than relevant.

11      **THE COURT:** But how much of it do you anticipate --

12  how much more testimony do you anticipate?

13      **MR. CUNNINGHAM:** There's -- we're on page -- we've

14  come to page 81. It goes to page -- well, it goes all the way

15  to page 140.

16      **THE COURT:** All right. Here's what I'm going to

17  suggest --

18      **MR. CUNNINGHAM:** Okay.

19      **THE COURT:** -- I have a few -- it's now almost 10 to

20  4:00. There's a few other things I need to take up with the

21  jury before we break for the day. Why don't you continue with

22  this first thing tomorrow morning after having had an

23  opportunity to go through and flag what you think is

24  appropriate.

25     And then I don't know if counsel wants to go through the

1  transcript and then ask other questions or how you wish to

2  proceed.

3       MR. LEWIS:  Yes, Your Honor, we would probably do

4  somewhat similar, but I think a lot of the testimony will be

5  duplicative so we can -- we will substantially narrow down

6  whatever stuff we have.

7       THE COURT:  After we're done with this testimony from

8  the deposition of Warden Curry, do plaintiffs have any further

9  witnesses to present at this time?

10      MR. CUNNINGHAM:  No, Your Honor.

11      THE COURT:  All right.  Does defense counsel then have

12  witnesses they wish to present tomorrow morning after we've

13  concluded with the deposition of Warden Curry?

14      MR. LEWIS:  Yes, Your Honor, we will.

15      THE COURT:  How many witnesses do you have?

16      MR. LEWIS:  Two, Your Honor.

17      THE COURT:  All right.

18      MR. CUNNINGHAM:  Do we know who they are?

19      THE COURT:  You can discuss that with counsel, please.

20   So it is probably fair to say that perhaps sometime by

21  tomorrow morning we may be done with the evidence in this

22  matter.

23      MR. LEWIS:  I would probably say by lunch, Your Honor,

24  depending on how long Warden Curry's deposition takes.

25      THE COURT:  All right.  Let's work on the idea that we

 1  will be done with the evidence portion by lunch tomorrow,

 2  Wednesday.  We should then probably spend some time going

 3  through the jury instructions.

 4      The parties were given proposed final jury instructions.

 5  So what I'm going to ask of you, probably, ladies and

 6  gentlemen, we'll take a little longer lunch tomorrow so that

 7  the Court and counsel can go through the jury instructions and

 8  proposed verdict form so that we have that ready.

 9      And then we can anticipate, it's up to the parties, I

10  generally think it's useful if I read the jury instructions

11  first and allow you to argue from the jury instructions or

12  would you prefer to argue first and then for the Court to read

13  the jury instructions?

14      **MR. CUNNINGHAM:**  I'd rather you read them first,

15  Judge, so we can talk about them.

16      **MR. LEWIS:**  Same here, Your Honor.

17      **THE COURT:**  All right.  So then I would read the

18  concluding jury instructions, let the parties argue; and it

19  sounds like there's a good possibility that you may get this

20  matter late tomorrow afternoon or first thing Thursday morning.

21      So why don't we do that.  We've concluded -- well, let me

22  just have the transcript for a moment.

23      There was an instruction that I had thought that I should

24  give you but I didn't at the beginning of this, but I would

25  like to read it now.

 1    The deposition is the sworn testimony of a witness taken

 2  before trial.  The witness is placed under oath to tell the

 3  truth and the lawyers for each party may ask questions.  The

 4  questions are answered and recorded.

 5    The deposition of Ben Curry, Warden, which was taken on

 6  Friday, January 29th, 2010, is currently being presented to

 7  you.  Deposition testimony is entitled to the same

 8  consideration and to be judged, insofar as possible, in the

 9  same way as if the witness had been present to testify.  Do not

10  place any significance on the behavior or tone of voices or any

11  person reading the questions or answers.

