UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nandor J. Vadas, Magistrate Judge

| | |
|---|---|
| IVAN VERNORD CLEVELAND, et al., ) ) ) | |

IVAN VERNORD CLEVELAND, et          )
al.,                                )
                                    )
          Plaintiffs,               )
                                    )
   VS.                              )     NO. C 07-02809 NJV
                                    )
BEN CURRY, WARDEN, et al.,          )
                                    )
          Defendants.               )
_____)

San Francisco, California
Wednesday, November 6, 2013

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

          LAW OFFICE OF DENNIS CUNNINGHAM
          115 A Bartlett Street
          San Francisco, California  94110
     **BY:  DENNIS CUNNINGHAM, ATTORNEY AT LAW**

          THE LAW OFFICES OF JEFF WOZNIAK
          179 11th Street - 2nd Floor
          San Francisco, California  94103
     **BY:  JEFF WOZNIAK, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
             Candace L. Yount, CSR No. 2737, RMR, FCRR
             Official Reporters

**APPEARANCES**: (CONTINUED)

For Defendants:

> OFFICE OF THE ATTORNEY GENERAL
> State of California
> 455 Golden Gate Avenue - Room 11000
> San Francisco, California  94102
> BY:  **MICHAEL J. QUINN, DEPUTY ATTORNEY GENERAL**
> **KYLE A. LEWIS, DEPUTY ATTORNEY GENERAL**

# I N D E X

Wednesday, November 6, 2013

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **CURRY, BENJAMIN** | | |
| By Deposition | 409 | 3 |

| DEFENDANTS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **STOLTENBERG, TODD** | | |
| (SWORN) | 422 | 3 |
| Direct Examination by Mr. Lewis | 422 | 3 |
| Cross-Examination by Mr. Cunningham | 434 | 3 |
| Redirect Examination by Mr. Lewis | 472 | 3 |
| Recross-Examination by Mr. Cunningham | 476 | 3 |
| **ABANICO, IRWIN (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 477 | 3 |
| Direct Examination by Mr. Quinn | 478 | 3 |
| Cross-Examination by Mr. Cunningham | 494 | 3 |

# E X H I B I T S

| PLAINTIFFS' EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 14 | 448 | | 3 |
| 15 | 509 | 510 | 3 |

# E X H I B I T S

| DEFENDANTS' EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| D | 476 | | 3 |

```
 1   Wednesday - November 6, 2013                    8:53 a.m.

 2                     P R O C E E D I N G S

 3                         ---000---

 4        (Proceedings were heard out of the presence of the jury:)

 5        THE COURT:  Good morning, ladies and gentlemen.  I

 6   know we have the jury here -- please be seated -- so we can

 7   start promptly.

 8        Do the defendants have something to bring up with the

 9   Court?

10        MR. QUINN:  Good morning, Your Honor.  Michael Quinn

11   for the defendants.

12        THE COURT:  Mr. Cunningham?

13        MR. CUNNINGHAM:  Yes, sir.  I'm sorry.

14        MR. QUINN:  We just wanted to raise one brief issue

15   with the Court.

16        During -- we plan on calling Officer Abanico in to

17   testify, and we were going to try to demonstrate -- have him

18   demonstrate how a clothed body search is conducted on an

19   individual from our office; and we just want to alert the Court

20   to that and see if the Court had any objections.

21        THE COURT:  No, no objection.

22        MR. QUINN:  He can to it to the lawyer, how about

23   that?

24        THE COURT:  I'm sure that will be fine.  Maybe you'll

25   want to use one of the other COs.
```

**PROCEEDINGS**

1      MR. QUINN:  Say that again?

2      THE COURT:  Maybe use one of the other correctional

3  officers.

4      MR. QUINN:  We have an individual from our office

5  who --

6      THE COURT:  However you want to do that, I have no

7  objection.

8      MR. CUNNINGHAM:  Judge, I have a question.  I'm sorry.

9  I thought you --

10      MR. QUINN:  Just the location of putting somebody

11  against the wall, we were thinking maybe, so the jury could see

12  it, maybe by the door to the -- to my left or --

13      THE COURT:  Yeah.  There's not a lot of wall space; is

14  there?

15      THE CLERK:  You could do it over here (indicating)?

16      MR. QUINN:  It's away from the jury, though, over

17  there.

18      THE COURT:  Okay.  Well, what's --

19      MR. QUINN:  I was thinking the door.

20      THE COURT:  All right.  Yeah.  That's fine.  They can

21  do it there or maybe up against the backdoor there

22  (indicating).  I don't know.  There's not a lot of wall space.

23      Why don't you ask them if they can see it and then we can

24  go from there?  I'll ask them if they can see it.

25      MR. QUINN:  Okay.

1    **MR. CUNNINGHAM:**  From over here (indicating)?

2        **THE COURT:**  From there.  I'll say, "Can you all see

3    it?  If you'd like, you can move to the front row."  And they

4    can observe it, stand, and I'll tell them they're more than

5    welcome to stand up if they like.

6        **MR. QUINN:**  Okay.

7        **THE COURT:**  Now, the next question is:  The parties

8    stipulated to reading the transcript of Warden Curry into the

9    record.  Does that resolve the issues regarding Warden Curry?

10        **MR. CUNNINGHAM:**  Yes, Judge.

11        **MR. QUINN:**  I believe so, yes.

12        **THE COURT:**  All right.  Thank you.

13    So we'll continue now with the --

14        **MR. CUNNINGHAM:**  I have one other issue, Judge.

15    When Mr. Trask was testifying yesterday about where his

16    signature was forged on the withdrawal of the 602, we'd like to

17    get those documents in the record.  I wonder if the Court would

18    give us leave to recall him for just a moment before we rest

19    and just identify the documents.

20        **THE COURT:**  Would you stipulate to allow him to move

21    those records into evidence without Mr. Trask getting back on

22    the stand?

23        **MR. QUINN:**  If we can just look at the documents

24    beforehand.

25        **THE COURT:**  All right.  Why don't you look at it, and

1  go ahead --

2       MR. CUNNINGHAM:  At the break?

3       THE COURT:  -- at the break, and you can just move

4  them in without Mr. Trask.

5       MR. CUNNINGHAM:  All right.  Fine.  Thank you.

6       THE COURT:  All right.  Why don't we move along.

7     Oh, let me ask this -- oh, before we start, plaintiff has

8  300 -- Mr. Cunningham?

9       MR. CUNNINGHAM:  I'm sorry, Judge.

10      THE COURT:  Plaintiff has 340 minutes left.

11  Defendants have 666 minutes left.

12      MR. LEWIS:  Thank you, Your Honor.

13      MR. CUNNINGHAM:  We have 340, is that what you're

14  saying?

15      THE COURT:  That's correct.

16    Do we anticipate finishing this morning?

17      MR. LEWIS:  Yes, Your Honor.

18      MR. QUINN:  Yes.

19      THE COURT:  All right.

20      MR. CUNNINGHAM:  May we get our witness on the witness

21  stand?

22      THE COURT:  Yes.  Go ahead.

23    (Proceedings were heard in the presence of the jury:)

24      THE COURT:  Good morning, everyone.

25      ALL:  Good morning.

**PROCEEDINGS**

1    **THE COURT:**  At the conclusion of the testimony

2  yesterday, I talked to counsel and I also talked to my staff

3  for a moment, and it appears that we will finish with the

4  evidence this morning, probably by the lunch break.

5    Do the parties think that that's probably accurate?

6    **MR. CUNNINGHAM:**  Close, Judge.

7    **THE COURT:**  All right.  And here's the issue that came

8  up:

9    In chambers we talked about the fact that we still need to

10  settle the jury instructions and the verdict form before we can

11  instruct you and allow the lawyers to argue their case and then

12  allow you to go into the jury room to deliberate.

13    Rather than have you wait around here this afternoon for

14  maybe two or three hours while we do this -- and the reason we

15  have to wait till then to do it, is because we have to know

16  what the evidence actually is before we can really

17  intelligently talk about what the verdict is going to look like

18  and what the jury instructions are going to look like.  We've

19  already done a lot of the work sort of roughing things out, but

20  it will take a while to do that.

21    The long and short of it is, I think rather than having

22  you sit here and wait and then maybe not even get through the

23  instructions by the end of the day, I could release you this

24  morning at lunchtime and then you'd come back tomorrow morning,

25  which is still Thursday, which is well within the time that we

1  talked about, we can instruct you, argue, and you can be in the

2  jury room probably by 11:00 tomorrow.

3      How does that sound?

4          **ALL:**  That sounds great.

5          **THE COURT:**  So everybody agrees that you can be

6  released this afternoon at lunchtime and then come back at

7  9:00?

8                  (Jurors nod heads.)

9          **THE COURT:**  All right.  Great.  Thanks so much.

10      All right.  Mr. Cunningham?

11          **MR. CUNNINGHAM:**  Yes, sir.

12                  **BENJAMIN CURRY,**

13  called as a witness for the Plaintiffs, having been duly sworn,

14  was examined and testified through **DEPOSITION TESTIMONY** as

15  follows:

16      **(Transcript of deposition testimony as read by Dennis**

17  **Cunningham and Douglas Lubes:)**

18          **MR. CUNNINGHAM:**  Judge, we were on page 81, I think,

19  or thereabouts.  I'm going to go back and just pick it up in

20  the middle of page 81, if the Court please, at line 12,

21  question -- are you all right, Mr. Witness?

22          **MR. LUBES:**  Yes.

23          **MR. CUNNINGHAM:**  All right.  (reading)

24      **"Q.**  The issue about the possibility that Abanico was

25      molesting guys and there was going to be some -- there was

1   a danger and a security problem was going to be ongoing.

2   "A.  I didn't feel that Abanico's safety was imminently

3   being jeopardized at that point.  I already told you that

4   I had some reservations about the veracity of the

5   complaint itself.  My experience with that number of names

6   attached to the complaint and what I felt was not

7   necessarily 150 mad guys were more likely three to four.

8   "Q.  Just three or four?

9   "A.  That's a speculative number.  I do not believe there

10  was 150, though.

11  "Q.  What about 20 or 30?

12  "A.  Counselor, I can't give you an answer to that.

13  "Q.  Did --

14  "A.  I do not believe there was a majority.  I do not

15  believe --

16  "Q.  Majority of the 150 you mean?

17  "A.  Exactly.  I do not believe that there was a

18  significant number of them either.

19  "Q.  At that point did you find out whether there were any

20  other specific complaints beside the one that everybody

21  signed?

22  "A.  I don't recall if I did or not.

23  "Q.  Okay.  If there had been not 3 or 4 but 15 or 20 who

24  gave specific information, would that have caused you to

25  question your own hypothesis?

1    **"A.**  It may have.

2    **"Q.**  Is it right to say, then, that it never came to that

3    in your recollection?

4    **"A.**  I don't have information that supports 15 or 20 other

5    individual complaints."

6    **MR. CUNNINGHAM:**  All right.  I'm over on page 83,

7  middle of page, middle of the text there, line 10:  (reading)

8    **"Q.**  Did you set any kind of follow-up with anyone that

9    there would be a special watch on him, Abanico, or that

10    there would be any kind of ongoing attention to the

11    possibility that there was something to that?

12    **"A.**  The fact that I'd asked a number of questions of

13    multiple sources, IST, the Deputy Warden, the Security

14    Squad lieutenant --

15    **"Q.**  And IST, again?  I'm sorry.

16    **"A.**  In-Service Training.

17    **"Q.**  Okay.

18    **"A.**  -- provided more than ample motivation to know that

19    the Administration was looking at this.  This wasn't, you

20    know, that knowledge ultimately, I believe, motivated

21    Mr. Abanico to come see me.

22    **"Q.**  And is it right that that was all on his initiative,

23    you didn't put out the word?

24    **"A.**  I didn't ask to see him.

25    **"Q.**  You didn't say, 'We ought to talk to this guy'?

1  "A.  No.

2  "Q.  Did Biggs tell you he had talked to him?

3  "A.  No, he did not tell me that.  Mr. Biggs used to be

4  the union chapter president here.

5  "Q.  Uh-huh.

6  "A.  His sources and contacts with rank and file are

7  numerous.

8  "Q.  Okay.

9  "A.  The fact that he had looked into it, it would have

10  been a shock to me that Abanico didn't know that.

11  "Q.  Uh-huh.

12  "A.  Fair enough.  I mean, that's --

13  "Q.  So, okay.

14  "A.  So did I ask to see Abanico?  No, I did not."

15      MR. CUNNINGHAM:  All right.  Hold up a second.

16              (Pause in proceedings.)

17      MR. CUNNINGHAM:  (reading)

18  "Q.  Okay.  And you don't have any knowledge of anybody

19  saying to him, 'You ought to go and see the Warden and get

20  this straightened out'?

21  "A.  No, I don't, but I'm not surprised if somebody did

22  either.

23  "Q.  Okay.  So what happened in that meeting" -- I'm

24  sorry.  We're over on page 85, now, bottom of the page --

25  "in that meeting with Abanico?  What did you say and what

1    did he say and what did you say and what did he say?

2    What's your best recollection of the substance of that

3    conversation?"

4    **MR. CUNNINGHAM:** Down to line 14: (reading)

5    **"A.** Okay. Abanico came to see me; and during that

6    conversation, he tried to explain himself in terms of why

7    there were so many concerns about how he was doing his

8    job, and he wanted to assure me that he was not doing

9    anything other than doing a clothed body search the way

10    he'd been trained to do that in the Academy.

11    "My response to him was, 'There is a lot of names on

12    this appeal and your name in this particular situation is

13    the only name that's coming up. So you're going to have

14    to find a way to do your searches without creating so much

15    hate and discontent.'

16    "And he said, 'I'm just doing it the way they taught

17    me to do them in the Academy.'

18    "He demonstrated it to me, and by this time I was well

19    aware of the cupping of the genitals thing; but he was

20    earnest, and I listened to his conversation with me and I

21    came away convinced that he was being honest with me. And

22    I thought there must be something else going on here that

23    I'm missing, that I'm not seeing. I began at that point

24    to question the sources of the complaint.

25    **"Q.** And did we pin down about when it was that this

1    happened?"

2         MR. CUNNINGHAM:  That's at line 12, line 14:

3    (reading)

4         "A.  I don't -- I don't have a recollection of exactly

5         when it happened.

6         "Q.  And would there be --

7         "A.  In terms of the events, I'm not really sure.

8         "Q.  Would there be some kind of record of his visit to

9         you or that conversation?

10        "A.  There may be a record in the Warden's office in the

11        secretary's office.  She may -- if she still has them.

12        "Q.  Of the appointment?

13        "A.  Yes.

14        "Q.  You didn't write a memo about it or anything?

15        "A.  Well, of course, not.  Yeah, I meet with employees

16        all the time.  I don't write memos about my meetings with

17        employees.

18             MR. CUNNINGHAM:  All right.  Now, down to page 88,

19   line 2:  (reading)

20        "Q.  I need to make sure of what you do and don't remember

21        in that regard.

22             "When we were talking about -- earlier about the

23        timing, was it -- was it your recollection that this" --

24        the meetings we're still about -- "say, was in the first

25        year after you got here that you had the conversation with

1    him?

2    **"A.**  I don't want to respond to that because I'm not sure.

3    **"Q.**  You can't tell, okay.

4    **"A.**  Okay.  I can tell you that the complaint came in.  My

5    first conversation was with the Deputy -- was with the

6    Deputy Knoll about it.  That led to, after her getting

7    back to me with, 'He's just doing his job, and this is

8    what he is being taught.'

9       "That led me to a conversation with Peterson about

10   exactly, you know, what was being taught, which led to a

11   conversation with the Security Squad lieutenant, you know,

12   'What do you know about this?  What are you hearing?

13   What's going on here?'  And then a conversation with

14   Abanico.

15   **"Q.**  Okay.

16   **"A.**  That's kind of what I remember.  I can't tell you

17   exactly, you know, calendar day, year.  I don't remember.

18   **"Q.**  I understand."

19      **MR. CUNNINGHAM:**  Now you're up at the top of page 89,

20   line 1:  (reading)

21   **"A.**  But I can tell you, though, I'm pretty certain that

22   was the sequence.  I wanted to satisfy myself as to the

23   legitimacy of the complaint itself.  You know, I certainly

24   was well aware of what my obligations were.

25      "Additionally, I believe I may have talked to Colleen

1    one more time about it to -- just to satisfy myself; and

2    at that point, I'm not certain, but I may have been

3    responding to the court, to Monterey maybe, possibly.

4    "Q.  I think there was some activity there, yes.

5    "A.  I think there was a report submitted.

6    "Q.  Okay.

7    "A.  Grand Jury proceeding."

8       MR. CUNNINGHAM:  Now, down on page 90, I'm at line 9:

9  (reading)

10    "Q.  Was there ever any discussion about putting him into

11    a different job, Abanico?

12    "A.  I can't tell you for -- I don't remember that.  There

13    may have been, though.  Possibly.  I just don't know.

14    "Q.  To your knowledge he wasn't moved?

15    "A.  I don't want to say to my knowledge, because I don't

16    remember.

17    "Q.  Okay.

18    "A.  I don't remember, but certainly that would have been

19    a possibility.

20    "Q.  Would it have been a possibility to decide to put him

21    in a job where he didn't have that responsibility to do

22    clothed body searches?

23    "A.  Not necessarily.

24    "Q.  Okay.  Did -- after the follow-up conversation with

25    Ms. Knoll, was it ever brought back to you -- your

1      attention again that there was a continuing problem with

2      Abanico against -- along these same lines?

3      **A.**   No.  The issue seemed to die really.  Yeah, I don't

4      know why, but I think we may have moved him; and I'm --

5      **Q.**   But do you" --

6          MR. CUNNINGHAM:  Well, stop right there.

7                  (Pause in proceedings.)

8          MR. CUNNINGHAM:  All right.  I'm all the way over now

9      on page 110, he was shown the document:  (reading)

10     **Q.**   Looking at the document, do you see three boxes" --

11         MR. CUNNINGHAM:  I'm sorry.  I'm starting at line 19,

12     you're at line 22 -- no.  I'm at line 22:  (reading)

13     **Q.**   Looking at that document, do you see the three boxes

14     in the first paragraph there, under the first paragraph?

15     **A.**   Uh-huh.

16     **Q.**   That's -- that's where the staff determines whether

17     or not there will be an Internal Affairs investigation

18     requested or whether it will be handled in-house or

19     whether it will even be -- will even go any further.

20     **A.**   This is a document that's used to document the case

21     conference between the appeals coordinator and the Chief

22     Deputy Warden.  Okay, that's what this is for.

23     **Q.**   Okay.  And we have whoever was the -- would have been

24     the Chief Deputy Warden's signature that's blocked out

25     there on the left toward the bottom?

1    **"A.**  Yeah.

2    **"Q.**  Okay.  And here -- and this, frankly, is one of the

3    few places I have seen it just baldly stated -- in the

4    handwritten entry at the lines at the bottom of the page

5    there you have the plain allegation sexual assault;

6    correct?  Right?

7    **"A.**  Uh-huh.  He alleges that the officer conducts sexual

8    assault during clothed body searches.

9    **"Q.**  Okay.

10   **"A.**  That is the group appeal.  I'm assuming this is the

11   one that was attached to the 150 names.

12   **"Q.**  I believe so.

13   **"A.**  Okay.

14   **"Q.**  And for the record, that's case 3011 that was brought

15   by Cleveland; and that is, I'll represent, in the file the

16   one that's signed by all of the names.  There's two of

17   them, I think, in that folio that's in front of you.

18   There's all the names.

19   **"A.**  Right."

20        **MR. CUNNINGHAM:**  Well, okay.

21             (Pause in proceedings.)

22        **MR. CUNNINGHAM:**  Going on:  (reading)

23   **"A.**  This is signed off by Barker.  That's" --

24        **MR. CUNNINGHAM:**  Wait.  Wait.  Wait.  No.  I'm sorry.

25   Not you.  Me.  That's --

1      **THE COURT:**  Just read the question.

2      **MR. CUNNINGHAM:**  Let me just get a question.

3      (Pause in proceedings.)

4      **MR. CUNNINGHAM:**  On page 119 at line 20:  (reading)

5      "**Q.**  Okay.  So then -- then it would be -- it would be

6      part of a protocol, then, that you would not review the

7      paperwork, you would deal with the presentation that was

8      made to you if you had to and make a decision as to

9      whether or not to request the Internal Affairs?"

10      **MR. CUNNINGHAM:**  Down to line 8 on page 120:

11  (reading)

12      "**A.**  Had I looked at it, I would have referred it to the

13      Deputy for generation of the Internal Affairs

14      investigation, had I felt that an IA was warranted based

15      on the information collected, if there was enough smoke

16      there to believe there would be a fire.

17      "**Q.**  Okay.

18      "**A.**  And by a fire, I mean, I want to see the twigs

19      burning.

20      "**Q.**  You want some outside people to come in and look at

21      it?

22      "**A.**  I don't want somebody's rumor off the mainline here,

23      and I don't want somebody just signing a piece of paper in

24      cellblock housing somewhere because they stuck it in front

25      of them to sign.  I want to know what the factual

1     information is, what I saw, what I know.  That's the

2     information I'm interested in."

3              (Pause in proceedings.)

4        **MR. CUNNINGHAM:**  Okay.  Now we're over on page 129.

5 I'm starting at line 20:  (reading)

6     **"Q.**  I understand that.  My only question at this point is

7     whether or not you recall, once the process that you

8     described had occurred and you had had this last

9     discussion with Colleen Knoll, and I think your testimony

10    has been that it was never brought back to you again, you

11    never again, as best you recall --

12    **"A.**  Not that I recall.

13    **"Q.**  -- were told that Abanico was --

14    **"A.**  It never came up to me again, and which I must tell

15    you I did kind of reaffirm my suspicions.  I have to say

16    that.

17    **"Q.**  That this was meritless?

18    **"A.**  Yeah, that it wasn't necessarily sexual assault as

19    much as it -- as much was it -- was his methods and

20    potentially some attempt to evade or hide some other

21    activities."

22             (Pause in proceedings.)

23        **MR. CUNNINGHAM:**  I'm on page 131 -- excuse me just a

24 second here.

25             (Pause in proceedings.)

1       **MR. CUNNINGHAM:**  Question at line 7:  (reading)

2       **"Q.**  I'm responding to his question about whether we

3       had --

4       **"A.**  The additional complaints were never brought to my

5       attention again."

6       **MR. CUNNINGHAM:**  All right.

7                    (Pause in proceedings.)

8       **MR. CUNNINGHAM:**  That's all we have, Judge.

9       **THE COURT:**  All right.  Thank you.

10      Let me ask defense counsel.  Do you intend to read -- hold

11      on for just a moment -- do you intend to read additional

12      excerpts from the Curry transcript into the record?

13      **MR. QUINN:**  No, Your Honor.

14      **THE COURT:**  All right.  Thank you.  You may step down.

15                    (Mr. Lubes exiting witness stand.)

16      **THE COURT:**  Do plaintiffs have further witnesses?

17      **MR. CUNNINGHAM:**  No, other than the matter that I

18      spoke to you about that we're going to have further discussion

19      about.  So we would defer -- we would rest otherwise.

20      **THE COURT:**  Well, I think we agreed that that could be

21      taken --

22      **MR. CUNNINGHAM:**  Yeah.  Oh, okay.

23      **THE COURT:**  -- outside the presence of the jury.

24      **MR. CUNNINGHAM:**  Yes.  Yes, that's what I mean.

25      **THE COURT:**  So plaintiffs rest?

1        MR. CUNNINGHAM:  Subject to that other possible

2   addition to the evidence, yes.

3        THE COURT:  All right.

4        MR. LEWIS:  Your Honor, we may have to have a quick

5   sidebar.

6        (Sidebar conference heard but not reported.)

7        MR. LEWIS:  Your Honor, defendant will now call

8   Lieutenant Todd Stoltenberg.

9        THE CLERK:  Will you please come forward and take the

10  witness stand?

11     Raise your right hand.

12                    **TODD STOLTENBERG**,

13  called as a witness for the Defendants, having been duly sworn,

14  testified as follows:

15        THE WITNESS:  I do.

16        THE CLERK:  Please be seated.

17     Please state your full name for the Court and spell your

18  last name.

19        THE WITNESS:  Todd Stoltenberg, S-T-O-L-T-E-N-B-E-R-G.

20        THE COURT:  Good morning.

21        THE CLERK:  Thank you.

22        THE WITNESS:  Good morning.  How are you?

23                  **DIRECT EXAMINATION**

24  BY MR. LEWIS:

25  **Q.**   Good morning, Lieutenant Stoltenberg.

