**Volume 4**

**Pages 569 - 680**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nandor J. Vadas, Magistrate Judge

| | | |
|---|---|---|
| IVAN VERNORD CLEVELAND, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| VS. | ) ) | NO. C 07-02809 NJV |
| BEN CURRY, WARDEN, et al., | ) ) | |
| Defendants. | ) ) ) | |

San Francisco, California
Thursday, November 7, 2013

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:

    LAW OFFICE OF DENNIS CUNNINGHAM
    115 A Bartlett Street
    San Francisco, California  94110
  **BY:  DENNIS CUNNINGHAM, ATTORNEY AT LAW**

    THE LAW OFFICES OF JEFF WOZNIAK
    179 11th Street - 2nd Floor
    San Francisco, California  94103
  **BY:  JEFF WOZNIAK, ATTORNEY AT LAW**

  **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
    Candace L. Yount, CSR No. 2737, RMR, FCRR
    Official Reporters

1   **APPEARANCES**:  (CONTINUED)

2   For Defendants:

3                           OFFICE OF THE ATTORNEY GENERAL
                            State of California
                            455 Golden Gate Avenue - Room 11000
4                           San Francisco, California  94102
                    BY:   **MICHAEL J. QUINN, DEPUTY ATTORNEY GENERAL**
5                           **KYLE A. LEWIS, DEPUTY ATTORNEY GENERAL**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

Thursday, November 7, 2013

|  | PAGE | VOL. |
|---|---|---|
| Jury Instructions | 596 | 4 |
| Opening Argument by Mr. Cunningham | 618 | 4 |
| Closing Argument by Mr. Lewis | 653 | 4 |
| Closing Argument by Mr. Cunningham | 669 | 4 |

## E X H I B I T S

| PLAINTIFFS' EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 14 |  | 584 | 4 |
| 15 |  | 585 | 4 |

## E X H I B I T S

| DEFENDANTS' EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| A1 |  | 585 | 4 |
| A3 |  | 585 | 4 |
| A4 |  | 586 | 4 |
| D |  | 587 | 4 |
| E |  | 588 | 4 |

1    Thursday - November 7, 2013                    8:37 a.m.

2                    P R O C E E D I N G S

3                        ---oOo---

4        (Proceedings were heard out of the presence of the jury:)

5        THE COURT:  All right, Counsel, you've had a chance

6    to -- Oh, I'm sorry.

7        THE CLERK:  Okay.  Calling Civil 07-2809, Cleveland

8    versus Curry.

9        MR. CUNNINGHAM:  Good morning, Your Honor.  Dennis

10   Cunningham for the plaintiffs.  Jeffrey Wozniak has another

11   appearance he has to make.  He'll be here later.

12       THE COURT:  All right.

13       MR. QUINN:  Good morning.  Michael Quinn for

14   defendants.

15       THE COURT:  All right.  Yesterday at the closing of

16   yesterday afternoon, I submitted to the parties the Court's

17   proposed final closing instructions.  Comments?

18       MR. QUINN:  Sorry?

19       THE COURT:  Yesterday at the closing of the session, I

20   submitted to the parties the Court's proposed closing jury

21   instructions and verdict form.  Comments?

22       MR. QUINN:  We just have one issue that we want to

23   take up with the Court regarding Instruction Number 9.24.

24       THE COURT:  9.24.  That's the final one.

25       MR. QUINN:  The final one.

 1    The instruction indicates that the Court has relied on

 2  *Wood v. Beauclair*, pages 1049 to '51; and in reading that case,

 3  the case does include particular language and a particular

 4  standard that should be applied, essentially a two-prong

 5  standard, the first part of which is that, you know, prisoners

 6  alleging excessive force must show that the force was applied

 7  maliciously and sadistically to cause harm.  The second part of

 8  the standard requires that the officer's actions be offensive

 9  to human dignity.

10    And in our view, if the Court is going to rely on the *Wood*

11  case, it should include that language -- include that standard

12  in the jury instruction.

13    **THE COURT:**  Do you have a proposed revision?

14    **MR. QUINN:**  We do.  I can read it to you.  We would

15  essentially, at the beginning of the second paragraph there,

16  state that:  (reading)

17    "Under the Eighth Amendment, a convicted prisoner has

18    the right to be free from 'cruel and unusual punishment.'

19    In order to prove the defendant deprived the plaintiffs of

20    this Eighth Amendment right, the plaintiffs must prove" --

21    **THE COURT:**  Each plaintiff.

22    **MR. QUINN:**  (reading)

23    -- "each plaintiff must prove the following additional

24    elements by a preponderance of the evidence..."

25    **THE COURT:**  Hold up.  Hold up.  "Each plaintiff must

1    prove"?

2         **MR. QUINN:** "... the following additional elements by

3    a preponderance of the evidence."

4         **THE COURT:** "... the following additional evidence" --

5         **MR. QUINN:** "Elements."

6         **THE COURT:** What?

7         **MR. QUINN:** "Elements."

8         **THE COURT:** "Elements," okay.

9    "... elements by a preponderance of the evidence."

10         **MR. QUINN:** And then colon, subsection (1): (reading)

11         "The defendant acted maliciously and sadistically for

12    the purpose of causing harm; and" --

13         **THE COURT:** "Maliciously and sadistically to cause

14    harm"?

15         **MR. QUINN:** "For the purpose of causing harm."

16         **THE COURT:** "For the purpose of causing harm."

17         **MR. QUINN:** Semicolon and, subsection (2): (reading)

18         "The acts of defendant caused harm to the plaintiffs'

19    human dignity."

20         **THE COURT:** "The acts of the defendants" -- "defendant

21    caused harm to the plaintiffs' human dignity."

22    I know that we had gone over that language yesterday, and

23    I think we had made some decisions that it wasn't necessary,

24    but let me hear from plaintiffs' counsel regarding that.

25         **MR. CUNNINGHAM:** Excuse me. I'm sorry, Judge. Did

1  you ask me my response?

2         THE COURT:  Yes.

3         MR. CUNNINGHAM:  I think that would be way too

4  complicated and not warranted to make such a highly technical

5  and stringent requirement in the instruction.  It seems to

6  me -- I mean, you might just as well say there was no

7  penological purpose.  You would have to put that in there.

8      And you would -- and that it also -- in *Wood* it also says

9  that the fact that it's a sexual application of force in and of

10  itself meets the malicious and sadistic standard.  That was the

11  thing that was most striking I thought about the quote in your

12  notes before.

13         THE COURT:  I think that that is what we had basically

14  hashed out yesterday.  Looking at *Wood* again, *Wood* says, and I

15  think that the simple -- if you find this is a sexual assault,

16  that in and of itself meets that standard.

17         MR. QUINN:  *Wood* indicates, and this is from --

18         THE COURT:  Where are you looking, sir?

19         MR. QUINN:  I'm looking right in the page 1049 of

20  *Wood*.

21         THE COURT:  1049.

22         MR. QUINN:  The *Wood* case talks about the subjective

23  and objective elements necessary for an Eighth Amendment

24  violation, and it breaks it down.  Subjective prong involves

25  a --

1        **THE COURT:** I have --

2        **MR. QUINN:** I'm sorry.

3        **THE COURT:** -- page -- I'm not sure if these pages --

4  well --

5        **MR. QUINN:** This is page 1049 of the case itself --

6        **THE COURT:** I've got the case itself.

7        **MR. QUINN:** -- the pincite. There's a subheading "The

8  Second Incident of Sexual Harassment," and that's in that

9  little paragraph.

10        **THE COURT:** Hold on. Hold on.

11                (Pause in proceedings.)

12        **THE COURT:** "The Second Incident of Sexual

13  Harassment," all right. *Wood* alleges....

14        **MR. QUINN:** Right. At the end of that paragraph there

15  the Court references -- or the opinion references the

16  subjective and objective elements necessary for an

17  Eighth Amendment violation; and then the opinion goes on to

18  define what those elements are: Subjective element, the

19  objective element.

20    And that's just lifted from the case, the language that

21  I've referred to regarding malicious and sadistic and the

22  offense to human dignity. I mean, that's what the Court was

23  looking at in the case.

24    And if this Court decides to rely --

25        **THE COURT:** And then, I'm sorry to interrupt, and then

1  the second portion of that is the objective prong, the offense

2  to human dignity.

3        MR. QUINN:  Yeah.  And if I could add, just to address

4  Mr. Cunningham's comment about how complicated it would be for

5  the jury, we do have a definition that was used of "malicious

6  and sadistic" in a recent case that we could provide to the

7  Court if there's some concern about the jury being confused

8  about the definition of "malicious and sadistic."

9        THE COURT:  All right.  Any other -- I'll take this

10  under submission and I'll go back and look.  I want to think

11  about it for a moment.

12     Any other objections to the instructions?

13        MR. QUINN:  Not on our side.  Do you want the

14  definition of "malicious and sadistic" that was used in the

15  previous --

16        THE COURT:  We can figure it out if we're going to use

17  it.

18     Mr. Cunningham, any objections to the instructions other

19  than what we talked about in 9.24?

20        MR. CUNNINGHAM:  Judge, this instruction or that

21  rationale --

22        THE COURT:  Listen to what I said.

23        MR. CUNNINGHAM:  I'm sorry.

24        THE COURT:  Any other objections to the instructions

25  other than 9.24?

1          MR. CUNNINGHAM:  Oh, no.

2          THE COURT:  All right.  Let's then move on to the

3    verdict.

4       Have the parties had an opportunity to look at the

5    verdict?

6          MR. CUNNINGHAM:  Yes, sir.

7                     (Pause in proceedings.)

8          MR. CUNNINGHAM:  Judge, I'm sorry.  Before I didn't

9    introduce Ben Rosenfeld, a long-time associate of mine who's

10   here this morning helping out.

11         MR. ROSENFELD:  We met years ago, Your Honor.

12         THE COURT:  It's nice to see you, Mr. Rosenfeld.

13         MR. QUINN:  The change we would propose, I mean, it's

14   dependent how you rule with regard to Jury Instruction 9.24, if

15   the Court adopts our view with regard to how the 9.24 should be

16   revised, then the first -- the initial question in the verdict

17   form should be altered to -- or revised to reflect that

18   language, "malicious and sadistic," "human dignity."

19         THE COURT:  All of that is to focus the jury on

20   whether any of plaintiffs' constitutional rights were violated.

21         MR. QUINN:  Right, but -- I mean, it is a very

22   general -- the language is very general in the question, the

23   initial question here in the verdict form; and if the Court is

24   going to have -- adopt the revised language in 9.24 that we

25   propose, we think that language should be reflected in the

1   initial question in the verdict form.

2          **THE COURT:**  All right.  I'll have -- anything else?

3   Anything else?

4          **MR. QUINN:**  In addition, Your Honor, the jury at

5   various points in this case has heard a little bit about

6   retaliation and then excessive force, and it would be -- this

7   would clarify that what the jury is deciding is an excessive

8   force case, and this is the standard for excessive force.

9       It's not a retaliation claim.  So there should be some --

10  it would clarify for the jury, I think, what the standard is

11  and what they are applying.

12         **THE COURT:**  "Do you find by a preponderance of the

13  evidence that any of the plaintiffs' constitutional rights were

14  violated by Defendant Abanico's use of excessive force"?

15         **MR. QUINN:**  That's an improvement, but --

16                      (Laughter)

17         **THE COURT:**  Well, I thank you so very much, Counsel.

18         **MR. QUINN:**  I'm not trying to be flippant.

19         **THE COURT:**  I know.

20         **MR. QUINN:**  But, again, we think if we're going to use

21  the language from *Wood*, or if the Court is going to use the

22  language from *Wood*, that it only makes sense, in our view,

23  after the jury instructions are read to the jury and that

24  language regarding malicious and sadistic is in the jury

25  instruction, that they go back to deliberate and have that

1  standard with them.

2      THE COURT:  All right.  Let me say that my take on

3  this is that, given what I have heard in the last two or three

4  days, this is a pretty black-and-white case.  I mean, you say

5  defendant grabbed your clients' penises --

6      MR. QUINN:  Or not.

7      THE COURT:  -- and you say, "No, he never did it and

8  what he did was by the book."  I think that that's pretty much

9  the line that comes down the middle of this courtroom.

10     Now, they're going to believe a hundred percent for you or

11  a hundred percent for you.  I can't see them sort of blending

12  any of this.  I mean, it's either he did it right or --

13     MR. CUNNINGHAM:  He did it wrong.

14     THE COURT:  -- he did it wrong.

15     MR. CUNNINGHAM:  Yes.

16     THE COURT:  And then, of course, Curry, that's a

17  different issue and it's a little bit more nebulous as to

18  whether, you know, was it sufficient what he did in exercising

19  his supervisory authority or not, but that's neither here nor

20  there.  I mean, what we're talking about right now, the

21  gravamen of this is did he grab the penis or didn't he.

22     MR. CUNNINGHAM:  Yes.

23     THE COURT:  And, so, I guess what I'm saying is that I

24  think both the jury instructions, to the extent that the Court

25  is going to follow *Wood*, and to the verdict as to be read to

1    the jury should really basically reflect the end result here in

2    terms of what the parties' positions are.  And I don't want to

3    confuse them by excessively dwelling on issues that aren't

4    necessary.

5        So when you look at Question Number 1, what is it that

6    we're really asking these jurors?  Did plaintiff -- were

7    plaintiffs' constitutional rights violated by Defendant

8    Abanico's use of excessive force?  Because that in the end -- I

9    mean, the sexual assault is a subsection of excessive force.

10       **MR. QUINN:**  In a very general way that's what you're

11   asking.  You're asking:  Was there excessive force?

12       **THE COURT:**  Yes.

13       **MR. QUINN:**  But if, again, if the Court is going to

14   rely on the *Wood* case, which we don't object to, all we're

15   arguing is that the language from the *Wood* case and the

16   standard from the *Wood* case be incorporated into the jury

17   instruction and into the verdict form.

18       **THE COURT:**  Let me think about it.

19       And I know, Counsel, you believe that it will confuse the

20   jury rather than instruct them.

21       **MR. CUNNINGHAM:**  On the first instruction, absolutely,

22   yes.

23       **THE COURT:**  All right.  And --

24       **MR. CUNNINGHAM:**  And, Judge, I have one little detail.

25   It doesn't strike me that the use of the term "excessive force"

1    is as accurate as "wrongful force."  And we have a case, you

2    know, the *Headwaters* case; if no force is necessary, any force

3    is unreasonable.  "Excessive force" suggests that there could

4    be some force that wasn't excessive.

5              **THE COURT:**  Well, yeah.

6              **MR. QUINN:**  The *Wood* case uses the term "excessive

7    force."

8              **THE COURT:**  "Excessive force."  The Court will use the

9    terminologies found in *Wood*.

10             **MR. CUNNINGHAM:**  All right, Judge.

11             **THE COURT:**  Now, then, again, what if -- so, again,

12   you have no other objections to the jury instructions as

13   prepared by the Court?

14             **MR. CUNNINGHAM:**  To the instructions, no.

15             **THE COURT:**  I mean --

16             **MR. CUNNINGHAM:**  To the verdict form --

17             **THE COURT:**  Wait.

18             **MR. CUNNINGHAM:**  I'm sorry.

19             **THE COURT:**  Inconsistency is the hobgoblin of small

20   minds.

21        Then additionally I'd like to look at 2.2 on page 17.

22             **MR. QUINN:**  Jury instruction 2.2?

23             **THE COURT:**  Yeah, 2.2, Stipulation of Facts.

24             **MR. CUNNINGHAM:**  Is it from the version we had

25   yesterday?

1        **THE COURT:** No. These are the version I gave you at

2  close of business yesterday.

3        **MR. CUNNINGHAM:** Yesterday, that's right.

4        **THE COURT:** These, I believe, are the stipulated facts

5  that the parties have agreed to. How would you like me to

6  handle this? Shall I before I read -- before we instruct the

7  jury go through this once and say, "Ladies and gentlemen, the

8  parties have stipulated to the following facts," and then read

9  it again as part of the jury instructions?

10      Because, I mean, technically before everybody closes and

11  the case is over with these -- this is part of the evidence and

12  should go to the jury as evidence. So my feeling is I probably

13  should read it twice, once at the close -- when they come in.

14  Then I'll ask the parties, "Is there anything further. Does

15  each side rest?" Then I'll turn and instruct them and then, of

16  course, I'll ask the questions again.

17        **MR. CUNNINGHAM:** I think that's right, Judge.