12    Ladies and gentlemen of the jury, during the

13  cross-examination of plaintiff Kenneth Trask, defense counsel

14  inquired about a case that the plaintiff had filed against

15  defendant Irwin Abanico.  That is not part of this case.  In

16  that case the court granted a motion for summary judgment.  In

17  granting the summary judgment motion, the court in that case

18  held defendant's filing of the rules violation report based on

19  his mistaken belief that plaintiff had threatened his life did

20  not violate plaintiff's constitutional rights.

21    You must decide whether the testimony of each of the

22  witnesses is truthful and accurate in part, in whole, or not at

23  all.  You must decide what weight, if any, you give to the

24  testimony of each witness.

25    In evaluating the testimony of any witness, including any

1    party to the case, you may consider, among other things, the

2    ability and opportunity the witness had to see, hear, or know

3    the things that the witness testified about; a witness' memory;

4    any interest, bias, or prejudice the witness may have; the

5    witness' intelligence; the manner of the witness while

6    testifying; and the reasonableness of the witness' testimony in

7    light of all of the evidence in this case.

8                    (Pause in proceedings.)

9         THE COURT:  And then I'd also like to caution, you

10   we're about to take our evening break during the trial, and I

11   want to remind you of the instruction I gave you earlier.

12        Until the trial is over, you're not to discuss this case

13   with anyone, including your fellow jurors, members of your

14   family, people involved in the trial, or anyone else.

15        If anyone approaches you and tries to talk to you about

16   the case, do not tell your fellow jurors but advise me about it

17   immediately.

18        Do not read or listen to any news reports of the trial.

19        Finally, remember to keep an open mind until all the

20   evidence has been received and you have heard the views of all

21   your fellow jurors.

22        I may not repeat this to you before every break that we

23   take, but please keep this in mind throughout the trial.

24        And you're excused for the afternoon and I'll see you

25   first thing tomorrow morning.  Please be ready to start at

1    9:00 a.m.

2        (Proceedings were heard out of the presence of the jury:)

3        **THE COURT:**  Counsel, let's be ready to settle the

4    instructions right after the testimony.

5        **MR. LEWIS:**  Yes, Your Honor.

6        **THE COURT:**  I assume there will be some motion

7    practice right after.

8        **MR. LEWIS:**  Yes, Your Honor, there will be.

9        **THE COURT:**  All right.

10        **MR. CUNNINGHAM:**  Judge, could I ask, did you complete

11    the instruction about the other case?

12        **THE COURT:**  I'm sorry?

13        **MR. CUNNINGHAM:**  Did you complete just now the

14    instruction you were going to give about the other case?

15        **THE COURT:**  Yes.

16        **MR. CUNNINGHAM:**  You did.  Okay.  All right.  I

17    thought that it spilled into the further discussion about, you

18    know, listening to the witness and paying attention.

19        **THE COURT:**  No.  That was a cautionary instruction

20    after I gave the other one --

21        **MR. CUNNINGHAM:**  All right.  Okay.  Thank you, Judge.

22        **THE COURT:**  -- the instruction about the other case.

23    All right.  I'll see everybody tomorrow morning.

24        **MR. CUNNINGHAM:**  Okay.  Can we have a few minutes with

25    the plaintiffs before they go?

1      **THE COURT:** Yes. You can give them a couple minutes.

2    Mr. Cunningham, I'd appreciate that you tighten this up a

3 little bit; all right?

4      **MR. CUNNINGHAM:** I will, absolutely. I was trying to

5 do it on the fly.

6      **THE CLERK:** Judge, exhibits.

7      **THE COURT:** Before anybody goes, you need to

8 coordinate with Ms. Clark to make sure that the exhibits are

9 correct and in the right order.

10    Do you need me for that?

11      **THE CLERK:** Yes, because you need to put it on the

12 record --

13      **THE COURT:** All right. Go ahead.

14      **THE CLERK:** -- which ones they want to admit.

15      **THE COURT:** All right. Why don't we start with the

16 ones that haven't been admitted but have been marked.