1   **A.**   Good morning.

2   **Q.**   What is your current position within the California

3   Department of Corrections and Rehabilitation?

4   **A.**   I'm the correctional lieutenant assigned to the

5   Correctional Training Center in Galt.

6   **Q.**   And how long have you held this position at the

7   Correctional Training Center in Galt?

8   **A.**   Since 2007.

9   **Q.**   And what are your responsibilities at the Training

10  Academy?

11  **A.**   I'm the Office of Training Professional Development

12  Curriculum lieutenant and the Field Training and Compliance

13  Unit lieutenant.

14  **Q.**   And as the compliance officer and the training officer

15  that you described, what are some of the responsibilities of

16  that particular position?

17  **A.**   That we design the curriculum and implement it for the

18  training both at the Academy and at the institutions.

19  **Q.**   And the curriculum that you cover, what kind of materials

20  does that material -- or does that training pertain to?

21  **A.**   What we are mandated under Penal Code 832, the California

22  Code of Regulations, and Title 15, and our DOM.

23  **Q.**   And by "DOM" you mean?

24  **A.**   Department Operational Manual.

25  **Q.**   And that is specific, that DOM or that Department

1    Operation Manual is specific to the California Department of

2    Corrections and Rehabilitation?

3    **A.**    Correct.

4    **Q.**    Are correctional officers considered peace officers?

5    **A.**    Yes.

6    **Q.**    And, so, then as peace officers, do they have mandated

7    training?

8    **A.**    Yes, they do.

9    **Q.**    And is that the kind of training that you're talking about

10   under Penal Code, Section 832?

11   **A.**    Yes.   Penal Code 832 basically says, and I'm paraphrasing,

12   that it sets the standards for our training.

13   **Q.**    And is one of the responsibilities or duties that you have

14   to train to involve search and seizure of persons?

15   **A.**    Yes.

16   **Q.**    And in the correctional setting does that include search

17   and seizure of prisoners?

18   **A.**    Search of inmates and their cells, their living quarters,

19   the grounds, everything inside the institution, yes.

20   **Q.**    And by Department Operations Manual, what is the

21   Department Operations Manual?

22   **A.**    It gives us our guidelines on what we're supposed to do as

23   employees of that department.

24   **Q.**    I'm now going to show you what has been previously marked

25   as Defendants' Exhibit A3.

1      **THE COURT:**  Do you have that, Lisa?

2      **THE CLERK:**  Yes.

3  BY MR. LEWIS:

4  Q.    Could you please look that over?

5  A.    (Witness examines document.)

6  Q.    Does that look familiar to you?

7  A.    Yeah.  It's the 2007 version.

8  Q.    Is this the Department Operations Manual or an excerpt of

9  the Department Operations Manual?

10  A.    Yes, it is.

11  Q.    I'd like you to look at the second page of that exhibit,

12  and there's a section number that is titled "Searches of" --

13  it's titled "Clothed Body Searches," and it's in the middle of

14  the page on the right-hand side.

15  A.    Okay.

16      **THE COURT:**  Counsel, just so that we're clear, this

17  was the excerpt of the Department manual as it was in effect in

18  2007; right?

19      **THE WITNESS:**  Correct.

20      **THE COURT:**  Okay.

21      **MR. LEWIS:**  Yes, Your Honor.

22  Q.   And, Lieutenant Stoltenberg, the manual is updated -- in

23  your experience, is the Department Operations Manual updated

24  regularly?

25  A.    Annually.

1  Q.   So, then, this version that's in 2007, that had been

2  revised in 2007, does it -- it goes back in time as well as

3  forward in time, so it includes information or regulations that

4  existed in 2006 but then were updated in 2007?

5  A.   Correct.

6  Q.   And in the section marked -- on the middle of the

7  right-hand side it says "Section 52050.18.2, Clothed Body

8  Searches."  Does that describe the Department's procedures,

9  roughly, regarding the purpose of clothed body searches?

10 A.   (Witness examines document.)  Yes.

11 Q.   What does it generally say about how clothed body

12 searches -- what their purpose is or how they're to be

13 conducted?

14 A.   That they will be done in a random fashion, not more

15 than -- no more frequent than is necessary to control

16 contraband and items of, you know, concern to the institution.

17 Q.   And then does this kind of operations manual in

18 combination with the Penal Code 832, does it build what you

19 have to instruct your students on?

20 A.   Yes, it -- basically it's an extraction from what we put

21 in our training documents.

22 Q.   And at the Academy, does your particular section review or

23 publish curriculum on how to do searches of inmates?

24 A.   Yes.

25 Q.   And do you also teach other subjects besides searching?

1    A.    Yes.

2    Q.    What are some of those subjects?

3    A.    Report writing, application of restraint gear, arrest and

4    control methods, baton use, weapons training, which is a large

5    part of the Academy.

6    Q.    Are students at the Academy taught with classroom

7    instruction?

8    A.    Classroom and then hands-on.

9    Q.    And, so, classroom --

10         MR. CUNNINGHAM:  I'm sorry.  I didn't hear the last

11   part of the answer.  Classroom?

12         THE WITNESS:  Classroom and hands-on, meaning actual

13   reality based.

14         MR. CUNNINGHAM:  Hands-on.  Thank you.

15   BY MR. LEWIS:

16   Q.    Are they issued publications during their classroom

17   instruction?

18   A.    Yes.  They're issued workbooks.

19   Q.    I'm now going to show you what's previously been marked as

20   Defendants' Exhibit A1.

21         MR. CUNNINGHAM:  Yes.

22   BY MR. LEWIS:

23   Q.    I ask you to take a look at that.

24   A.    (Witness examines document.)

25   Q.    Does that document look familiar to you?

1    **A.**    Yeah.  It's a workbook.

2    **Q.**    And is that -- what is that workbook?  What is it?

3    **A.**    It's a workbook that we give our trainees in this

4    particular case that will cover body, cell, area, and grid

5    search.

6    **Q.**    So that is a workbook that's given to students to help

7    educate them regarding how to conduct body searches?

8    **A.**    Yes.

9    **Q.**    Is there a date on the front page of that document?

10    **A.**    Yes.  It's a CPOST approved December 10th, 2003.

11    **Q.**    So what does the "CPOST approved" and that date mean?

12    **A.**    "CPOST" stands for Correctional Peace Officer Standards

13    and Training, and the date is when that body approved it,

14    section body approved it.

15    **Q.**    And do you recognize that as a training manual that your

16    office uses?

17    **A.**    Yes.

18    **Q.**    Is that what is trained to cadets in the Academy?

19    **A.**    Yes.

20    **Q.**    All right.  Now I'd like you to look at page 16 of that

21    document.

22    **A.**    (Witness examines document.)

23    **Q.**    And can you generally describe what page 16 discusses?

24    **A.**    (Witness examines document.)  It's -- it's the middle

25    portion of a clothed body search.

1  **Q.**   Does that thing -- does that document say anything about

2  how to search an inmate's hip, buttock, or groin area?

3  **A.**   Yes, it does.

4  **Q.**   What does it say about how to search an inmate's groin

5  area?

6  **A.**   (Witness examines document.)  Do you want me to read --

7  **Q.**   Please read, yes.

8  **A.**   Where it says "Male Inmates" or "Female Inmates"?

9  **Q.**   "Male Inmates."

10 **A.**   It says:  (reading)

11      "Cup the groin to check for contraband.  Do not

12      squeeze the inmate's scrotum."

13 **Q.**   Is this how correctional officers are trained to search

14 inmate groin area?

15 **A.**   Yes.

16 **Q.**   So in your own words, how are they taught to -- how does

17 the staff that works for you teach new correctional officers

18 how to search inmates in their groin area?

19 **A.**   Well, basically we tell them that that is one of the

20 better hiding places for them to transport contraband,

21 whatever; but, you know, it's a sensitive area, and you have to

22 be careful about it.  And it has to be searched, so whether we

23 sweep with the front of the hand and we touch their whole body

24 basically.

25 **Q.**   And what kind of things are officers looking for when

1    they're searching a groin area or a body?

2    **A.**    Contraband, such as, you know, what we call kites, which

3    are notes transported between inmate-inmate or whatever; drugs;

4    tattoo paraphernalia; tobacco; food; weapons.

5    **Q.**    And are these items a threat to prison operations?

6    **A.**    Yes.

7    **Q.**    Why?

8    **A.**    Well, it can put -- you know, our job is to protect the

9    public, first of all, and that means keeping these inmates in

10   custody; but it can present problems for staff, for inmates,

11   and the institution as a whole.

12       When you introduce contraband, basically everything that I

13   mentioned can be bartered or traded.  It's like money.

14   **Q.**    So then the Department has an interest in finding this

15   stuff?

16   **A.**    Correct.

17   **Q.**    And you said that officers are instructed to cup the groin

18   area.  How is that cupping done?  Can you show with your hand

19   how that cupping is done, how officers instruct or how your

20   training officers instruct other officers?

21   **A.**    Well, so if I'm behind the inmate and you reach and your

22   hand is cupped, and then you sweep and then you come back

23   through.

24   **Q.**    And what's that sweeping motion?  How does --

25   **A.**    Basically from pocket to pocket.  So from your belt all

1    the way down to --

2        THE COURT:  Why don't you -- if you're going to

3    demonstrate, why don't you stand up so the jury can see what

4    you're doing.

5        THE WITNESS:  Well, I can't really do it on myself.

6        THE COURT:  No, but, I know, but you were making --

7        THE WITNESS:  So when you reach underneath, you go up

8    above the belt area and sweep, and then come back through.

9    BY MR. LEWIS:

10   Q.   And is a sweep from a hip to hip?

11   A.   From what we call pocket to pocket.

12       MR. LEWIS:  All right.  And, so, for the record the

13   witness has stood up and was making a sweeping motion with his

14   hand across his body in the groin region.

15   Q.   Would that be correct to say?

16   A.   Right.  From your waistline to....

17   Q.   And then afterwards are they taught to pull their hand out

18   through the groin area?

19   A.   Yes.

20   Q.   And are they taught to do -- why are they taught to do

21   that?

22   A.   In case there's anything hidden there, they can feel it,

23   and that's why I think it specifically says in there to do not

24   squeeze the scrotum.

25   Q.   But it does say to cup the groin?

1  **A.**   Yes.

2  **Q.**   And why is it important -- is there a danger if officers

3  don't sweep or search the groin area?

4  **A.**   Yes, for what I mentioned earlier as far as, you know,

5  transporting contraband.  I mean, that's dangerous for

6  everybody that works in there.

7  **Q.**   And before you were a lieutenant --

8  **A.**   Or lives there.

9  **Q.**   I'm sorry.

10     Before you were a lieutenant at the training Academy, what

11  other positions have you held at CDCR?

12  **A.**   I was an officer at San Quentin for 12 and a half years or

13  I was assigned as an officer, as a sergeant and a lieutenant at

14  San Quentin for 12 and a half years.

15  **Q.**   And during that time at San Quentin for 12 years, what

16  kinds of positions did you hold?

17  **A.**   As an officer, I pretty much worked everywhere.  In the

18  housing unit, on the yard.  As a sergeant, I did a lot of work

19  in control in the housing units and in the watch office; R & R,

20  receiving and release.  As a lieutenant, the housing unit and

21  watch commander.

22  **Q.**   During that time, did you have contact with inmates such

23  that you would conduct clothed body searches on inmates at

24  San Quentin?

25  **A.**   Yes.

1    Q.   And during your time as an officer at San Quentin

2    conducting clothed body searches, did you ever find contraband

3    on inmates in their groin area?

4    A.   Yeah, quite frequently.

5    Q.   What kinds of items did you find?

6    A.   Tattoo paraphernalia, drugs, tobacco, and a lot of food

7    items.

8    Q.   Food items?

9    A.   Food.

10   Q.   So you found food items in their groin?

11   A.   Yeah.

12   Q.   Once out of the Academy, do officers receive further

13   training on their duties once they're in the individual

14   institutions?

15   A.   Yes.  That's the other part of the job that I was -- that

16   I'm responsible for, is the Field Training and Compliance Unit.

17   We put out training material and curriculum to the IST offices

18   to make sure that in their off-POST training they receive this

19   updated annual training.

20   Q.   And what subjects are instructed?

21   A.   Again, range, baton, chemical agents, alarm response,

22   emergency operations, searching, in some cases report writing.

23   Q.   And as part of that searching curriculum, are officers

24   retrained regarding how to conduct clothed body searches?

25   A.   Yes.  It's more of a refresher, yes.

1    **Q.**    And is this refresher training uniform across all CDCR

2    institutions?

3    **A.**    Yes.

4    **Q.**    And is your office -- I guess, is your office responsible

5    for ensuring that it's uniform?

6    **A.**    Yes.

7    **Q.**    And are officers still instructed to cup the groin?

8    **A.**    Yes.

9    **Q.**    So today officers in CDCR are still instructed to cup the

10   groin during a clothed body search?

11   **A.**    Yeah.  This is the same one that's used only.  It's been

12   updated, different date.

13         **MR. LEWIS:**  All right.  Thank you.  No further

14   questions.

15         **THE COURT:**  Cross-examination?

16         **MR. CUNNINGHAM:**  Yes, Your Honor.  Thank you.

17                       <u>**CROSS-EXAMINATION**</u>

18   **BY MR. CUNNINGHAM:**

19   **Q.**    Good morning, Lieutenant.

20   **A.**    Good morning.  How are you?

21   **Q.**    I'm good.  How about yourself?

22   **A.**    Good.

23   **Q.**    All right.  Have you been briefed about the specifics of

24   this case?

25   **A.**    Not necessarily, no.

1  **Q.**  What the accusation is or anything like that?  You don't

2  know that?

3  **A.**  All's I know is I was contacted by Mr. Lewis saying that

4  he was discussing with me how inmates were searched, and that

5  it was a federal case; and he told me exactly -- he just said

6  that -- I think he said sexual harassment.

7  **Q.**  All right.  So you did know that and you do know that this

8  is about a claim or claims that during clothed body searches

9  there was a squeezing of the genitals and of the penis and

10  gestures like that; is that right?

11       **MR. LEWIS:**  Objection.  Misstates the testimony,

12  Your Honor.

13       **THE COURT:**  Overruled.  I'll allow him to answer the

14  question.

15       **THE WITNESS:**  No, that wasn't disclosed to me.

16  **BY MR. CUNNINGHAM:**

17  **Q.**  All right.  Well, I'm disclosing it now, all right,

18  that --

19  **A.**  Okay.

20  **Q.**  -- that this is --

21       **THE COURT:**  Proceed by questions and answers.

22       **MR. CUNNINGHAM:**  Yes, sir.

23  **Q.**  Do you have any problem discussing that aspect of the

24  issue of clothed body searches and cupping the groin,

25  et cetera?

1    **A.**    No.

2    **Q.**    In the training that is given and with the use of the

3    manual, the manual is quite detailed in terms of how the search

4    should proceed from step to step to step; right?

5    **A.**    Yes.

6    **Q.**    That almost every part of the body is covered by a

7    separate question or instruction the way it's written out;

8    fair?

9    **A.**    Yes.

10   **Q.**    And they're tested on that, as they go through, have they

11   absorbed the knowledge of what the trainers expect them to

12   understand about how to do these searches; fair?

13   **A.**    Yes.

14   **Q.**    Uh-huh.  And these are -- as counsel pointed out, this

15   stuff is codified in Penal Code 832, and in Title 15, and in

16   your operations manual, and in the training manual; correct?

17   **A.**    Correct.

18   **Q.**    Uh-huh.  And, obviously, the purpose of it is, as you

19   testified, as part of the overall effort to control or at least

20   retard any contraband traffic in and out of the institution;

21   right?  In the institution.

22   **A.**    Or coming into it, yeah.

23   **Q.**    Yeah.  And coming into it is also an issue; right?  The

24   same kind of searches are done on family members who come to

25   visit on occasion; correct?

1    A.    Not necessarily, but they're put through a different type

2    of screening, yeah.

3    Q.    But they're -- in other words, there are methods applied

4    to screen for contraband coming in?

5    A.    Correct.

6    Q.    And how about staff, does the staff go through these

7    clothed body searches?

8    A.    No.

9    Q.    Do they go through -- what kind -- do they go through any

10   search when they come into the institution, come to work?

11   A.    No.  They basically know what they're allowed to bring in

12   and what they're not allowed to bring in.

13   Q.    Uh-huh.  But -- well, is it fair -- is it fair to say the

14   flow of contraband pretty much never stops in these

15   institutions; isn't that right?

16         MR. LEWIS:    Objection.  Calls for speculation.

17         THE COURT:    Given what he's testified to already, I'll

18   direct --

19         MR. LEWIS:    Withdrawn, Your Honor.

20         THE COURT:    I think he has knowledge of that.

21   Overruled.

22                       (Pause in proceedings.)

23   BY MR. CUNNINGHAM:

24   Q.    So the question is:  It's fair to say the flow of

25   contraband never stops, it's always a continuing problem in the

1  institution and in and out of the institution; fair?

2  **A.**   Yes, but that doesn't mean that we shouldn't try to deter

3  it and prevent it as much as we possibly can.

4  **Q.**   Oh, of course, not.  And that's the reason that they have

5  the provision for not just random clothed body searches but

6  further searches, strip-searches, whatever, when there is a

7  reasonable suspicion established in a clothed body search;

8  correct?

9  **A.**   Yes.

10  **Q.**   And is it not also the case that when a -- when an officer

11  does a clothed body search and believes that he or she has

12  detected some foreign object under the clothing, then the

13  prisoner is taken to some special place and strip-searched

14  normally; right?

15  **A.**   Yes, that is normal procedure, but there is some

16  discretion there.

17  **Q.**   Discretion for who?

18  **A.**   Depending on what they find.

19  **Q.**   Uh-huh.  But I'm saying if they feel -- if they feel that

20  there is something there, then are they authorized to go inside

21  the clothing and get it or do you have to go to the

22  strip-search then?

23  **A.**   Well, I can't speak to every single case; but, like I

24  said, if you're doing the clothed body search the correct way,

25  you'd ask the inmate if they have anything on them.  And a lot

1    of times we ask them to turn their pockets inside out; and if

2    we have an another cover officer, those items that they take

3    out of their -- off their person are given to that cover

4    officer.  So after that, if they still have items on them,

5    yeah, it's going to probably be a little more of an intense

6    search.

7    **Q.**   Okay.  When you say "the cover officer," this is a second

8    officer that's normally present when a clothed body search is

9    performed?

10   **A.**   Well, not all the time but there should be somebody there.

11   It's a good idea to always have somebody there.

12   **Q.**   Uh-huh.  And when it's -- when the searches are being done

13   at random in corridor traffic where there are a lot of inmates

14   passing back and forth, they normally have a cover officer who

15   watches the traffic while the other officer does the search on

16   the wall; is that right?

17   **A.**   I would hope so.  I can't speak for every institution,

18   sir.

19   **Q.**   I understand.  But that would be what you would teach and

20   what you would hope would happen, what you would expect to be

21   the practice?

22   **A.**   What we teach, yes.

23   **Q.**   And they do -- they are taught, as well as in connection

24   with the clothed body search, to get the inmate against the

25   wall; correct?

1   **A.**   Yes, that's a method.

2   **Q.**   Put his hands up on the wall and lean, pull the feet back

3   and legs apart and lean so that the weight is against the wall

4   on the hands?

5   **A.**   Yes.  So we have a position of advantage, yes.

6   **Q.**   Yes.  And do you teach, then, that the search should be

7   done with both hands up and down the leg or in the body, or is

8   it done only with one hand?

9   **A.**   We teach with you put one hand on the collar normally and

10  the other hand is the one that's doing the searching.

11  **Q.**   Okay.  And when you say "on the collar," you grab ahold of

12  the collar of the clothing?

13  **A.**   Yes.

14  **Q.**   Okay.

15  **A.**   On occasion.

16  **Q.**   But you don't -- you put it up there in the back of the

17  neck --

18  **A.**   Right.

19  **Q.**   -- area?

20  **A.**   Correct.

21  **Q.**   Okay.  How about in the middle of the back?

22  **A.**   Do we put our hand in the middle?

23  **Q.**   Yeah.  Is that acceptable?  As opposed to up at the top,

24  is the middle of the back a reasonable way to do it?

25  **A.**   I guess you could do it that way.  That's not the way we

1    teach it but, okay.

2    **Q.**    You teach it up at the neck?

3    **A.**    Right.

4    **Q.**    And do you teach them that it's okay to put the elbow in

5    the back, in the small of the back, and lean on the prisoner's

6    body that way while they're searching with the other hand?

7    **A.**    Sir, the way I teach it is if I grab your collar, my whole

8    harm is against your back.

9    **Q.**    Okay.

10   **A.**    So if that's what -- if you're describing jabbing them,

11   no; but placing your forearm against them, yes.

12   **Q.**    The forearm would be flat against the back?

13   **A.**    Correct.

14   **Q.**    The elbow wouldn't be jabbing into the back; correct?

15   **A.**    Correct.  We don't teach that.

16   **Q.**    That wouldn't be right; would it?

17   **A.**    No.  The way you're describing it, no.

18   **Q.**    Okay.  And I know you said you know that the training is

19   from the book, but it's also reality based; right?

20   **A.**    Correct.

21   **Q.**    Hands-on, you try to recreate the real-world situation

22   that these people coming through the Academy are going to meet

23   when they are working in institutions?

24   **A.**    That's correct.

25   **Q.**    Okay.  And, so, what -- and, of course, we understand that

1  searching the groin area, searching near -- at and near where

2  the genitals are, that's a really sensitive thing; right?

3  A.   Yes.

4  Q.   And I know that --

5  A.   Any searches, I think, are sensitive.

6  Q.   Yes.  But isn't there a heightened phase of the search

7  when it gets to the crotch?

8  A.   I don't know.  When you do -- when the inmates are

9  strip-searched, I think that that is more of a loss of dignity

10  than what you're talking about, but that's just my personal

11  opinion.

12  Q.   Yes.  But -- and I'm not saying that -- well, strike it.

13       I mean, prisoners have to go through thousands of searches

14  in the course of years in prison; right?

15  A.   Not only of their person, but of their belongings and

16  everything else.  So I don't really see that one is more

17  important than the other.  It's just what we have to do.

18  Q.   And from the standpoint of the training, I understand

19  that.  What about in the reality-based aspect of it, though?

20  Isn't it true that there is a special sensitivity around the

21  genitals, and that special care is needed in doing that part of

22  a clothed body search not to get the person mad at you for the

23  way you do it; right?

24  A.   Well, I don't know because I don't know what's in their

25  head; but I would say that probably, yeah, if it was me, I'd

1    probably, you know, be a little more sensitive.

2         But what I'm trying to say is, nobody likes to be

3    searched, nobody likes to be strip-searched, nobody likes to

4    have their property gone through.  It's just one of those

5    things.

6    Q.   Uh-huh.

7    A.   It's unfortunate for them, but that's what we're mandated

8    to do.

9    Q.   Uh-huh.  But, again, I don't want to belabor it, but the

10   possibility of a sudden outburst of anger or resentment is much

11   heightened at the point -- I mean, it might be heightened if

12   the person is searching the cell and he takes a photograph off

13   the wall and tears it in half.  That would be something that

14   would -- you could --

15   A.   I think that would be equally as important.

16   Q.   Yes.  But there would be a principle in any case, don't

17   provoke the prisoner; right?  Don't do anything gratuitous to

18   start trouble?

19   A.   That's a fair statement, sure.

20   Q.   Don't take it on yourself to make sure he hates being in

21   prison?

22        THE COURT:  Mr. Cunningham, please make sure that you

23   allow the witness --

24        MR. CUNNINGHAM:  I'm sorry.  Of course, Judge.

25        THE COURT:  -- to answer your question.

1      **THE WITNESS:**  That's a fair statement.

2   **BY MR. CUNNINGHAM:**

3   **Q.**   It kind of goes without saying, I understand that, but

4   that has turned to be what our case is about.  So that's why

5   I'm pressing the subject.

6      **THE COURT:**  Don't editorialize, please.  Just ask

7   questions.

8      **MR. CUNNINGHAM:**  All right.

9   **Q.**   And at least in the manual you have that line about "DO

10  NOT SQUEEZE THE SCROTUM" written in capital letters; right?

11  **A.**   Correct.

12      (Pause in proceedings.)

13  **BY MR. CUNNINGHAM:**

14  **Q.**   And, as a matter of fact, if you look at that section of

15  the workbook, and I'm sure you're familiar with it, that's the

16  only statement that's in capital letters in several pages of a

17  description that -- except for the statement on page -- well,

18  it's 36 of this document, "SWITCH FEET IN YOUR STANCE WHEN

19  YOU'RE GOING FROM ONE SIDE OF THE BODY TO THE OTHER"?

20  **A.**   You're talking about page 16?