18        **MR. QUINN:** That's fine.

19        **MR. CUNNINGHAM:** It should be in the record as part of

20  the evidence.

21        **THE COURT:** All right. And then do you have any

22  objection, other than to the additional language that defense

23  counsel has suggested in Question Number 1, as to the verdict

24  form as prepared?

25        **MR. CUNNINGHAM:** Unless, Judge, there should be a --

1    no, I think not.

2              THE COURT:  All right.

3              MR. CUNNINGHAM:  I think not.

4              THE COURT:  Let me go back.  I want to take a look at

5    *Wood* one more time, and we've got a few minutes.

6         Lisa, if the jury is already back there, just explain to

7    them I need a couple more minutes.

8              THE CLERK:  Okay.  We need to do the exhibits, too.

9              THE COURT:  Oh, all right.  Let's do the exhibits

10   quickly.  Why don't we do that right now.

11             MR. CUNNINGHAM:  Exhibits?

12             THE COURT:  From yesterday.

13             MR. LEWIS:  I want to move exhibits in.

14             THE CLERK:  Okay.  Exhibit 14.

15             MR. LEWIS:  No objection.

16             THE COURT:  Any objection?

17             MR. CUNNINGHAM:  No objection.

18             MR. LEWIS:  No objection.

19             THE COURT:  14 in.

20        (Plaintiffs' Exhibit 14 received in evidence)

21             THE CLERK:  15?

22             THE COURT:  Any objection?

23             MR. LEWIS:  No.

24             MR. CUNNINGHAM:  No, Your Honor.

25             THE COURT:  Exhibit 15 in.

**PROCEEDINGS**

1      (Plaintiffs' Exhibit 15 received in evidence)

2          **THE CLERK:**  A1?

3          **THE COURT:**  Any objection?

4      **MR. LEWIS:**  None.

5          **MR. CUNNINGHAM:**  No.

6          **THE COURT:**  A1 in.

7      (Defendants' Exhibit A1 received in evidence)

8          **THE CLERK:**  A3?

9          **THE COURT:**  Any objection?

10         **MR. CUNNINGHAM:**  No, Your Honor.

11         **MR. LEWIS:**  No.

12         **THE CLERK:**  A4.

13         **THE COURT:**  Hold on.

14     A3 is in.

15     (Defendants' Exhibit A3 received in evidence)

16         **THE CLERK:**  Oh, sorry.

17         **THE COURT:**  That's all right.

18         **THE CLERK:**  A4.

19         **THE COURT:**  Any objection?

20         **MR. CUNNINGHAM:**  Judge, A4 is a strange exhibit.

21 Would you look at it?

22         **THE COURT:**  Let me see.

23              (Pause in proceedings.)

24         **THE COURT:**  Oh, but this is Abanico's training record.

25         **MR. CUNNINGHAM:**  His record, yes.

1    THE COURT:  Yeah.  No, I mean, these generally come

2    in.

3         MR. CUNNINGHAM:  I don't say it doesn't belong in.

4    I'm saying maybe the one place that he finally found where he

5    had been trained in the search should be highlighted or

6    something so that they don't get hung up.

7         MR. LEWIS:  That's fine with me.

8         THE COURT:  Do you want to highlight it with a yellow

9    marker?

10        MR. LEWIS:  If you'd like that, Your Honor, that's

11   fine by me.

12        THE COURT:  Why don't you go ahead, with the yellow

13   marker, highlight the one -- I guess he's talking about the

14   one --

15        MR. LEWIS:  We asked him about where he'd been given

16   training in searching.

17        THE COURT:  Searching, yes.  Just go ahead and

18   highlight that.

19        MR. LEWIS:  Yes, Your Honor.

20        THE COURT:  With that amendment, any objection?

21        MR. CUNNINGHAM:  No, Your Honor.

22        MR. QUINN:  No, Your Honor.

23        THE COURT:  A4 is in.

24      (Defendants' Exhibit A4 received in evidence)

25        THE CLERK:  And D?

1    MR. CUNNINGHAM:  Which one is that?

2              (Pause in proceedings.)

3    MR. CUNNINGHAM:  Oh, I thought that was in a while

4    ago.

5    THE COURT:  Any objection?

6    MR. CUNNINGHAM:  No.

7    THE COURT:  D is in.

8    (Defendants' Exhibit D received in evidence)

9    MR. LEWIS:  One last thing, Your Honor.  During the

10   testimony on the cross-examination of Plaintiff Morris, his

11   deposition was unsealed and testimony was taken regarding his

12   statements within that deposition.  That deposition testimony

13   was never moved in as an exhibit.  We have a copy of it here.

14   It would be Exhibit Echo, E, next in order.

15   THE COURT:  Any objection?

16   MR. CUNNINGHAM:  Let's just look at it, Judge.

17   MR. LEWIS:  The cover page and that page that he was

18   questioned about.

19   MR. CUNNINGHAM:  All of it or just should we block out

20   the --

21              (Counsel conferring.)

22   MR. CUNNINGHAM:  If the extraneous stuff is whited

23   out, I think that will be fine.

24   MR. LEWIS:  We can block it out, Your Honor.

25   THE COURT:  All right, fine.  Block it out.  With

1   those revisions, E goes into evidence.

2        (Defendants' Exhibit E received in evidence)

3        **MR. LEWIS:**  It's going to be page 1 cover page, page

4   62 and 63 we'll block out the irrelevant portions, Your Honor.

5        **THE COURT:**  All right.  Anything further?

6        **MR. CUNNINGHAM:**  No.

7        **MR. LEWIS:**  Nothing, Your Honor.

8        **THE CLERK:**  No.  That's it, Your Honor.  That's it.

9        **THE COURT:**  Are you satisfied?  All right.  We'll take

10  a brief recess.

11              (Recess taken at 8:57 a.m.)

12           (Proceedings resumed at 9:28 a.m.)

13     (Proceedings were heard out of the presence of the jury:)

14        **THE CLERK:**  We're back on the record in Civil 07-2809,

15  Ivan Cleveland versus Ben Curry.

16        **MR. CUNNINGHAM:**  Dennis Cunningham for the plaintiff.

17        **THE COURT:**  Mr. Cunningham.

18     Mr. Quinn, I did -- we went back and took a look again at

19  *Wood*, because, I think, the Court believes that *Wood* is

20  instructive as to jury instructions regarding Abanico.

21     And looking at part (b), "The Second Incident of Sexual

22  Harassment," I note the following.  I'd like, Mr. Quinn, for

23  you to comment on this and let me go through it just quickly:

24  (reading)

25           "The Court notes that sexual contact between a

1     prisoner and a prison guard serves no legitimate role and

2     is simply not part of the penalty that criminal offenders

3     pay for their offenses against society."

4     I'll leave out the citations.  (reading)

5         "Where there is no legitimate penological purpose for

6     a prison official's" --

7         **MR. QUINN:**  Excuse me.  Where are you reading from?

8         **THE COURT:**  The subjective prong under "The Second

9     Incident of Sexual Harassment."  My page numbers, I think, are

10    different than yours.

11        **MR. QUINN:**  Sorry.  I got it.  Go ahead.

12        **THE COURT:**  All right.  (reading)

13        "Where there's no legitimate penological purpose for a

14    prison official's conduct, courts have presumed malicious

15    and sadistic intent."

16    Then I go down to the next paragraph where I think the

17    Court then discusses the subjective prong:  (reading)

18        "Here Martin was not attempting to discipline Wood or

19    quell a prison riot, instead acted for own gratification.

20    Martin's coercive sexual actions serve no valid objective,

21    and we agree with the Tenth Circuit that in such cases the

22    conduct itself constitutes sufficient evidence that force

23    was used maliciously and sadistically for the very purpose

24    of causing harm."

25    Then going on to the objective prong, looking at 10 and

1  12, These decisions," do you see that?  It's probably on the

2  next page.

3  **MR. QUINN:**  I see the objective prong.

4  **THE COURT:**  All right.  Then going down it says:

5  (reading)

6  "These decisions and others comport with the view that

7  at its core the Eighth Amendment protects the basic

8  concept of human dignity and forbids conduct that is so

9  totally without penological justification that it results

10  in gratuitous infliction of suffering."

11  And then citations omitted.  (reading)

12  "We have previously held that a sexual assault on a

13  prisoner by a prison guard is always deeply offensive to

14  human dignity and is completely void of penological

15  justification.  We, thus, conclude that Wood's allegations

16  are sufficient to state an Eighth Amendment claim and we

17  reverse the District Court's grant of summary judgment."

18  I would like you to address those comments in *Wood* in

19  regards to your motion to amend the Proposed Jury Instruction

20  9.24.

21  **MR. QUINN:**  I would just say that, again, I don't

22  believe there's any inconsistency between what I said earlier

23  and what you've just read.  I mean, you've read essentially the

24  sections that we were relying on in arguing that there should

25  be this language regarding malicious and sadistic initially,

1    and then language regarding the officer's actions being

2    offensive to human dignity.

3        So I'm not sure I understand what --

4        **THE COURT:**  The Court believes at this time -- I'll

5    allow counsel to comment if he feels it's appropriate -- that

6    given everything that I've heard, that the *Wood* case does not

7    require the Court to add the language that the defendants have

8    requested.

9        The Court would also find that given the holding in *Wood*,

10   that language would be confusing to the jury and the Court will

11   read the 9.24 instruction as it has previously written it

12   understanding there's an objection by defense counsel.

13       **MR. QUINN:**  Yeah.  I mean, we maintain our objection

14   that --

15       **THE COURT:**  I understand.

16       **MR. QUINN:**  Okay.  The language is clear in the case,

17   and we would assert that it should be in the jury instruction.

18       **THE COURT:**  All right.  Fine.  Thank you.

19       **MR. CUNNINGHAM:**  I have nothing further, Judge.  I

20   agree with the Court.

21       **THE COURT:**  All right.  The verdict following trial,

22   we did look at Question Number 1, though, I think the language

23   that Defense counsel had recommended would have been

24   appropriate had the Court adopted the defendants' positions on

25   9.24.  The Court declines to include that.

1          However, on a closer reading of the verdict, I do think

2     it's probably more appropriate to state:  (reading)

3          "Do you find by a preponderance of the evidence that

4     any of the plaintiffs' Eighth Amendment rights were

5     violated by Defendant Abanico?"

6          To say, then, the Court added as to Question Number 8:

7     (reading)

8          "Do you find by a preponderance of the evidence of the

9     evidence that Defendant Curry failed to intervene to stop

10    the violation of plaintiffs' Eighth Amendment rights?"

11         **MR. QUINN:**  Okay.

12         **THE COURT:**  All right.

13         **MR. CUNNINGHAM:**  Yes, sir.

14         **THE COURT:**  Anything further?

15         **MR. CUNNINGHAM:**  Nothing, Judge.

16         **THE COURT:**  Okay.  Subject to reading of the

17    stipulations, plaintiffs rest?

18         **MR. CUNNINGHAM:**  Yes, plaintiffs rest.

19         **THE COURT:**  Defendants rest?

20         **MR. QUINN:**  Yes, Your Honor.

21         **THE COURT:**  All right.  Call the jury in.

22         (Proceedings were heard in the presence of the jury:)

23         **THE COURT:**  Good morning, ladies and gentlemen.  As I

24    indicated to you before, we spent yesterday afternoon settling

25    the jury instructions and the verdict form that will be read to

1   you shortly.

2       I believe the parties are now ready to resume with the

3   case, and I'd like to read to you some stipulations that the

4   parties have entered into.

5       The parties have agreed to certain facts that will be read

6   to you.  You should, therefore, treat these facts as having

7   been proved.

8       Plaintiffs were inmates in the custody of the California

9   Department of Corrections and Rehabilitation, CDCR, and were

10  housed at the Correctional Training Facility in Soledad,

11  California, at the time that the initial complaint in this case

12  was filed in May of 2007.

13      At the time that the events alleged in the complaint,

14  Defendant Curry was the Correctional Training Facility's Warden

15  and Defendant Abanico was a correctional officer at the prison.

16      California Code of Regulations, Title 15, Section 3287,

17  subsection (b), provides that:  (reading)

18          "Random or spot check inspections of inmates may be

19          authorized by the institution head to prevent possession

20          and movement of unauthorized or dangerous items and

21          substances into, out of, or within the institution."

22      Section 52050.18.2 of the CDCR Departmental Operations

23  Manual states that:  (reading)

24          "Custody post orders shall require random clothed body

25          searches of inmates, or when reasonable suspicion is

1      established.  Random searches should be no more

2      frequent" --

3      Counsel, is that "or" or should be "on"?

4                    (Pause in proceedings.)

5          **MR. QUINN:**  I'm sorry.  Where are you reading from?

6          **THE COURT:**  (reading)

7          "Custody post orders shall require random searches of

8      inmates, or when reasonable suspicion..."

9      All right.  That makes sense.  I'm sorry.  I misread it a

10     little bit.

11     Let me start from the beginning on that one so you're not

12     confused.

13     Section 52050.18.2 of the CDCR, Departmental Operations

14     Manual states, that:  (reading)

15         "Custody post orders shall require random clothed body

16     searches of inmates, or when reasonable suspicion is

17     established.  Random searches should be no more frequent

18     than necessary to control contraband or to recover missing

19     or stolen property; however, the routine search of inmates

20     entering or leaving certain specified areas is not

21     precluded."

22     Clothed body searches are conducted routinely when inmates

23     are moving between locations and are integral to protecting the

24     safety and security of staff, inmates, the prison, and the

25     public.

1    As part of correctional officer training at the

2  Department's Correctional Training Center, officers are taught

3  to conduct clothed body searches for weapons, drugs, and other

4  contraband.

5    The Department's body, cell, area, and grid search student

6  workbook establishes procedures for a systematic clothed body

7  search.  The workbook directs the officer to check the inmate's

8  groin, hip, and buttock in the following manner:  (reading)

9    Using the palm side of your left hand, check the hip

10    area and high into the left groin area.  Your left hand

11    simultaneously searches the left rear hip and buttock

12    area.  Using a firm touch, continue searching down the

13    left leg to the foot.  The officer then repeats this

14    procedure for the inmate's right side.

15    "While searching an inmate's groin, one officer is

16    also directed to cup the groin and check for contraband.

17    Do not squeeze the inmate's scrotum."

18    The parties stipulate for the purposes of liability under

19  42 United States Code, Section 1983, the acts or omissions of

20  defendants relevant to this case were done under color of law.

21    Anything further on the part of the plaintiffs in this

22  case?

23    **MR. CUNNINGHAM:**  No, Your Honor.

24    **THE COURT:**  Plaintiffs rest?

25    **MR. CUNNINGHAM:**  Yes.

1    **THE COURT:**  Anything further on the part of

2    defendants?

3    **MR. LEWIS:**  No, Your Honor.  Thank you.

4    **THE COURT:**  Defendants rest?  All right.

5    Ladies and gentlemen of the jury, that concludes the

6    evidentiary portion of this trial.  At this juncture I'm going

7    to read to you the jury instructions, and then the parties will

8    have an opportunity to argue their case to you.  Thereafter,

9    you'll be asked to go into the jury room.  You'll be given a

10   copy of these instructions and the verdict form.

11                    **JURY INSTRUCTIONS**

12   **THE COURT:**  Members of the jury, now you have heard

13   all of the evidence.  It is my duty to instruct you as to the

14   law of the case.  A copy of these instructions will be sent

15   with you to the jury room when you deliberate.

16   You must not infer from these instructions or from

17   anything I may say or do as indicating that I have an opinion

18   regarding the evidence or what your verdict should be.

19   It is your duty to find the facts from all the evidence in

20   the case.  To those facts you will apply the law as I give it

21   to you.  You must follow the law as I give it to you whether

22   you agree with it or not; and you must not be influenced by any

23   personal likes or dislikes, opinions, prejudices, or sympathy.

24   That means that you must decide the case solely on the evidence

25   before you.  You will recall that you took an oath to do so.

1    In following my instructions, you must follow all of them

2  and not single out some and ignore others.  They are all

3  important.

4    Plaintiffs allege that beginning in May 2006 they were

5  intentionally pointedly groped, fondled, and molested by

6  Defendant Abanico under cover of an authorized clothed body

7  search in violation of the Eighth Amendment.

8    The plaintiffs argue that the searches were not conducted

9  in accordance with the rules or with the training Abanico

10  received.  They claim that although they complained about the

11  searches and filed formal grievances against Abanico, prison

12  officials, under the supervision of Defendant Curry, failed to

13  take meaningful action to prevent Abanico from interacting with

14  or abusing prisoners.