17      **THE CLERK:** Okay. Exhibit 6B.

18      **THE COURT:** Counsel, 6B?

19      **MR. LEWIS:** We need -- we might need to look at it to

20 make sure it doesn't have some of the materials we talked about

21 before and are not attached to it.

22    Is this the document?

23            (Pause in proceedings.)

24      **MR. QUINN:** It looks right.

25      **THE COURT:** All right. Any objection?

PROCEEDINGS

1          MR. QUINN:  No.

2          THE COURT:  6B in evidence.

3      (Plaintiffs' Exhibit 6B received in evidence)

4          THE CLERK:  6C.

5                      (Pause in proceedings.)

6          THE COURT:  Any objection?

7          MR. QUINN:  No.

8          THE COURT:  6C in evidence.

9      (Plaintiffs' Exhibit 6C received in evidence)

10         THE CLERK:  6D.

11         MR. CUNNINGHAM:  6D, this is the Morris papers.

12                      (Pause in proceedings.)

13         MR. QUINN:  Fine.

14         THE COURT:  Any objection?

15         MR. QUINN:  No.

16         THE COURT:  That's C as in Charlie?

17         THE CLERK:  D as in dog.

18         THE COURT:  6D in evidence.

19     (Plaintiffs' Exhibit 6D received in evidence)

20         THE CLERK:  6E as in Edward.

21                      (Pause in proceedings.)

22         MR. QUINN:  Just for the record, there's three pages

23 with names of other --

24         THE COURT:  I've already ruled that's not coming in.

25         MR. CUNNINGHAM:  Yes.

1                    (Pause in proceedings.)

2          **MR. CUNNINGHAM:**  All right.  The record will show,

3     Judge, we wanted these pages in, but counsel has taken them out

4     and you've ruled they should be out.

5          **THE COURT:**  That's correct.  6E as handed to the clerk

6     any objection?

7          **MR. QUINN:**  No.

8          **THE COURT:**  6E comes into evidence.

9          (Plaintiffs' Exhibit 6E received in evidence)

10         **THE CLERK:**  10.

11         **MR. CUNNINGHAM:**  10 was the Huff.

12         **THE COURT:**  Any objection?

13         **MR. QUINN:**  No.

14         **THE COURT:**  10 comes into evidence.

15         (Plaintiffs' Exhibit 10 received in evidence)

16         **THE CLERK:**  11.

17         **MR. CUNNINGHAM:**  11 was the letter from -- notice to

18    Abanico about one of the complaints.

19         **THE COURT:**  Any objection?

20         **MR. QUINN:**  No.

21         **THE COURT:**  It comes into evidence.  11 into evidence.

22         (Plaintiffs' Exhibit 11 received in evidence)

23         **THE CLERK:**  12.

24         **MR. CUNNINGHAM:**  12.

25         **THE COURT:**  Any objection?

1       MR. QUINN:  No.

2       THE COURT:  12 into evidence.

3     (Plaintiffs' Exhibit 12 received in evidence)

4       THE CLERK:  And 13.

5       MR. CUNNINGHAM:  And 13 is the same kind of paper,

6  Judge.

7       THE COURT:  Any objection?

8       MR. QUINN:  No, Your Honor.

9       THE COURT:  13 in evidence.

10    (Plaintiffs' Exhibit 13 received in evidence)

11      THE COURT:  Anything else?

12      THE CLERK:  That's it, Your Honor.

13      THE COURT:  Thank you.  See you in the morning.

14      MR. CUNNINGHAM:  Thank you, Judge.

15         (Proceedings adjourned at 4:02 p.m.)

16              ---oOo---

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTERS**

4              I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Tuesday, November 5, 2013

8

9

10

11     _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR
                    U.S. Court Reporter

13

14     _____

15        Candace L. Yount, CSR No. 2737, RMR, FCRR
                    U.S. Court Reporter

16

17

18

19

20

21

22

23

24

25