21  **Q.**   Page 16 is where the line about the "DO NOT SQUEEZE THE

22  SCROTUM" is; right?

23  **A.**   Okay.  Yeah, it's in all caps.

24  **Q.**   I mean, I -- I don't know if I have a different document

25  than you do.  Mine is on page 37 or is marked page 37, AGO595.

1          THE COURT:  Are we referring to -- what are we

2   referring to?

3          MR. CUNNINGHAM:  Exhibit 1 -- Exhibit A I think it is.

4   And I can't exactly account for the difference in pagination.

5   It's the one we were given.

6          THE COURT:  Let's make sure we're all on the same

7   line.

8          MR. CUNNINGHAM:  Oh, I'm sorry.  He's referring to the

9   AGO pages and I was referring to the documents.

10         MR. LEWIS:  Same page, 16 and 16.

11         MR. CUNNINGHAM:  Well, this is what I've got.

12               (Pause in proceedings.)

13         MR. CUNNINGHAM:  All right.  Let me look at that.

14      Judge, I was provided with a different version of the

15  manual apparently.  It has different pagination.  I just want

16  to check the exhibit.  Thank you.

17               (Pause in proceedings.)

18  BY MR. CUNNINGHAM:

19  Q.   You said the manual is updated periodically; right?

20  A.   Correct.

21  Q.   And can you recall that at some point the whole typeface

22  and the layout and everything was changed?

23  A.   Yes, it is.

24  Q.   So that I -- strike it.

25         MR. CUNNINGHAM:  Let me -- I'll show him this other

1  version, Judge, just without bothering to mark it.

2  **Q.**   Is this a familiar format to you as well (indicating)?

3  **A.**   Yes.  What --

4        **THE COURT:**  Let's all -- I'm sorry.  Let's all be on

5  the same page here --

6        **MR. LEWIS:**  So, Your Honor --

7        **THE COURT:**  -- with the document.  I mean, I'm not

8  interested in the questions that are asked.  I would like the

9  document to be used to be the same that you use and counsel

10  uses so there isn't confusion for the jury.

11        **MR. LEWIS:**  Your Honor, we've used Exhibit A1.  It

12  appears that Mr. Cunningham has a different document that's not

13  Exhibit A1.

14        **THE COURT:**  Is it just a question of pagination?

15        **MR. LEWIS:**  It's a completely different document.

16        **THE COURT:**  All right.  Well, then, if that's a

17  completely different document, then do you want to mark that as

18  Plaintiffs' next in order and then show the witness Plaintiffs'

19  next in order?

20        **MR. CUNNINGHAM:**  I do do want.  I just want to make

21  sure it's the same text, Judge, and I think he can probably

22  satisfy us of that.  I can do that and mark the other one, the

23  one that was turned over to us.

24        **THE COURT:**  Is there some reason you couldn't use

25  Defendants' A rather than the one that you have?

1    **MR. CUNNINGHAM:** Well, except by the fact that it's a

2  different format, I'm not familiar with it. I'm not going to

3  go into it a great deal, but let me just look at it briefly, if

4  that's all right, and make sure that I can deal with.

5                    (Pause in proceedings.)

6  BY MR. CUNNINGHAM:

7  **Q.** I'm sorry for the confusion. You could recognize the

8  earlier version -- strike it.

9         Was that earlier or later? Do you know?

10 **A.** The one you had?

11 **Q.** The one I showed you.

12 **A.** I'd have to look at it.

13 **Q.** Uh-huh. But it's a different version of the same text

14 basically, as far as you know; is that correct?

15 **A.** I don't know what the date is on that.

16 **Q.** This one is marked "CPOST Approved December 10th, 2003."

17 **A.** Okay. Do you want me to look at the document so I can

18 make a better decision?

19        **THE COURT:** If it's a different document, mark it.

20        **MR. CUNNINGHAM:** We better mark it. But I want to get

21 the whole document, Judge, so I have to take a minute and look

22 for it.

23                    (Pause in proceedings.)

24        **MR. CUNNINGHAM:** Okay. I'm going to use the excerpt,

25 Judge. Will you mark this as Plaintiffs' next in order for me.

1    (Plaintiffs' Exhibit 14 marked for identification) (14)

2  **BY MR. CUNNINGHAM:**

3  **Q.**  I'm sorry this is complicated like this, but I had a note.

4    So that's a selection of pages from the entire document

5  that we were provided with, the pages referring to the clothed

6  body search.

7  **A.**  Well, just from the few things that I've just scanned,

8  what you have here is a combination of a student workbook and

9  an instructor's guide, so I don't know where you got this from.

10  It's not a complete document, though.

11  **Q.**  No, I understand it's not complete.  Some pages were taken

12  out of it, but we were provided with what I believe was an

13  entire document.  If --

14  **A.**  No, because --

15    **THE COURT:**  Could we have a sidebar?

16    **MR. CUNNINGHAM:**  Sure.

17    (Sidebar conference heard but not reported.)

18    **THE COURT:**  Ladies and gentlemen of the jury, I

19  apologize, but in order to avoid confusion, I'm going to ask

20  you to take a brief 15-minute recess so that the parties can

21  settle which documents they're showing to whom, and that way we

22  don't have an issue.

23    Thank you.  And I'll ask you to be back in your seats

24  let's say five after 10:00.

25    Thank you so much.

1      (Proceedings were heard out of the presence of the jury:)

2          **THE COURT:**  All right.  Why don't you guys --

3          **MR. CUNNINGHAM:**  Yes, sir.

4          **THE COURT:**  -- settle on one document that reflects

5   what the lieutenant -- Lieutenant, you can step down -- the

6   lieutenant is talking about so that we have a document.

7          **MR. LEWIS:**  Yes, Your Honor.

8          **THE COURT:**  I mean, unless, Counsel, unless there's an

9   issue that you're going to impeach him with something

10  different.  I mean, I understand that.  But if we're talking

11  about the same document and all there is is the pages are

12  different, then let's get this settled and use one document.

13         **MR. CUNNINGHAM:**  We can do it, Judge, and we'll just

14  consult with the witness.

15              (Recess taken at 9:54 a.m.)

16      (Proceedings were heard out of presence of the jury:)

17         **THE COURT:**  All right.  We're all on the same page

18  now.

19         **MR. CUNNINGHAM:**  Well, Judge, can I explain the

20  situation?

21         **THE COURT:**  I'm not interested in explaining the

22  situation.  I want to know if you now all have the same

23  document you can use to question the Lieutenant.

24         **MR. CUNNINGHAM:**  I think we have two different

25  documents, Judge, and they were two different documents.  One

1  was for the students and the other was for the instructors.

2     And so then the text is entire -- is different.  And the

3  answers to a lot of questions that are in the student's book

4  are in the instructor's book.  And there's a whole -- It's --

5  On one side of the page, it's written under a heading

6  "Instructor's Dialogue."

7     Now, that's the version -- The instructor's version is the

8  version that was turned over to me in 2009 in the entirety of

9  the AGO pages.

10    There's another version, the student's version, which

11  counsel had come into possession of, that I never saw, but that

12  he had used in the sealed exhibit in the motions in the last

13  year or so.

14    And it wasn't -- He wasn't aware of the difference and I

15  certainly wasn't because I never saw the sealed exhibit.  I

16  never asked for it because I knew I had it, or I thought I knew

17  I had it.

18        **THE COURT:**  Lieutenant, are there two different

19  versions?  I mean, so one that the teachers get --

20        **THE WITNESS:**  The instructor version, Judge, is

21  just -- It -- It accentuates more than what the instructor has

22  to get across.

23    So there's training notes in there.  There's visual aids

24  that --

25        **THE COURT:**  I used to teach P.O.S.T. so it's the

1    P.O.S.T. teacher's version vs. the P.O.S.T. student version.

2         THE WITNESS:  Correct.

3         THE COURT:  But it does contain different things in

4    the teacher's version.

5         THE WITNESS:  It just elaborates more.

6         THE COURT:  Yeah, right.  So . . . which one do you

7    want to cross-examine with?

8         MR. CUNNINGHAM:  Judge, at this point, I haven't seen

9    a -- a problem with the -- using either one --

10        THE COURT:  Well, but --

11        MR. CUNNINGHAM:  -- but I would rather --

12        THE COURT:  But the witness doesn't know what you're

13   talking about.

14        MR. CUNNINGHAM:  I'm sure.  I'd rather use the one I'm

15   familiar with and that I've poured over.

16        THE COURT:  Do we have a second copy for him to look

17   at while you're looking at it?

18        MR. CUNNINGHAM:  Yes.  Yes.

19        THE COURT:  All right.  Why did that --

20        MR. CUNNINGHAM:  They kindly made us a copy.

21        THE COURT:  Shall we go ahead and do that?

22        MR. LEWIS:  Your Honor, that's fine.  If the witness

23   is comfortable with it.

24        THE COURT:  All right.  Let's take whatever you have

25   now off the bench, yours.

1              MR. LEWIS:  We'll take Exhibit A1 off.

2              THE COURT:  Off.

3        Now, this is the one that we've been talking about that

4    they have.

5              MR. LEWIS:  No.  This is actually a different document

6    altogether.

7              THE COURT:  Then take that off so . . .

8              MR. QUINN:  We need to have this marked.

9              THE CLERK:  That's 14.  Isn't that the one you just

10   marked as 14?

11             MR. CUNNINGHAM:  No.  This is an excerpt.

12             THE CLERK:  Right there.  See on the front?

13             MR. CUNNINGHAM:  Yes.

14             THE CLERK:  On the front there, it says 14.  Doesn't

15   it say 14 at the bottom?

16             MR. CUNNINGHAM:  Yes.

17             THE CLERK:  Okay.  That's the one I just did.

18             THE COURT:  You have two copies of that?

19             MR. CUNNINGHAM:  I want to point out that this is an

20   excerpt I had which is just the portion on the clothed-body.

21             THE COURT:  And that's the one you want.

22             MR. CUNNINGHAM:  That's the one.

23             THE COURT:  You make a copy of that, put on it on the

24   stand.

25             MR. CUNNINGHAM:  Yes.

1          THE COURT:  Then you can ask him if he's familiar with

2      it.

3          Why don't you take the stand again.

4          Okay.  So now everybody has a copy of the document we've

5      been talking about.

6          MR. CUNNINGHAM:  Yes, sir.

7          THE COURT:  Mr. Lewis?

8          MR. LEWIS:  No, Your Honor, but we don't have an

9      objection.

10         THE COURT:  All right.  Could you --  Lisa, could you

11     bring the jury in?  Thank you.

12         THE CLERK:  Okay.

13         (Proceedings were heard in the presence of the jury:)

14         THE CLERK:  Please be seated.

15         THE COURT:  All right.  Ladies and gentlemen of the

16     jury, I believe we've resolved the issue with the documents and

17     I believe now both the witness and defense counsel and also --

18     excuse me -- plaintiff's counsel and defense counsel are all on

19     the same page, so to speak.

20         MR. CUNNINGHAM:  We hope.  We're going to try to be.

21     BY MR. CUNNINGHAM:

22     Q.  Lieutenant, just so I can clear this up a little bit for

23     the jury:

24         We have two versions of this training document; correct?

25     And we've recognized that now in the break?

**PROCEEDINGS**

1   **A.**   Yes.

2   **Q.**   And one is for instructors and one is for students; fair?

3   **A.**   Yes.

4   **Q.**   Okay.  And the one that now is in front of you is an

5   excerpt from the Instructor's Manual; correct?

6   **A.**   Except for the first two pages, yes.

7   **Q.**   Okay.  And -- And in those pages, on the -- where -- where

8   it's marked at the bottom AGO595, and it also says from the

9   document itself Page 37.

10      Do you see that?

11   **A.**   (Examining document.)

12      Page 37 and 595?  Yes.

13   **Q.**   Yeah, okay.  And on that page there, that's where it's

14   written in capital letters:  "

15         "DO NOT SQUEEZE THE INMATE'S SCROTUM."

16      Right?

17   **A.**   Correct.

18   **Q.**   And that's in capital letters for a reason; right?

19   **A.**   Yes.

20   **Q.**   And the reason is?

21   **A.**   It emphasizes do not do that.

22   **Q.**   Okay.  And I think on the preceding page, you can look and

23   see at the very bottom there's another statement in the -- in

24   capital letters; right?

25   **A.**   (Examining document.)

**PROCEEDINGS**

1       On Page 36?  Yes.

2  **Q.**  And that is --

3  **A.**  "SWITCH FEET IN YOUR STANCE."

4  **Q.**  What does that mean exactly?

5  **A.**  That means so you don't lose the position of advantage.

6  So when you go from one side of the body to the other, they

7  want you to switch.

8  **Q.**  Okay.

9  **A.**  It should also be emphasized.

10  **Q.**  You -- You mean --

11      **THE COURT:**  When you -- I'm sorry.

12  When you say "switch feet," just so that I'm clear, you

13  mean for the correctional officer --

14      **THE WITNESS:**  The officer --

15      **THE COURT:**  -- to switch.

16      **THE WITNESS:**  Yes.  You're standing with your posture

17  like this (indicating) searching this side (indicating).  When

18  you go to the other side, it wants you to switch feet

19  (indicating).

20      **THE COURT:**  So you change the balance.  You change

21  where the --

22      **THE WITNESS:**  Correct.

23      **THE COURT:**  -- where the weight is on your feet.

24      **THE WITNESS:**  Correct.

25      **THE COURT:**  Okay.  Thanks.

PROCEEDINGS

**BY MR. CUNNINGHAM:**

**Q.**   Do you switch it over -- move over to that side a little
bit so that you -- There's a little arc to the two positions,
from one side to the other?

**A.**   Well, you -- As an officer, you don't want to lose the
position of advantage.

**Q.**   That's the point.

**A.**   That's correct.

**Q.**   And that's why that one's capitalized; right?

**A.**   Correct.

**Q.**   And there's nothing else that's capitalized in the whole
thing that I could find.  I don't know if you --

**A.**   Without reading through the whole document, I don't know
that there is.

**Q.**   I don't think there is.  Well, it'll be in evidence and we
won't have to worry about it.

      But . . . I guess my question, then, is now that that's
hopefully clear . . .

      In the -- In the instruction and keeping with the
capitalizing the --  the --  the . . . admonishment not to
squeeze the scrotum, that's because of the sensitivity of that
part of the search, isn't it, where the genitals are and the
possibility that if it was done wrong, it could start trouble.

      Is that fair to say?

**A.**   Um . . .  Yeah, but I also would think that if something

1  like that would happen, that the staff member that accidentally

2  did that would learn from it and -- just like anything else.

3  **Q.**  Wouldn't do it again.

4  **A.**  Well, would definitely -- We're required to search that

5  area.

6  **Q.**  Yes.

7  **A.**  But to say that I would be scared not to go back to that

8  area because I didn't want to upset somebody, sir, working in

9  the prison, I have inmates upset at me every day.

10 **Q.**  I'm sure that's true, but I'm not talking about going back

11 to the area so much as -- as a grabbing, an illicit grabbing,

12 squeezing, that goes beyond the proper searching technique, the

13 need to --

14 **A.**  If -- If a staff member does that, they're doing it

15 incorrectly.

16 **Q.**  And it's -- it's wrong; right?  It's trouble; isn't it?

17 **A.**  Well, yeah.

18 **Q.**  And if a -- If he does something like squeeze the scrotum

19 or squeeze the penis to the point that the prisoner comes off

20 the wall in anger, then it's real trouble; isn't it?

21 **A.**  If you're asking me about a hypothetical situation, yeah.

22 **Q.**  Yeah.  And -- And so wouldn't you expect, if it happened

23 one time, then the -- the staff member would understand he'd

24 better be careful not to do that again?

25 **A.**  I -- I guess I'm -- I'm really going to be kind of

1   critical on how I take that question, because I think you need

2   to be a little more specific on what you mean, "do that again."

3       We're going to Search that area, sir.

4   **Q.**   I understand.  And you're going to search it, as you

5   described, with the hand through the legs all the way up across

6   the belt line from pocket to pocket so that if there's anything

7   in this area (indicating) --

8   **A.**   Right.

9   **Q.**   -- that's foreign --

10  **A.**   Or underneath.

11  **Q.**   -- it's detected.

12  **A.**   Right.

13  **Q.**   And you come through the back.

14  **A.**   Correct.

15  **Q.**   You come all the way through --

16  **A.**   Right.

17  **Q.**   -- to sweep the front, and then you come under --

18  **A.**   Right.

19  **Q.**   -- and you go across the groin; right?

20  **A.**   Right.

21  **Q.**   The groin being the area at the top where the two thighs

22  come together.

23  **A.**   Correct.

24  **Q.**   And in the course of doing that, you sweep across the

25  scrotum as well; right?  The penis and the scrotum.

1  **A.**   Correct.

2  **Q.**   But if you were to stop and grab the penis and squeeze it,

3  till it hurt a person and made them him away, or the scrotum,

4  that would be absolutely wrong; wouldn't it?

5  **MR. LEWIS:**  Objection, Your Honor:  Argumentative.

6  **MR. CUNNINGHAM:**  I'll -- I'll withdraw --

7  **THE COURT:**  No, it's -- it's --

8  **MR. CUNNINGHAM:**  -- the question.

9  **THE COURT:**  It's been asked and answered.

10  **MR. CUNNINGHAM:**  Okay.

11  **BY MR. CUNNINGHAM:**

12  **Q.**   Don't you teach them to be careful not to do that?  You'd

13  better not do that?

14  **A.**   Yeah.  It's in the Instruction Manual.

15  **Q.**   All right.

16  (Pause in proceedings.)

17  **BY MR. CUNNINGHAM:**

18  **Q.**   And you're not called upon to judge somebody -- a

19  complaint that somebody makes that "He squeezed my penis" or

20  "He squeezed my scrotum"; right?

21  **A.**   Well, if it's brought to my attention, yeah, I would deal

22  with it.

23  **Q.**   You would deal with it.  Would -- Well, strike it.

24  It wouldn't happen in the academy; right?  You don't have

25  prisoners to practice on in the academy; do you?

1  **A.**   No.  But --

2  **Q.**   Okay.

3  **A.**   -- I've also worked in the prisons so --

4  **Q.**   Yes, I understand that.  That's my next question.

5       Did anything like that ever happen to you or come to your

6  attention in the -- working in the prison?

7  **A.**   Having an officer grab an inmate's penis?  No.

8  **Q.**   Yes.

9  **A.**   (Shaking head.)

10 **Q.**   And if you were a Supervisor and somebody came to you with

11 a 602 and say, "He grabbed my penis and squeezed it," or "He

12 grabbed my scrotum and squeezed it," you'd take action;

13 wouldn't you?

14 **A.**   Yes.

15 **Q.**   You'd have the guy sit down and you'd find out what in the

16 world was going on with him; right?

17 **A.**   Yeah.

18 **Q.**   And if he -- If he had five 602s or 15 602s all saying the

19 same thing --

20       **MR. LEWIS:**  Objection --

21 **BY MR. CUNNINGHAM:**

22 **Q.**   -- you'd --

23       **MR. LEWIS:**  -- Your Honor --

24 **BY MR. CUNNINGHAM:**

25 **Q.**   -- you'd --

1    MR. LEWIS:  -- argumentative.

2    THE COURT:  Overruled.

3  BY MR. CUNNINGHAM:

4  Q.  As a Supervisor, now you've really got a problem; isn't

5  that true?

6  A.  I'd probably look at it a little bit different.  I'd look

7  at the staff that I have there, and maybe it could be a

8  training issue.  Maybe this guy is actually doing his job where

9  maybe some of the other ones aren't.

10    And we also teach in the Academy that that's one way

11  inmates can get rid of a staff member that's doing their job,

12  is to complain.

13  Q.  Uh-huh.  And so would that be your reaction, if 15 inmates

14  complained about --

15  A.  No.

16  Q.  -- a --

17  A.  I said I -- that's something that I would look at.

18  Q.  You'd have to take into account.

19  A.  Correct.

20  Q.  And you'd talk to the Supervisors, and you'd talk to other

21  officers who've done searches with the guy --

22  A.  Right.

23  Q.  -- and like that; right?

24    You really have to make a thorough, detailed investigation

25  in order to satisfy yourself that it was okay to leave an

1  officer in the position where he's doing these searches on

2  prisoners on a daily basis; isn't that true?

3  **A.**  I would do an investigation and that would be my job, yes.

4  **Q.**  And if it was -- If you were persuaded -- Strike it.

5      In the investigation, would you talk to inmates who were

6  complaining in saying that he did this?

7  **A.**  Yes, I would.

8  **Q.**  Okay.  And -- And would you expect --

9  **A.**  That's required.

10  **Q.**  Would --  Would you expect to talk to every inmate --

11  inmate -- every prisoner -- I'm sorry -- who -- who made such a

12  complaint in a 602?

13  **A.**  If they had filed a 602.

14  **Q.**  A 602 is -- Filing a 602 is a serious step; isn't it?

15  **A.**  Yes.

16  **Q.**  And when you accuse a staff member of outright wrongdoing,

17  that's a real serious step, isn't it, for a prisoner to take?

18  **A.**  In . . .  That's actually a --  a different procedure,

19  yes.

20                  (Pause in proceedings.)

21  **BY MR. CUNNINGHAM:**

22  **Q.**  Did it ever come to your attention that sometimes, when

23  prisoners make 602s accusing serious -- accusing a staff of

24  serious wrongdoing, that their . . . that other staff members

25  put pressure on them to withdraw it, or threaten them with

1  going to the hole if they don't withdraw it?

2  (Pause in proceedings.)

3  **THE WITNESS:** I -- I can't say that I've ever heard

4  that, but what I -- I know for a fact is that inmates have made

5  false accusations.

6  **BY MR. CUNNINGHAM:**

7  **Q.** Uh-huh.

8  **A.** Okay? And there is no . . . anymore type of . . . I

9  think -- How can I say? -- ramifications for them filing a

10  false accusation against a staff member.

11  **Q.** Right. In the Statement of Rights and Responsibilities;

12  right? If you make a false charge, you can be prosecuted;

13  right?

14  **A.** Well, there are no more -- more ramifications for

15  inmates' complaint on staff if it's proven to be false.

16  **Q.** There are consequences.

17  (Pause in proceedings.)

18  **BY MR. CUNNINGHAM:**

19  **Q.** I mean, in something like that, the prisoner says, "Well,

20  when he was doing the clothed-body search and he was searching

21  my groin area, he grabbed my penis and squeezed it hard" or "he

22  grabbed my scrotum and squeezed it hard."

23  (Pause in proceedings.)

24  **BY MR. CUNNINGHAM:**

25  **Q.** This is something that -- that . . .

1          Well, strike it.  I'm sorry.  I've lost my train of

2    thought there.

3                    (Pause in proceedings.)

4    **BY MR. CUNNINGHAM:**

5    **Q.**   Would -- Would -- Would -- In the -- In the instruction on

6    this, do you or don't you -- do the teachers at the Academy or

7    don't they -- give a special admonishment about that?  About

8    the searching the groin area because of sensitivity.

9    **A.**   Yes, I -- I believe that I already answered that, and you

10   asked me already.  That's why it's --

11   **Q.**   All right.

12   **A.**   It's capitalized --

13   **Q.**   As --

14   **A.**   -- in caps.

15              **THE COURT:**  Why don't we move on, counsel.

16              **MR. CUNNINGHAM:**  I'm going to do that, Judge.

17                    (Pause in proceedings.)

18   **BY MR. CUNNINGHAM:**

19   **Q.**   You, in the -- in the role of field training and

20   compliance, are you, and were you in 2006 and 2007, in touch

21   with various institutions to make sure that they were . . . in

22   compliance with the -- the training that's given to the

23   officers and they weren't having particular problems with any

24   part of the training?

25   **A.**   We -- We contact in-service training officers quite

1  frequently because we go out and audit.  We provide the

2  training materials.

3  **Q.**  Um-hmm.

4  **A.**  And when we go out and audit, we make sure that the

5  training is offered, that it's attended, and it's documented.

6  **Q.**  Okay.  And -- And the on-the-job training, it has a

7  specific component about clothed-body searches; right?

8  **A.**  Sir, I'm mandated to put out a -- an outpost training

9  schedule for every Correctional Officer in the State of

10  California.

11  And that outpost training schedule consists of 40 hours of

12  training, one week -- 40 hours of continuous training, so

13  that's one week out of the calendar year.  And they have to do

14  12 hours of what they call on-the-job training, required

15  on-the-job training.