15    Defendants deny plaintiffs' claims in their entirety.

16  Defendants argue that they did not violate plaintiffs' rights.

17  To the contrary, they argue that Abanico adhered to the

18  training he received at the Correctional Academy while

19  performing such searches.

20    Defendants further argue that such searches, if performed

21  in accordance with the Department's training manual, require

22  some amount of touching or cupping of plaintiffs' groin and

23  buttocks through their clothes to accomplish the purposes of

24  the search.

25    Defendants also argue that because Abanico's contact with

1  plaintiffs' groins during the searches did not last longer than

2  a few seconds and was consistent with search procedures and

3  that there's no evidence that plaintiffs were sexually abused

4  or molested during the searches and, therefore, there was no

5  reason for Curry to intervene in the matter, accordingly,

6  defendants argue that they did not violate plaintiffs'

7  Eighth Amendment rights.

8      When a party has the burden of proof on any claim by a

9  preponderance of the evidence, it means you must be persuaded

10  that by the evidence that the claim is more probably true than

11  not true.  You should base your decision on all of the evidence

12  regardless of which party presented it.

13      You should decide the case as to each party separately.

14  Unless otherwise stated, the instructions apply to all parties.

15      The evidence you are to consider in deciding what the

16  facts are consists of the sworn testimony of any witness, the

17  exhibits which are received into evidence, and any facts to

18  which the lawyers have agreed.

19      In reaching your verdict, you may consider only the

20  testimony and exhibits received into evidence.  Certain things

21  are not evidence and you may not consider them in deciding what

22  the facts are.  I will list them for you.

23      Arguments and statements by lawyers are not evidence.  The

24  lawyers are not witnesses.  What they have said in their

25  opening statements, what they will say in their closing

arguments and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

Testimony that has been excluded or stricken or that you have been instructed to disregard is not evidence and must not be considered.  In addition, sometimes testimony and exhibits are received only for a limited purpose.  When I give a limiting instruction, you must follow it.

Anything you may have seen or heard when the Court was not in session is not evidence.  You are to decide the case solely on the evidence received at trial.

Some evidence was admitted for a limited purpose.  When I instructed you that an item of evidence was being admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from

which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

By way of example, if you wake up in the morning and see the sidewalk is wet, you may find from that fact that it rained during the night; however, other evidence, such as a turned-on garden hose, may provide a different explanation for the presence of water on the sidewalk.  Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

There are rules of evidence that control what can be received into evidence.  When a lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought that it was not permitted by the rules of evidence, the lawyer may have objected.  If I overruled the objection, the question was answered or the exhibit received.  If I sustained the objection, the question could not be answered and the exhibit could not be received.  Whenever I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may have ordered that evidence be stricken from the record and that you disregard or ignore the evidence.

1  That means that when you are deciding the case, you must not

2  consider the evidence that I told you to disregard.

3    In deciding the facts in this case, you will have to

4  decide which testimony to believe and which testimony not to

5  believe.  You may believe everything a witness said or part of

6  it or none of it.  Proof of a fact does not necessarily depend

7  on the number of witnesses who testified about it.

8    In considering the testimony of any witness, you may take

9  into account the opportunity and ability of the witness to see

10  or hear or know the things testified to; the witness' memory;

11  the witness' manner while testifying; the witness' interest in

12  the outcome of the case and any bias or prejudice; whether

13  other evidence contradicted the witness' testimony; the

14  reasonableness of the witness' testimony in light of all the

15  evidence; and any other factor that bears on believability.

16    The weight of the evidence as to a fact does not

17  necessarily depend on the number of witnesses who testified to

18  it.

19    Certain demonstrations of search procedures have been

20  shown to you.  Those demonstrations are used for convenience

21  and to help explain the facts in the case.  They are not

22  themselves evidence or proof of any facts.

23    During this trial, I've asked the witness a question

24  myself.  Do not assume that because I asked questions, I hold

25  any opinion on the matters I asked about or on what the outcome

of the case should be.

During deliberations, you will have to make your decisions based on what you recall of the evidence. You will not be given a transcript of the trial.

You may have taken notes to help you remember the evidence. When you leave, your notes should be left in the envelope in the jury room. No one will read your notes. They will be destroyed at the conclusion of the case.

Whether or not you took notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

From time to time during the trial it may have been necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury was present in the courtroom or by calling a recess. Please understand that while you were waiting, we were working.

The purpose of these conferences was not to keep relevant information from you, but to decide how certain evidence was to be treated under the rules of evidence and to avoid confusion and error. Of course, we did what we could to keep the number and length of these conferences to a minimum.

I may not have always granted an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or

1   what your verdict should be.

2       The parties have agreed to certain facts that will be read

3   to you.  You should, therefore, treat these facts as having

4   been proved.

5       Plaintiffs were inmates in the custody of the California

6   Department of Corrections and Rehabilitation, CDCR, and were

7   housed at the Correctional Training Facility in Soledad,

8   California, at the time that the initial complaint in this case

9   was filed in May, 2007.

10      At the time of the events alleged in the complaint,

11  Defendant Curry was the Correctional Training Facility's Warden

12  and Defendant Abanico was a correctional officer at the prison.

13      California Code of Regulations Title 15, Section 3287,

14  subsection (b), provides that:  (reading)

15          "Random or spot check inspections of an inmate may be

16      authorized by the institution head to prevent possession

17      and movement of unauthorized or dangerous items and

18      substances into, out of, or within the institution."

19      Section 52050.18.2 of the CDCR Department Operations

20  Manual states that:  (reading)

21          "Custody post orders shall require random clothed body

22      searches of inmates, or when reasonable suspicion is

23      established.  Random searches should be no more frequent

24      than necessary to control contraband or to recover missing

25      or stolen property; however, the routine search of inmates

1    entering or leaving certain specified areas is not

2    precluded."

3    Clothed body searches are conducted routinely when inmates

4 are moving between locations and are integral to protecting the

5 safety and security of staff, inmates, the prison, and the

6 public.

7    As part of correctional officer training at the

8 Department's Correctional Training Center, officers are taught

9 to conduct clothed body searches for weapons, drugs, and other

10 contraband.

11    The Department's body, cell, area, and grid search student

12 workbook establishes procedures for a systematic clothed body

13 search.  The workbook directs the officer to check the inmate's

14 groin, hip, and buttock in the following manner:  (reading)

15    "Using the palm side of your left hand, check the hip

16    area and high into the left groin area.  Your left hand

17    simultaneously searches the left rear hip and buttock

18    area.  Using a firm touch, continuing searching down the

19    left leg to the foot.  The officer then repeats this

20    procedure for the inmate's right side.

21    "While searching an inmate's groin, one officer is

22    also directed to cup the groin and check for contraband.

23    Do not squeeze the inmate's scrotum."

24    The parties stipulate that for the purposes of liability

25 under 42 U.S.C., Section 1983, the acts or omissions of

1  defendants relevant to this case were done under the color of

2  law.

3      A deposition is the sworn testimony of a witness taken

4  before trial.  The witness is placed under oath to tell the

5  truth and lawyers for each party may ask questions.  The

6  questions and answers are recorded.  When a person is

7  unavailable to testify at trial, the deposition of that person

8  may be used at the trial.

9      The deposition of Benjamin Curry was taken on

10  January 29th, 2010.

11      You should consider deposition testimony presented to you

12  in court in lieu of live testimony, insofar as possible, in the

13  same way as if the witness had been present to testify.  Do not

14  place any significance on the behavior or tone of voice or any

15  person reading the questions or answers.

16      The evidence that a witness made inconsistent prior

17  statements may be considered along with all other evidence in

18  deciding whether or not to believe the witness and how much

19  weight to give to the testimony of the witness and for no other

20  purpose.

21      When you begin your deliberations, you should elect one

22  member of the jury as your presiding juror.  That person will

23  preside over the deliberations and speak for you here in court.

24  You will then discuss the case with your fellow jurors to reach

25  agreement if you can do so.  Your verdict must be unanimous.

1  Each of you must decide the case for yourself, but you
2  should do so only after you've considered all of the evidence,
3  discussed it fully with the other jurors, and listened to the
4  views of your fellow jurors.

5  Do not hesitate to change your opinion if the discussion
6  persuades you that you should.  Do not come to a decision
7  simply because other jurors think it is right.

8  It is important that you attempt to reach a unanimous
9  verdict; but, of course, only if each of you can do so after
10  having made your own conscientious decision.  Do not change an
11  honest belief about the weight and effect of the evidence
12  simply to reach a verdict.

13  Because you must base your verdict only on the evidence
14  received in the case and on these instructions, I remind you
15  that you must not be exposed to any other information about the
16  case or to the issues it involves except for discussing the
17  case with your fellow jurors during your deliberations.

18  Do not communicate with anyone in any way and do not let
19  anyone else communicate with you in any way about the merits of
20  the case or anything to do with it.

21  This includes discussing the case in person, in writing,
22  by phone, or electronic means, via email, text messaging, or
23  any Internet chat room, blog, Web site, or other feature.  This
24  applies to communicating with your family members, your
25  employer, the media, or the press, and the people involved in

1    the trial.

2        If you are asked or approached in any way about your jury

3    service or anything about this case, you must respond that you

4    have been ordered not to discuss the matter and to report the

5    contact to the Court.

6        Do not read, watch, or listen to any news or media

7    accounts or commentary about the case or anything to do with

8    it.

9        Do not do any research, such as consulting dictionaries,

10   searching the Internet, or using other reference materials; and

11   do not make any investigation or in any other way try to learn

12   about the case on your own.

13       The law requires these restrictions to ensure the parties

14   have a fair trial based on the evidence that each party has had

15   an opportunity to address.  A juror who violates these

16   restrictions jeopardizes the fairness of these proceedings.  If

17   any juror is exposed to any outside information, please notify

18   the Court immediately.

19       If it becomes necessary during your deliberations to

20   communicate with me, you may send a note through the courtroom

21   deputy signed by your presiding juror or by one or more members

22   of the jury.  No member of the jury should ever attempt to

23   communicate with me except by a signed writing.  I will

24   communicate with any member of the jury on anything concerning

25   the case only in writing or here in open court.

1    If you send out a question, I will consult with the

2  parties before answering it, which may take some time.  You may

3  continue your deliberations while waiting for the answer to any

4  question.

5    Remember that you are not to tell anyone, including me,

6  how the jury stands, numerically or otherwise, until after you

7  have reached a unanimous verdict or have been discharged.  Do

8  not disclose any vote count in any note to the Court.

9    A verdict form has been prepared for you:  (reading)

10    "Verdict Following Jury Trial.  The jury should choose

11    the appropriate boxes and fill in the corresponding blanks

12    if applicable.  On the last page the foreperson should

13    sign and date the verdict on behalf of the jury.  The

14    verdict must be unanimous.

15    "1.  A violation of 42 United States Code,

16  Section 1983, Eighth Amendment, Sexual Assault Against

17  Defendant Abanico.

18    Question Number 1:  Do you find by a preponderance of

19  the evidence that any of the plaintiffs' Eighth Amendment

20  rights were violated by Defendant Abanico?

21    "No, sign and date the verdict form.  Yes, proceed to

22  the next question.

23    "Question Number 2:  Identify each plaintiff whose

24  constitutional rights were violated by Defendant Abanico:

25  Ivan Cleveland, Demetrius Huff, Desmond Jones, Robert

Morris, Kenneth Trask.

"Question Number 3:  What amount of money, if any, do you find would reasonably compensate each plaintiff you identified in response to Question Number 2 for the injury he has provided by a preponderance of the evidence" -- "for the injury he has proved by a preponderance of the evidence was caused by Abanico?

"For each plaintiff identify the amount of compensatory damages:  Ivan Cleveland, Demetrius Huff, Desmond Jones, Robert Morris, Kenneth Trask.

"If you entered any amount here, proceed to Question Number 5.  If you entered no amount here, proceed to the next question.

"Question Number 4:  If you entered no amount in Question Number 3 for each plaintiff you identified in response to Question Number 4, you must award nominal damages between one cent and one dollar.

"Identify the amount of nominal damages by individual plaintiff:  Ivan Cleveland, Demetrius Huff, Desmond Jones, Robert Morris, Kenneth Trask.

"Question Number 5:  Were Abanico's acts malicious, oppressive, or in reckless disregard of plaintiffs' rights such that you find punitive damages appropriate?

"No, proceed to Question 8.  Yes, proceed to the next question.

1    "Question Number 6:  For each plaintiff, identify

2    whether you find punitive damages against Abanico are

3    appropriate:  Ivan Cleveland, Demetrius Huff, Desmond

4    Jones, Robert Morris, Kenneth Trask.

5    "Question Number 7, what amount of punitive damages

6    against Abanico, if any, do you find appropriate for each

7    plaintiff you identified in response to Question Number 6?

8    "For each plaintiff identify the amount of punitive

9    damages:  Ivan Cleveland, Demetrius Huff, Desmond Jones,

10   Robert Morris, Kenneth Trask.

11   "2.  Violation of 42 U.S.C. 1983, Eighth Amendment

12   Sexual Assault Failure to Intervene Against Defendant

13   Curry.

14   "Question Number 8:  Do you find by a preponderance of

15   the evidence that Defendant Curry failed to intervene to

16   stop the violation of plaintiffs' Eighth Amendment rights?

17   "No, please sign and date the bottom of the form.

18   Yes, proceed to the next question.

19   "Question Number 9:  Identify each plaintiff whose

20   constitutional rights were violated because Defendant

21   Curry failed to intervene:  Ivan Cleveland, Demetrius

22   Huff, Desmond Jones, Robert Morris, Kenneth Trask.

23   "Question Number 10:  What amount of money, if any, do

24   you find will reasonably compensate each plaintiff you

25   identified in response to Question Number 9 for the injury

1    he has proved by a preponderance of the evidence was

2    caused by Curry?

3         "For each plaintiff, identify the amount of

4    compensatory damages:  Ivan Cleveland, Demetrius Huff,

5    Desmond Jones, Robert Morris, Kenneth Trask.

6         "If you entered any amount here, proceed to Question

7    12.  If you entered no amount here, proceed to the next

8    question.

9         "Question Number 11:  If you entered no amount in

10   Question Number 10 for each plaintiff you identified in

11   response to Question Number 9, you must award nominal

12   damages between one cent and one dollar.

13        "Identify the amount of nominal damages by individual

14   plaintiff:  Ivan Cleveland, Demetrius Huff, Desmond Jones,

15   Robert Morris, Kenneth Trask.

16        "Question Number 12:  Was Curry's failure to intervene

17   malicious, oppressive, or in reckless disregard of

18   plaintiffs' rights such that you find punitive damages

19   appropriate?

20        "No, please sign and date the bottom of the form.

21   Yes, proceed to the next question.

22        "Question Number 13:  For each plaintiff, identify

23   whether you find punitive damages against Curry are

24   appropriate:  Ivan Cleveland, Demetrius Huff, Desmond

25   Jones, Robert Morris, Kenneth Trask.

1    "What amount of punitive damages against Curry, if

2    any, do you find appropriate for each plaintiff you

3    identified in response to Question Number 13?

4    "For each plaintiff identify the amount of punitive

5    damages:  Ivan Cleveland, Demetrius Huff, Desmond Jones,

6    Robert Morris, Kenneth Trask.

7    "You will return to court for further testimony" --

8    (Pause in proceedings.)

9    **THE COURT:**  (reading)

10   "The above verdict is our unanimous verdict in this

11   case, dated November 2013, signed by the foreperson."

12   After you have reached unanimous agreement on the verdict,

13   your presiding juror will fill in the form that has been given

14   to you, sign and date it, and advise the Court that you are

15   ready to return to the courtroom.

16   It is the duty of the Court to instruct you about the

17   measure of damages.  By instructing you on damages, the Court

18   does not mean to suggest for which party your verdict should be

19   rendered.  If you find for any of the plaintiffs, you must

20   determine that plaintiff's damages.

21   Each plaintiff has the burden of proving damages by a

22   preponderance of the evidence.  Damages mean the amount of

23   money that will reasonably and fairly compensate any plaintiff

24   for any injury you find was caused by the defendants.

25   You should consider the following:  The nature and extent

of the injuries and the mental, physical, and emotional pain and suffering experienced.  It is for you to determine what damages, if any, have been provided.  Your award must be based upon evidence and not upon speculation, guesswork, conjecture.