16  And that's the schedule I put out.

17  What the institutions do, I will not know what they do

18  until I go to that institution and audit.

19  But they know, according to the DOM, that they are

20  supposed to provide every officer, custody staff member, up to

21  the classification of a Lieutenant, at least 52 hours of

22  training --

23  **Q.**  Um-hmm.

24  **THE COURT:**  I'm --

25  **THE WITNESS:**  -- annually.

1          THE COURT:  I'm sorry.

2      I'm a little confused, Lieutenant.

3      So each calendar year, a Correctional Officer has to have

4  how many hours of -- of OTJ -- you know, on-the-job training?

5          THE WITNESS:  There's 40 hours of classroom

6  instruction -- okay? -- where they're pulled off their post --

7  okay? -- and then there's 12 hours of on-the-job training,

8  which can consist of when they're working.

9          THE COURT:  So they're watched by a -- by a Field

10  Training Officer?

11          THE WITNESS:  Their Supervisor.

12          THE COURT:  The Supervisor.

13          THE WITNESS:  So basically there's a total of 52 hours

14  mandatory for training in a calendar year --

15          THE COURT:  For each --

16          THE WITNESS:  -- but --

17          THE COURT:  For each Correctional Officer.

18          THE WITNESS:  Yes.

19      But 40 hours which are -- are -- they're taken off their

20  post.  The other 12 hours can be on the job.

21          THE COURT:  On the job just watching him to make

22  sure -- him or her -- make sure that they're -- they're doing

23  the job right.

24          THE WITNESS:  Right.

25          THE COURT:  Okay.

1    **THE WITNESS:**  And that's also in the DOM.

2    **THE COURT:**  Thank you.

3  **BY MR. CUNNINGHAM:**

4  **Q.**   And that would include both classroom and on the job or

5  on -- as to the clothed-body search; right?

6  **A.**   Yes.  There is a version of the on-the-job searches in the

7  IST office.

8  **Q.**   And you rely on the documentation as to when it happened

9  and who got it.

10  **A.**   That's what we audit, yes.

11  **Q.**   Okay.  And -- And . . .

12      So you -- you assume that -- that in a particular place

13  like the central facility at Soledad, all the officers are

14  trained pretty much the same in a given year about anything --

15  about clothed-body searches and are put through their paces, so

16  to speak, to make sure they understand and do it right; fair?

17  **A.**   Yeah.  When I go to audit that particular institution,

18  again, was it offered, was it attended, and was it documented?

19  **Q.**   Okay.

20  **A.**   So those, yeah, we check.

21  **Q.**   Okay.  Is it right to say that this -- the techniques of

22  cupping the groin are fairly new addition to the search routine

23  that -- that is -- has been used in the prison over the years?

24  **A.**   No.  I just think it's a terminology thing.

25  **Q.**   Well, we had testimony from a -- from the former Warden at

1  Soledad, that he said, when he heard that that's what they did,

2  he was shocked or surprised that he had never been trained that

3  way.

4      Do you go back far enough so that you would know that?

5          **MR. LEWIS:**  Objection:  Vague, Your Honor.  We're not

6  given any dates or any time frame other than "new."

7          **THE COURT:**  Well, if I remember correctly --

8          **MR. LEWIS:**  This witness was not here for Warden Curry

9  so --

10          **THE COURT:**  I understand that.

11      Why don't you rephrase -- rephrase the question, if you

12  can.

13          **MR. CUNNINGHAM:**  Um-hmm.

14          **THE COURT:**  The objection's sustained.

15  BY MR. CUNNINGHAM:

16  **Q.**  All right.  And as -- When he came to Soledad, he found

17  this out.  He'd been in the system for 35 years.  And he said

18  he was never trained that way, and he'd never done searches

19  that way involving cupping the groin or cupping the genitals.

20      And he told us he was concerned about that because of the

21  possibility that an inmate would -- would bring trouble.

22          **MR. LEWIS:**  And, Your Honor, another objection:

23      Plaintiff has not said when Warden Curry showed up to the

24  institution.  We're talking many years ago that he showed up,

25  so that 35 years-plus when the Warden showed up.

1    **THE COURT:** I understand.

2    **MR. CUNNINGHAM:** He --

3    **THE COURT:** I think the testimony speaks for itself

4    that the Warden was assigned as the Warden of Soledad.

5    **MR. LEWIS:** Yes, but this witness is not aware of

6    that.

7    **BY MR. CUNNINGHAM:**

8    **Q.** Starting in May 2006, that's when he came to Soledad, and

9    that's when he told us he found this out.

10   **A.** At that particular time this document was approved by

11   C Post in 2003.

12   **Q.** Yes.

13   **A.** As a warden, he's not required to go through block

14   training.

15   **Q.** I understand that.

16       But in terms of the newness of it, in terms of the

17   difference from what he had learned and practiced for

18   previous -- during his previous career up until May of 2006,

19   he'd never heard of that. He had to make a whole special

20   inquiry about it.

21   **A.** Sir, and I hope I don't offend you, but I think -- like I

22   said, I think this is just a terminology thing.

23   **Q.** Uh-huh.

24   **A.** So if I didn't use the word "cup my hand," if I said, "I

25   have to use the entire front of my hand," tell me what the

1  difference is.

2  **Q.**  Uh-huh.  Well, I don't think it's a difference.

3         **THE COURT:**  Let's not get argumentative here.

4         **MR. CUNNINGHAM:**  No.

5         **THE COURT:**  And, counsel, why don't we move on.

6         **MR. CUNNINGHAM:**  Okay.

7  **BY MR. CUNNINGHAM:**

8  **Q.**  If all the officers are given the same training, and one

9  officer gets a whole set of 602s filed against him for the way

10 he's doing the searches involving grabbing the genitals,

11 squeezing the genitals, and no other officers are complained

12 against by any of the prisoners, would that -- in your mind,

13 would that indicate that there's something really wrong going

14 on here?

15 **A.**  I would definitely look into it as a Supervisor.

16 **Q.**  And would you assume that -- Or -- Or would it be your

17 first reaction that, "Well, they're -- they might be making

18 this up"?

19 **A.**  The inmates?

20 **Q.**  Yeah.

21 **A.**  Well, you're asking me my opinion; right?

22 **Q.**  Yeah.

23 **A.**  Okay.  In my professional opinion, if there's a 602,

24 that's a sworn Peace Officer.  So unless I -- I'm not going to

25 speculate anything.  So I'm going to do my investigation and

1    let the facts lead me where they may end up.

2        But I have to believe a sworn Peace Officer.

3    **Q.**    Uh-huh.  You have to believe him regardless?

4    **A.**    No.  You're asking in my professional opinion.

5    **Q.**    Yeah.

6    **A.**    So just on the face of things, if an inmate is accusing

7    somebody of this, I -- I'm not going to say, "Oh, yeah, the

8    inmate's right."  I'm just saying this is a sworn Peace

9    Officer.  And I take my oath very seriously, so I would hope

10   that that sworn Peace Officer would do the same.

11   **Q.**    All right.  But if you make an investigation, there's no

12   way to prove whether it happened or didn't happen in a given

13   case; right?  There's no evidence that -- outside of what

14   actually happened in the gesture with the fingers or not; isn't

15   that true?

16        **MR. LEWIS:**  Your Honor, we're getting highly

17   speculative and really long on this one.

18        **THE COURT:**  Well, I think he's sort of plowing the

19   same ground now again.

20        I think it is getting somewhat speculative.  I'll sustain

21   counsel's motion.

22   **BY MR. CUNNINGHAM:**

23   **Q.**    Would it be right -- Would you say, as -- If you're

24   investigating it, you come back and say, "Well, it -- there's

25   no substantiation of the fact that he squeezed the genitals,

1    so, therefore, we're going to deny the 602"?

2    **A.**    No.  There's other measures that could be put in place.

3        The thing about it is if -- if it continually happens,

4    maybe it's a training issue.  I don't know.

5        But you're asking me to formulate an opinion based on what

6    has happened.  I have not seen any documentation.  I haven't

7    been present for any of that --

8    **Q.**    I understand.

9    **A.**    -- and so --

10   **Q.**    I understand.

11   **A.**    -- it's very -- very vague and ambiguous.

12   **Q.**    Not to the person whose genitals are squeezed.

13       **THE COURT:**  All right.  Let's not --

14       **MR. CUNNINGHAM:**  I'm done.

15       Thank you, Lieutenant, and thank you for your candor.  I

16   understand this is difficult for you not having known it?

17       **THE COURT:**  Any redirect.

18       **MR. LEWIS:**  Yes, Your Honor, to clarify some exhibits

19   actually, Your Honor.

20       **THE COURT:**  All right.  Proceed.

21                    **REDIRECT EXAMINATION**

22   BY MR. LEWIS:

23   **Q.**    Lieutenant Stoltenberg, I showed you what I previously had

24   identified at Defendant's A3, and that is the 2007 DOM.

25   **A.**    Right.

1   Q.   And you saw that previously; right?

2   A.   Yes.

3   Q.   Okay.  I'll represent to you that that actually is an

4   error.

5        This is Defendant's Exhibit A3.  I'd like you to look at

6   this document right here (indicating) and that document

7   (indicating).  Tell me what that document right there is.

8   A.   This is the correct -- most recent version of the DOM.

9   Q.   And when you say the most recent version --

10  A.   It's the 2013 version.

11  Q.   Okay.  Do you see a section on that page that involves

12  clothed-body searches of male inmates?

13  A.   Yes.

14  Q.   Could you look at that section and tell me if that

15  accurately describes what current officers are supposed to do

16  with regard to why they conduct clothed-body searches?

17  A.   (Examining document.)

18           "Custody post orders shall require random

19       clothed-body search of inmates.  When reasonable

20       suspicion is established, random searches, should be

21       no more frequent and necessary to control contraband."

22       The only difference was, it talked about female and

23  transgenders.

24  Q.   All right.  And then if you could look back at the exhibit

25  that I showed you earlier, the 2007 DOM.

1      Are those sections substantially similar regarding why

2   clothed-body searches are conducted or the policies behind

3   them?

4          MR. CUNNINGHAM:  I'm sorry, counsel.  Can we have the

5   section again?

6          THE WITNESS:  It's just a different section.

7   BY MR. LEWIS:

8   Q.   And what section number is that?

9   A.   In the new DOM, it's 52050.16.4.

10         MR. CUNNINGHAM:  So that's the . . .

11                    (Counsel confer.)

12         MR. CUNNINGHAM:  All right.  16.3 and 1 --

13  BY MR. LEWIS:

14  Q.   .3 for male inmates?

15  A.   Yes.

16  Q.   .3.

17         MR. CUNNINGHAM:  And that's the 2013 version.

18         MR. LEWIS:  That's the 2013 version.

19         MR. CUNNINGHAM:  But the testimony is that it's the

20  same as 2007.

21  BY MR. LEWIS:

22  Q.   Is it substantially similar to this?

23  A.   Yes.

24  Q.   And so, basically, it says that officers can conduct

25  clothed-body searches randomly; can't they?

1    **A.**    Yes.

2    **Q.**    And they do that because there are legitimate safety and

3    security concerns behind for motivating those searches;

4    correct?

5    **A.**    Right.

6    **Q.**    And those searches do include searches of the groin area?

7    **A.**    Right.

8         **THE COURT:**  Counsel, we've gone over this already.

9    **BY MR. LEWIS:**

10   **Q.**    So, then, this 2007 document that I showed you is

11   substantially similar to the 2013.

12   **A.**    Correct.

13   **Q.**    Okay.

14                    (Pause in proceedings.)

15        **MR. LEWIS:**  No further questions, Your Honor.  Thank

16   you.

17        **THE COURT:**  I just have one brief question.

18   Which was the operative Department Manual in May of 2007?

19   The ones you have in front of you.

20        **THE WITNESS:**  This one right here (indicating).

21        **THE COURT:**  That's marked as --

22        **MR. LEWIS:**  That will be Defense Exhibit Delta, D.

23        **THE COURT:**  Delta.

24        **THE WITNESS:**  The 2007 version.

25        **MR. LEWIS:**  The 2007 version.

1       **THE COURT:**  That was the one that was operative at the

2   time that the incident took place in May of 2007.

3       **THE WITNESS:**  Correct.

4       **THE COURT:**  Okay.  Thank you.

5       (Defendant's Exhibit D marked for identification)

6                   <u>**RECROSS-EXAMINATION**</u>

7   **BY MR. CUNNINGHAM:**

8   **Q.**   And the purpose of the random searches is to -- is to

9   impede the flow of contraband; correct?

10      **THE COURT:**  It's been asked and --

11      **MR. CUNNINGHAM:**  Foundational.

12      **THE COURT:**  -- answered.

13      **MR. CUNNINGHAM:**  Foundational.

14      **THE WITNESS:**  Yes.

15  **BY MR. CUNNINGHAM:**

16  **Q.**   And that prisoners know that; right?  The prisoners are

17  told as well when they're told that they're going to be given

18  clothed-body searches, and God knows they go on enough so that

19  they know perfectly well they run the risk if they're

20  trafficking in contraband.

21      **MR. LEWIS:**  That's actually speculative and

22  argumentative; assumes facts.

23      **THE COURT:**  If he knows, he can answer the question.

24      **THE WITNESS:**  Sir, they're given the Title 15 in R&R

25  when they're in process.  And in Title 15, under 3287, it tells

1    them that they can expect this.

2         MR. CUNNINGHAM:  All right.  Thank you.

3         THE COURT:  Anything further from this witness?

4         MR. LEWIS:  Nothing, Your Honor.  Thank you.

5         MR. CUNNINGHAM:  No, Your Honor.

6         THE COURT:  Okay.  Thank you very much, Lieutenant.

7                   (Witness excused.)

8         THE COURT:  Next witness?

9         MR. QUINN:  Your Honor, defendants call Officer

10   Abanico.

11        THE COURT:  All right.  And let me ask counsel:  Will

12   this be your last witness?  Do you have another?

13        MR. QUINN:  No.  This is the last witness, Your Honor.

14                   (Pause in proceedings.)

15        THE COURT:  Let me remind you, Officer, you remain

16   under oath.

17        THE WITNESS:  Yes, sir.

18        THE COURT:  All right.  You can sit down.

19                   **IRWIN ABANICO**,

20   called as a witness for the Defendants, having been previously

21   duly sworn, testified further as follows:

22

23   ///

24

25

1    ### DIRECT EXAMINATION

2    BY MR. QUINN:

3    Q.    Good morning, Officer.

4    A.    Good morning, sir.

5    Q.    How long have you worked for the Department of

6    Corrections?

7    A.    Nine years, sir.

8    Q.    And where do you currently work?

9    A.    I work for Correctional Training Facility in Soledad,

10   California.

11   Q.    And what is your current job title?

12   A.    I'm a Correctional Peace Officer; I'm also a Training

13   Instructor.

14   Q.    And what are your responsibilities as a Correctional

15   Officer?

16   A.    For the safety of the institution, staff and inmates and

17   especially the public.

18   Q.    And what are your responsibilities as a Tactical

19   Instructor?

20   A.    As Tactical Instructor, my responsibility is to train

21   other officers, Sergeants and Lieutenants, custody staff, to

22   maintain their off-post training, their annual training, and

23   also on-the-job training.

24   Q.    And does this training -- Does this training include

25   training other Correctional Officers concerning body searches?

1  **A.**  Yes, sir.

2  **Q.**  I'd like to turn to some questions about your background.

3  Where are you from originally?

4  **A.**  From the Islands of the Philippines, sir.

5  **Q.**  And is English your first language?

6  **A.**  No, sir.

7  **Q.**  What is your --

8  **A.**  It's Tagalog, Filipino.

9  **Q.**  Okay.  Did you attend high school in the Bay Area?

10  **A.**  Yes, sir.

11  **Q.**  Are you married?

12  **A.**  Yes, sir.

13  **Q.**  How long have you been married?

14  **A.**  Eight years.

15  **Q.**  Where did you meet your wife?

16  **A.**  We met at church, sir.

17  **Q.**  And are you still active in that church?

18  **A.**  Yes, sir, I am.

19  **Q.**  Did you have any children?

20  **A.**  Yes, sir, I do.  I have a daughter of six and a son of two

21  years old.

22  **Q.**  Okay.  And what did you do after obtaining your high

23  school diploma?

24  **A.**  After my high school diploma, I went straight to the

25  United States Marine Corps, sir.

1  **Q.**  And did you have a specific job in the Marine Corps?

2  **A.**  Yes, sir.  I was the Motor Transport Operator.

3  **Q.**  And what were your responsibilities as a Motor Transport

4  Operator?

5  **A.**  I was the marine in charge of delivering items assigned to

6  us.

7  And as Sergeant of Marines, you're in charge of security

8  and making sure the staff is maintained, trained, and you have

9  to deliver any cargo or equipment to point B, so it gets there

10  properly on time, sir.

11  **Q.**  And did your position -- In that position, did you have a

12  set procedures or checklist that you used to work in the

13  field -- in that position?

14  **A.**  Yes, sir.  Before a vehicle or motor comes out of the

15  Motor Pool, we have a list of inspection that we had to met

16  (sic).  And for -- That's called the preventive maintenance.

17  We check the tires, oil, car.  We make sure the vehicle is

18  properly and able to get to point A and point B with no problem

19  and get back to safety, sir.

20  **Q.**  And were you promoted in the -- in the Marines?

21  **A.**  Yes, sir.  I earned the rank of a sergeant within three

22  and a half years, sir.

23  **Q.**  So you were essentially a Supervisor --

24  **A.**  Yes, sir.

25  **Q.**  -- for lack of a better term.

1     How many Marines served under you?

2  **A.**   When I was a sergeant, approximately 30 Marines, sir.

3  **Q.**   And were you responsible -- Were you responsible for

4  ensuring that they followed the applicable procedures and

5  checklists that were applicable to that -- your particular

6  field?

7  **A.**   Yes, sir.  I'm responsible for each marine, make sure they

8  do the job properly.

9  **Q.**   And did you eventually leave the military?

10 **A.**   Yes, sir, I left the military.

11 **Q.**   And what was your status when you left?

12 **A.**   When I left the military, 2001, I got out with honorable

13 discharge.

14 **Q.**   And how soon after leaving the Marine Corps did you join

15 the Department of Corrections?

16 **A.**   I joined the Department of Corrections within two years,

17 the reason being the hiring freeze.  So while the hiring freeze

18 going on, I had to make a living and I worked for the Town of

19 Santa Clara.

20 **Q.**   And now I'd like to turn to some questions about the

21 training you received in the course of becoming a Correctional

22 Officer.

23 **A.**   Yes, sir.

24 **Q.**   Did you go to the CDCR training Academy?

25 **A.**   Yes, sir, in Galt, California.

1   **Q.**   And when were you a student there?

2   **A.**   I was there from November 4th, 2004, until February '05.

3   **Q.**   And what subject areas did you receive training in?

4   **A.**   I received the subject of all applies to Peace Officer,

5   Correctional Officer, like the range, baton, throughout the

6   baseline response, searches, use of force, and then more, sir,

7   that leads to becoming a Correctional Peace Officer.

8   **Q.**   Okay.  I'd like to show you now what's been previously

9   marked as, I believe, Defense Exhibit A1, the student handbook.

10  **A.**   Yes, sir.

11  **Q.**   Does that document look familiar to you?

12  **A.**   Yes, sir, it does.

13  **Q.**   And how do you recognize it?

14  **A.**   Sir, because I teach it.

15  **Q.**   And does the document have a date on the front of it?

16  **A.**   Yes, sir, it does.  It's C Post approved, December 10,

17  2003.

18  **Q.**   And does it resemble the training materials that you were

19  given while you were at the Academy?

20  **A.**   Yes, sir.

21  **Q.**   Can you turn to Page 16 of the materials.

22  **A.**   (Turning to document.)

23  **Q.**   And is that -- is that a section regarding clothed-body

24  searches?

25  **A.**   (Examining document.)

1      Yes, sir.

2  **Q.**  And after looking at that page, does the section refresh

3  your recollection regarding how you were trained to conduct

4  clothed-body searches in the groin area?

5  **A.**  Yes, sir.

6  **Q.**  And does that page tell you how to search a certain

7  portion of the inmate's body?

8  **A.**  Yes, sir.  It tells you from left groin, right groin, all

9  the way down to your groin area.

10  **Q.**  Does the training -- Or does the document there refer to

11  the practice of cupping the groin as part of a clothed-body

12  search?

13  **A.**  Yes, sir, for male inmates.

14  **Q.**  And, again, this is how you were trained to conduct the

15  clothed-body searches at the Academy.

16  **A.**  Yes, sir.

17      **MR. QUINN:**  At this time, Your Honor, we'd like to

18  have Officer Abanico, if possible, demonstrate how he was

19  trained --

20      **THE COURT:**  All right.

21      **MR. QUINN:**  -- to conduct the clothed-body searches.

22  We have an individual who's willing to be subject of the

23  search.

24      **THE COURT:**  Fine.

25      **MR. QUINN:**  Where would you like us to . . .

1    THE COURT:  I don't know.  Probably -- Well --

2    THE CLERK:  I can raise it.

3    THE COURT:  Do you mind doing it over there?  Does

4  that work?

5    MR. QUINN:  That's fine, or the doorway might be

6  closer to the jury.

7    MR. LEWIS:  The door might be better, Your Honor.

8    THE COURT:  Oh, all right.  I want to make sure the

9  jury sees what's going on.

10    If you feel comfortable, just stand up and observe it.

11    MR. QUINN:  So, Officer, you can come down.

12    THE WITNESS:  (Witness approaches doorway.)

13    THE COURT:  So can all of you see?  That's the

14  important thing.

15               (Pause in proceedings.)

16    THE WITNESS:  I start --

17    THE REPORTER:  I can't hear him, Judge.

18    THE COURT:  You have to speak up because the reporter

19  has to take this down.

20    THE WITNESS:  I ask the inmate to take everything out

21  of his pocket.

22    VOLUNTEER:  Okay.

23    THE WITNESS:  First of all, after his I.D. is given to

24  me, "Place your hands on the wall.  Okay.  Step back.  Spread

25  your feet out."

1    The reason I'm doing this, so I have access to the body so

2  it's easier for me to see the body.

3    My left hand will be right here on the upper body

4  (indicating).  In the position, in the stance, if he's

5  combative, I would have to either step back or pretty much take

6  an action what I need to do for safety and myself.

7    From here, I check the collar.  I check the collar because

8  a lot of inmates would hide contraband in here (indicating).  I

9  check the collar.

10    From here, I ask him, "I'm going to pat you down."  I do

11  the front, to the back, to the armpit.

12    From here, I check the front, the front, the side, and the

13  back.

14    From here, I check the waist area, make sure there's

15  nothing hidden in the pocket area.  So I'm going to check that

16  area.  At the same time, we obtain a visual on him.

17    So once that side is done, I go down to the leg.  And here

18  I'm going to bend down right here (indicating), all the way

19  down to his ankle.  If I choose to, I can ask him to remove his

20  shoes but I'm not going to do that today.

21    I move to the front, all the way down to his pocket and to

22  the back.

23    Now I'm going to search the inside of his thigh.  All the

24  way down to his pocket; okay?

25    From then on, I'm going to switch my position from here

1    (indicating) to here (indicating) and my hand going back for

2    protection, for -- to protect myself and obtain advantage.

3         Same thing on the opposite.  I'm going to check the

4    sleeve, all the way down to the armpit.

5         Then I go to the front area of the chest, all the way down

6    to his abdominal.  To the side, and to the back, now checking

7    the waist area for any kind of contraband.

8         From here, I'm going to check the pants, the leg.  I go

9    down to the front, going up to the side, going back to the

10   back.  I'm going to search the inside of his thigh.

11        From here, I'm going to zip across -- okay -- cup the

12   groin area all the way down to the front.  I'm going to say,

13   "Sir, have a good day."

14        If I find any contraband on him, or find anything, I'm

15   going to call for a Supervisor, request the Supervisor approval

16   for an unclothed-body search because there could be something

17   in his groin area.  So I'm going to ask for approval.

18        If he says yes, then you do whatever you got to do to get

19   the contraband.  If it's not, I'm going to say, "Sir, have a

20   good day," and step away, and he goes on his way.

21             THE COURT:  All right.  If you'd take the stand again.

22             THE WITNESS:  (Resuming stand.)

23   BY MR. QUINN:

24   Q.  And, Officer Abanico, what you just demonstrated is how

25   you conduct clothed-body searches at CTF; correct?

1    **A.**    Every time, sir.