If you find for one or more of the plaintiffs, you may, but are not required to, award punitive damages.  The purposes of punitive damages are to punish a defendant and to deter similar acts in the future.

Punitive damages may not be awarded to compensate a plaintiff.  The plaintiff has the burden of providing by a preponderance of the evidence that punitive damages should be awarded and, if so, the amount of any such damages.

You may award punitive damages only if you find that the defendant's conduct that has harmed one or more of the plaintiffs was malicious, oppressive, or in reckless disregard of that plaintiff's rights.

Conduct is malicious if it is accompanied by ill will, or spite, or it is for the purpose of injuring the plaintiff. Conduct is in reckless disregard of that plaintiff's rights if, under the circumstances, it reflects complete indifference in plaintiff's safety or rights or if one or more of the defendants acts in the face of a perceived risk that his actions will violate that plaintiff's rights under federal law.

An act or omission is oppressive if a defendant injures or damages or otherwise violates the rights of a plaintiff with

1  unnecessary harshness and severity such as by the misuse or

2  abuse of authority or power or by the taking advantage of some

3  weakness or disability or misfortune of the plaintiff.

4      If you find that punitive damages are appropriate, you

5  must use reason in setting the amount.  Punitive damages, if

6  any, should be in an amount sufficient to fill their purposes

7  but should not reflect bias, prejudice, or sympathy towards any

8  party.

9      In considering the amount of any punitive damages,

10 consider the degree of reprehensibility of the defendant's

11 conduct.  You may impose punitive damages against one or both

12 of the defendants and may award different amounts against

13 different defendants.

14     Punitive damages may be awarded even if you award one or

15 more of the plaintiffs only nominal and not compensatory

16 damages.

17     The law which applies to this case authorizes an award of

18 nominal damages.  If you find for the plaintiff but you find

19 that the plaintiff has failed to prove damages defined in these

20 instructions, you must award nominal damages.  Nominal damages

21 may not exceed one dollar.

22     Each plaintiff brings his claim under the federal statute

23 42 U.S.C., Section 1983, which provides that any person or

24 persons who, under the color of law, deprives another of any

25 rights, privileges, immunities secured by the constitution and

1  laws of the United States shall be liable to the injured party.

2  In order to prevail on his Section 1983 claim against

3  Defendant Abanico, each plaintiff must prove each of the

4  following elements by a preponderance of the evidence:

5  Defendant Abanico acted under color of law and the acts of

6  Defendant Abanico deprived him of his particular rights under

7  the United States Constitution as explained in the instruction

8  at page 31.

9  A person acts under color of law when a person acts or

10  purports to act in the performance of official duties under any

11  state, county, or municipal law, ordinance, or regulation.  The

12  parties have stipulated that Defendant Abanico acted under

13  color of law.

14  As to each plaintiff you find has proved each of these

15  elements and has proved all the elements he is required to

16  prove under the instructions found in page 31, your verdict as

17  to Abanico should be for that plaintiff.  If, on the other

18  hand, a plaintiff has failed to prove any one or more of these

19  elements, your verdict should be for Defendant Abanico as to

20  that plaintiff.

21  In order to prevail on the Section 1983 claim against the

22  supervisory defendant Benjamin Curry, each plaintiff must prove

23  each of the following elements by a preponderance of the

24  evidence:

25  The Defendant Curry acted under color of law, the acts of

the defendant's subordinate Abanico deprived the plaintiff of

his particular rights under the United States Constitution as

explained in the instruction at page 31, and Defendant Curry

knew or reasonably should have known that his subordinate was

engaged in these acts and that his conduct would deprive one or

more of the plaintiffs of these rights, and Defendant Curry

failed to act to prevent a subordinate from engaging in such

conduct.

A person acts under color of law when a person acts or

purports to act in the performance of official duties under any

state, county, or municipal law, ordinance, or regulation.

The parties have stipulated that the defendant acted under

color of law.

As to each plaintiff you find has proved each of these

elements and has proved all the elements he's required to prove

under the instruction found at page 31, your verdict as to

Curry should be for that plaintiff.  If, on the other hand, a

plaintiff has failed to prove any one or more of these

elements, your verdict should be for Defendant Curry as to that

plaintiff.

In order to establish that the acts of Defendant Abanico

and failure to intervene by Defendant Curry deprived the

plaintiffs of their particular rights in the United States

Constitution as explained in these instructions, the plaintiffs

must prove by a preponderance of the evidence that Abanico's

1  acts and Curry's failure to intervene were so closely related

2  to the deprivation of the plaintiffs' rights as to be the

3  moving force that caused the ultimate injury.

4      As previously explained, each plaintiff has the burden to

5  prove that the acts of Defendant Abanico deprived him of

6  particular rights under the United States Constitution.  In

7  this case each plaintiff alleges that Defendant Abanico

8  deprived him of his rights under the Eighth Amendment to the

9  Constitution when Abanico conducted clothed body searches at

10  the Correctional Training Facility.

11      Under the Eighth Amendment, a convicted prisoner has the

12  right to be free from cruel and unusual punishment.  In order

13  to prove the defendant deprived each of his Eighth -- in order

14  to prove defendant deprived each plaintiff of his

15  Eighth Amendment right, each plaintiff must prove by a

16  preponderance of the evidence that Defendant Abanico sexually

17  assaulted one or more of the plaintiffs.

18      In determining whether Defendant Abanico sexually

19  assaulted one or more of the plaintiffs in this case, consider

20  the need to use force in conducting the search, the

21  relationship between that need and the amount of force used,

22  and whether defendant applied the force in good faith.

23      Counsel, closing?

24          **MR. CUNNINGHAM:**  Do you want us up there?

25          **THE COURT:**  Closing argument.

1    **MR. CUNNINGHAM:**  I'm sorry.  Thank you.  I

2    misunderstood you.

3                    **OPENING ARGUMENT**

4    **MR. CUNNINGHAM:**  Good morning.  This is now going to

5    be the closing argument for the plaintiffs.  This is my job to

6    interpret the case from our point of view and talk to you about

7    what we think you ought to decide and how you ought to decide

8    it.

9    The judge has given you, in rapid fire I know, a number of

10   instructions.  You'll have those instructions with you when you

11   go back and, so, that you can study them further if you need

12   to, you can use them to straighten out a misunderstanding of

13   the dispute about what you're supposed to do or anything of

14   that nature.  Those instructions are the bedrock for the basic

15   plan for your deliberations.  They're some things the way

16   you're supposed to do it and what you're supposed to decide.

17   We've had a trial that's gone quickly, quicker I think

18   than any of us anticipated last Monday.  We've saved a day

19   here, maybe more, and that's a help I'm sure.

20   When I spoke to you the other day, I spoke about the

21   prison as not necessarily another world, part of this world but

22   it's a different place and different -- a place where life is

23   different.  And I think you have been able to see and gather

24   during these three days, four days that just from the presence

25   of these guys here and the officers that there are some very

1  striking differences in the way they have to live and the way

2  the rest of us live, and then there are some very basic

3  similarities, sameness.  Human beings there, here, over there.

4      And the point about it is, I think, that, you know, the

5  prison as a separate place and a place that's governed by

6  separate principles and separate rules is something we have to

7  accept the reality of, but something that involves so much of a

8  change for the people who go there and so much -- such heavy

9  restriction and such narrow ambit and narrow scope for their

10 life, their daily life and life through the years that it is

11 very different.

12     We're not talking -- we're not complaining that Soledad is

13 Guantanamo or the Tower of London, for that matter, and there's

14 been a whole lot worse prisons in this world, and there

15 probably are today in a lot of places than that prison; but at

16 the same time everybody who's in prison needs to be protected

17 from mistreatment that goes beyond what they're subject to

18 merely by being prisoners.

19     One judge once said, you know, that a lot of prison

20 officials seem to lose the distinction between the fact that

21 people are sent to prison as punishment.  That's what the rule

22 is.  You go to -- that's your punishment.  You go there.  You

23 don't go there for punishment.  You don't go there to be

24 tormented.  There's enough torment and enough sanction and

25 enough punishment on the fact of confinement.

1    That's why we have the Eighth Amendment.  That's why the

2    Constitution, the Bill of Rights, explicitly includes a

3    provision against cruel and unusual punishments.  Anything that

4    goes beyond the needs of the confinement and associated

5    security requirements and restrictions on movement and

6    legitimate punishments, like going to the hole if an offense is

7    found or a disciplinary violation occurs, violates the

8    Eighth Amendment because the life that they have is already so

9    narrow.

10    You can't be cruel and you can't use unusual punishment.

11    I think what's happened in this case was something that was

12    both.

13    Your position as jurors in a civil rights case has the

14    function of enforcing the Eighth Amendment, of vindicating the

15    Eighth Amendment, of making it real and applying it to a given

16    situation.  That's the remedy that's available under the

17    statute that says, you know, anyone who violates, as the judge

18    just read, anyone who violates rights guaranteed by the

19    Constitution is liable to the person who's the victim of the

20    violation.

21    Here we've got five people who are claiming that their

22    rights were violated by this man's searches as he performed

23    them on him going beyond and around and below the rules, doing

24    it in a cruel way, doing it in a way that, by that definition

25    that protects people from anything over the needs of

1　confinement, is forbidden.

2　　　And that's something, obviously, that goes double for a

3　cruelty that involves sex and involves a sexual organ, that

4　involves that specially vulnerable part of the body, that

5　specially vulnerable or concerned part of the feelings that

6　actually demeans the person, that attacks his dignity as a

7　human being way beyond anything that's necessary to keep him

8　confined or keep him in line while he's confined, something

9　that serves no purpose of penology, no reasonable need of the

10　confinement and the sentence.

11　　　And that's what's forbidden, and that's what we have

12　charged here has happened, and that's what we're asking you to

13　rule/decide has happened to find from the evidence that was

14　before you that this went on and was committed directly by the

15　officer and was indulged, as it were, by the Warden.

16　　　It was essentially ignored.  He didn't obviously ignore it

17　from the testimony that you heard from the deposition.  He

18　asked some questions.  He spoke to some of his subordinates and

19　asked them to look into it, but he didn't really do anything

20　except formulate an excuse for him, to work out in his own mind

21　a notion that:  127 witnesses, forget it.  There's only three

22　or four guys and they coerced these signatures, and they are

23　doing something illicit and he's cramping their style and

24　that's why this happened.

25　　　He made that up out of thin air.  There was no evidence of

1     that anywhere.  There hasn't been any evidence of it in this

2     court.  There's no testimony that there was any kind of

3     contraband traffic or conspiracy or criminal conduct by these,

4     or any other prisoners, that he had -- that was detected or

5     pinned down or anything about it learned.  There wasn't --

6     there's no evidence that there was any such thing.

7         What the evidence is, I think, is that he made that up in

8     order to avoid having to intervene and change what this officer

9     did; in other words, in order to avoid having to put the

10     officer in the wrong over against the prisoners.

11         You remember Lieutenant Stoltenberg who came in here

12     pretty much cold.  He said he didn't really know the details of

13     the case.  He was just here to explain what he did and the kind

14     of teaching that they have in the Academy; and he was kind of

15     taken aback, I think, and even embarrassed by what turned out

16     to be the subject matter that he was unfamiliar with.  But he

17     said that --

18         I'm sorry.  There's something in particular I wanted to

19     get out.

20         Oh, I'm sorry.  He said regardless of what the -- when he

21     was working as a supervisor, regardless of what the accusation

22     would be, he would side with the officer until he was forced

23     away from that.  He would tend to believe another peace

24     officer.  He would tend to look at the situation from that

25     person's -- from that side.  He would tend to keep a solidarity

1  with other staff members until he -- until the evidence showed

2  him different.

3      But he said for sure he would make a complete

4  investigation.  He would sit down and talk with everybody

5  involved.  He would get to the bottom of it.  He wouldn't be

6  making up excuses for the officer.  He didn't imply that there

7  was any basis for covering up what the officer did or inventing

8  a story even if it's only for yourself or something that you

9  promulgate in the circle of the high officials under you if

10  you're the Warden; that, "Okay.  We're going to take this as

11  the expert.  Yeah, there's something going on we don't see and

12  that's why these guys organized this whole protest against

13  him."

14      They never caught them with anything.  There's no evidence

15  of that.  There's no evidence that in some period of time there

16  was contraband traffic that Abanico was supposed to detect and,

17  therefore, he needed to do these aggressive searches.

18      And he's allowed to do a very thorough search.  Lieutenant

19  Stoltenberg showed you and told you the particulars of the

20  search are such that you make sure, even at the risk of getting

21  a person sore at you, of upsetting the prisoner that you're

22  searching, you make sure you do a thorough search, make sure,

23  as sure as you can, that there's no foreign object, there's no

24  food, there's no tattoo materials, there's no dope, there's no

25  any of those things that he listed, as best you can.

1    If you have a suspicion that there's something there,

2    though, you don't grab them and feel them up.  You go and you

3    take him to the cage.  You have them take off their clothes.

4    You inspect the clothes.  You inspect the body.  That's the way

5    you find it.  That was -- all the prisoners testified to that,

6    and it was also testified to by Lieutenant Stoltenberg.

7    So I'll come back to it, to the Warden's role in it, but I

8    think that that's a thing to keep in mind, to think is how this

9    thing -- how such a thing could go on in the face of repeated

10   complaints over a period of time, more than a year, and it

11   doesn't stop.  I mean, there's no -- there's no -- nothing has

12   been done.  Nobody -- not only the Warden but nobody that he

13   charges with that responsibility has sat this guy down and told

14   him, "You've got to stop this"; or, "What's your problem"; or

15   "How come we're getting all these complaints only about you?"

16   Now, the lieutenant said that the search, that aspect of

17   the search that has come to be referred to as cupping the

18   genitals or cupping the groin has always been part of it, and

19   that makes sense to me because it's always been possible, if

20   you're going to be smuggling something, to put it up in that

21   place there.  That's probably -- you know, otherwise, what are

22   you going to do, tape it to your arm or something?  It's going

23   to obviously be found.

24   You might, if you're going to try to take some contraband

25   through the prison, you might take a chance with it but you'd

1   take the best chance you could.  You'd hide it in the best

2   place.  Now, it depends how big it is, what the object is,

3   whether it's hard or soft, all that kind of stuff.  You might

4   hide something under your collar.  You might hide something in

5   your armpit.  There's other places, in your feet, but that's an

6   obvious place.

7   So it doesn't make sense to me that there was anything

8   new, other than possibly some language that was used about

9   cupping the genitals or cupping the groin.

10   The manual, which you'll have with you as one of the

11   exhibits, both versions that you can look at and see, and you

12   can see how carefully they break down the steps and the aspects

13   of a search in order to make it complete; and then it comes to

14   the point where it says in capital letters, "Do not squeeze the

15   prisoner's scrotum."

16   Because that's such an obvious violation and apparently;

17   and I suppose it's sensible to believe or to understand that

18   there's a temptation there or there may be for some people,

19   there may be a temptation to seek some sexual gratification

20   from a gesture that you might do.

21   **MR. LEWIS:**  Objection, Your Honor.  Improper argument

22   and inflammatory.

23   (Pause in proceedings.)

24   **THE COURT:**  Overruled given the testimony I've heard.

25   **MR. CUNNINGHAM:**  There may be a simple temptation just

1    to dominate the person and hurt him and shock him and do

2    something to him that makes him understand he's got to submit

3    to you; but it has a sexual aspect if you grab his penis or if

4    you grab his scrotum, if you use your fingers and squeeze.

5        And, obviously, that can't be legitimate because that's

6    not a way you can protect against the flow of contraband.

7    That's a way you can do a cruel act to a prisoner that is in a

8    position where if he comes back at you about it, he's running a

9    great risk.

10        Now, we had testimony from a couple of the prisoners that

11    they did, at least in the gesture of pulling away, yanking

12    themselves away, Cleveland said he even balled his fists, they

13    took -- you know, they -- it was -- I think the testimony was

14    clear this was a reaction they could barely control, maybe not

15    even control other than finally they could get themselves so he

16    didn't raise his hands.  None of them raised their hands to

17    Abanico.  None of them took a step towards him.  I mean, they

18    all managed to control themselves even though they were

19    outraged.

20        You would be outraged.  Thousands of searches through

21    years on end in prison, going here, going there, going back and

22    forth to a meal, going to the yard, it never happened to any of

23    them.  It never happened.  Nothing like that was ever

24    experienced by any of them.