2    **Q.**    When did you graduate from the Academy?

3    **A.**    February 2005, sir.

4    **Q.**    And after graduating, where were you assigned to work?

5    **A.**    I was -- I was assigned at Baker Wing first watch, which

6    is from -- it's a grave yard shift from 10 p.m. to 6 a.m.

7    **Q.**    And you were a Tier Officer there; correct?

8    **A.**    Yes, sir.

9    **Q.**    And how long were you working as a Tier Officer.

10   **A.**    For Baker Wing, first watch, approximately eight months.

11   **Q.**    And after those eight months, what position were you moved

12   to?

13   **A.**    I got moved to Charlie Wing, third watch, which is swing

14   shift, from 2 p.m. to 10 p.m.  I was a Security Officer.

15   **Q.**    And --

16            **THE COURT:**  Counsel, I'm sorry, which institution are

17   you talking about?

18            **MR. QUINN:**  CTF.

19        I'll just ask the question.

20   **BY MR. QUINN:**

21   **Q.**    Since graduating from the Academy, you've been stationed

22   at CTF your entire career?

23   **A.**    Yes, sir.

24   **Q.**    And just to reiterate:  You were -- After eight months as

25   a Tier Officer, you were moved to the position of Security

1   Officer; is that correct?

2   **A.**   Yes, sir.

3   **Q.**   What were your duties as a Security Officer?

4   **A.**   As Security Officer, make sure the door, only inmates is

5   coming out with approval, or pass coming out, or to go into the

6   yard, to go into chow, to go into church.

7        As long as they have a pass, then I let them out.  If they

8   don't have a pass, then, of course, they can't come out.

9   **Q.**   And you were responsible for a particular part of the

10  prison; is that correct?

11  **A.**   Yes, sir.

12  **Q.**   What --

13  **A.**   It's pretty much the -- the door and also, when there's

14  inmate movement, the corridor.

15  **Q.**   And how many inmates were in the section that you were

16  responsible for?

17  **A.**   For one Wing, approximately 250 inmates.

18  **Q.**   And as a Security Officer, did you conduct clothed-body

19  searches?

20  **A.**   Yes, sir.

21  **Q.**   And when were these -- When would the searches be

22  performed?

23  **A.**   It would be performed any time of day, during massive

24  movements, or pretty much any time of the day, sir.

25  **Q.**   And where did you typically conduct searches during this

1  period?

2  **A.**    In the corridor.

3  **Q.**    And how would you identify an inmate to be searched?

4  **A.**    Pretty much I just pick a random inmate out of the crowd.

5  **Q.**    And are other officers -- Would other officers typically

6  be in the area while you're conducting the searches?

7  **A.**    Yes, sir.  There would be someone always with me, always

8  covering me.

9  **Q.**    And would other inmates be present or walking by typically

10  when you were doing a search?

11  **A.**    Yes, sir, sometimes inmates would be walking by passing

12  around, yes.

13  **Q.**    What kind of things would you be looking for during those

14  searches?

15  **A.**    I would be looking for any kind of contraband, drugs,

16  tattoo paraphernalia, any pretty much unauthorized items that

17  they're not supposed to have.

18  **Q.**    And have you found contraband on inmates during previous

19  searches?

20  **A.**    Yes, sir.  I have found drugs, marijuana; I've found a

21  tattoo paraphernalia in the groin area, and I also found a

22  razor blade in their waist in the corridor.

23  **Q.**    Officer Abanico, do you obtain any sexual gratification

24  from conducting these type of searches?

25  **A.**    No, sir.

1  **Q.**   Now, several of the plaintiffs have noted during the

2  previous few days, past few days, that you frequently use the

3  term "sir" during your interactions with inmates; is that

4  correct?

5  **A.**   Yes, sir, I do.

6  **Q.**   And why do you use that term in addressing the inmates?

7  **A.**   Because I want to give the inmates the courtesy and

8  respect of calling them "sir" instead of "inmate."

9  **Q.**   And we also heard yesterday Warden Curry, and partly

10  today.

11      Warden Curry said he met with you on a single occasion

12  regarding clothed-body searches.

13      Do you recall that meeting?

14  **A.**   No, sir.  It's been long, no, sir.

15  **Q.**   So you're not saying it didn't happen.  You just don't

16  have a recollection of it.

17  **A.**   I have no recollection of it, sir.

18  **Q.**   As a Security Officer during this time in the mid-2000s,

19  would you receive refresher training regarding searches,

20  clothed-body searches at CTF?

21  **A.**   Yes, sir.

22  **Q.**   And this type of training was performed at the prison at

23  CTF?

24  **A.**   It would be performed, yes, sir, at CTF.

25  **Q.**   And what kind of refresher training would you receive in

1   connection with clothed-body searches?

2   **A.**   We would do also any kind of on-the-job training, like use

3   of force, report writing, restraint -- application of

4   restraints.

5   And for off-post training, we pretty much -- The 40 hours

6   that the Lieutenant was talking about, we pretty much teach

7   range, use of firearms, the baton.  We teach how to respond,

8   searches, report writing, chemical agent, using pepper spray

9   deploying chemicals.  So various types, sir.

10  **Q.**   And the institution would have kept a record of the

11  training; correct?

12  **A.**   They would have in-service training records in the

13  personnel file.

14  **Q.**   And in-service training records are maintained on each

15  officer; correct?

16  **A.**   Yes, sir.

17  **Q.**   I'm going to show you now what's been marked as Exhibit

18  A -- Defense Exhibit A4.

19  **A.**   (Examining document.)

20  **Q.**   Do you recognize that document?

21  **A.**   Yes, sir, I do.

22  **Q.**   What is it?

23  **A.**   It's the In-Service Training Staff Report.

24  **Q.**   And is it your In-Service Training Staff Report?

25  **A.**   Yes, it is, sir.

1   **Q.** Does the document refer to any training you received on

2   clothed-body searches?

3   **A.** (Examining document.)

4       Yes, sir, it does.

5   **Q.** And did the training you received in 2006, it concern --

6   it concerned those searches; correct?

7   **A.** Yes, sir.

8   **Q.** Was the training similar to the training you received at

9   the Academy, to the best of your recollection?

10  **A.** Yes, sir.

11  **Q.** I want to turn briefly to your position as Range Master

12  and Tactical Instructor at the facility.

13      When did you become a Training Officer?

14  **A.** I became a Training Officer 2007.

15  **Q.** And what certifications do you possess?

16  **A.** I'm a certified Range Master, which is, we pretty much

17  teach other cops -- pretty much, we certify them on using the

18  firearm, which is with a rifle and a pistol.  And also Range

19  Master's chemical instructor, which we have pepper spray and

20  other chemicals we have in the institution.  And also Impact

21  Munition Instructor, which is a less lethal weapon that fires a

22  foam -- foam baton -- foam rounds out of the weapon.

23      I'm also certified instructor for baton, extendable baton.

24      Also certified instructor for relative base on the spine,

25  which is a relative base on the spine is when something going

1   on in the prison system, we pretty much instruct officers of

2   what to do if something has happened.

3       I'm also certified to teach first aid, CPR with EMS and

4   also with the American heart.  Pretty much, I'm certified for

5   the majority of the lesson plan that CDC or CTS has to offer.

6   **Q.**   Okay.  Now, are you certified to give training in

7   clothed-body searches?

8   **A.**   Yes, sir.  Every officer is certified to teach those

9   curriculum.

10      Some officers are pretty much certified for other things,

11  like Range Master, baton, and response, but those lesson plans,

12  any certified instructor could teach those.

13  **Q.**   And do you instruct -- In the training that you provide

14  regarding clothed-body searches, do you instruct officers to

15  cup the groin during such searches?

16  **A.**   Yes, sir, I instruct every custody staff to do that.

17  **Q.**   In the clothed-body search procedures, they're

18  substantially similar or identical to the procedures that were

19  in effect in 2006?

20  **A.**   Yes, sir.

21  **Q.**   And they're still being taught today.

22  **A.**   They're still being taught as of today, yes.

23          **MR. QUINN:**  Those are all the questions I have.

24          **THE COURT:**  All right.  Thank you.

25      Cross-examination.

1    **MR. CUNNINGHAM:**  Thank you, Judge.

2                    <u>**CROSS-EXAMINATION**</u>

3    **BY MR. CUNNINGHAM:**

4    **Q.**   You testified the other day that you don't remember any

5    302's -- 602s -- I'm sorry -- that were filed against you for

6    searches in 2006 and 2007; right?

7    **A.**   Not that I recall, because those years have been -- 2006,

8    '07, is many years, sir, so . . .

9    **Q.**   That was when you were first working at Soledad; right?

10   **A.**   Sir?

11   **Q.**   You were first at Soledad in 2006, 2007; right?

12   **A.**   Yes, sir, I was as Soledad 2006, 2007.

13   **Q.**   Um-hmm.  And in demonstrating the technique that you use

14   searching -- and correct me if I'm wrong -- when you have your

15   hand on the collar -- right, your one hand, is that right? --

16   on the collar of the person -- of the prisoner you're

17   searching.

18   **A.**   Upper back, yes, sir.  I have it on the upper back.

19   **Q.**   And you do the other patting with your other hand?

20   **A.**   With the free hand, yes, I do.

21   **Q.**   One side, the other side; right?

22   **A.**   Right, sir.

23   **Q.**   And you said the other day, you go down -- There's

24   actually four sides of the leg that you pat down; right?

25   **A.**   Yes, sir, you're right.  There's four sides of the leg.

1  **Q.**   Okay.  And when you do the inside, are you reaching all

2  the way around from the back, and do you reach through -- I

3  mean, to the front like that (indicating), or are you reaching

4  through from the back (indicating)?

5  **A.**   What do you mean around the front like that, sir?

6  **Q.**   Where you are reaching around the inmate's hip and you're

7  going down inside of the leg (indicating) from the groin.

8  **A.**   Can you be -- refine that, sir, because I'm not

9  understanding what you're saying.

10       **MR. CUNNINGHAM:**  Where is Jeff?  Come on up here.

11       **THE COURT:**  Well, I think what counsel's asking is, do

12  you put your hand around the body and go with your hand on the

13  front of the inmate, or do you place your hand between his legs

14  and go behind the inmate?

15  **BY MR. CUNNINGHAM:**

16  **Q.**   So I'm asking, when you get -- you do the back of the leg

17  (indicating)?

18  **A.**   Yes, sir.

19  **Q.**   You do the side of the leg (indicating)?

20  **A.**   Yes, sir.

21  **Q.**   You do the front of the leg (indicating)?

22  **A.**   Okay.

23  **Q.**   And you do the inside of the leg (indicating); right?

24  **A.**   Yes, sir.

25  **Q.**   When you do the inside of the leg, are you reaching around

1  to the front like this (indicating) from the back, or are you

2  coming in from the back here (indicating)?

3  **A.**  I'm coming from the back, sir.

4  **Q.**  So you come back around from the front.  The -- When you

5  do the inside of the leg, you're down here (indicating).

6  **A.**  Yes, sir.

7  **Q.**  Okay.  And is that when you'd also cup the groin?

8  **A.**  At the end, that's when I cup the groin.

9  **Q.**  At the end of the second leg?

10  **A.**  Yes, sir.

11       **THE COURT:**  Are we done with the -- with --

12  **BY MR. CUNNINGHAM:**

13  **Q.**  The inside of the second leg?

14  **A.**  Yes.

15       **MR. CUNNINGHAM:**  Thank you, Mr. Wozniak.

16       **THE COURT:**  I'm assuming you didn't find anybody.

17       **MR. CUNNINGHAM:**  Thank you, Judge, for pointing that

18  out.

19  **BY MR. CUNNINGHAM:**

20  **Q.**  So it's the last thing you do.

21  **A.**  Yes, sir.

22  **Q.**  And do you at that point -- So is there -- Do you have a

23  habit of one side first, then the other side?

24  **A.**  I always start off with the right side first.

25  **Q.**  So you're doing the right side with your left hand on the

1    back and you're using your right -- and you're on the right

2    side of the prisoner.

3    **A.**   Say again, sir?

4        If I was doing the right side, my left hand will be in the

5    back, my right hand was free to do the searches on the right

6    side, sir.

7    **Q.**   And then you switched to the left side.

8    **A.**   Yes, sir.

9    **Q.**   So when cupping of the groin is the last thing, that's

10   done normally with the left hand; right?

11   **A.**   Yes, sir.

12   **Q.**   And do you reach through the legs and go across the front

13   of the body, then, from pocket to pocket the way the Lieutenant

14   testified?

15   **A.**   Pretty much I do the same thing the Lieutenant says, from

16   pocket to pocket, the groin area, switch to the back.

17   **Q.**   So you're coming through the legs and doing the pocket to

18   pocket and then pulling your hand back through and sweep the

19   groin; is that right?

20   **A.**   Say it again, sir?

21   **Q.**   You -- You come through the legs to go from pocket to

22   pocket on the front, and then you bring your hand back through,

23   out from under, and that's when you sweep the groin itself.

24   **A.**   Yes, sir.  That's the way I demonstrated, sir.

25   **Q.**   Okay.

1          (Pause in proceedings.)

2    BY MR. CUNNINGHAM:

3    Q.   Have you -- Have you ever -- Strike it.

4         You said you also didn't remember any meeting with the

5    Warden.

6    A.   Until now, no, sir.

7    Q.   And --

8    A.   It could have happened; it could have not.  I don't

9    recall, sir.

10   Q.   Have you ever met with the Warden at the institution for

11   any other reason?

12   A.   Since being an instructor, I see him mostly every week,

13   just say, "Hi, sir."

14   Q.   Just to pass, like, say "Hello"?

15   A.   Just passing by, yes, sir.

16   Q.   Not going through his office and sitting down talking.

17   A.   His office is way off the building in the in-service

18   training.  I usually see him in in-service training for a

19   meeting, or taking a tour, or whatever he feels like doing.

20        So when I see him, out of respect, sir, "Good morning" or

21   "afternoon."

22   Q.   Okay.  That happens fairly often; right?

23   A.   Once in awhile, sir, it does.

24   Q.   Okay.

25   A.   It happens.

1  Q.   This is not Warden Curry anymore; right?

2  A.   No, sir, it's not.

3  Q.   And it hasn't been him for several years; right?

4  A.   I believe so, sir.

5  Q.   Okay.  Do you remember seeing Warden Curry out in the

6  institution when you were working there, when you were first

7  working there in those years 2006, 2007?

8  A.   When I first worked -- When I first started, I don't know

9  who's the Warden because there's a lot of people wearing suits,

10  a lot of people wearing ties, so I wouldn't know who the Warden

11  is.  If I seen him, maybe I seen them.  Maybe I have not, sir.

12  Q.   Okay.  And . . . when you were in the Marine Corps, did

13  you do clothed-body searches there of other soldiers?

14  A.   In the Marines, we are not soldiers, sir.  We're Marines.

15  Q.   I'm sorry.  Beg your pardon.  Please don't take it wrong.

16       As a military man.

17  A.   Yes, sir.

18  Q.   Was that part of your work, to search people?

19  A.   In the Marines, sir, there's no inmates in the Marine

20  Corps.

21  Q.   Okay.  So there's -- And you -- There was no inmate --

22  some inmates -- Marines sometimes get arrested; right?

23  A.   There is no inmates in my unit, sir.

24  Q.   Okay.  And -- And did you ever have a member of your unit

25  who got in trouble and was arrested and had to be searched?

1   **A.**   Not that I could recall, sir.  None of my Marines ever got

2   in trouble during my term, sir.

3   **Q.**   Did you have a nickname in the Marines as Sergeant Crazy?

4   **A.**   Yes, sir.

5   **Q.**   And you have a website -- or AOL -- I mean -- I'm sorry --

6   an e-mail address now, "Sergeant Crazy"?

7   **A.**   I used to, sir.

8   **Q.**   You don't have it anymore?

9   **A.**   No, sir.

10   **Q.**   Okay.

11   **A.**   It's now "Sergeant Abanico."

12   **Q.**   All right.  Why was it Sergeant Crazy before?

13   **A.**   It was -- Crazy was a nickname given to me by my First

14   Sergeant way back then.

15   **Q.**   When you were in the Marines?

16   **A.**   Yes, sir.

17   **Q.**   Okay.  And when did you give it up?

18   **A.**   I don't know, sir.

19   **Q.**   But you used it after you got out of the Marines for your

20   e-mail; is that fair?

21   **A.**   I used -- I kept it for a while because everybody asked my

22   e-mail address and I don't feel like contacting people to

23   change my e-mail address.

24       It's like when you change your cellphone number, you have

25   to call everybody in your cell -- in your phone book, and that

1  sometimes becomes a hassle.  Or sometimes you forget a person

2  and that person needs to get ahold of you and you can't.

3      That's why in -- for a time, I kept it, because I didn't

4  want to lose contact with my fellow Marines, because other

5  Marines keep in touch with me by e-mail.  So for a while I had

6  that e-mail.

7  **Q.**  How come they called you Crazy?

8  **A.**  Sir, I never asked my First Sergeant that question.

9  **Q.**  Okay.  But did everybody else use the nickname?

10  **A.**  No, sir.

11  **Q.**  Did anybody else use the nickname?

12  **A.**  They will address me as "Sergeant" or "Corporal."  They

13  would not -- the hierarchy in the Marines -- in hierarchy by

14  the Sergeant, my -- the Marines would not call me by my

15  nickname because it's pretty much insubordinate.  So they would

16  call me Sergeant Abanico or Sergeant.

17  **Q.**  Before you had rank, did the other people in the rank call

18  you Sergeant -- call you Crazy?

19  **A.**  No, sir.  They just called me by my last name.

20  **Q.**  Okay.

21                  (Pause in proceedings.)

22  **BY MR. CUNNINGHAM:**

23  **Q.**  I'm sorry.  One last question.

24      The Crazy part was only when you were a Sergeant?

25  **A.**  No, sir.  That was given to me when I was a Lance

1    Corporal, the year '90 -- '98 or '99.  I'm not too exactly sure

2    when, sir.

3    Q.    Okay.

4                      (Pause in proceedings.)

5    BY MR. CUNNINGHAM:

6    Q.    And now when you're doing training, you give training on

7    clothed-body searches, among other things, all the other things

8    you mentioned; right?

9    A.    Yeah, right, sir.

10   Q.    And at that time, do you -- Well, strike it.

11          Do you recall the testimony of Lieutenant Stoltenberg

12   where we saw in the exhibit in the Training Manual that there

13   were capital letters that said "Do not squeeze the scrotum"?

14   A.    Yeah, right, sir.

15   Q.    And did you have that Training Manual as something you

16   used when you were trained?

17   A.    Every time we do training, we always have a Training

18   Manual with us in case a student or a staff member wants to

19   challenge us and wants to know exactly where we're teaching

20   that.

21          So we actually show them, "It's right here on this page,

22   and we're not authoring it, we're not adding to it, we're

23   pretty much teaching you what's in the lesson plan."

24   Q.    And that was the same as you were being trained and also

25   when you were giving training; is that correct?

1  A.   Yes, sir.

2  Q.   Okay.  And when you're training them on clothed-body

3  searches, do you caution them to be careful not to use a

4  gesture that would give offense or that would -- the inmate

5  might resent?

6  A.   They -- Every Peace Officer, sir, should know that they

7  should be professional at all times.

8  Q.   So you don't say it.

9  A.   As a Peace Officer, sir, we are professional at all times.

10      MR. CUNNINGHAM:  I have no further questions, Judge.

11 Thank you.

12      THE COURT:  All right.  Thank you.

13      MR. QUINN:  Nothing further, Your Honor.

14      THE COURT:  All right.  Officer, you may step down.

15      THE WITNESS:  Thank you, sir.

16           (Witness excused.)

17      MR. LEWIS:  We have no further witnesses, Your Honor.

18      THE COURT:  Defense rests?

19      MR. LEWIS:  Defense rests, Your Honor.

20      MR. CUNNINGHAM:  We have this issue.  We have an issue

21 of --

22      THE COURT:  Well, we can resolve that with --

23      MR. LEWIS:  We can do that.

24      THE COURT:  All right.  Ladies and gentlemen of the

25 jury, that concludes the evidence portion of the trial.

1    At this juncture, the parties and myself will now settle

2 the jury instructions and also prepare the Verdict Form for

3 you.

4    It's my understanding that we most likely can start

5 argument first thing tomorrow morning.

6    I'll read the instructions first, then we'll have

7 argument, and the matter should be submitted to you no later

8 than noon tomorrow.

9    So what I'd like to do now is, I'll ask you to adjourn,

10 and I'll see you first thing tomorrow morning at 9 a.m.

11    **THE CLERK:**  All --

12    **THE COURT:**  Please remember my admonition not to talk

13 to anyone about this case.  Thank you so very much.

14    **THE CLERK:**  All rise.

15    (Proceedings were heard out of presence of the jury:)

16    **THE COURT:**  All right.  Let's -- Let's -- Let's do the

17 housekeeping things first.

18    Now, what documents did you want marked?

19    **MR. CUNNINGHAM:**  Judge, we have the documents from

20 the -- from the 602 that was filed by . . . the Plaintiff Trask

21 against Abanico about the . . . when he -- when he testified

22 that he had a file against him for taking food from prisoners,

23 taking their dinner trays, taking their stuff.

24    And then he said he was told -- he was -- that -- that his

25 602 had been withdrawn.  And there was a document supposedly

signed by him consenting to the withdrawal. And he objected that that was not signed by him and that he wanted the 602 reinstated, and it was reinstated.

So he has the page here with the false signature on it and the rest of the file with that 602.

He testified about it, and he was concerned that the document be in the record as well, and I am as well, so . . .

**MR. LEWIS:** And just so I can clarify: This is regarding Mr. Trask?

**THE COURT:** I think you -- I believe -- I've forgotten who cross-examined this witness.

**MR. LEWIS:** I think it was me.

**THE COURT:** You cross-examined. If I'm not mistaken, you asked him about, "Didn't you withdraw this 602?"

**MR. LEWIS:** I don't think I did ask him, Your Honor.

**THE COURT:** All right.

**MR. LEWIS:** I think he said, "This was -- This was falsified. My name was falsified."

**THE COURT:** No. But you asked him about whether it was withdrawn.

**MR. LEWIS:** I don't think I asked if it was withdrawn but I'm not going to state that. I can look at the transcript.

But one thing we do have, is, Your Honor, it's highly extraneous and highly irrelevant because it's not Officer -- there's no allegation Officer Abanico did it. There's no

1　allegation that Officer -- that Warden Curry did it.

2　　　　**THE COURT:**　No.　But you used it for -- Basically,

3　from what I remember, it was used for impeachment to show that

4　this witness' testimony was not truthful.

5　　　　**MR. LEWIS:**　I never submitted this exhibit.

6　　　　**THE COURT:**　No.　No, no.　But --

7　　　　**MR. LEWIS:**　I questioned him regarding his complaint

8　in general, but I didn't request him whether or not he withdrew

9　it or anything like that.

10　　　　**MR. CUNNINGHAM:**　I think it was a question about bias

11　on Abanico.

12　　　　**MR. LEWIS:**　Yes.　I -- I mean, I think the fact that

13　he brought a complaint is biased but Abanico -- there's no

14　evidence --

15　　　　**THE COURT:**　Didn't he say -- If I remember correctly,

16　somebody said, "And didn't you withdraw this complaint?"

17　　　　**MR. LEWIS:**　I don't believe I would have asked that,

18　Your Honor, but I -- it could be.

19　　　　**THE COURT:**　Whoo boy.

20　　　　**MR. LEWIS:**　We just -- We just believe it's irrelevant

21　to -- to say it better.

22　　　　**THE COURT:**　No.　I think if -- if you asked him

23　whether he withdrew this complaint --

24　　　　**MR. LEWIS:**　We actually have the daily transcript,

25　Your Honor.　I -- I could look that up.

1          THE COURT:  All right.  Why don't we take a quick

2    look.

3          MR. CUNNINGHAM:  Okay.

4          THE COURT:  If -- If he did, I'll let it in.  And if

5    he didn't, I won't.

6          MR. LEWIS:  And we believe it was yesterday

7    afternoon's cross-examination; right?

8          THE COURT:  Yes, I remember you saying that.

9       Do you have it written down?  You're a much better note

10   taking than I am.

11          LAW CLERk:  I'll see if I can find it.

12          THE COURT:  What's this?

13          THE CLERK:  It's the document with the faked signature

14   on it.

15          THE COURT:  I'll look at it later.

16          THE CLERK:  All right.

17                    (Defense counsel confer.)