25        I don't see that you wouldn't believe that absolutely

1   because it would show in the record.  There would have been an

2   incident.  There would be complaints.  There would be 602s.

3   Obviously they jumped right on it when it did happen.  They

4   started filing on him, and that's the recourse that they're

5   given under the rules the way the prison is run.  If you've got

6   a problem with an officer, you write him up just like he writes

7   you up if you do something wrong.

8       And that complaint against the officer, the 602, has got

9   to be taken seriously in the institution.  But nobody came and

10  told Abanico, "Cut it out."  It kept on happening months on end

11  this went on.  Months on end the Warden didn't do anything.

12      You're supposed to find, if you think the Warden was in

13  the wrong -- or, strike it.

14      The Warden -- in order for you to find that he was in the

15  wrong, that he contributed to the violation which occurred, you

16  have to find he was deliberately indifferent to that loss of

17  rights that the prisoners were suffering by these searches.

18      He wasn't interested in that part.  He was interested in

19  the search he found -- he claimed he found out, "Oh, gee, I

20  wasn't trained to search like this."  But I think that was

21  pretty well refuted by the lieutenant because you wouldn't --

22  if you were -- if you had a scheme and you're operating one of

23  these institutions and you have a scheme of security against

24  the flow of contraband and this involves random searches so

25  that prisoners don't know when they might be pulled over and

1  they might be searched throughout their clothing, their body,

2  that that deters the flow of contraband.  That creates a big

3  risk if you're caught.  But there was never a time when if you

4  were trying to do that, running an institution, you wouldn't

5  have to make sure that there wasn't something hidden all the

6  way up in the groin.

7      Your function in judging this case as on the basis of the

8  Eighth Amendment and whether the Eighth Amendment was violated

9  is the only remedy besides a 602 that these prisoners have.

10  That's the way our system works.  It's worked that way for

11  sometime.  It's a little bit imperfect.

12      In my point of view there should be a stronger remedy than

13  you have to bring a private action, you have to find a lawyer

14  who's willing to attempt to get paid by pushing a case through

15  like this to its conclusion against some fairly substantial

16  odds and against strong standards that give protection to the

17  officers if they're doing the right thing.

18      But here we have what I think is really an unusual

19  situation in that -- where the prisoners have said, "This man

20  violated me.  This man squeezed my genitals for no good reason.

21  It hurt.  It caused me to react."

22      There was no possible justification for it and we don't

23  have any denial of that.  He never came here -- he came here

24  and he said he didn't remember if he did it or not.  He didn't

25  remember anything.  So he hasn't told you, "I didn't do that."

1     He said, "I wouldn't do that." He gave you a demonstration

2 over by the door where he didn't do that.

3     He said, "I'm just doing what I was trained to do." But

4 if you look in the manual, you'll see they don't go up and down

5 the leg four times. They don't tell you to do that. Two

6 times; up one side, down the other.

7     He had his own version, he still has it. If you notice,

8 he didn't even cup the groin when he did the demonstration

9 search. He was with the back of his hand, which is not

10 unreasonable. Maybe he's learned his lesson.

11     **MR. LEWIS:** Objection, Your Honor. Misstates

12 testimony.

13     **THE COURT:** You're going to have a chance to talk

14 about it, Counsel.

15     **MR. LEWIS:** Yes, Your Honor.

16     **MR. CUNNINGHAM:** Let me keep track of everything here.

17              (Pause in proceedings.)

18     **MR. CUNNINGHAM:** You know, in a circumstance like this

19 and within the confines of the case we're dealing with, I don't

20 think there could be anything more telling than that not only

21 did he not say, "No, I didn't do that," that nobody came and

22 said anything about what they did about it.

23     The Warden didn't bother to come. He didn't send or the

24 State didn't call the Deputy Warden, the Captain, the Security

25 Squad Lieutenant, any of the people who were supposedly -- the

1   people who sign those different papers in the files, nobody

2   came in here and said, "Look, we looked into this.  It was we

3   did the right thing and we were right and we did it, you know,

4   the way we're supposed to do it; and if we missed it, we still

5   did it in good faith."  He didn't care.

6       You saw a tiny case put on in defense here.  There's still

7   indifference.  There's still knowing disregard, lack of

8   interest at all as reflected in that fact in the way this case

9   was tried.

10      You're more or less -- I mean, it's obviously a yes-or-no

11  thing.  There is no nuance.  He either did it or he didn't.

12  There's no middle way, "Oh, he might have done it.  Oh, it

13  might have been an accident."

14      And, yet, there's no denial.  So really the testimony of

15  the prisoners that this happened to each one of them is

16  uncontradicted on this record.

17      Now, you had two -- you had Morris and Jones who said,

18  "Well, it happened to me once, and that was enough for me.  I

19  came off the wall.  I caused a little scene there one way or

20  another, and then I refused to ever be searched by him again."

21      And one time you remember Desmond Jones said, "The next

22  time he pulled me over, I told him he couldn't search me; and

23  the lieutenant was there, and he searched me."  And he did a

24  perfectly reasonable search.  He did a normal search right

25  there in front of Abanico.  And Jones was able to avoid after

1  being searched by Abanico.  So the violation of his rights was

2  more confined to the episode where he was molested, where he

3  was grabbed, squeezed.

4      Same goes for Morris.  He managed to evade, get into a

5  situation where Abanico would search him again.

6      The others not so good, especially if you think about

7  Demetrius Huff.  It's like he searched him every -- he pulled

8  him over every time he saw him just about; and he, like, tries

9  to hide in the crowd when there's a lot traffic.  And he tries,

10 you know -- or he doesn't succeed in that.  He's pulled over.

11 He's up against the wall.  He gets rubbed real hard, and it

12 happens over and over again.  And he's telling him, "Don't do

13 that to me."

14     And not only that, but then the guy goes and makes up this

15 phony beef against him about the earring.  There was no

16 earring.  There was no earring there, but he didn't have any

17 problem telling a lie to get him locked in the cage, just

18 making something up.

19     Maybe he was -- you know, who knows?  Why would he do

20 that?  Why would he do that?  Why would he pretend that Trask

21 said right, you know, to his friend, "Oh, we'll kill this guy"?

22 He didn't say that.  Why would he?  That's outlandish to even

23 conceive that he would have done that.  A guy who's in there

24 all these years, Level 2 security, clean disciplinary record,

25 he's got a family at home, he's trying to get home, he says, "I

1   want to kill this guy because he doesn't let us go to a

2   religious service."  He didn't say that.  He didn't say that.

3   And, yet, he went to the hole.

4       And Cleveland, who you could imagine, because he organized

5   the initial protest and he got out there and got all those

6   signatures that the Warden looked at, that he would be a

7   special target, and he was.  It took a while for him to come

8   back at him; but then a few months after that first time and a

9   few months after he filed that group appeal, the 602 petition,

10  he got him three or four days in a row, and he made him -- he

11  put him in that same position.

12      And when Biggs came to get him to take the charges back,

13  he said, "I'm ready to go to the hole.  My stuff is packed.

14  I'm not taking anything back.  I don't know what anybody else

15  is going to do."

16      And he, Cleveland, is still having dreams about it.

17  That's how much it meant to him.  We can't, you know, say,

18  "Well, that's -- would that really happen from something like

19  that?"  Well, you know, you're in prison.  You're thinking

20  stuff over.  It stays on your mind.  Maybe it plagues you.  I

21  don't think he was lying telling you he had dreams a guy is

22  coming in his cell, it's going to happen again.

23      And then with the help of the psychologist he learns to

24  control the dream just enough.  How you do that is, you know, a

25  mystery to me, but I've heard of it before.  He stops him at

1   the door.  It's taken him, what is it, six years to get to that

2   point just to get his rest.  That's cruel and unusual.

3       You know, cruel and unusual, the effect of the action is

4   what counts and the motivation, the malice, the dislike, the,

5   you know, ill will that would have to be present.  Even if it

6   was -- even if your motivation was to get sexual gratification,

7   you've still got to have ill will, you've still got to have

8   malice to do that to a guy right out there in the hall and dare

9   him to do something about it, dare him to respond, dare him to

10  give you an excuse to lock him up or worse, dare him to press

11  his alarm and bring all the officers.

12      This was a practice by Abanico which, again, I'll say is

13  established here on this record, which I don't see how you

14  could possibly accept the denial because there was no denial.

15      And it was a disruption of the institution.  It was

16  something that if, as the lieutenant said, you get right on it.

17  You get to the bottom of it.  You put a stop.  You make sure it

18  wasn't happening.  If there was some cabal that was running

19  contraband, you'd find that out.  There couldn't still be the

20  same excuse on and on and on for months on end.  What did he do

21  to interrupt it, to stop it?

22      And the same thing goes for the searches.  If the cupping

23  the genitals, if that was something new to the Warden and he

24  had to find out about it and then he found out that all the

25  officers did it and all the officers were trained to do it and

1  trained on the job to do it, the same training that Abanico

2  got, why didn't he make sure that that training was escalated

3  if he thought they didn't -- you know, they were lax?

4       He's going to just keep going, "Oh, I've only got one

5  officer that's doing this right, and the rest of them...."

6  That doesn't make any sense.  That's indifference.  That's not

7  caring or having, you know, a contrary agenda, "I'm going to

8  back this officer.  I will stand behind him regardless."

9       It doesn't make any sense that Abanico was the only one

10 who was doing the searches right.  That's a phony-baloney

11 excuse.  The brothers told you that different officers do it

12 different ways, and you can tell that's a commonsense

13 understanding.

14      Some have different degrees of feelings about the

15 prisoners.  They have different degrees of feelings about their

16 job.  They have the obligation to catch the contraband.  They

17 have different degrees of feeling about doing a search.  Some

18 of them don't like it that much.  Some of them may, you know,

19 think, "This is the essence of my job," and they do it

20 completely and thoroughly; and you can believe that thing --

21 there's a line and they can come right up to that line, and

22 it's rigorous and they'll find the contraband.

23      And when you cross the line, that's a violation.  It's a

24 violation to do it and it's a violation to let it go on.  It's

25 the same violation that they experienced.  It's the same

1  deprivation of fundamental human rights.  What could be more

2  fundamental in the rights of humans than when they're taken

3  into custody by government, they don't get maltreated?

4      That's what -- I mean, our country was founded on that.

5  The Bill of Rights is about that.  We're going to constrain

6  officials because they have so much power, and power corrupts

7  people so we have to have rules that limit their power, and we

8  have to have a mode of enforcement that sanctions them when

9  they abuse their power.  That's what we've got going right

10  here.  That's the system that came out of it.

11      Now, I'll say again, you know, there might be a more

12  effective system, but it is a real system and it's a strong

13  system if strong citizens understand both the obligation and

14  the importance of the rights and the profound basis that those

15  rights have in this Constitution that governs our country that

16  is a unique invention in human history; that recognized in a

17  formal way and enacted as the basic law of the country that

18  there must be a limitation on the powers of the authorities.

19  They can't take you and throw you in the Tower of London and

20  chain you up to the wall and burn you with a branding iron.

21      In the old days in England, they couldn't stop -- nobody

22  could stop that.  Finally in the Magna Carta they started that,

23  that's already the 12th Century, they started to develop that

24  notion that there had to be these limits, that there had to be

25  a power over against the power of the King to protect people

1  from arbitrary, from whimsical abuse.

2      Just the same thing goes for the Fourth Amendment.  You

3  cannot just come into a person's house and search it and toss

4  it and take what you want, and you cannot grab them and take

5  them away without a warrant; and it's based on what they call

6  probable cause, reasonable grounds to do what you're doing

7  according to law.

8      We're talking about violating the law and we're talking

9  that as the law is developed that, you know, the person who

10  does the act is not necessarily the only one who's in the wrong

11  when it's allowed to go on.  When the Warden has a

12  responsibility when he learns of it to do something to prevent

13  it, to stop it and make sure it doesn't happen anymore and he

14  is indifferent to that responsibility or he covers it up or he

15  deflects it or he does -- out of indifference to the rights, to

16  the loss of rights that the prisoners are suffering or they're

17  going to suffer if he doesn't stop it, he doesn't stop it.

18      There are these kind of I don't want to call them numbers

19  game, but there are these numerical measures here that are all

20  about one against everybody else.  You know, one officer is

21  doing this stuff.  None of the other officers are.  Nobody --

22  at least nobody has said they were.  One against everybody.

23  One officer is -- strike it.

24      One search or one series of searches in Huff's case or

25  Trask's case where it happened to him again and again against

1  all the searches that they went through, and you know you can

2  tell, I think that's pretty simple to accept and the lieutenant

3  certainly confirmed it, the searches go on all the time.  He

4  said -- I think he said -- I think he said, well, three or four

5  a week anyway would be easy to understand that a prisoner would

6  go through that.

7      All right.  What's that times 52 weeks, times 10 years, 20

8  years?  It's hundreds of searches if it isn't thousands of

9  searches.  You know, it's really thousands of searches because

10  there's thousands of days in 10 years and, yet, it's never

11  happened.

12      Well, you can say, "Well, that speaks well maybe of the

13  system as a whole that officers are disciplined, well-trained."

14  And, you know, even the ones who may have illicit impulses

15  learn to control them or maybe it happens and, you know, we

16  don't know about it, but as far as we know.  And they don't

17  know about it because they've never had it happen, so that's,

18  again, that's one out of many.  Only this one here.

19      So I want to make sure that we're clear about the

20  exhibits.

21      Do you have the exhibits, Madam Clerk?  Thank you.

22      I just want to, you know, look and see, this is all the

23  stuff you're going to take back there with you, the stuff

24  you've seen referred to and heard referred to mostly when the

25  prisoners were on the stand.

1      But Abanico and Lieutenant Stoltenberg, also they gave

2  you -- and Stoltenberg, as it turned out, there's two versions

3  of this manual:  One for the students, one for the instructors.

4  And there was a little bit of a contratto when we had -- one

5  side had one version, the other side had another version

6  although our version we had came from them.  That was

7  straightened out.

8      And there's, you know, corresponding content between the

9  two; and the instructor's version is replete with instructions

10  to the instructor what you have to get across, how you're

11  supposed to teach this, how you teach the step-by-step moves of

12  the search, down the body, down the arm, up the -- you know,

13  down the leg, up the other leg, cup the genitals.  Do not

14  squeeze the scrotum.  Capital letters.

15      The other capital letters in there, it reminds you, well,

16  when you move from one side to the other, be sure you shift

17  your weight, be sure you shift your feet position.

18      But, I mean, to me it seems it would take a lot more, but

19  certainly that is the essence of it and that's the thing that

20  the officer is responsible to observe.  Don't squeeze it.

21  Don't grab it, not the scrotum or the penis.  It doesn't say

22  the penis but the penis is included.  You don't grab and

23  squeeze and hurt.  You don't run the fingers around the

24  genitals in order to hurt or in order to assault the person's

25  dignity, in order to demean the person, in order to make them

1  feel lousy and scared and helpless.  That's what we don't

2  allow.  That's cruelty.  That serves no purpose.  That has no

3  place in the operation of a prison.

4      And here it stuck out like a sore thumb.  All of a sudden

5  he gets a petition with 150 names on it.  He says, "What's

6  going on?"

7      **MR. LEWIS:**  Objection, Your Honor.  Subject to a

8  motion in limine.

9      **THE COURT:**  Yeah, it was brought out during the direct

10 and cross of Warden Curry on repeated times.  Counsel have an

11 opportunity to argue about that in his closing.

12     **MR. CUNNINGHAM:**  So in the exhibits that we have are

13 just the petition that Cleveland wrote that he was referring to

14 when he said he had 127 witnesses.

15     Counsel is ragging on him because he says, "You don't have

16 any witnesses to the fact that this officer grabbed your penis

17 or grabbed your scrotum."  Well, what witnesses would you have?

18 You're pulled over on the side.  You're on the wall.  Everybody

19 is going back and forth outside the perimeter established by

20 the second officer whose back is to you and who is making sure

21 that nobody stops and watches.  "Keep moving.  Nothing going on

22 here."

23     But how would there be a witness?  Who would know besides

24 the squeezee and the squeezor, the grabee and the grabor.  It's

25 over, two, three seconds.

1    And I hope you noticed that they didn't pretend it went on

2    way too long.  They didn't embellish the claim about what they

3    said happened.  They didn't try and shock you by saying -- you

4    know, they didn't pretend that he had said anything nasty to

5    them or anything sexy.  They told -- they told it exactly like

6    it was, exactly like you would understand it would be:  He

7    reaches through there.  He grabs it.  You back away or you say,

8    "No.  Don't do that.  You're not supposed to do that."