18          THE LAW CLERK:  It happened at 11:35 if that helps.

19   That cross was at 11:35 yesterday.

20          MR. LEWIS:  And so I did . . .

21       He says, "Okay.  That particular" --

22          THE COURT:  Read the question and answer.

23          MR. LEWIS:  I'm sorry.  This is Page 269.

24          MR. QUINN:  279.

25          MR. LEWIS:  279, I'm sorry, of the dailies.

1     **Q.** That's fine.  But I'm --

2     Let the witness just briefly explain.

3     Okay.  That particular 602 . . ."

4     Okay.  I'll go back:

5     **Q.** And you accused him of preventing you from getting the

6     medical appointments.

7          "Yes.  Can we deal with these one at a time?

8          "Yes.

9          "The inmate food" --

10          This is the answer.

11          "The inmate food.  That was a 602 that I asked

12     to withdraw.  However, before I can withdraw it,

13     someone in the administration -- You're asking me,

14     sir, about the 602s and I'd like to explain."

15     So he volunteered that he -- but it wasn't in a response

16     to a question by me.

17     And then:

18          "Okay.  That particular 602, when it was given

19     to Administration, someone in administration, and I

20     don't know who, signed my name on it, signed my

21     number, and dated and withdrew my 602 without my

22     knowing.  And I have a copy of that 602 with the

23     signature of whoever signed it and it's different from

24     my signature."

25     He volunteered that.  It wasn't a question I asked him

1  about whether or not he withdrew it.

2       **MR. CUNNINGHAM:**  Well, but the witness asked him to

3  stop and go through the 602s one at a time so he could respond

4  instead of just saying --

5       **MR. LEWIS:**  This is the answer that he gave --

6       **THE COURT:**  Yeah, but the answer --

7       **MR. LEWIS:**  -- but I didn't ask a question.

8       **THE COURT:**  I suppose at the time counsel could have

9  asked to have it marked and show him the document, so I'm going

10  to allow the page with the signature in it.  All right?

11       **MR. LEWIS:**  All right.

12       **MR. CUNNINGHAM:**  All right.

13       **THE COURT:**  Mark that as what's next in plaintiff's.

14       **MR. CUNNINGHAM:**  Should it -- Should it go with the

15  602, Judge?

16       **THE COURT:**  No.  Just the page.  You can argue it, you

17  can talk about it, only the page with the signature.

18       **MR. CUNNINGHAM:**  All right.  And then I have

19  another --

20       **THE COURT:**  Hold on.  Hold it.  What number is that,

21  Lisa?

22       **THE CLERK:**  That's going to be 15.

23      (Plaintiff's Exhibit 15 marked for identification)

24       **THE COURT:**  Plaintiff's 15, objections?

25       **MR. LEWIS:**  Is that going to be --

1      THE COURT:  Just the face page with the signature.

2      MR. LEWIS:  With the false signature we were talking

3  about?

4      THE COURT:  Yes.

5      MR. LEWIS:  Objection on relevance grounds, Your

6  Honor.

7      THE COURT:  All right.  That will be overruled.  15

8  comes in evidence.

9      (Plaintiff's Exhibit 15 received in evidence).

10      THE COURT:  Next item.

11      MR. CUNNINGHAM:  The other item we have at this point,

12  you may recall that plaintiff Demetrius Huff testified that he

13  was written up by Abanico for supposedly having an earring that

14  he wasn't supposed to have --

15      THE COURT:  Yes.

16      MR. CUNNINGHAM:  -- and that led to a whole incident.

17      And what he -- What we're asking is if we can add to the

18  evidence the 115, the disciplinary report that was written

19  up -- by which in which he was written up for the earring.

20      MR. LEWIS:  Absolutely not, Your Honor.  We object to

21  this.

22      They have not -- They had a chance to produce this when

23  the witness was on.  They might have discussed it but the

24  actual document wasn't put in front of him.  He didn't have a

25  copy of it.

1    In fact, we mentioned during the proceedings that we

2  didn't have a copy of it.  So we cannot -- We think it's highly

3  improper to allow the document to now come in that was said

4  they didn't have at the time.

5          **MR. CUNNINGHAM:**  I can't --

6          **THE COURT:**  It's a document generated by the

7  Department of Corrections and Rehabilitation?

8          **MR. CUNNINGHAM:**  Yes.  Yes.

9          **MR. LEWIS:**  Yes, Your Honor.

10    But, I mean, this -- the witness had a chance to testify

11  about it, did not have it in front of him.  We didn't have a

12  chance to question him on it.

13    We don't want to reopen evidence to bring this in because

14  it's improper.  It wasn't there when the witness talked about

15  it.  He even said it wasn't there.

16          **MR. CUNNINGHAM:**  He talked about the incident that is

17  reflected in the document.  He testified fully about it and the

18  only issue here is whether or not the document that reflects

19  the incident ought to be part of the record.

20          **THE COURT:**  Now let me see it.

21                (Pause in proceedings.)

22          **MR. LEWIS:**  Your Honor, to the extent that this is

23  going to involve any kind of . . .

24          **THE COURT:**  Just one second.  Let me . . .

25                (Pause in proceedings.)

 1          MR. LEWIS:  And, Your Honor, if I may be heard on two

 2   issues --

 3          THE COURT:  Okay.

 4          MR. LEWIS:  -- before you issue your ruling.

 5          THE COURT:  Go ahead.

 6          MR. LEWIS:  To the extent this might be used for

 7   evidence on retaliation, we remind the Court there's no

 8   retaliation issue involving Mr. Huff.

 9       Second, plaintiffs are now using this after close of

10   evidence when Mr. Abanico is not on the stand.

11       He can't address it now.  To bring in it would be highly

12   prejudicial.

13          THE COURT:  The Defense motion to exclude will be

14   granted.

15          MR. CUNNINGHAM:  Are we going to go to lunch now?

16          THE COURT:  Motions?

17          MR. LEWIS:  Your Honor.  We will make a Rule 50 motion

18   on various grounds.

19          THE COURT:  Yeah.

20          MR. CUNNINGHAM:  I'm sorry.  I should have --

21          THE COURT:  Do you want to do that now?  Do you want

22   to go --

23          MR. LEWIS:  I think we can do it now.  It's 11:30,

24   Your Honor.  I'm willing to push now if you'd like to.

25          THE COURT:  Okay.

1          (Pause in proceedings.)

2          THE COURT:  Obviously, I've anticipated this.

3      There's still three remaining claims, the Eighth Amendment

4  violation, Warden Curry's liability in the matter, and then the

5  remaining retaliation claim.

6          MR. LEWIS:  Yes, Your Honor.  We have one argument for

7  each of them.

8          THE COURT:  Why don't we start with the retaliation.

9          MR. LEWIS:  Yes, Your Honor.

10          MR. CUNNINGHAM:  Judge, let me intervene for a moment.

11      I think it's clear we have abandoned the retaliation claim

12  on the part of Cleveland.

13          THE COURT:  Plaintiff moves to -- to -- to strike the

14  allegations of retaliation from the First Amended Complaint.

15          MR. CUNNINGHAM:  Yes.

16          THE COURT:  Any objection?

17          MR. LEWIS:  No objection.

18          THE COURT:  Granted.

19          MR. LEWIS:  And if I'm correct, Your Honor, that is

20  the only retaliation claim in the case.

21          THE COURT:  My understanding, after a detailed reading

22  of the complaint again yesterday with my staff, that that was

23  the remaining retaliation claim.  The other retaliation claim

24  had basically been stricken through -- at summary judgment.

25          MR. LEWIS:  And we'd just ask for a clarifying

1  instruction for that purpose to the jury because they did hear

2  about it.

3         **THE COURT:**  Yes, I will.

4         **MR. LEWIS:**  And in the second claim, we'll address

5  Warden Curry if you feel that's appropriate, Your Honor.

6         **THE COURT:**  Yeah.  Go ahead.

7         **MR. LEWIS:**  First of all, the Rule 50 standard we all

8  know, but just for clarification.

9      Defendants are entitled to judgment as a matter of law on

10  certain claims.

11     If a party has failed -- has been fully heard on an issue,

12  and the Court finds a reasonable jury could not legally

13  sufficient evidentiary basis to find for that party on the

14  issue, the Court may resolve the issue against that party.

15     Defendants feel that the claim against Warden Curry should

16  be -- judgment should be granted in our favor.

17     In order to the order screening the plaintiffs' amended

18  complaint, the plaintiffs allege that Defendant Curry violated

19  Plaintiffs' Amendment -- Eighth Amendment rights by failing and

20  refusing to intervene to prevent the sexual harassment and

21  misconduct by Defendant Abanico.

22     I do have a copy of the screening order.  We can show it

23  to you if you like.

24         **THE COURT:**  I have it.  I also have the First Amended

25  Complaint.

1          **MR. LEWIS:**  Yes, Your Honor.

2      In order to state -- And by analogy, we'll use other

3  Eighth Amendment cases.

4      In order to state an Eighth Amendment claim for, say,

5  excessive force against a Correctional Officer or bystander,

6  plaintiff must allege circumstances demonstrating that these

7  officers, in the case of Warden Curry, had an opportunity to

8  intervene and prevent or curtail the violation, such as, enough

9  time to observe what was happening and intervene to stop it but

10  failed to do so.

11      Citation to Robert vs. Meecham, 60 F. 3d 430 -- 1436.

12          **THE COURT:**  Let me -- Let me -- I'm sorry.  Go ahead.

13          **MR. LEWIS:**  Comma 1442, Ninth Circuit, 1995.

14          **THE COURT:**  One of the issues you're going to address

15  in this is the fact that the testimony that was read into

16  evidence regarding Warden Curry specifically said that Warden

17  Curry, in fact, had Correctional Officer Abanico in his office

18  to talk about this very issue.

19          **MR. LEWIS:**  Um-hmm.

20          **THE COURT:**  So he knew about it.  I don't say whether

21  he agreed with it but he knew about it.  He knew about the

22  complaints.  He talked at length about what he thought about

23  these complaints, and yet still he did nothing.

24      I think he indicated he did nothing to intervene in the

25  sense -- Whether you agree with it or not, there's testimony

1    that he knew about it and did nothing. He certainly gave his

2    reasons for it.

3         **MR. LEWIS:** Um-hmm.

4         **THE COURT:** But isn't that sufficient for -- for the

5    jury enough to determine the liability?

6         **MR. LEWIS:** And there's two issues there. If it is a

7    failure to intervene claim, that implies a physical presence, I

8    would believe, and there's been no testimony that Warden Curry

9    was physically present at any of these searches.

10       Now, he did speak with Officer Abanico but to address

11    that, we have no information regarding dates. The plaintiffs,

12    aside from a few -- few isolated instances, have never been

13    able to provide dates about numerous searches. They have a few

14    here and there. But there's no information in the record about

15    when that meeting with Officer Abanico was. So there's --

16         **THE COURT:** I think it's clear.

17         **MR. LEWIS:** -- no way of telling --

18         **THE COURT:** I think it's clear. I don't mean to

19    interrupt.

20       But I think it's clear that one can infer it was after at

21    least some of the searches that are in question.

22         **MR. LEWIS:** And that would be a fair assumption

23    because obviously that's how the Warden got the notice.

24       But if it was after some of the searches, we have no

25    evidence the searches' other retaliatory -- I'm sorry -- other

1    alleged sexual molestation searches occurred after that

2    meeting.

3         So, therefore, Warden Curry couldn't be held liable for

4    failing to intervene because there's no evidence in front of

5    the jury that these searches happened after the meeting.  They

6    don't even know when the meeting was.  So, therefore, there's

7    no way he could have intervened because we don't even know if

8    the searches occurred after the meet.

9         Now, if there's a supervisory liability hook -- And I

10   would ask the Court:  Is my interpretation correct that this is

11   a failure to intervene claim and not a supervisory liability

12   claim.

13        **THE COURT:**  Correct.

14        **MR. LEWIS:**  All right.  So, then, I think that that is

15   telling right there with the fact that there's no real evidence

16   in the dates.

17        We have questioned the witnesses and the plaintiffs

18   regarding dates, and many of them were not able to provide one.

19   And we don't know when that meeting was.

20        For the third issue --

21        **THE COURT:**  Wait, wait, wait, wait.  We'll take these

22   one at a time.

23        **MR. LEWIS:**

24        All right.

25        **THE COURT:**  My tentative ruling is to deny the Rule 50

1  motion as to this point.

2      Do you have anything to add?

3          **MR. CUNNINGHAM:**  Well, if your ruling is going to be

4  to deny it, Judge, no, I won't argue with you.

5      I mean, I should point out, Judge --

6          **THE COURT:**  Hold on just a minute.

7          **MR. CUNNINGHAM:**  Sure.

8                      (Pause in proceedings.)

9          **MR. CUNNINGHAM:**  In terms of the timing of the

10  interview, that the testimony was that it was after he had made

11  the first inquiry of Deputy Warden Knoll, and then it was after

12  she -- he had checked back with her again.

13      And we did receive answers.  We made some followup

14  interrogatories.

15          **THE COURT:**  There's sufficient -- There's sufficient

16  evidence, I believe, for both sides to argue that issue.  But I

17  think it should go to -- to the jury.

18      Now, would you be specific as to exactly what this claim

19  is.

20          **MR. CUNNINGHAM:**  The claim of nonintervention?

21          **THE COURT:**  Correct.  Not supervisory --

22          **MR. CUNNINGHAM:**  No, it's not supervisory liability.

23      He was -- He was informed.  He said early on the petition

24  that was filed by Cleveland, the 150 names, he started asking

25  questions, he said.

1    He told Ms. Knoll to look into it.  He told Lieutenant

2  Biggs to look into it.  He, you know, did what he did and --

3  and, ultimately, as he said -- I assume I -- I would assume

4  that somebody would tell him, you know, "You ought to do

5  something about this because your name is coming up too

6  much" -- told Abanico.

7    Abanico came and saw him.  And he told Abanico, "You've

8  got to find out a way to do this without generating so much

9  hate and discontent," and there is a point when they stopped

10 the searches.  The complaints stopped.  Nobody's saying he's

11 doing it anymore.

12    **THE COURT:**  All right.

13    **MR. CUNNINGHAM:**  That's a year and a half later.  A

14 year and 14 months.

15    **THE COURT:**  Based on the arguments that I've heard, I

16 cannot find as a matter of law against plaintiffs on the

17 claim -- or against the defendant for the reasons stated, and

18 that no jury could find in favor of the plaintiff based on

19 what's been provided to the Court at this juncture.  So that'll

20 be denied.

21    **MR. LEWIS:**  Thank you, Your Honor.

22    And, lastly, regarding the Eighth Amendment claims.

23    The defendants believe they're entitled to judgment on the

24 Eighth Amendment claims by plaintiffs Morris, Huff and Jones,

25 because the plaintiff -- those particular plaintiffs have

1    produced no evidence that they suffered physical injury and

2    were not subject to a sexual act by defendant.

3         Furthermore, the searches conducted on them only resulted

4    in de minimis injury, if at all, from the isolated, brief

5    incidents.

6         The PLRA specifically provides that prisoners cannot

7    recover damages for mental or emotional injuries suffered while

8    in custody without a prior showing of physical injury or the

9    commission of a sexual act as defined by Title 18,

10   Section 2246.

11        The Ninth Circuit has recognized this in Oliver vs.

12   Keller, 289 F. 3d 623, 626 to 28, Ninth Circuit, 2002.

13        Basically the Ninth Circuit has construed this provision

14   to preclude recovery of damages from mental or emotional

15   injuries unless the prisoner has suffered a physical injury

16   that is more than de minimis.

17        In this case, we heard testimony that Plaintiff Morris and

18   Jones identified they were searched by Defendant Abanico only

19   one time; that they were single search incidences and the

20   contact with their groin lasted only a few seconds.

21        In the case of Mr. Huff, he testified that his penis and

22   scrotum were grabbed one time and that the rest of the other

23   searches involved a fluid and firm sweep of his groin area.

24        None of these inmates testified regarding physical harm

25   from defendant Abanico's searches and none of them sought

1  medical attention.

2      None of these inmates suffered the sexual harassment that

3  was egregious, pervasive or widespread efficient to constitute

4  a claim under the Eighth Amendment.  And that's citing to

5  Jordan vs. Gardner, 986 F. 2d 151 (sic), Page 1525, Ninth

6  Circuit, 1993, en banc.

7      Because of this, and because the de minimis injuries are

8  there, and because there's no damage, no emotional injury or no

9  medical injury, they can't recover.  And because the injury was

10  so slight, the defendants are entitled as a matter of law as to

11  those defendants -- as to those plaintiffs.

12          **THE COURT:**  Thank you.

13          **MR. CUNNINGHAM:**  Judge --

14          **THE COURT:**  The Court -- Just a moment.

15      The Court notes the United States vs. Wood, 692 Fd.3d

16  1041, 2012 case.

17      The Court in that matter, Ninth Circuit . . .

18      The Court noted that:

19          "Sexual harassment or abuse of an inmate by

20          Corrections Officer is a violation of the Eighth

21          Amendment."

22          Schwenk vs. Hartford, 204 Fd.3d 1187, Ninth Circuit

23  2000.

24          "In the simplest and most absolute terms,

25          prisoners have a clear established Eighth Amendment

right to be free from sexual abuse.

"The unsolicited touching of a prisoner's genitalia by prison employees are simply not part of the penalty that criminal offenders pay for their defenses against society."

Quoting Farmer vs. Brennan, 51 U.S. 825.

The Court goes on to argue . . .

"Sexual contact between a prisoner and a prison guard search in a legitimate role is simply a part of the penalty that criminal offenders pay for their offenses against society. Where there is no legitimate penological purpose for a prison official's conduct, the courts have presumed malicious and sadistic intent.

"We have previously held that a sexual assault on a prisoner by a prison guard is always deeply offensive to dignity and is completely void of penological justification. We, thus, conclude that Woods' allegations are sufficient to state an Eighth Amendment claim."

And based on that, that will go to the jury. Rule 50 is denied.

**MR. LEWIS:** Yes, Your Honor.

We would ask that -- and we will address this at the -- at instructions -- but that this particular provision regarding

1  the recovery of damages without emotion -- or without emotional

2  damages shown, we'd ask for a jury instruction on that, on

3  those specifics.

4      **THE COURT:**  All right.  We can take that up.

5    Do you have anything to add on the defendant's final --

6      **MR. CUNNINGHAM:**  No, Judge.  You stated it very

7  completely.

8      **THE COURT:**  All right.  Thank you.

9    Anything further at this time?

10      **MR. CUNNINGHAM:**  No.  We'll see you at 1 o'clock for

11  instructions?

12      **THE COURT:**  1 o'clock, we'll settle jury instructions

13  and then also the verdict.

14      **MR. QUINN:**  Thank you, Your Honor.

15      **MR. CUNNINGHAM:**  Thank you, Your Honor.

16      **THE COURT:**  Courts' in recess.

17      (Luncheon recess was taken at 11:37 a.m.)

18  **Afternoon Session**                                    **1:16 p.m.**

19     (Proceedings were heard out of the presence of the jury:)

20      **THE COURT:**  All right.  Let's go through and settle

21  the instructions.

22     Before we start, we need to talk about Curry's liability

23  and how we're framing it because what we did was we took a look

24  at some of the instructions and it still remains, even though

25  his failure to intervene, that's a subsection of supervisory

1  liability.  So --

2          **MR. CUNNINGHAM:**  Well, so the issue is, then?

3          **THE COURT:**  Which jury instructions are we going to

4  use?

5          **MR. CUNNINGHAM:**  As to -- I think -- well, I mean,

6  we'll get to it; but I think, you know, the substance of the

7  charge is a failure to do something.  I mean, he -- you can't

8  say he was supervising the guy in any direct way and he was

9  doing it; and, therefore, he knew and it's kind of like a

10 sergeant's responsibility or somebody who's on the scene and

11 that kind of intervention.

12         **THE COURT:**  No, no, no.  I mean, look, the evidence,

13 as I see it, what's going to go to the jury, is that there were

14 reports filed about this conduct; that the defendant went to

15 Warden Curry, discussed, apparently, something about this.

16 Warden Curry testified that he did some independent

17 investigation, I believe, and then testified as to what he

18 thought he should or shouldn't do, which included failing to

19 intervene in the matter, and the question is whether or not

20 that's a violation.

21         **MR. CUNNINGHAM:**  Whether or not what he did was

22 reasonable response to the information or the charges that were

23 brought to him, yes.

24         **THE COURT:**  Okay.

25         **MR. CUNNINGHAM:**  The 150 signatures, I mean, he said

1  that's what got him started.  In other words, he doesn't even

2  normally deal with these things; but when he saw -- when that

3  was put in front of him with so many people making -- saying

4  the same thing, then he got -- I think he said, "That caught my

5  attention."

6      And then he began to take the steps that he took that led

7  him to the point of what we think of as the cover-up to say,

8  "Oh, no, that must be three or four guys racketeering or

9  trafficking in something, and the rest of it is all, you know,

10  phony."

11      And, so, really the essence of it is, in that whole

12  progress of his activity around the case, is that he was always

13  trying to find a way.  Like Lieutenant Stoltenberg said:  I'm

14  always going to go with the peace officer.  You know, I have to

15  find a way to defend this guy.  I have to find a way to protect

16  this guy in the face of even this 18 whatever it was, 16, 18

17  602s, and these two petitions, one nine, ten months after the

18  first one all signed by a lot of prisoners.

19      He found it expedient to say, "Oh, well, that doesn't mean

20  anything," but that was unreasonable, Judge.

21      **THE COURT:**  All right.  Well, let's go ahead and start

22  through some of the other ones and then we can talk about that.

23      **MR. CUNNINGHAM:**  All right.

24      **THE COURT:**  And I have some additional ones also we've

25  been sort of going through and taking a look at these.

 1          MR. CUNNINGHAM:  Yes.  You gave us those.

 2          THE COURT:  All right.  Anybody have any objection to

 3    1.1C, Duty of Jury?

 4          MR. WOZNIAK:  No.

 5          MR. CUNNINGHAM:  No.

 6          MR. QUINN:  No.

 7          THE COURT:  Okay.  1.2, Claims and Defenses, as we've

 8    outlined them in the instructions and edited by the parties and

 9    Court on the 4th?

10          MR. WOZNIAK:  The plaintiffs would request some

11    changes in light of the testimony.

12          THE REPORTER:  Counsel, I need you to speak up,

13    please.

14          MR. WOZNIAK:  The plaintiffs would request, I think

15    it's obvious that the "in addition," second paragraph, will be

16    taken out.

17          THE COURT:  All right.  We'll strike this.

18       Any objection?

19          MR. QUINN:  No.  The Court removed that claim, so

20    that's fine.

21          MR. WOZNIAK:  And then the plaintiffs would also

22    request that in the second line after "Defendant Abanico," we'd

23    like to add "grabbing and squeezing of the genitals under cover

24    of an authorized clothed body search."

25          THE COURT:  Hold on a second.

PROCEEDINGS

1          (Pause in proceedings.)

2          THE COURT:  I'm sorry.  Excuse me, Counsel.

3      "They were intentionally pointedly groped, fondled, and

4  molested."

5      What was the exact testimony?

6          MR. QUINN:  That's taken from their Complaint, I

7  believe, the Amended Complaint, the operative Complaint.  And

8  the Court has rejected -- Judge Breyer previously rejected an

9  attempt to amend the Complaint and add new claims.

10         THE COURT:  Judge White; wasn't it?

11         MR. QUINN:  Judge Breyer.

12         THE COURT:  How many judges has this gone through?

13         MR. QUINN:  It was Judge Fogel, Judge Breyer and --

14         THE COURT:  Oh, okay.

15         MR. CUNNINGHAM:  But Judge Breyer didn't say anything

16  about claims.  He said we were trying to add defendants.

17         MR. QUINN:  Well, you were trying to amend the

18  Complaint and -- or change the Complaint and change the

19  defendants and the plaintiffs involved in the claims.

20         THE COURT:  Is this the language that's in the

21  Complaint?

22         MR. QUINN:  I think I cut and pasted it right from

23  there.  We have....

24         THE LAW CLERK:  I have it.

25         MR. WOZNIAK:  I mean, we're just suggesting to add

1  "grabbing and squeezing" because that was the testimony of the

2  plaintiffs about the specific conduct of Defendant Abanico.

3      THE COURT:  I understand that, but....

4              (Pause in proceedings.)

5      THE COURT:  We'll take a look at the Complaint.

6              (Pause in proceedings.)

7      MR. QUINN:  It's page 4 of the Complaint, line 17.

8              (Pause in proceedings.)

9      THE COURT:  That is what's in the Complaint; and, two,

10  what's been described can certainly be called a subset of that.