9    And he's like, "Sir, have a nice day."  "Sir, get up

10   against the wall."  "Sir, get back on the wall, sir."

11   Sergeant Crazy.  You know, it's beyond the Marine Corps let

12   alone what can happen in the prison, what is allowed in the

13   prison.  There's nothing voluntary about being in the prison.

14   So you have that.  That's Exhibit 1.

15   Exhibit 2 was one of the handwritten affidavits that

16   Cleveland devised, and it's the one that he then filled in for

17   himself.  And there are two or three others in here from some

18   of the other plaintiffs so you can see -- and especially you

19   have to remember his testimony about all the things he did.

20   He wrote to Internal Affairs.  He pulled together a writ

21   that he put in the court, in County Court.  He did everything

22   he could or everything he could think of certainly.  They don't

23   have a bureau of attorneys paid by the State that sits in an

24   office and says, "Bring us the constitutional violations.

25   We'll deal with them."  It's an entrepreneurial exercise for an

1    attorney.  It's an imperfect remedy.

2        He tried to get Internal Affairs.  He wrote to Sacramento,

3    "Come down here and do something about this."  He told the

4    court, "Do something about this."  The Warden fended it off.

5        All right.  The next exhibit is 6A2.  That's his second

6    602 that he filed.  I think this is in June of '07.  The first

7    one was in September of '06.  I think September.  It may be

8    October.  It says on it.

9        The second time that Cleveland had to file a 602 he didn't

10   even.  He said he felt that the better part of discretion, the

11   better part of going ahead with this would be not to be

12   explicit.  He said his experience was the more severely you

13   accuse an officer, the more likely there's going to be instant

14   negative consequences; and the other prisoners said more or

15   less the same thing, I think just about each one of them.

16       You have to be careful.  You have to be firm.  You have to

17   be ready to suffer whatever consequences come.  And if you are

18   lucky enough so that all it is is, "Sir, get back on the wall,"

19   or, "Sir, go to the cage and then we'll discharge you later,"

20   on a bogus claim, but we saw that something much worse than

21   that can happen because of the animus that rolls with this

22   officer from the complaints.

23       He wasn't backing off.  Huff told him at the beginning,

24   the very first time, "You can't do that.  You're not supposed

25   to do that.  You know that's not right."  He kept on doing it.

1   It was like he had his certain targets maybe; or whatever he

2   had, whatever made him keep on doing it to Huff even though he

3   wasn't grabbing Huff.  He was just giving him a hard rub maybe

4   with the back of his hand, probably the other way.

5       He showed you the back of his hand yesterday, but I don't

6   think he was using the back of his hand.  You can't grab with

7   the back of your hand.

8       You have that 302 [sic].  You have Huff's -- I'm sorry,

9   602, and you have a bunch of the consequent documents showing

10  the progress of the 602; and if you read all through it, you'll

11  see it went nowhere.  "Oh, your appeal was partial granted

12  because we considered it.  Now we've got statistics.  Yeah, we

13  partially grant a lot of appeals."

14      They're real evenhanded in this institution.  We actually

15  read them.  We might have an interview like the interview that

16  Abanico had to concede he must -- you know, he had to concede

17  at least that he was notified to show up for an appeal because

18  his signature was on those notices.  I mean, not an appeal.  An

19  interview.  But he didn't remember any of it.  He didn't

20  remember any interview.  He didn't remember anything.

21      But you can see what happened to Huff.  It went no place.

22  Cannot be substantiated.  I say again:  How would you

23  substantiate it?  How could there be a witness?  It's something

24  that's over in two or three seconds.  You either believe the

25  person or you don't, or you have a motive to disbelieve him and

1 squash his complaint.

2 And the next exhibit is number 6C is Jones' 602 and the

3 writ that he filed in the County Court after they intimidated

4 him and made him withdraw it; and the writ that he got back or

5 the order he got back that says, "You have to exhaust your

6 remedies before you can even come to the court. You have to go

7 through a 602 process all the way to the end before you can

8 even come into the court." They all had to do that in order to

9 come into this court.

10 And, so, he went back and he said, "I'm filing this

11 because I'm not going to let this go by." And he got the same

12 rejection all the way up.

13 And Trask got the same rejection also, and his was one

14 around in June of '07 where he also had a group of people and a

15 lot of signatures on it.

16 The signatures are a form of hearsay. It's not part of

17 this evidence; but the fact of it, the Warden acknowledged, "I

18 saw a petition with a long list of names, but I came to the

19 conclusion that 150 guys, it wasn't true. Somebody just stuck

20 a paper in their nose and they went ahead and signed their

21 name, 'I'm joining this complaint against this officer for

22 sexual assault,' but that was just because the guy said, "Here,

23 sign this." It wasn't real.

24 Well, I'm telling you it was real and it was very -- all

25 those prisoners took that same risk, and it still went no place

1    because the Warden wasn't thinking about it.  He didn't care.

2    He was indifferent to the violations.  He was indifferent to

3    what happened to the prisoners.  He was interested in

4    formulating a cover-up.  "Oh, they're running some kind of

5    racket there."  No evidence at all of that.

6         Okay.  That's 6E.  That's Trask.

7         Number 7, 8, and 9 didn't come.  Those had been marked or

8    listed before.  They never --

9         **THE COURT:**  Counsel, confine your remarks to the

10   evidence that was presented to the jury or that's in evidence.

11        **MR. CUNNINGHAM:**  Yes, sir.  I'm just --

12        **THE COURT:**  Thank you.

13        **MR. CUNNINGHAM:**  The next exhibit is Number 10 so

14   there's a jump there you don't have to concern yourselves

15   about.

16        **THE COURT:**  Thank you.

17        **MR. CUNNINGHAM:**  And that is Huff's handwritten

18   affidavit, Huff's filled-out portion and his name where he

19   joined in Cleveland's attempt to get some action by the court.

20        The next three, 11, 12, and 13, were those notices that

21   Abanico was given that he was to appear for an interview about

22   the 602.

23        The first one is in January of '06 -- I'm sorry, the first

24   one is in January of '07, there's one in July of '07, and

25   there's one in January of '08 that I believe refers to a 602

1    that was filed in '07.  Nothing came out of that.  Nothing came

2    out of it, and he didn't remember it.  He didn't know if it

3    happened or not.

4        Number 14, we're back with this, 14 is a shortcut, I

5    guess, and part of the instructor's version that just has the

6    search pages in it and goes to that statement in capital

7    letters that we put a lot of stock in.

8        And Number 15, finally, is the paper supposedly that

9    Kenneth Trask testified where his signature was forged to

10   withdraw his appeal in August of '07.

11       Those are the materials, and the defendants have some

12   other exhibits besides their version of the thing, and they

13   have those deposition excerpts where they supposedly showed

14   inconsistent statements by the prisoners.  They said three to

15   four seconds at one point and he said two to three seconds.  I

16   don't think that really amounts to anything.

17       And they've given you a section of the manual, a section

18   of what they call Title 15, the regulations that govern the

19   prison system so you can read these random searches and clothed

20   body searches, in order to protect against contraband, are

21   mandated.  Nobody's disputing that.  Of course, they are.

22   That's the way the prison is run.  One of the things that has

23   to be done is prison, I'm beating a dead horse here, is they've

24   got to try and stop the contraband.  And you've also got to

25   stop any abuse of the prisoners by the staff members, and

1    that's what didn't happen here.

2        If you think about the Warden's indifference, he never --

3    I mean, he said he talked to Abanico at some point.  He

4    couldn't remember.  He had no record of it.  There's no report

5    of it written.  He didn't really do what he needed to do.  He

6    didn't do what Stoltenberg said was obvious you would have to

7    do because it's such a serious thing.

8        And even though your impulse as a supervisor would be to

9    protect your officer if you could and to back him up if you

10   could in conscience and honesty do it, you have to get to the

11   bottom of it.  He had to make a reasonable investigation.  Talk

12   to somebody who says he did it to him.  Talk to all those

13   somebodies.  You don't have to talk to 150 guys.

14       He even said, "You know, if it was 15 or 20 people that

15   were really saying this, I'd be concerned."  But he decided he

16   could just forget about that.  There were 15 or 20.  There were

17   127 witnesses, just as Ivan Cleveland said when they asked him

18   if he had any witness, "Yeah.  These are all the people who say

19   he's doing this to us.  Do something about it."

20       It was clear, I think, that there were no other officers

21   with complaints against him, and that was something that it

22   strikes me would be almost the strongest thing, especially to

23   the extent the Warden thought, "Oh, this is new.  Oh, I never

24   heard of this.  Oh, I got to consult the In-Service Training

25   lieutenant.  I've got to find out, oh, yeah, they're teaching

them that at the Academy now, cup the genital -- the groin.

The manual says groin.  At one point it says genital.  They're

two different things and they've both got to be inspected in

some dignified way, in some effective but inoffensive way.

The prisoners know and the manual you can see that in

there, too, it tells them, "You talk to the prisoner.  You

don't take for granted that he understands what's happening in

the search or what the purpose of the search is.  You tell

him."  He's a prisoner, you're the police, he's got to accept

it; but you can't tell him, "I'm going to do this because, you

know, I get a charge out of it," or, "I'm going to do this to

show you you ain't worth a thing and you should feel like...."

(Pause in proceedings.)

**MR. CUNNINGHAM:**  I think the deliberate indifference,

which is a legal standard that has to be met, but it's shown

very clearly by what the Warden did and didn't do and attitude

he had; and really, I mean, I thought you would have to take

from Stoltenberg the fact that if you heard this might be

happening, you'd be out there in a New York minute making sure

it didn't happen again, that it was stopped, it was cut off.

You can't tell what might come out of it.  The Warden

himself said, it might -- he might be jeopardizing his own

safety.  He doesn't know how many people might get mad at him

and what could happen out of that even despite the risk of the

sanction that would come from it, and he wasn't concerned about

1    that.

2        The point being that he really wasn't concerned about the

3    fact that these basic rights were being violated, that this

4    basic protection was being taken away in these quick things

5    with these searches, and that they were so offensive and so

6    demeaning and so unacceptable.

7        **THE COURT:**  Counsel, about how much more do you have?

8        **MR. CUNNINGHAM:**  I'm getting done, Judge.  I'm

9    definitely getting to the end.

10       I mean, you know, I'm sure you can understand I could go

11   on and on, right, and it would just be more and more of the

12   same; but I don't think you could emphasize it too much,

13   frankly.  Obviously, time has to have a stop.  The judge is

14   right.

15       But I'll say, you know, you're asked to award damages if

16   you find that these violations took place.  You have to take,

17   and the instructions will tell you, you have to take into

18   account what the injury was, what the loss was, what the

19   deprivation was.  You have to -- and what the consequences were

20   for the prisoners who were the victims of this.

21       And, as I said, obviously there are different amounts --

22   there was different levels of violation or extent of violation,

23   but at the same time it was the same violation.  It was part of

24   the same practice that this officer carried on that affected

25   all of them.

1     So you have to figure out an award of damages, and our

2  Supreme Court says that one of the purposes of full

3  compensation for the injury or the loss that's experienced when

4  rights are violated is deterrence.

5     They have a separate -- and the judge read to you there's

6  a separate provision for punitive damages if you find that

7  either/or both of the defendants acted maliciously or with

8  callous or reckless disregard for the plaintiffs' rights, you

9  have the option to award punitive damages in addition to

10  compensatory damages.  And that, obviously, also has the

11  function of deterrence as well as punishment.  Punitive

12  damages, they call them sometimes exemplary damages; you make

13  an example of the guy to send a message to everybody else, "You

14  don't do this."

15     But actually the compensation, full compensation, does

16  that as well.  It shows the others that the system has got to

17  be run right or else there's going to be consequences and it's

18  going to cost money; and the prisoners are going to be awarded

19  compensation that reflects the seriousness of the deprivation

20  that they experience, and you have to take that fully into

21  account as well.

22     And I don't, you know -- let me....

23          (Pause in proceedings.)

24     MR. CUNNINGHAM:  In the instructions you'll also find

25  a reference -- a list of aspects that you pay attention to in

1    judging the credibility of the various witnesses and the judge

2    read them to you.  And I'm not going to read them again, but

3    they -- you can -- they're obvious.  You should look at that.

4    You should think about that logical structure of what you take

5    into account when you decide who to believe.

6        Again, I say you're deciding really only whether or not to

7    believe the plaintiffs in the absence of any denial by the

8    officer; and the credibility instruction tells you, "Well, you

9    know, if you're thinking about that, if you want to break it

10   down, here's some ways to break it down," and you should follow

11   through with that with respect to each plaintiff.

12       Each plaintiff we have -- there's a joint complaint here.

13   There's a complaint about recurrent action of the same kind by

14   the officer.  I don't think you can say one plaintiff -- I

15   mean, you judge each plaintiff separately.  You judge also the

16   loss or the injury, the extent of the deprivation of his rights

17   that he experienced, but the story is the same.  So there's a

18   jointness to their claim.  You have to break it down.

19       And I'm suggesting, I'm saying here, I'm urging you that

20   we're talking about real money here, not hundreds of thousands

21   of dollars, not a hundred thousand dollars in any given case,

22   I'm sure, but several thousand dollars; $10,000 would not be

23   too much to award to someone who had this happen to him and

24   then had to deal with it and had to try and do something about

25   it, had to follow up with the 602, had to see it go nowhere,

1    had to come all the way here, exhaust the remedy, take all

2    those rejections, you know.  And for somebody like Huff, for

3    example, who it kept happening to and who was like a pet

4    victim, Trask the same way, it should be more than that.  It

5    should be real money.

6        Deterrence is the point.  It should be something; and, you

7    know, if some of it's punitive damages, that's proper also.

8    But the amount of money that comes out of this is something

9    that's supposed to reverberate through the whole system, "You

10   better watch out.  Don't be crossing the line."

11       Anybody knows where those lines are.  They're clear-cut.

12   Life is very confined and narrow gauged in the prison, and

13   that's why the protection is so important; and that's why the

14   message is so important that you can't take those protections

15   away and you can't ignore it.  If you're running an

16   institution, you can't pretend that you can just twist the

17   story and turn your back on the prisoners.  And even figure out

18   your own story where you're blaming them, you're putting it on

19   them, "Ah, they sign anything.  Ah, they were probably running

20   some game."  No, no evidence of any of that.  No evidence in

21   this court.  No evidence that he had.

22       This was a -- you know, somebody might say, "Well, a

23   couple of seconds he got squeezed.  It's painful.  Okay.  They

24   got in trouble.  They didn't get in trouble.  They got their

25   appeals totally rejected.  Who cares?  What's the big deal?"

1   The big deal is just straight bottom line:  Human dignity.

2   That's what we're talking about.  The Constitution follows the

3   prisoners through the gate into the prison.  It doesn't work

4   exactly the same way, but it's there.  The Bill of Rights is

5   there.  The Eighth Amendment is there.

6       One of the instructions will say that it's, like, there

7   was force used.  Yes, a squeeze is force.  A pain that comes,

8   even momentary pain from the squeeze is force.  It's wrongful

9   source.  It's called excessive.  It is excessive.  It's

10  unnecessary.  It can't be justified and you can't allow them to

11  get away with it.

12      And I'm going to be able to come back and answer briefly

13  after the defense argues to you, and then I'll talk to you a

14  little bit more and we'll be done.

15      Thank you.

16          THE COURT:  Counsel --

17          A JUROR:  Can I request a restroom break?

18          MR. LEWIS:  I was just wondering, Your Honor.

19          THE COURT:  Not only for the jurors, but for the staff

20  I got a look.

21      How long do you think your closing is going to be?

22          MR. LEWIS:  Are you talking about a lunch break,

23  Your Honor?  Is that what you're thinking now?

24          THE COURT:  I'm wondering.  Let me ask the jurors

25  this:  If we have a break now for maybe 15 minutes, shall we

1   just go through and get the arguments done, then you can have a

2   little bit of a later lunch break?  Does that work?

3            **ALL:**  That's fine.

4        **THE COURT:**  All right.  So why don't we take a

5   15-minute break now and then come back, let's say 11:40.  All

6   right?  Thanks so much.

7                    (Recess taken at 11:24 a.m.)

8              (Proceedings resumed at 11:43 a.m.)

9        (Proceedings were heard in the presence of the jury:)

10           **THE COURT:**  Mr. Lewis.