11      MR. WOZNIAK:  I can't disagree with you, Judge; but,

12  you know, we would request that if we could take out

13  "intentionally and pointedly groped, fondled" and just write

14  "molested by Abanico and that he grabbed and squeezed

15  genitals," that's what the plaintiffs are requesting.

16      MR. QUINN:  They shouldn't be allowed to change their

17  Complaint or claims that are asserted in their Complaint.

18      THE COURT:  I think I agree with counsel.  That will

19  be denied.

20      MR. WOZNIAK:  And then at the end of that first

21  paragraph, plaintiffs request that "interacting with" be

22  changed to --

23      THE COURT:  Let me see, what are we talking about?

24  Oh, "interacting."

25      MR. WOZNIAK:  The end of the first paragraph where it

1   says, "Meaningful action to prevent Abanico from," and the next

2   word, "interacting with," we'd request that those be struck and

3   then "abusing."

4       **THE COURT:** "They claim that although they complained

5   about the searches and filed formal grievances against Abanico,

6   prison officials under the supervision of Defendant Curry

7   failed to take meaningful action to prevent Abanico from..."

8       **MR. WOZNIAK:** "Abusing prisoners." I think that the

9   gist of this here is that they weren't saying no interaction,

10  but that he was actually abusing them within his interaction.

11      **MR. QUINN:** I mean, the allegation is that --

12      **THE COURT:** Yeah, nobody's ever said that he couldn't

13  interact with them or he couldn't -- in fact, nobody ever said

14  that he couldn't search them. The gist of it is that this was

15  abusive behavior. The allegation is that it's an abusive

16  behavior.

17      **MR. QUINN:** True. I mean, but the -- you know, part

18  of the testimony was whether the allegation is that Curry

19  should have moved him to a separate section of the prison or

20  somewhere where he wouldn't have to be interacting with the

21  inmates in this manner in the sense with regard to doing

22  clothed body searches.

23      **THE COURT:** How about "interacting or abusing"?

24      **MR. WOZNIAK:** Or we could say "mistreating."

25      **MR. QUINN:** "Interacting or abusing," no.

1    THE COURT:  All right.  We'll go ahead with

2  "interacting or abusing."

3      Anything else on Claims and Defenses?

4      MR. WOZNIAK:  Yes.  In the third paragraph, the fourth

5  sentence, "Defendants further argue that such searches," that

6  sentence:  (reading)

7          "Defendants further argue that such searches, if

8          performed in accordance with the Department's training

9          manual, requires some amount of touching or grabbing of

10         plaintiffs' groin and buttocks."

11     We're requesting that "grabbing" be taken out because

12  grabbing is not what the testimony was.

13     THE COURT:  There was nothing that said it was

14  appropriate to grab.  The testimony was that it was touching.

15     MR. QUINN:  Can we replace it with "cupping"?

16     THE COURT:  "Touching or cupping," I think that was

17  what was said, and we can go ahead and change that.  So "some

18  amount of touching or cupping of plaintiffs' groin and

19  buttocks."

20     MR. WOZNIAK:  And then in the next sentence:

21  (reading)

22          "Defendants also argue that" --

23     THE COURT:  Hold on.  Hold on.

24     MR. WOZNIAK:  I'm sorry.

25     THE COURT:  Okay.

1    **MR. WOZNIAK:**  Ready, Judge?

2    **THE COURT:**  Yes.

3    **MR. WOZNIAK:**  In the next sentence:  (reading)

4        "Defendants also argue that because Abanico's contact

5    with plaintiffs' groins during the search did not" --

6    **THE COURT:**  It should be "groin."  No, I guess it's

7    plaintiffs here, plaintiffs' groins.

8    **MR. WOZNIAK:**  (reading)

9    -- "plaintiffs' groins did not last longer than a few

10   seconds and was consistent with search procedures..."

11   And we're requesting that "because" be changed to "that,"

12   "and that there is no evidence that plaintiffs were sexually

13   abused," not "because" but have "that."

14                (Pause in proceedings.)

15   **THE COURT:**  And you want to change "because" to what?

16   **MR. WOZNIAK:**  "That."

17   **THE COURT:**  That's actually better for you, I think.

18   What's defense position?

19   **MR. QUINN:**  The second "because" -- the second

20   "because" or the first "because"?  I guess the second

21   "because."

22   **THE COURT:**  No.  What he wants is -- now we're on the

23   record.  Now I'm mumbling on the record.  (reading)

24       "Defendant also argue" -- "Defendants also argue that

25   because Abanico's contact with plaintiffs' groins during

1    the searches did not last longer than a few seconds and

2    was consistent with search procedures and that there

3    is" -- "and that there is no evidence that plaintiffs were

4    sexually abused or molested during the searches, there was

5    no reason for Curry to intervene in the matter."

6         **MR. QUINN:**  That's fine.

7         **THE COURT:**  Okay.

8         **MR. WOZNIAK:**  The other -- in that sentence there's

9    another suggested change.

10        **THE COURT:**  Yes.  Go ahead.

11        **MR. WOZNIAK:**  So in the last -- after the last comma

12   there, you know, to add "and, therefore, there was no reason

13   for Curry to intervene in that matter."

14        **THE COURT:**  "And there was no reason for Curry"?  All

15   right.

16        **MR. WOZNIAK:**  "And, therefore, there was no reason for

17   Curry to intervene."

18        **THE COURT:**  I don't see any --

19        **MR. QUINN:**  Okay.

20        **THE COURT:**  Okay.  So let me read the whole --

21        **THE LAW CLERK:**  And, Judge, strike the

22   next-to-the-last sentence.

23        **MR. WOZNIAK:**  Oh, yes.  Plaintiffs also request

24   because that's the retaliation part.

25        **MR. QUINN:**  Oh, yeah.  Strike that.

1    **THE COURT:**  All right.  So the Claims and Defenses

2  that are to be read to the jury is as follows:  (reading)

3       "Plaintiffs allege that beginning in May 2006 they

4       were intentionally and pointedly groped, fondled, and

5       molested by Defendant Abanico under cover of an authorized

6       clothed body search in violation of the Eighth Amendment.

7       "Plaintiffs argue that the searches were not conducted

8       in accordance with the rules or with the training Abanico

9       received.  They claim that although they complained about

10       the searches and filed formal grievances against Abanico,

11       prison officials, under the supervision of Defendant

12       Curry, failed to take meaningful action to prevent Abanico

13       from interacting or abusing prisoners."

14    **MR. WOZNIAK:**  Should that be "interacting with or

15  abusing prisoners"?

16    **MR. QUINN:**  I think that should be "interacting with

17  or abusing prisoners."

18       **THE COURT:**  Or what?

19    **MR. WOZNIAK:**  "Interacting with or abusing."

20    **THE COURT:**  Oh, "interacting with."  All right.

21  "Interacting with or abusing prisoners."  (reading)

22       "The defendants deny plaintiffs' claims in their

23       entirety.  Defendants argue that they did not violate

24       plaintiffs' rights.  To the contrary, they argue that

25       Abanico adhered to the training he received at the

1  Correctional Academy while performing such searches.

2      "Defendants further argue that such searches that are

3  performed in accordance with the Department's training

4  manual requires some amount of touching or cupping of

5  plaintiffs' groin or buttocks through their clothes to

6  accomplish the purpose of the search.

7      "Defendants also argue that because Abanico's contact

8  with plaintiffs' groins during the searches did not last

9  longer than a few seconds and was consistent with search

10  procedures and that there is no evidence that plaintiffs

11  were sexually abused or molested during the searches and,

12  therefore" --

13  "And, therefore, there was no reason"?

14      **MR. WOZNIAK:**  Yes.

15      **THE COURT:**  (reading)

16  -- "and, therefore, there was no reason for Curry to

17  intervene in the matter.

18      "Accordingly, defendants argue that they did not

19  violate plaintiffs' Eighth Amendment rights.

20      "Finally, defendants argue that they are entitled to

21  qualified immunity."

22  Are the parties satisfied with that?

23      **MR. WOZNIAK:**  One other thing I would suggest is we

24  take out "buttocks" because there was really no -- well, was

25  there?

1  **THE COURT:**  No, there was testimony about it.   There

2  was testimony about that.

3       Are the defendants satisfied with the Claims and Defenses?

4  **MR. QUINN:**  Yeah.   The second-to-the-last sentence is

5  sort of a run-on or third-to-the-last sentence, but I think it

6  gets the point across.

7  **MR. CUNNINGHAM:**  I'm intervening here, Judge, to say I

8  think the line about qualified immunity should go out.   I don't

9  think we have a qualified immunity situation here, and I don't

10  think -- I think that terminology is something that would cause

11  confusion.   I think that's really not in the case.

12  **MR. QUINN:**  We were going to argue that a qualified

13  immunity instruction should be included in the jury

14  instructions.

15  **THE COURT:**  Well, let's put 1.2 to the side and move

16  on.

17       Burden of Proof/Preponderance of the Evidence.   And,

18  again, I will ask the parties, there are no claims here that

19  require clear and convincing evidence?

20  **MR. CUNNINGHAM:**  Correct.

21  **MR. QUINN:**  I don't believe so.

22  **THE COURT:**  All right.   1.3 okay?

23  **MR. WOZNIAK:**  Yeah.

24  **THE COURT:**  1.5, Two or More Parties Different Legal

25  Rights?

1    MR. WOZNIAK:  Good.

2    MR. QUINN:  That's fine.

3    THE COURT:  Standard 1.6, What is Evidence?

4    MR. WOZNIAK:  Good.

5    MR. QUINN:  That's fine.

6    THE COURT:  1.7, What is not Evidence?

7    MR. WOZNIAK:  Good.

8    MR. QUINN:  That's fine.

9    THE COURT:  1.8, Evidence for a Limited Purpose?

10   MR. WOZNIAK:  Good.

11   THE COURT:  I think there was some -- wasn't there --

12   yeah, I mean, I guess -- what was limited?

13       No, don't.  Who's going to argue this?

14   MR. CUNNINGHAM:  I'll leave it to him, Judge.  I'm

15   sorry.

16   THE COURT:  I'm trying to think.

17   MR. WOZNIAK:  Because the impeachment stuff was all

18   brought in; right?  It wasn't....

19                   (Pause in proceedings.)

20   THE COURT:  I'm trying to think.  The reports that

21   Curry was shown saying, "Well, you had notice of this," is that

22   for a limited purpose?

23   MR. QUINN:  The reports that Curry was shown that were

24   referenced in his deposition you're referring to?

25   THE COURT:  Yeah.

# PROCEEDINGS

1                      (Pause in proceedings.)

2        **THE COURT:**  Let's put this to the side.  Let's put

3  this to the side.  Let's go through the ones that we can all

4  agree on right now, then we'll go through the rest afterwards.

5      Direct and Circumstantial Evidence?

6        **MR. WOZNIAK:**  Good.

7        **MR. QUINN:**  That's fine.

8        **THE COURT:**  Rulings on Objections?

9        **MR. WOZNIAK:**  Good.

10        **MR. QUINN:**  That's fine.

11        **THE COURT:**  Availability of Witnesses?

12        **MR. WOZNIAK:**  Good.

13        **MR. QUINN:**  That's fine.

14        **THE COURT:**  Taking of Notes as modified?

15        **MR. WOZNIAK:**  That's good.

16        **MR. QUINN:**  That's fine.

17        **THE COURT:**  Bench Conferences and Recesses?

18        **MR. QUINN:**  That's fine.

19        **THE COURT:**  Any objection?

20        **MR. WOZNIAK:**  No.

21        **THE COURT:**  All right.  I believe there were some

22  stipulations of fact?

23        **MR. QUINN:**  In the joint pretrial statement.

24        **THE COURT:**  I was going to read those at this time,

25  but actually the parties didn't stipulate to anything yet.

1   What we could do is tomorrow before we read the instructions,

2   do you want to stipulate to these facts?

3          MR. QUINN:  They're stipulated to in the joint

4   pretrial statement.

5          THE COURT:  I know, but it has to be done in front of

6   the jury.  They have to have notice of it.

7       These were ones that were in the pretrial -- these are all

8   the ones in the pretrial statement.

9          MR. WOZNIAK:  Right.

10          THE COURT:  Do you want to stipulate to them tomorrow

11   in front of the jury, and then I'll read this instruction?

12          MR. QUINN:  That's fine.

13          MR. WOZNIAK:  Can I have one brief moment to talk to

14   Mr. Cunningham?

15          THE COURT:  Yes.

16                        (Pause in proceedings.)

17          MR. WOZNIAK:  The one we'd like to add to this in the

18   "clothed body searches are conducted" paragraph, the very last

19   sentence:  (reading)

20          "While searching an inmate's groin, one officer is

21       also directed to," quote, "cup the groin and check for

22       contraband."

23       In that section within the handbook or the workbook, that

24   is where it says "DO NOT SQUEEZE THE SCROTUM" right immediately

25   after that; and, so, we're requesting that the entirety of that

1  phrase be in there.

2       **MR. QUINN:**  It seems to me that if they wanted that

3  phrase in there, they had ample amount of time to put it in the

4  pretrial statement.  It's a little late for that.

5       **THE COURT:**  Are you going to stipulate to that or not?

6       **MR. QUINN:**  To including that new part?

7       **THE COURT:**  Yes, and me reading it to the jury.

8       **MR. QUINN:**  I guess it's fine.

9       **THE COURT:**  All right.  Where do we want it?

10       **MR. QUINN:**  It's right after "contraband."

11       **THE COURT:**  "Contraband" and then what do you want to

12  add?

13       **MR. WOZNIAK:**  And then it says, "Do not squeeze the

14  scrotum."  "Do not squeeze" --

15       **THE COURT:**  "Cup the groin and check for contraband"

16  and not to?

17       **MR. WOZNIAK:**  The way it's written in here, it's a new

18  sentence, "Do not squeeze the inmate's scrotum.  It's in all

19  caps in here, too.  I don't know if you want to do it in all

20  caps.

21       **THE COURT:**  No.  I'm just going to read it to them.

22  "Do not squeeze the scrotum."

23     All right.  Any other stipulations?

24       **MR. WOZNIAK:**  No.

25       **THE COURT:**  All right.  Proof?

1          **MR. QUINN:** That's fine.

2          **THE COURT:** Okay. Was there any impeachment evidence?

3          **MR. LEWIS:** Yes.

4          **MR. QUINN:** Well, we used some of the depositions for

5     impeachment.

6          **MR. LEWIS:** Two exhibits, Your Honor, by defendants.

7          **THE COURT:** So how do we want to phrase 2.8,

8     Impeachment Evidence of Witness?

9          **MR. WOZNIAK:** We were going to suggest "inconsistent

10    prior statements."

11         **THE COURT:** "The evidence that a witness made

12    inconsistent prior statements"?

13         **MR. QUINN:** I would just keep, "The evidence that a

14    witness lied under oath on a prior occasion would be

15    considered," et cetera, et cetera.

16         **MR. WOZNIAK:** There's nothing that suggests that they

17    lied. I mean, the differences were two or three seconds versus

18    three to four seconds or differences of dates.

19         **THE COURT:** That's not lying, no. I think that's

20    inappropriate to what the testimony was. And I know counsel

21    cross-examined vigorously on whether it was one or two seconds

22    or three or four seconds, and I noted that the plaintiffs were

23    cross-examined with that evidence. It appeared to be that it

24    was more of an inconsistency, as counsel said, rather than an

25    attempt to misstate the facts.

1    And, so, I'm going to -- I think what I will do is say,

2    "The evidence that a witness" -- and what was counsel's?

3        **MR. WOZNIAK:**  "Made inconsistent prior statements."

4        **THE COURT:**  -- "made inconsistent prior statements."

5    That really reflects more what happened.

6    So the plaintiff agrees with that and the defendant

7    objects?

8        **MR. QUINN:**  We object?  Yeah, we objected initially,

9    but if that's your ruling.

10       **THE COURT:**  Well, I mean, are you satisfied with it or

11   not?

12       **MR. QUINN:**  Yeah.  That's fine.

13       **THE COURT:**  All right.  Then both parties are

14   satisfied.  That's it.

15   Duty to Deliberate?

16       **MR. WOZNIAK:**  Good.

17       **MR. QUINN:**  That's fine.

18       **THE COURT:**  All right.  3.1A, I don't think -- I think

19   we may have added.  Is that in there?  Do you have that in your

20   package?

21       **MR. WOZNIAK:**  Yes.

22       **MR. QUINN:**  Yes.

23       **THE COURT:**  Consideration of Evidence, Conduct of the

24   Jury.  Kind of straightforward.

25       **MR. WOZNIAK:**  That's good.

**PROCEEDINGS**

1          **MR. QUINN:**  It's fine.

2          **THE COURT:**  Communication with the Court.

3     Lisa, let me make sure that this is how you want to do it,

4  too.

5                    (Pause in proceedings.)

6          **THE CLERK:**  Yes, that's the standard instruction.

7          **THE COURT:**  Standard.  Thank you.

8          **THE CLERK:**  And they have notes in there.

9          **THE COURT:**  Good with 3.2?

10          **MR. WOZNIAK:**  Yes.

11          **MR. QUINN:**  Yes.

12          **THE COURT:**  All right.  Good?

13          **MR. QUINN:**  Yes.

14          **THE COURT:**  All right.  3.3, sort of standard, Return

15  a Verdict.

16          **MR. WOZNIAK:**  Good.

17          **THE COURT:**  Good?

18          **MR. QUINN:**  That's fine.

19          **THE COURT:**  Okay.  Damages Proof.  We're going to have

20  to talk about that, so let's put that to the side and we'll go

21  through that afterwards.

22     Punitive Damages I'm sure we're going to be talking about,

23  so we'll put that to the side.

24     Nominal Damages?

25          **MR. WOZNIAK:**  We have some suggestions.  Just --

1      THE COURT:  Well, why don't we put that to the side?

2      MR. WOZNIAK:  Yes.

3      THE COURT:  The Section 1983 claim, introductory

4  instructions, 9.1 was submitted by the defendants and there was

5  no objection.

6      MR. WOZNIAK:  That's good.

7      THE COURT:  Good?

8      MR. QUINN:  It's fine.

9                  (Pause in proceedings.)

10      THE COURT:  That's right, we have -- do we need in 9.1

11  somehow say each plaintiff brings his claim under?  I was just

12  worried about that.

13      MR. WOZNIAK:  The plaintiffs --

14      THE COURT:  "The plaintiffs" makes it sound as though

15  it's one block.  You know, they might find that Mr. Huff

16  doesn't meet his burden of proof; whereas, Mr. Cleveland does.

17      MR. CUNNINGHAM:  Isn't that dealt with in another

18  instruction?

19      THE COURT:  We don't want contradictory -- who's

20  arguing this?

21      MR. WOZNIAK:  That was to me.

22      MR. CUNNINGHAM:  I'm just whispering to him, Judge.

23      THE COURT:  All right.

24      MR. WOZNIAK:  I mean, within the damages there is talk

25  about you can split it between the plaintiffs.

1    **THE COURT:**  Right.

2    **MR. WOZNIAK:**  But, you know --

3    **THE COURT:**  But that's different.  If they come up

4  with one dollar amount, they can apportion it amongst the

5  plaintiffs; but what I'm saying is, if for some reason they

6  don't believe Mr. Trask's testimony because of some of the

7  issues of impeachment that were brought before them but

8  believed Mr. Cleveland, shouldn't we have this tailored to more

9  individual?

10    So let's put this to -- let's put 9.1 to the side and

11  we'll talk about how to do that.  All right?

12    **MR. WOZNIAK:**  We agree to that right now if you want

13  to just settle it.

14    **THE COURT:**  All right.

15                (Pause in proceedings.)

16    **THE COURT:**  So shall we do, "Each plaintiff brings his

17  claims under, dah, dah, dah, which provides that any person,

18  et cetera, et cetera..."?  Can we leave it with that?  Does

19  that work?

20    **MR. QUINN:**  That's fine.

21    **MR. WOZNIAK:**  That's fine.

22    **THE COURT:**  Good?

23    **MR. WOZNIAK:**  Yes.

24    **MR. QUINN:**  Yes.

25    **THE COURT:**  9.2 submitted by the defendants,

plaintiffs do not object, but I do have a note here.  Given

that the parties have stipulated to under color of law, how do

they want to deal with the instruction?

          MR. QUINN:  For 9.2?

          THE COURT:  Yeah.  It says if you stipulated to it,

it's --

          MR. QUINN:  Strike it.

          THE COURT:  Well, it's an element.

          MR. QUINN:  So I'm not sure what you're asking.

          MR. WOZNIAK:  We can just put a little parenthetical

in number one that, you know, element one has been stipulated

to.

          THE COURT:  Or you can argue it at closing.

          MR. WOZNIAK:  Yeah.

          THE COURT:  I mean, you could say, "The element is

that you acted under the color of law.  We have stipulated to

that."

          MR. WOZNIAK:  I mean, we'd suggest that it be added

into the instruction.

          THE COURT:  What do you think?

          MR. QUINN:  I think our view is that it's not needed

and it can be taken out, but given that we've stipulated to it.

          THE COURT:  I think it should stay in.

          MR. QUINN:  It's read to the jury as being stipulated

to.

1    **THE COURT:**  Stipulated to, but it's --

2                        (Pause in proceedings.)

3    **THE COURT:**  Oh, okay.  All right.  I note that I think

4    we've already included that.  I'm sorry.  I didn't see this.

5    The second paragraph already says:  (reading)

6        "The parties have stipulated that the defendants acted

7        under color of law."

8    **MR. WOZNIAK:**  And we did that in 9.3 as well.  I see

9    that.

10    **THE COURT:**  Oh, okay.

11    **MR. WOZNIAK:**  So 9.2 is good?

12    **THE COURT:**  All right.  And then it says here:

13    (reading)

14        "However, if you find that the plaintiffs proved all

15        the elements they are required to prove under the

16        instructions found at pages..."

17    And that is -- that would be the 9.3; right?  Is that what

18    we -- I'm not quite sure what you have in mind.

19    **THE COURT:**  We're thinking it should be the ones on

20    page 29.

21    **THE LAW CLERK:**  It should be page 29 and also the

22    9.24, which is on page -- the pagination is going to change.

23    **THE COURT:**  Pagination is going to change.  But what

24    we intended to do was that are required to prove -- oh, the

25    reason I have this in here is because the instructions I give

1  to the jury has none of the proposed closing instruction or any

2  of the numbers.  It only has the language.  So, in other words,

3  they'll need to know where to go, so we have to add the pages.

4       **MR. WOZNIAK:**  Right.

5       **THE COURT:**  All right?

6       **MR. QUINN:**  Okay.  I mean, I'm sure it will make

7  sense.

8       **THE COURT:**  What we'll do is just before we give them,

9  I'll make sure that everybody's good with the page numbers.

10 All right?

11      **MR. WOZNIAK:**  But we agree it's going to reference 9.3

12 and 9.24; is that it?

13      **THE COURT:**  Yes.

14      **MR. WOZNIAK:**  Okay.

15      **THE COURT:**  All right?

16      **MR. QUINN:**  We haven't agreed to 9.3 yet, but

17 something that will appear in 9.3.

18      **THE COURT:**  All right.  9.3.

19                    (Pause in proceedings.)

20      **THE COURT:**  A couple of questions that I have.  In

21 this paragraph right after four, starting "A person who acts

22 under color of law," I assume that the parties want to then

23 add, "The parties have stipulated that defendant acted under

24 color of law."

25      **MR. QUINN:**  Actually, I'd actually start from the

1    beginning if we could.

2        **THE COURT:**  All right.

3        **MR. QUINN:**  You know, the plaintiffs, it's become

4    clear that the claim is actually a failure-to-intervene claim.

5    That's what was identified as a cognizable claim.

6        We would actually propose that this instruction be

7    replaced with a different instruction focusing on the claim of

8    failure to intervene rather than a supervisorial liability

9    claim.  We have proposed language.

10        **THE COURT:**  Well, why don't the parties take a quick

11    look at this which is underlined.  Because a review of the law

12    that we conducted in chambers indicates there is only a

13    supervisory liability claim that can be based on several

14    different acts, and I think that what we're looking at here is

15    supervisory liability for failure to intervene.

16        **MR. WOZNIAK:**  I mean, I think this instruction kind of

17    connects the two things, connects what Abanico did and what

18    Curry did.

19        **MR. QUINN:**  And I think given the fact that from the

20    beginning of the case the court's order of service indicated it

21    was a failure-to-intervene claim, used that particular

22    language, that the instruction can be more focused with regard

23    to that particular language, that particular claim, and we can

24    provide such a proposed instruction to the Court.