11        **MR. LEWIS:**  Yes, Your Honor.  Thank you.

12                    **CLOSING ARGUMENT**.

13        **MR. LEWIS:**  Good morning, ladies and gentlemen.

14       You've heard evidence that Irwin Abanico was a United

15   States Marine and he took an oath to uphold the Constitution of

16   the United States against all enemies, foreign and domestic, an

17   oath represented by that flag (indicating).

18       You've heard evidence that he is a Peace Officer for the

19   State of California, and he took an oath to uphold the laws of

20   the State, and protect the public and the citizens, and that

21   includes the plaintiffs, from harm.

22       And you heard him take an oath when he got on that stand

23   two days ago.  I'm now going to read to you part of what he

24   said when he was on that stand.

25       "**Q.** By Mr. Cunningham:  All right.  Now -- And you've heard

1    all these prisoners say, when you searched them, when you

2    were at the groin area, you grabbed their penis or you

3    grabbed their testicles or both.

4    "A. I don't grab their penis, testicles or both, sir.  And

5    so -- All right.

6    "Q. And are you saying that you've never done that?

7    "A. I have never grabbed, pinched their penis or their

8    groin areas or their scrotum, sir."

9         Who said that?  Irwin Abanico.

10         Who has fully denied what the plaintiffs have said?

11   Irwin Abanico.

12         Plaintiffs have said this is an important case about

13   Constitutional rights, and they're right, it is very important,

14   but not because their rights were violated.

15         This is important because the plaintiffs are trying

16   to blame a good law enforcement officer for doing his job

17   correctly, and they're asking you to pay them money for that.

18         We told you at the beginning of this case three days

19   ago that the issues here were very simple.  Officer Abanico

20   cannot be held liable for violating Plaintiffs' Eighth

21   Amendment rights because he did his job correctly and with a

22   purpose doing random clothed-body searches.

23         Warden Curry cannot be held liable for failing to

24   intervene because his investigation showed that Officers

25   Abanico -- Officer Abanico's searches were reasonable and in

1    accordance with policies.

2         Plaintiffs allege that Officer Abanico's conduct

3    toward them constituted cruel and unusual punishment under the

4    Eighth Amendment of the Constitution, the very document that

5    Mr. Abanico has sworn to uphold, and they allege that Warden

6    Curry failed to intervene to prevent that conduct.

7         What you just heard for the past hour and 15 minutes

8    was argument.  It wasn't evidence.  But let's walk through the

9    evidence right now to show you why Officer Abanico and why

10   Warden Curry are not liable for violating any of plaintiffs'

11   Constitutional rights.

12        At the beginning of this case, defendants promised

13   that they would present to you evidence regarding various

14   issues.

15        First, we told you that this case was about an

16   officer doing his job conducting clothed-body searches in

17   accordance with California Department of Corrections and

18   Rehabilitation's training and procedures.

19        You heard from Lieutenant Todd Stoltenberg, a

20   Training Officer at the Academy, who told you about the legal

21   authority and responsibility that officers have to conduct

22   random clothed-body searches under the California criminal law

23   and the Department of Regulations.

24        Cadets are taught search procedures according to

25   certified training manuals.  Full-body clothed searches include

1  pocket to pocket sweep with a cupping of the groin out and to

2  the back.

3        This was echoed by testimony from Warden Curry whose

4  staff repeatedly told him the same thing, that this includes

5  cupping the groin, up, down and back.  You saw that

6  demonstration by the Training Officer, Officer Irwin Abanico.

7        You have heard evidence that these clothed-body

8  searches serve a purpose and are necessary.  Counsel said that

9  they are allowed and that Abanico did it because he wanted to.

10  He did it because he was mandated to.

11        Remember the same rules that we talked about.  Why

12  are these important?  Because they catch contraband.

13        You heard that Officer Abanico has caught, while he

14  was there at CTF, at the prison, a razor blade in the

15  waistband, tattoo materials in the groin, and marijuana.

16        You heard Officer Stoltenberg, when he was a Line

17  Officer at San Quentin, talk about how he's caught tattoo

18  materials, notes, jewelry, tobacco and food.  And those are

19  just two officers.  Imagine what happens if you have more.

20        There's a reason why these searches occur and we

21  know that.  There is a definite danger posed by them.

22        Warden Curry testified that there's a reason.  He

23  was aware that there was an increase in narcotics being taped

24  to the inner thighs and the genital areas of inmates, and

25  that's probably why these regulations came into play.  It

didn't shock him.  He's been around for 40-plus years.  He knows that there's a reason why they're doing this.

He checked with the staff, and what did the staff say?  "Yup, it's the way we do it."  And he'd seen Officer Abanico catching stuff.  And you know what?  He's seen Officer Stoltenberg catching stuff.  Plaintiffs may not like it but that's the way it is.

And, remember, Officer Abanico swore, took an oath, and the oath is very serious to him, because I've told you he's taken it at least three times now, and he told you the truth, and he denied these charges.

Stoltenberg told you that officers are given 52 hours of training through the course of the year.  Part of that training is on clothed-body searches.

What does it say?  The same exact thing:  Cup the groin.  Don't squeeze the scrotum.  Cup the groin and out. That is still the training given today because it works and it's necessary.

A lot of noise has been made by plaintiff about the fact that Warden Curry didn't do an investigation.  And he talks about Lieutenant Stoltenberg all the time.  But you heard Lieutenant Stoltenberg say he would do the investigation this way.

How many times did you hear Lieutenant Stoltenberg go, "This is really speculative, getting far out there."  But

1    he said, "Yeah, I do an investigation."

2          What did Warden Curry do about investigations?

3    Well, that's one thing we told you we would look into.  We told

4    you that we would explain that to you, and here's what he did:

5    He talked to his Deputy Warden; he talked to his Associate

6    Warden; he talked to the Training Lieutenant, and he talked to

7    the Security Lieutenant.  He talked to all those people and

8    investigated this issue.  He also talked with Officer Abanico.

9          You heard Lieutenant Stoltenberg say he would go out

10   and investigate it as a Commander.  He was a Lieutenant.

11         Who did Warden Curry talk to?  At least one

12   Lieutenant, his Security Lieutenant.  Then he talked to the

13   Associate Warden, and he talked to other people.  He talked to

14   In-Service Training.  He investigated it, because he talked to

15   the people who he testified would know what to do and knew

16   about this.

17         He is the Warden.  He is in charge of the entire

18   prison.  He's got a lot of people to look out for.  He needs

19   his staff, his command staff, to help him do his job.  And what

20   did they do?  They did it.  They went out and looked.

21         You heard testimony about how all the interviews

22   went on and all that stuff.  Who was doing that?  Lieutenant

23   Biggs.  ISU Lieutenant.  That was one of his Lieutenants.  That

24   was one of the people that went out and investigated this

25   issue.

1    We also told you that Defendant -- that Abanico

2  conducted searches -- his searches in accordance with

3  Department training.  He told you about the training he

4  received and how it said, "Cup the groin."  He demonstrated it

5  for you.  And his hand came out and up.  You saw that.  His

6  hand wasn't down (indicating).  His hand was up (indicating).

7  Remember that when you saw that demonstration?

8    Counsel said there's no evidence at all about

9  contraband at CTF, but you heard from Lieutenant -- or from

10  Irwin Abanico that there was.  You heard the things that he

11  found.  And he was only one officer.  You heard things that

12  Lieutenant Stoltenberg found at San Quentin.  You heard Warden

13  Curry testify about the need because of the increased transport

14  of narcotics taped to thighs.

15    Officer Abanico's now a training instructor.  He

16  still trains officers to cup the groin.  That dovetails

17  perfectly with what you heard Lieutenant Stoltenberg say,

18  because that's how valuable this policy is.

19    He is a former Marine in motor transport.  He

20  follows procedures; he follows policies; he follows checklists

21  to make sure that things get done.  That's what he did in the

22  Marines; that's what he did to get his Marines back safely; and

23  that's what he did to get his job done.

24    What does he do when he gets in the Correctional

25  Academy?  What does he do when he hits the field?  He does the

1    job like he's been trained to do.

2           He is a professional.  Have you heard the -- The

3    plaintiffs themselves, you heard Mr. Cleveland and Mr. Huff

4    testify that he uses "sir," that he shows courtesy, he shows

5    respect.  That was Irwin's testimony.

6           You also heard that he's a family man with two kids.

7    He met his wife at church.  He's active in church.

8           Defendants told you that Officer Abanico did not

9    place hands on inmates or say anything sexual to them.

10          And you heard testimony that's exactly what

11   happened.  Nothing like that.  He did not touch them underneath

12   their skin.  He did not say anything sexual to them, and the

13   plaintiffs admitted that.

14          We promised that and we delivered.

15          He is a thorough professional, yet he's here today

16   having taken an oath, got on that stand and denied everything.

17          Warden Curry.  I talked to you about the length that

18   he went to talking with his staff.  He wanted to satisfy

19   himself as to the legitimacy of the complaint itself.  He

20   eventually became suspicious that this wasn't necessarily a

21   sexual assault as it may be the prisoners just didn't like him.

22          You heard testimony that inmates could have been

23   targeting Abanico.  And you heard other people testify that

24   inmates sometimes do false accusations and that there's no

25   consequences for those.  They're already in prison.

1          These search policies served a purpose.  And Warden

2     Curry told you it looked like some of his CTF officers were a

3     little lax on this.  That concerned him.

4          Abanico was new and by the book.  And he got the

5     sense, Warden Curry, that the CTF inmates didn't like what he

6     was doing.  He investigated that activity with his staff.  His

7     Associate Warden, his ISU, his Lieutenant, Lieutenant

8     Stoltenberg, his own Lieutenant, training officers, all said

9     the same thing.  He was doing the searches correctly.

10         And as you see here today, he is that kind of person.

11         Plaintiffs have even testified that he's thorough.  And

12     you saw how thorough he did that search.  You saw how well he

13     communicated that he was doing.

14         Warden Curry testified he wasn't familiar with cupping the

15     groin during clothed-body searches.  He admitted it.  He's been

16     in for four decades, but he could understood why it was

17     happening.  He could understand because of that contraband, and

18     he understood the value of it.

19         He even had his IST go and get a copy of the license --

20     lesson plan, In-Service Training Officer, get a copy of the

21     lesson plans so he verify, "Hey, I've got to make sure this is

22     really the way it's supposed to be."  He depended on his staff

23     to do that.

24         After his investigation, he became convinced that Abanico

25     performed his duties according to what he had been trained.

1    There's no evidence of a coverup.  There is no coverup.

2    There's a dedicated staff that used staff functions and command

3    staff disciplines to figure out what the investigation was

4    about.  The Warden used his version of Lieutenant Stoltenberg

5    and he found out what was happening.

6        Now, plaintiffs claim that they told you exactly like it

7    was.  But let's look at what the plaintiffs have told you.

8        Mr. Trask said there was about 20 searches, but there are

9    problems with his testimony.  First of all, there is a highly

10   inconsistent statement out there.

11       Remember the 9/13/07 com --search, the one where it was

12   alleged that "kill" was used and things like that?  He has said

13   now three different stories on that.

14       We ask you to look at Defendant's Exhibit B because you're

15   going to see one thing, which was, Abanico didn't search me.

16   He was standing by, but somebody else did."

17       And then in one part of the testimony, he said, "No,

18   Abanico didn't search me."

19       And then in another part, he went back and said, "No,

20   Abanico did search me."

21       Inconsistent story.

22       Trask is also biased.  Other complaints against Abanico

23   for stealing food, interfering with medical -- medical

24   appointments, making a false report.  That turned into a

25   lawsuit, a different Federal lawsuit that wasn't successful,

1   and now he's back here going at Abanico again.

2       Trask didn't record the dates of those 20 searches.

3   Despite claiming pain during each of them, he didn't go to

4   medical, he didn't write down when they happened.  There's no

5   information regarding that.

6       Mr. Huff.  Mr. Huff claims that he was also searched by

7   Abanico on several occasions and the searches were conducted in

8   the corridor with others around.  And these searches started at

9   the top and went down.

10       And that's been consistent across all the inmates, except

11   for Mr. Cleveland.  We'll get to him later.

12       They all start at the top, contact down.  Contact with the

13   groin in the case of Mr. Huff lasted for two seconds or less.

14   There was no skin-to-skin contact.  Huff later stated that,

15   actually, that was only a one-time interaction where he

16   allegedly grabbed the penis.  The rest of the searches did not

17   include a momentary holding of the genitals.  During those1

18   searches, Abanico would search the genitals in one -- genitals

19   in one fluid motion, pocket to pocket just like you heard

20   Lieutenant Stoltenberg talk about, just like you saw defendant

21   Abanico demonstrate.  A sweep.  Fluid motion.

22       Mr. Huff didn't suffer any injuries or seek any medical

23   treatment regarding these searches.  And he admitted that some

24   officers do searches in different ways.  And he admitted that

25   Abanico was very thorough in his searches.

1    Mr. Morris.  Mr. Morris was searched on a single occasion,

2  on January --on June 21st, 2007.

3    He says that it began just like all the other searches.

4  Top, patting down the body, very methodically like you saw him

5  demonstrate.  And then eventually he cupped his groin for one

6  and a half or two seconds.

7    Morris later wrote in a 602, an administrative appeal,

8  that his penis was smashed.  But then he later wrote -- He

9  later wrote that in a declaration.

10    But at his deposition and here in court, he said that his

11  penis was pinched.  So a statement that was made right after

12  the incident, markedly different from the statement that he

13  made later.

14    And he admitted that he was more concerned with

15  consistency rather than accuracy.  Consistency rather than

16  accuracy.  He said that under oath.

17    Look at Defendant's Exhibit E.  That is what we're talking

18  about.

19    Morris also said that he started anger management therapy

20  years after the alleged single search happened -- years

21  later -- but that he's never mentioned it in the therapy

22  sessions.

23    So he won't talk about it with the therapist that would be

24  there to help him, but he'll talk about it with you here when

25  it gets him money.

1     Plaintiff Jones.  Plaintiff Jones was only searched once

2 by Abanico in August 2006.  He claimed that during the search,

3 Abanico's contact with the genital area lasted two to three

4 seconds, just like all of the other plaintiffs.  Two to three

5 seconds, one to two seconds, one to two seconds, consistent.

6 Because that's what Officer Abanico was told to do.  That's

7 what he was trained to do.  That's how he cups and sweeps the

8 groin, sweep, cup, back (indicating).

9     As with Plaintiffs Trask, Huff and Morris, he didn't

10 suffer any physical injuries and he didn't go to any medical.

11     Mr. Cleveland.  Mr. Cleveland alleges that Officer Abanico

12 searched him a few times, maybe as many as five, while he was

13 at CTF.  And throughout these searches, Mr. Cleveland alleges

14 that Abanico focused his searches on the groin and inner thighs

15 for 80 seconds.

16                 (Pause in proceedings.)

17     **MR. LEWIS:**  That was 10 seconds.  Eight times longer

18 than that.  Eight times longer than that.

19     All he did was inspect or search his inner groin, inner

20 thigh and groin, in a corridor with other people going by.

21 Every time, he did that.

22     Does that make sense to you?  That the officer that showed

23 you that search, when all of the other plaintiffs have talked

24 about the search was conducted from top to bottom, very

25 routine, very thorough.  One plaintiff had an 80-second search

of only his inner thighs and his groin in an open corridor where others would be present.

This is completely different than any other plaintiffs' account.

He at one point was allegedly stopped and searched four different times in three days and during that time allegedly has had his genitals squeezed by Officer Abanico.

But in a 602 that was right after that, he never mentions any of that. He doesn't mention it at all. He doesn't mention the squeezing at all.

And he admits that Abanico never said anything sexual to him, never touched him beneath his clothing, just like all of the other inmates.

Does this make sense? You have to ask yourself, does this evidence make sense? All of these inconsistencies?

Now, Mr. Cleveland has mentioned that he had 127 inmates that were his witnesses. Now, you heard that occasionally in here with other numbers.

Where are they? Where are those witnesses? Plaintiffs have a burden to call them. They're not here. All you had was five witnesses, five plaintiffs with a monetary interest in this case. Four say the contact with the groin was for two seconds; one says it lasted 80 seconds.

And remember what Warden Curry said about his concern about prisoners sometimes signing anything that's put in front

1   of them.

2      Remember what you heard Warden Curry say how inmates

3   sometimes target officers.