25        **THE COURT:**  All right.  "In order to prevail...."

1                    (Pause in proceedings.)

2           **THE COURT:**  Well, would it work, "Defendant knew or

3    reasonably should have known that a subordinate was engaging in

4    these acts and that his conduct would deprive the plaintiff,"

5    and then, four, the defendant -- the primary one is, "The

6    defendant failed to act to prevent a subordinate from engaging

7    in such conduct."

8           **MR. QUINN:**  Can I just read you our competing

9    language?

10          **THE COURT:**  Do we have that already?

11          **MR. QUINN:**  I can provide it to you.

12          **THE COURT:**  Why don't you -- yeah, why don't you

13   just -- does counsel have a copy?

14          **MR. QUINN:**  Counsel, here you go.

15          **THE COURT:**  All right.  Why --

16          **MR. WOZNIAK:**  Is this from the model....

17                    (Counsel conferring.)

18          **THE COURT:**  And you want this in rather than --

19          **MR. QUINN:**  Rather than the current proposed 9.3.

20          **THE COURT:**  Can I take this out?

21          **MR. QUINN:**  Yes.

22          **THE COURT:**  We'll take a look at this and we'll come

23   back to it because I want to take a look at this.

24          **MR. WOZNIAK:**  It would be the plaintiffs' wish that we

25   stay with 9.3.

**PROCEEDINGS**

1      THE COURT: All right. We'll see.

2                    (Pause in proceedings.)

3      THE COURT: All right. What's next? Let's see, 9.8?

4      MR. WOZNIAK: Good.

5      THE COURT: We changed it a little bit, "In order to

6  establish the acts of Defendant Abanico and the failure to act

7  of Defendant Curry...."

8      MR. QUINN: We would just say "failure to intervene" I

9  believe. We would replace "act" with "intervene" in the first

10 line and in the middle of the fourth line.

11     THE COURT: That probably reflects the testimony more

12 than anything.

13     MR. WOZNIAK: The word "intervene"?

14     THE COURT: Yeah.

15     MR. WOZNIAK: Okay.

16     THE COURT: Agree?

17     MR. WOZNIAK: Agree.

18     THE COURT: All right. As to line 1, "... Abanico and

19 the failure to intervene by Defendant Curry..."

20     MR. WOZNIAK: So "act of" is taken out, "intervene

21 by"?

22     THE COURT: Yeah, "intervene by." And then the

23 second-to-the-last line, "and Curry's failure to intervene."

24   Agreed?

25     MR. WOZNIAK: Agreed.

**PROCEEDINGS**

1          MR. QUINN:  That's fine.

2          THE COURT:  All right.  In particular,

3     Rights/Retaliation, I'm sure we're probably going to want to

4     talk about those; right?

5          MR. QUINN:  The retaliation should be taken out.

6     There's no retaliation.

7          THE COURT:  Right.

8          MR. QUINN:  And the First Amendment.

9          THE COURT:  I'm not sure why we have these in here.

10          MR. WOZNIAK:  We were thinking everything was gone.

11          MR. LEWIS:  They're old, Your Honor.

12                    (Pause in proceedings.)

13          THE COURT:  Oh, okay.  All right.  I see.  We're in, I

14     think, manifestation five or six of these jury instructions by

15     now.  So you have to excuse us.

16          THE LAW CLERK:  We have 35 next.

17          THE COURT:  All right.  So page 35.

18        Never mind.  This is all --

19          MR. WOZNIAK:  So everything from 31 to 34 is out?

20          THE COURT:  Is out, right.

21          MR. WOZNIAK:  Okay.

22          THE COURT:  We've killed a lot of trees in the last

23     couple of days.

24        All right.  9.4, Particular Rights, Eighth Amendment

25     Convicted, "A person who's claiming excessive force..."

1    Plaintiffs object?

2        **MR. WOZNIAK:**  The plaintiffs -- just a couple of

3    suggestions.  In the title to take out "excessive" and put in

4    "wrongful force" because I don't think there's been a lot of

5    discussion about "excessive force."  And I think "wrongful"

6    kind of couches what has gone on here a lot more.

7        **MR. QUINN:**  I don't think anyone has referred to

8    anything, to my recollection, as "wrongful force."

9        **THE COURT:**  I think the statute talks about "excessive

10   force"; doesn't it?

11       **MR. QUINN:**  I'll be honest with you, we had a

12   conversation about this --

13       **THE LAW CLERK:**  The titles aren't going to the jury.

14       **THE COURT:**  Oh, that's right.  The titles aren't going

15   to the jury, so it really doesn't make a difference.

16       **MR. QUINN:**  Okay.

17       **MR. WOZNIAK:**  All right.

18       **THE COURT:**  I forgot about that.

19       **MR. WOZNIAK:**  Thanks.

20   The other -- and number two, you know, we've got the

21   bracket with the highlight.  We just suggest that that

22   language, "sexual assault by itself satisfies this prong," be

23   added into number two.

24       **MR. QUINN:**  I took the language -- the language in the

25   first line is taken right from case law.

1      THE COURT:  Which one?

2      MR. WOZNIAK:  Which first line?

3      MR. QUINN:  The first line of subsection 2 there,

4   "Defendant acted maliciously and sadistically for the purpose

5   of causing harm."  That's sufficient.

6      THE COURT:  I'm not going to put that in.  You can

7   argue that.

8      MR. WOZNIAK:  Okay.  I mean, that's from the *Wood*

9   case.

10      THE COURT:  I understand that.

11      MR. WOZNIAK:  Okay.

12      THE COURT:  We looked at it this morning, but I'm just

13   going to allow at this time just "maliciously and sadistically

14   for the purpose of causing harm," and you can talk -- you can

15   argue that at trial, the sexual assault.

16      MR. WOZNIAK:  I'm just worried that the jury won't

17   know that sexual assault by itself would satisfy that prong and

18   that they would be determining whether it was malicious and

19   sadistic as opposed to sexual.

20      THE COURT:  Let me think about it.

21      MR. WOZNIAK:  Okay.  There's a few additional ones.

22   1.13.

23      MR. QUINN:  Yeah.

24      THE COURT:  Yeah.  Did you guys get those?  So they

25   have everything?

1    Okay.  No transcript available.  I don't give a transcript

2  to the jury.

3         **MR. WOZNIAK:**  Good.

4         **THE COURT:**  If they have a question, they have to come

5  in and ask.

6    And then -- you did dailies; didn't you?

7         **THE REPORTER:**  Yes.

8         **THE COURT:**  So how do we do this?  If they say, "Well,

9  we can't remember if, you know, Curry said X or Y," and the

10  parties ask to have it read back, are you going to come back?

11         **THE REPORTER:**  Yes.

12         **THE COURT:**  All right.  1.13 okay?

13         **MR. WOZNIAK:**  Yes.

14         **THE COURT:**  Deposition in Lieu of Live Testimony?

15         **MR. WOZNIAK:**  Good with us.

16         **THE COURT:**  Okay.  So it would be the deposition of is

17  it Benjamin or Ben?

18         **MR. QUINN:**  I honestly don't know what he's going by.

19  It's Benjamin.

20         **THE COURT:**  Benjamin Curry.

21         **MR. WOZNIAK:**  Why don't you bring him in and we can

22  ask him?

23         **THE COURT:**  What was the date?

24         **MR. QUINN:**  I can get it.  Hang on.

25         **THE COURT:**  Actually, hold on for a second.

1    **MR. QUINN:**  January 29th, 2010.

2    **THE COURT:**  January 29th, 2010.  I want to take a look

3    at something very quickly.

4                    (Pause in proceedings.)

5    **THE COURT:**  Okay.  All right.  So 2.4 good, Deposition

6    in Lieu of Live Testimony?

7    **MR. WOZNIAK:**  And we're keeping all the bracketed

8    phrases in as well?

9                    (Pause in proceedings.)

10    **THE COURT:**  Question and answers...  "When a person is

11    unavailable to testify at trial, the deposition will be used at

12    trial."

13    **MR. QUINN:**  That's fine.

14    **THE COURT:**  Okay.

15    **THE LAW CLERK:**  Do we have a date on that?

16    **THE COURT:**  Yes.  We already got it.

17    And then do we also want to put, "Do not put any

18    significance on the behavior"?

19    **MR. QUINN:**  That's fine.

20    **MR. WOZNIAK:**  Yes.

21    **THE COURT:**  All right.  Good.

22    **THE LAW CLERK:**  2.8 is a duplicate.  That's my fault.

23    **THE COURT:**  2.8 is a duplicate of which?

24    **THE LAW CLERK:**  Of 2.8 that was already --

25    **THE COURT:**  Oh, all right.

1    **THE LAW CLERK:**  And then you want to look at the 1.7.

2    **THE COURT:**  Oh, that's right.  I have a couple here

3 that I was wondering if we should add I was thinking of, which

4 are not in the Ninth Circuit but in the Seventh Circuit:

5 (reading)

6        "No Inferences from Judge's Questions.  During this

7        trial, I have asked a witness a question myself.  Do not

8        assume that because I asked questions, I hold any opinion

9        on the matter I asked about or on what the outcome of the

10        case should be."

11    **MR. WOZNIAK:**  No objection.

12    **MR. QUINN:**  That's fine.

13    **THE COURT:**  Okay.  And then I guess we had

14 demonstrative exhibits; didn't we?  I mean, the fact that they

15 did -- both sides -- well, you did two.

16                (Pause in proceedings.)

17    **THE COURT:**  It goes:  (reading)

18        "Certain," and then it says, "describe the

19        demonstrative exhibit, have been shown to you.  Those,"

20        again, short description, "are used for convenience and to

21        help explain the facts of the case.  They are not evidence

22        or proof of any facts."

23        How should we -- what do you want to describe those as,

24 "certain demonstrations"?  "Certain demonstrations of search

25 procedures"?

1      MR. WOZNIAK:  How about "simulated clothed body

2 searches."

3      MR. QUINN:  I would just --

4      THE COURT:  Let's not lawyer it up.  Let's keep it

5 simple.

6      MR. QUINN:  The language you had -- the language you

7 had just said, which I can't recite as I'm standing here,

8 sounded accurate.

9      THE COURT:  So what did I say?

10               (Pause in proceedings.)

11      THE COURT:  Okay.  "Certain demonstration of search

12 procedures."  How's that?  Good?

13      MR. QUINN:  That's fine.

14      MR. WOZNIAK:  I guess I was thinking "certain" versus

15 "various," but that's fine.

16               (Pause in proceedings.)

17      THE COURT:  Good?

18      MR. WOZNIAK:  Good.

19      THE COURT:  Good?

20      MR. QUINN:  That's fine.

21      THE COURT:  All right.  And then a final one....

22               (Pause in proceedings.)

23      THE COURT:  There are no dismissed or withdrawn

24 defendants; are there?  It remains the two defendants.

25      MR. QUINN:  No dismissed or withdrawn defendants?  I

1  mean, the case was filed in '07, and I don't know if there

2  were --

3          THE COURT:  No, no.  What's before the jury.

4          MR. QUINN:  Oh.  No.

5          THE COURT:  No, no.  I mean the operative Complaint,

6  the First Amended Complaint, only refers to these two, to

7  Benjamin Curry and Correctional Officer Abanico.

8          MR. WOZNIAK:  I believe that's correct.

9          MR. QUINN:  It does name several John Does and it

10 refers to a CO JA.

11         MR. CUNNINGHAM:  The John Does are out at this point.

12         THE COURT:  Yeah.  I don't think I'm going to give

13 that.

14     What about Multiple Claims, Multiple Plaintiffs?  That's

15 probably something that we should think about:  (reading)

16         "You must give" --

17         THE LAW CLERK:  We have that multiple parties

18 instruction.

19         THE COURT:  What?  Do we have a multiple parties

20 instruction?  Where is that?  Did I miss -- did I already talk

21 about it?

22         MR. WOZNIAK:  That's my recollection.

23         THE COURT:  Okay.  I will stop talking, then, at this

24 juncture.

25         THE LAW CLERK:  You have 1.5, Two or More Legal

1    Parties.

2          THE COURT:  All right.  Fine.  Let me give you these.

3       And, so, then we'll also do no inferences from judges and

4    demonstrative evidence.

5                        (Pause in proceedings.)

6          THE COURT:  All right.  Let's....

7                        (Pause in proceedings.)

8          THE COURT:  I guess we go back and start off with

9    Claims and Defenses.  Now, what is it that's remaining to be

10   argued here?

11         MR. QUINN:  Just I think with regard to the last line

12   about how we argue -- defendants argue that they're entitled to

13   qualified immunity, and we would argue that that should be kept

14   here.  It's an appropriate -- it's appropriate language for

15   this instruction.

16      We'd also like to add an instruction, a separate

17   instruction, for the qualified immunity standard because we

18   don't -- we've had a fair amount of testimony about how -- how

19   officers are trained to conduct these searches and how

20   Officer Abanico was just doing his job, testimony to that

21   effect; and given that testimony, that the qualified immunity

22   standard should at least be presented to the jury for them to

23   consider.

24         MR. WOZNIAK:  We object and we request that that be

25   taken out.  I mean, it's clear that the testimony here shows

1   that what he was doing was outside of -- at least the

2   allegation is that what he was doing was outside of his job

3   and, you know.

4                    (Pause in proceedings.)

5           THE COURT:  You know --

6           MR. WOZNIAK:  And if the conduct --

7           THE COURT:  Wait a minute.  Hold on.

8       Lieutenant, and I can't remember his --

9           MR. QUINN:  Stoltenberg.

10          THE COURT:  -- Stoltenberg I think was pretty clear.

11  And correct me if I'm wrong, and I'm not saying whether your

12  client did this or not, but if, in fact, there was pinching and

13  grabbing of the penis and the scrotum as testified to by these

14  plaintiffs, then that was completely out of the realm of what a

15  search should have been.  Am I right or wrong?

16      I mean --

17          MR. QUINN:  I think what you've characterized is

18  something that would be outside of the guidelines or the

19  regulations, the procedures; but the jury should have that

20  instruction at least to consider if they believe that he was

21  following the regulations.

22          THE COURT:  So what you're saying is they would have

23  to make a two-step analysis.  First they would have to not

24  believe plaintiffs' testimony that they were pinched and

25  grabbed, and that the remainder of the Defendant Abanico's

1  conduct was within the guidelines as outlined by Lieutenant

2  Stoltenberg and I think to some extent confirmed by

3  Warden Curry.

4      There's a cupping issue that still remains, but it sounds

5  to me like the guidelines indicate there was supposed to be a

6  certain amount of cupping for contraband.

7      **MR. WOZNIAK:**  I think it was cupping.

8      **MR. QUINN:**  So if --

9      **THE COURT:**  Hold on.

10     **MR. QUINN:**  If the jury finds that Officer Abanico was

11  conducting himself in accordance with those procedures during

12  these searches, cupping the groin and doing the other things

13  that have been described both by the witnesses, and in the

14  stipulated facts I think we have some language regarding what's

15  required, that the jury should have that option to consider the

16  qualified immunity defense.

17     **MR. WOZNIAK:**  If the jury doesn't believe what the

18  guide said, the case is over.  I mean, there's no need to find

19  qualified immunity at that point.

20     And if there's a dispute about what happened, I mean, if

21  we were just talking about cupping and these guys were bringing

22  suit against cupping and it was clear that cupping was what he

23  was talking about, we're saying that's unconstitutional, I

24  think that would be correct.

25     But there's a dispute here about the facts about what

1   happened, and that takes it outside of that.  If the jury --

2   if, indeed, what the plaintiffs are alleging in terms of the

3   squeezing and grabbing, there's no way that the defendant would

4   have thought that what he was doing was lawful.

5        **THE COURT:**  So the argument is, let me make sure I'm

6   clear, is that if they find that your client did not pinch or

7   squeeze the scrotum, then they have no claim at all.  So why

8   would we need qualified immunity?

9        **MR. QUINN:**  I guess there's a potential for --

10       **THE COURT:**  I mean, can't you argue to the jury --

11       **MR. QUINN:**  -- the distinction between --

12       **THE COURT:**  -- can't you just argue, "Look, ladies and

13   gentlemen, if our client, if Correctional Officer Abanico did

14   not squeeze or pinch the scrotum or the penis, then he followed

15   the guidelines and has done nothing wrong"?

16       **MR. QUINN:**  I anticipate we will make that argument.

17       **THE COURT:**  I'm sure it's going to ring through the

18   hallways, but....

19               (Pause in proceedings.)

20       **MR. WOZNIAK:**  I guess they get two bites if they get

21   the qualified immunity instruction, and that's just not....

22       **MR. QUINN:**  I guess there's -- the argument would be

23   if the cupping also -- during the cupping, during the act of

24   cupping there was some sort of a pinch or a squeeze, but it was

25   in the course of --

 1        **THE COURT:**  If they find that, then from what I

 2  understood from the testimony of the lieutenant, that's not

 3  proper.  Maybe I'm wrong.  I mean, but it struck me that from

 4  what I heard from the lieutenant and, in fact, the big bold

 5  line -- what was boldly written again?

 6        **MR. WOZNIAK:**  "Do not squeeze the inmate's scrotum."

 7        **THE COURT:**  Yes, "Do not squeeze the inmate's

 8  scrotum."

 9     Did you already provide the --

10        **MR. QUINN:**  We hadn't provided it in our initial --

11        **THE COURT:**  Why don't you give me that?  I'm going to

12  think about that a little bit.  Okay?

13     Have you shown the other side the qualified --

14                    (Pause in proceedings.)

15        **THE COURT:**  Why don't you give me that?

16        **MR. QUINN:**  Actually, I think you already -- the

17  packet we previously gave probably has it.

18        **THE COURT:**  Let me just take that.

19     Okay.  I'm going to take the -- oh, here.  No, I have it.

20  You're right.  I have it already.  I have your damages and your

21  qualified immunity are the other two.

22     All right.  I'm going to put these -- thank you, Lisa --

23  I'm going to put these to the side and then I'm going to take

24  one more look at them in chambers.  I want to take a look at

25  some case law before I....

1     (Pause in proceedings.)

2        **THE COURT:**  All right.  Then what --

3        **MR. WOZNIAK:**  Judge, I can just -- I don't have a

4   specific cite, but there's a *Schenk* [sic], S-C-H-E-N-K [sic],

5   case, that deals with sexual contact as being outside of

6   qualified immunity.

7           **MR. CUNNINGHAM:**  It's cited in these notes.

8           **MR. WOZNIAK:**  We might be able to get you a cite.

9        **THE COURT:**  All right.  Give me a cite.  I'll take a

10   look at it.

11      1.8, Evidence for a Limited Purpose.  Let's go over that

12   one.

13        **MR. QUINN:**  I don't recall, to be honest, whether

14   there was some ruling that some evidence or some discussion

15   about the evidence being submitted for a limited purpose.

16        **THE COURT:**  I don't believe I indicated that there was

17   anything that was --

18        **MR. WOZNIAK:**  I don't think there is.

19        **THE COURT:**  All right.  Why don't we -- then both

20   parties agree this does not need to be given to the jurors?

21        **MR. WOZNIAK:**  Agreed.

22        **MR. QUINN:**  Agreed.

23        **THE COURT:**  All right.  Then I'm going to....

24              (Pause in proceedings.)

25        **MR. WOZNIAK:**  Here, Judge.  I have the cite for you on

1    the *Schwenk* case.  Are you ready?  It's 204 F.3d 1187.

2            **THE COURT:**  1187.  And it's *Schwenk*?

3            **MR. WOZNIAK:**  It's S-C-H-W-E-N-K.

4            **THE COURT:**  *Schwenk*.

5            **MR. WOZNIAK:**  *Schwenk v. Hartford*.  And I can direct

6    you --

7            **THE COURT:**  Okay, 204 Fed. 3d.

8        All right.  Now, we've got two -- we have 5.1, Damages

9    Proof, and then Defendants' Damages - Physical Injury required;

10   correct?

11           **MR. QUINN:**  Our proposed physical.

12           **THE COURT:**  Your proposed.

13                       (Pause in proceedings.)

14           **THE COURT:**  All right.  Where are we?  Let's see, so

15   we're going to take a look at your damages and then we'll go on

16   with the damage instructions.  I think that's -- I think that

17   really is -- the rest revolves on how we're going to do the

18   damages; right?

19           **MR. WOZNIAK:**  Well, and the 9.24 instruction.

20           **THE COURT:**  Didn't we already talk about that?

21           **MR. WOZNIAK:**  They're suggesting a different

22   instruction.

23           **THE COURT:**  Oh, all right.  All right.

24           **MR. QUINN:**  Oh, yeah.

25           **THE COURT:**  All right.  Why don't I take a brief

1  recess?  I'm going to go back and take a look at those cases

2  counsel cited and the arguments, and then I'll come back and

3  talk about it.  All right?

4      **MR. CUNNINGHAM:**  Judge, you also have the case that's

5  in these comments here right toward the end, that *Wood versus*

6  *Beauclair*.

7      **THE COURT:**  I think I read from it?

8      **MR. CUNNINGHAM:**  Yes.  Where --

9      **THE COURT:**  All right.  Let me take a look.

10      **MR. CUNNINGHAM:**  All right.  Sexual actions --

11      **THE COURT:**  Let me take a look at it.

12      **MR. CUNNINGHAM:**  -- in and of themselves.

13      **THE COURT:**  All right.

14          (Recess taken at 2:20 p.m.)

15          (Proceedings resumed at 4:38 p.m.)

16    (Proceedings were heard out of the presence of the jury:)

17      **THE COURT:**  All right.  We have the instructions that

18  my clerk has given you are the ones I intend to give tomorrow.

19      Starting off with qualified immunity, qualified immunity

20  isn't appropriate here.  The defendants have not alleged that

21  there was a constitutional violation conducted by Abanico and,

22  therefore, you haven't satisfied the first prong of qualified

23  immunity.

24      You first have to say he did something wrong but then,

25  therefore, he has immunity.  What do you allege that he did

1   wrong?

2           **MR. QUINN:**  I understand.  We'll -- we're not -- we're

3   alleging that he did everything --

4           **THE COURT:**  Right.

5           **MR. QUINN:**  -- to the contrary, properly.  So that's

6   fine.  We'll withdraw it.

7           **THE COURT:**  Physical Damage -- Physical Injury

8   Required - De minimis Injury Insufficient is not the Court's

9   reading of the *Wood* case.  That will be denied.

10      The claim of failure to intervene as presented by the

11  defendants, *Robbins versus Meecham*, *Cunningham versus Gates*,

12  both cases can be distinguished.  Neither case is on point.

13  Both cases refer to parties who had a duty to intercede; in

14  other words, one officer observes another officer hitting

15  somebody and stands there and does nothing.

16      This is a case of failure to intervene on the part of

17  Curry; and, therefore, the modified jury instructions that the

18  Court intends to give regarding Defendant Curry, we believe,

19  are appropriate and that would be the supervisory liability

20  claim specifically regarding the failure to intervene.

21      And, therefore, I think that's all that was -- we prepared

22  the damage instructions to coincide with the 1983 claims as we

23  have drafted them.

24      Finally, the verdict that we have also then follows the

25  jury instructions as we prepared them.

**PROCEEDINGS**

```
1        Now, what I'm going to do is, it's late, I have staff
2   here, it's already 4:42, so I'm going to allow the parties to
3   take the final jury instructions home, final verdict back, and
4   please be prepared to succinctly argue any objections you have
5   or comments first thing tomorrow morning before the jury comes
6   in.  All right?
7             MR. CUNNINGHAM:  8:30?
8             THE CLERK:  What time?
9             THE COURT:  8:30 is all right with you?
10            THE CLERK:  8:30.
11            THE COURT:  8:30.
12            MR. LEWIS:  Yes, Your Honor, one question.  We haven't
13  moved exhibits in yet.  Do you want to do that tomorrow
14  morning?
15            THE COURT:  Yes.
16       What do you want to do, Lisa?  Do you want to do that now
17  or do you want --
18            THE CLERK:  We can do it in the morning.
19            THE COURT:  Okay.  We'll do it in the morning.
20            MR. LEWIS:  All right, Judge.
21            THE COURT:  All right.  Thank you.
22            MR. CUNNINGHAM:  All right.  Thank you, Your Honor.
23                 (Proceedings adjourned at 4:42 p.m.)
24                     ---oOo---
25
```

# <u>CERTIFICATE OF REPORTERS</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Wednesday, November 6, 2013

_____
Jo Ann Bryce, CSR No. 3321, RMR, CRR
U.S. Court Reporter

_____
Candace L. Yount, CSR No. 2737, RMR, FCRR
U.S. Court Reporter