4      You have to assess the credibility of what the evidence

5   tells you.  Here we have prior testimony with four inmates

6   saying one thing in terms of the contact with their groin after

7   a search that lasts 60 seconds, yet another inmate is saying 80

8   seconds were spent on one area of his body.

9      You have bias by one of them.  He's got an obvious

10   interest in taking out the officer.  Mr. Trask has filed a lot

11   of complaints against him, and a lawsuit.  Now, in this one,

12   he's back again.  On the other hand, you've got defendants who

13   have been consistent throughout.

14      Abanico did no search -- did his searches in accordance

15   with the training he was given which requires cupping the

16   groin.

17      You saw testimony.  You saw how Mr. Morris was spread out

18   here.  You saw how Officer Abanico was spread out here.  If

19   you're spread like this (indicating) and you are a male,

20   genitalia works a certain way and gravity does, too.

21      When you cup the groin and your legs are spread like this,

22   there's no V.  That space gets bigger.  And when that space

23   gets bigger, gravity does its work.

24      Abanico testified under oath he didn't squeeze but he

25   cupped the groin just like he was taught.

1    He did not touch the plaintiffs under their clothes and he

2    didn't say anything sexual to them.  That's undisputed.

3    None of the plaintiffs made medical appointments following

4    their incidents.

5    Warden Curry thoroughly investigated the incident and was

6    con -- and was determined, after he determined that Abanico did

7    the right thing, and that the training was appropriate.  He

8    trusted his staff to do that.

9    The damages claim the plaintiffs have.  A little bit

10   nebulous, a little bit wide.

11   They're not entitled to damages.  Officer Abanico did his

12   job correctly and he did it for the right reasons:  To catch

13   contraband that he himself has caught before and that you've

14   heard other people testify is a great concern about it because

15   contraband is money.  And it can go a long way in prison.  And

16   they're -- and he caught some at CTF.  He caught some while he

17   was there.

18   There's no need for damages here because there's no

19   liability.  Do not punish Correctional Officer Abanico for

20   doing his job correctly, and don't punish Warden Curry for

21   Officer Abanico doing his job correctly.

22   Defendants and counsel thank you for your time today and

23   over the past few days.

24   You've seen the evidence.  You've heard the testimony.

25   What defendants promised in the opening has been delivered.

1    Abanico was a Correctional Officer discharging his duties

2 as instructed and trained.  And the evidence also shows that

3 Curry, a veteran of the Department for over 40 -- four decades,

4 and the senior official at a large prison, used his command

5 staff to investigate the situation.

6    We told you this was a simple case, and this is a simple

7 case for you.

8    Here is the jury Verdict Form (indicating).  You had it

9 read to you earlier by the judge.

10    Question Number 1 reads:

11         "Do you find by a preponderance of the evidence

12         that any of the Plaintiffs' Eighth Amendment rights

13         were violated by Defendant Abanico?"

14         Check no, sign this form, and you are done.

15         Do not hold defendants liable for a good

16 Correctional Officer doing his job.

17         Thank you.

18                    (Pause in proceedings.)

19    **THE COURT:**  Mr. Cunningham.

20                    **CLOSING ARGUMENT**.

21    **MR. CUNNINGHAM:**  Counselor, Officer.

22    I talked too much before.  I'm sure that's true.  Usually,

23 they give me a time limit.  I was going to thank the judge for

24 not giving me a time limit.  And I went on too long.  So I'm

25 sorry about that.  I'm sorry if you thought I was repetitive.

1    I'm wound up in this thing.  You can tell that.  I'm

2  caught up, and I'm caught up in the very issue because it all

3  comes down to that that counsel is talking about, is the

4  credibility.

5    Do you believe he grabbed their genitals or not?  Do you

6  believe they're all here lying and 127 guys were lying?  Or do

7  you believe that he was lying?

8    Now, I said he never denied it.  I -- I'm -- That's my

9  recollection.  He said, "I don't do that kind of thing."  "I

10  wouldn't do that kind of thing," but he didn't say, "I didn't

11  grab, you know, Morris' genitals."  "I didn't grab Jones'

12  genitals."  He didn't, and they didn't ask him.

13    **MR. LEWIS:**  Objection, Your Honor:  Misstates the

14  testimony.

15    **THE COURT:**  Well, I think that's up to the jury to

16  decide at this --

17    **MR. LEWIS:**  Thank you, Your Honor.

18    **THE COURT:**  -- juncture, counselor.

19    **MR. CUNNINGHAM:**  I'm -- I'm -- The question here, the

20  issue and the way you decide it, as you'll see in the

21  instructions, is whether or not we proved by a preponderance of

22  the evidence that he did these things.

23    A preponderance is merely 51 percent.  It tips the scales

24  in our favor.  If we didn't tip the scales, if they didn't

25  create a sense of -- of the correctness of our position enough

1    to overcome starting at dead even, then we don't prevail and

2    you're going to sign that first -- check that first box and

3    sign it and be gone, be out of here.

4        But I think you have to go beyond that.  You have to

5    decide, by going through the evidence and by going through the

6    testimony, that -- whether or not this happened, whether or not

7    he did it, or whether or not everybody was lying, made it up in

8    order to target him for some nefarious reasons.  After all,

9    they're crooks.  They're prisoners, you know.  You can't

10   believe them.

11       What is -- Was a person impeached by saying one time it

12   was -- it was . . . three to four seconds and another time it

13   was one to two or one and a half to two?  And didn't Cleveland

14   say the 80 seconds or the 60 seconds, or whatever it was, he

15   wasn't sure.  I think it was down to 40, 60 or 80 -- he wasn't

16   sure -- was for the whole transaction from the time he pulled

17   him over to the time they went through whatever . . . you know,

18   contention after he grabbed him, after he pulled away.

19       I don't think there's any inconsistency here.  There's

20   variance, you know, the -- But there's not anything that makes

21   liars out of them.

22       There's nothing at all that makes liars out of them

23   except, you know, an inability to accept it because we had this

24   honorable ex-Marine oath taker who is -- he's denying it.  He's

25   denying it, you know.

1    Obviously, he's here because he doesn't admit it.  If he
2  would admit it, we wouldn't be here.  If he had admitted it
3  back then, we wouldn't be.
4    Now you've got this whole hierarchy in the prison that
5  says, "Oh, he's doing it according to the way he was trained."
6  Nobody else is getting the complaints.  Everybody else got the
7  training.
8    And he sticks out.  Why is that?  If he caused so much
9  hate in this -- and discontent, in the Warden's words, not
10  because he searched them, not because he searched them
11  thoroughly, not because whatever he did, he found contraband.
12  He certainly never said he found contraband on any of these
13  guys or any of the 127 witnesses, just that sometimes he's
14  found contraband.
15    Well, as Lieutenant Stoltenberg said, as we've said --
16  right? -- we know there's contraband and we don't contest that,
17  and we don't contest the requirement to do the job.
18    What we contest is that he did this lying across, this
19  abuse, this violation of these fundamental rights, and that
20  we've shown it.
21    So I'm -- Because I went on a long time before, I'm not
22  going to go on again and get back into it.  I'm going to let
23  you get at your business.
24    We thank you also.  We -- We didn't have any means, let
25  alone an obligation, to bring 127 guys here.

1    You can see all these officers, all this . . . work, all

2    this expense, all this time, all this diversion from normal

3    activities that has happened because of this case, because

4    these brothers persisted in trying to get satisfaction for a

5    very singular grievance.

6    That, I -- I suggest to you, if you think of your own self

7    or people you know, you wouldn't make up something like that.

8    Why would you do that?  Why would all of them do it the same?

9    Why would it keep happening?

10   That's not what happened.  What happened was these

11   violations, and you have to make them right.  The Constitution

12   is requiring that.

13   So you have to dig into this and figure out whatever

14   happened and I'm sure, when you do, you're going to understand

15   that the -- these plaintiffs are telling the truth.  This man

16   did wrong, and something has to be done about it.

17   Thank you.

18   **THE COURT:**  Ladies and gentlemen of the jury, that now

19   concludes the evidentiary portion, the argument portion, of

20   this trial.

21   You shall retire to the jury room and begin your

22   deliberations.

23   Thank you.

24   (Proceedings were heard out of presence of the jury:)

25   **THE COURT:**  All right.  Thank you all.

1    It was a good trial.  We'll see what the jury says.

2    I think you both did a really good job and I appreciate
3 you keeping within the time frame that we had talked about
4 before, even though I cracked the whip occasionally.

5         **MR. CUNNINGHAM:**  We -- We likewise compliment the
6 Court --

7         **THE COURT:**  All right.  Thank you very much.

8         **MR. CUNNINGHAM:**  -- for the trial.

9    What -- Judge, what disposition would you make of the
10 plaintiffs while we're now going to wait for the -- for the
11 verdict?

12        **THE COURT:**  Well, I'm going to leave that up to -- to
13 security.  They probably will want to take them back in until
14 the verdict is read.

15        **THE DEPUTY MARSHAL:**  Yes, sir.  We're going to have
16 them --

17        **THE COURT:**  Wait upstairs?

18        **THE DEPUTY MARSHAL:**  No.  We'll stay here.  In case
19 there's deliberations and stuff, we'll bring them out.

20        **THE COURT:**  If you are going to be anywhere else but
21 the courtroom, let Lisa know.

22        **THE CLERK:**  They're not going to be here, so I'll get
23 their numbers.

24        **THE COURT:**  Okay.

25        **MR. QUINN:**  Thank you, Your Honor.

1    (Recess taken at 12:16 p.m.)

2    (Proceedings resumed at 2:24 p.m.)

3    (Proceedings were heard out of the presence of the jury:)

4    **THE COURT:** Good afternoon, Counsel.

5    I received from the foreperson, Michael Gray, a note from

6    the jury dated November 7th, 2013, at 1:50 p.m. The jury has

7    the following question: (reading)

8    "During testimony, Desmond Jones said that he," quote,

9    "filed a writ of habeas corpus," unquote, "on the Monterey

10   County Court. Please clarify/explain the term 'writ of

11   habeas corpus.'"

12   How would you like to proceed?

13   **MR. CUNNINGHAM:** Judge, I think we're pretty well

14   agreed that the best thing would be for Your Honor to just draw

15   on your infinite knowledge and wisdom and tell it.

16   **THE COURT:** Why don't we pick what you'd like me to

17   say.

18   **MR. QUINN:** I mean, we had talked about that, and

19   that's basically what we said. I came across a definition on

20   the Internet that I could read and see if --

21   **MR. CUNNINGHAM:** Have the judge read it.

22   **THE COURT:** Why don't I take a look and get the

23   declaration from the Ninth Circuit and see if there's something

24   there so that we have it clear.

25   **MR. CUNNINGHAM:** It might just be a dictionary,

1   *Black's Law Dictionary* --

2        **MR. QUINN:** I basically the definition.

3        **THE COURT:** Let me see. What's your definition? What

4   do you say?

5        **MR. QUINN:** Hang on a second. Are you ready?

6   (reading)

7        "A writ of habeas corpus orders the custodian of an

8      individual in custody" --

9        **THE COURT:** Hold on. "Writ of habeas corpus orders

10   the custodian"?

11        **MR. QUINN:** "Of an individual in custody."

12        **THE COURT:** "Custodian of an individual in custody."

13        **MR. QUINN:** "To produce the individual before the

14   court."

15        **THE COURT:** "To produce the individual before the

16   court."

17        **MR. QUINN:** "To make an inquiry concerning his or her

18   detention."

19        **THE COURT:** "To make an inquiry concerning" -- what

20   was it?

21        **MR. QUINN:** "His or her detention."

22        **THE COURT:** "His or her detention."

23        **MR. QUINN:** Comma.

24        **THE COURT:** Comma.

25        **MR. QUINN:** "To appear for prosecution."

PROCEEDINGS

1    **THE COURT:** "To appear for prosecution."

2    **MR. QUINN:** "Or to appear to testify."

3    **THE COURT:** "Or to appear to testify."

4  Well, we know it's not the prosecution or to appear to

5 testify.

6    **MR. QUINN:** Say that -- what do we know?

7    **MR. CUNNINGHAM:** I mean, I think, Judge, the thing

8 about it is whatever it was, the habeas corpus was a remedy

9 that Mr. Jones attempted in circumstances where I'm not sure he

10 knew whether that was, you know, the right kind of writ to file

11 or not, so....

12    **MR. QUINN:** There's one other sentence I would add.

13    **THE COURT:** All right.

14    **MR. QUINN:** "State Courts may issue such writs."

15    **THE COURT:** "State Courts may issue such writs."

16    **MR. QUINN:** "To prisoner custodians."

17    **THE COURT:** "To prisoner custodians."

18    **MR. QUINN:** "To produce federal prisoners." That

19 actually doesn't apply.

20    **THE COURT:** Well, I mean, that's clearly not --

21    **MR. QUINN:** No.

22    **THE COURT:** "State Courts may issue such writs to

23 prisoner custodians."

24    **MR. QUINN:** I think that doesn't apply. Sorry.

25    **THE COURT:** I think "to produce the inmate" and leave

1   it at that.

2           **MR. QUINN:**  Yeah.

3           **THE COURT:**  (reading)

4       "A writ of habeas corpus orders the custodian of an

5       individual in custody to produce the individual before the

6       court to make an inquiry concerning his or her detention

7       to appear for prosecution or to appear to testify.

8       State Courts may issue such writs to prisoner custodians

9       to produce the inmates."

10      Are the parties satisfied that that's what we should --

11          **MR. CUNNINGHAM:**  I think the only thing -- the

12  possible confusion might come out of the fact that he's filing

13  a petition for a writ; and, you know, maybe if it said, "A writ

14  of habeas corpus is an order of court that directs," or

15  whatever.

16          **THE COURT:**  A writ of habeas corpus orders the

17  custodian of an individual.

18          **MR. CUNNINGHAM:**  But it's an order of the court,

19  not -- in other words, I think the possibility is they think

20  he's filing the writ and he -- so we don't want them to think

21  he can order the individual.  I don't know, Judge.  You be the

22  judge of whether or not that's misleading.

23          **THE COURT:**  Writ of habeas corpus is a court order?

24          **MR. CUNNINGHAM:**  Yes.

25          **THE COURT:**  A writ of habeas corpus is a court order

1  ordering the custodian --

2      **MR. CUNNINGHAM:**  Directing the custodian.

3      **MR. QUINN:**  I mean --

4      **THE COURT:**  Come on, guys.  This isn't brain surgery.

5      **MR. QUINN:**  Yeah, that's fine.  There's two -- order

6  and orderings.  It's kind of grammatical but, that's fine.

7  Upon the petition it's an order.  The petition is prepared by

8  the inmate and then the order.

9      **THE COURT:**  Upon a petition by the inmate?

10     **MR. QUINN:**  Yeah.

11     **MR. CUNNINGHAM:**  I'm sorry, Judge.

12     **THE COURT:**  "Upon a petition by an inmate, a writ of

13  habeas corpus orders..."  All right?

14     **MR. CUNNINGHAM:**  Yes.

15     **MR. QUINN:**  (Nods head.)

16     **THE CLERK:**  Ready?

17     **THE COURT:**  Yes.

18    (Proceedings were heard in the presence of the jury:)

19     **THE COURT:**  I have a note from the jury dated

20  November 7th, 2013, 1:50 p.m., from Mr. Gray, is it?

21     **JUROR GRAY:**  Yes.

22     **THE COURT:**  The foreperson of the jury.  It requests

23  the following:  (reading)

24      "During testimony, Desmond Jones said that he filed on

25      writ of habeas corpus to the Monterey County court.

1    Please clarify/explain what the term 'writ of habeas

2    corpus' is."

3         Upon a petition by an inmate, a writ of habeas corpus

4    orders the custodian of an individual in custody to produce the

5    individual before the court to make an inquiry concerning his

6    or her detention to appear for prosecution or to appear to

7    testify.  State Courts may issue such writs to prisoner

8    custodians to produce the inmate.

9         All right.  Thank you so much.  You can go back and

10   deliberate.

11             (Jury continuing deliberations at 2:32 p.m.)

12        (Proceedings were heard out of the presence of the jury:)

13   no jury)

14        **THE COURT:**  And we'll make this a part of the record.

15   Here you go, Lisa.

16             (Recess taken at 2:33 p.m.)

17          (Proceedings adjourned at 4:00 p.m.)

18                   ---oOo---

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTERS**

          I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:    Thursday, November 7, 2013




_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR
U.S. Court Reporter


_____

Candace L. Yount, CSR No. 2737, RMR, FCRR
U.S. Court Reporter